

Deposition of:  Wayne Russell
11/15/1999

Page 1

1    IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

2

3    WAYNE RUSSELL,                )

4                                  )

5           PLAINTIFF,             )

6                                  )

7    vs.                           )    CIVIL ACTION NO.

8                                  )    CV-98-1299-GR

9    TRANSAMERICA OCCIDENTAL )

10   LIFE INSURANCE; AUGUSTUS)

11   KIRBY CLEMENTS, III;     )

12   JEFFERY LEON CADDELL;    )

13   et al.,                       )

14                                  )

15          DEFENDANT.             )

16          DEPOSITION OF:  WAYNE RUSSELL

17   EDMONDSON

18   Reporting & Video Inc.

19   Court Reporting & Forensic Video

20   1030 Financial Center
     Birmingham, AL 35203

21

22

23

1          I, Paula Murrell, a court reporter

2    acting as Notary Public, State at Large, certify

3    that on this date, as provided by Rule 30 of the

4    Alabama Rules of Civil Procedure, and the foregoing

5    stipulation of counsel, there came before me at the

6    offices of Beasley, Wilson, Allen, Crow, 218

7    Commerce Street, Montgomery, Alabama  36104

8    beginning at 10:10 a.m., WAYNE RUSSELL, witness in

9    the above cause, for oral examination, whereupon the

10   following proceedings were had:

11

12                  WAYNE RUSSELL

13

14          was duly sworn and testified

15                  as follows:

16

17        THE COURT REPORTER:  Do we have the usual

18   stipulations, Counsel?

19          MR. STEWART:  Yes.

20          MR. AUGHTMAN:  Yes.

21          MR. WHITEHEAD:  Yes.

22          MR. WALKER:  Yes.

23

Deposition of:  Wayne Russell
11/15/1999

```
 1          Q.  Wife's name?

 2          A.  Shirley Ann.

 3          Q.  And how long have you been married to her?

 4          A.  Coming up on 40 years, 39, 40.

 5          Q.  How many children do you have?

 6          A.  Three.

 7          Q.  Names and ages.

 8          A.  Okay.  This will be an educated guess.

 9   Mitsy Ann Russell McIntyre is 36; Ronald W. Russell,

10   35; Tina Russell Douglas, 34.

11          Q.  You went to Auburn?

12          A.  I did.

13          Q.  When did you graduate?

14          A.  1964.

15          Q.  And where were you raised?

16          A.  Grew up on a farm down in south Montgomery

17   County.

18          Q.  And is the area called anything?

19          A.  Lapine, Raynold in that little area, right

20   in the middle all three of them.  Grew up on a

21   cattle farm and cotton farm, peanut farm.

22          Q.  Have you got any education since Auburn,

23   any advanced degrees?
```

Deposition of:  Wayne Russell
11/15/1999

1      A.  No, sir.

2      Q.  And when did you start in the petroleum

3   business?

4      A.  December of '67.

5      Q.  And how did you get in that business?

6      A.  Well, my father was also a real small

7   jobber for Amoco, had three or four or five small

8   little peckerwood grocery store accounts down there

9   in the country.  And along with the farm work, I had

10  worked a little bit in his operation.

11          And when I finished Auburn, I went back

12  and worked down there for three or four years.  And

13  this little operation in Montgomery had been on the

14  market for a long, long time.  And when I bought it,

15  it had deteriorated down to two stores, two

16  stations.  Picked it up for a little of nothing and

17  started with nothing.

18      Q.  You said a little jobber.  You're talking

19  about an operation different from the one your

20  father had?

21      A.  Same type.

22      Q.  Same type.  But you're talking about you

23  bought another company?

Deposition of:  Wayne Russell
11/15/1999

1       A.   That's right.

2       Q.   And what kind of oil supplier were they?

3       A.   Texaco.

4       Q.   Texaco?

5       A.   Yes, sir.

6       Q.   So what are you saying?  You started off

7   with two stations in about '67, and you built it up

8   to where you are now?

9       A.   That's right.

10      Q.   And that's where you are.  You had Texaco

11  retail outlets?

12      A.   Well, Texaco and unbranded, some of my own

13  brands.

14      Q.   How many retail outfits do you have?

15      A.   Supply?  Own?  What is your question?

16  There's a lot of different answers.

17      Q.   Well, I guess I'm referring to a retail

18  outlet as a station-convenient store type of

19  operation, which I understand you did, that you

20  probably owned and ran.  Is that not accurate?

21      A.   Well, like I say, there's a lot of answers

22  to the questions you ask.  We owned a certain

23  number.  We operate a certain number, and we supply

Deposition of:  Wayne Russell
11/15/1999

1    a certain number.

2         Q.   All right.   How many do you own?

3         A.   Probably 25.

4         Q.   Okay.   And how many then do you operate?

5    And I take it by operating that somebody else owns

6    it, and you've got some kind of contract to where

7    you --

8         A.   Say 20 to 25 on that owned, because it

9    varies from time to time.

10        Q.   Okay.

11        A.   Say within the range of 20 to 25.

12        Q.   And how many do you operate?

13        A.   19.

14        Q.   Okay.   And how many more would you supply

15   in addition to those?

16        A.   Well, we supply all the rest of the

17   difference plus another 10 or 15.

18        Q.   Okay.   Is your office here in Montgomery?

19        A.   It is.

20        Q.   What's its address?

21        A.   Physical address is 3378 Tankview Court.

22        Q.   How many employees do you have?

23        A.   I don't know to be honest with you but

Deposition of:  Wayne Russell
11/15/1999

1   somewhere in the neighborhood of 300.

2       Q.  And are you the president and CEO?

3       A.  I am.

4       Q.  And did you have a right-arm man, so to

5   speak?

6       A.  No, sir.  Everything is departmentalized.

7   And they all report to me.

8       Q.  Okay.  How many departments do you have?

9       A.  Four.

10      Q.  What are they and who are the heads of

11  those?

12      A.  Okay.  The accountant is Jerry Wood, vice

13  president of store operations is Deon Witherow, vice

14  president of sales and wholesale sales is Mike

15  Hartselle.  And my brother is comptroller, Earl

16  Russell.

17      Q.  Do you have a personal accountant other

18  than Jerry Wood?

19      A.  Yes.

20      Q.  And who is that?  Is that Dan Lindsey?

21      A.  Jackson Thorn.

22      Q.  Who?

23      A.  Dan Lindsey with Jackson Thorn & Company.

Deposition of: Wayne Russell
11/15/1999

1        Q.   Is that a local accounting firm?

2        A.   It is.

3        Q.   How long has Mr. Lindsey been your

4    accountant?

5        A.   More than 20 years.  I don't know exactly.

6        Q.   Okay.  Who set up the Russell Insurance

7    Trust, founded the trust?

8        A.   Leon Capouano I would think.

9        Q.   You don't recall who did that?

10       A.   I don't.

11       Q.   Who handled that for the family, you or

12   your brother?

13       A.   Myself.

14       Q.   What role did Jerome Smith play in that?

15       A.   He just worked for Leon Capouano.

16       Q.   But the person who you dealt in connection

17   with setting that up was Leon?

18       A.   That's correct.

19       Q.   In one of your policy files with

20   TransAmerica, Mr. Russell, it refers to the fact

21   that your company back in 1994 had gross sales in

22   the neighborhood of about $38 million.  What would

23   that be today?

Deposition of: Wayne Russell
11/15/1999

Page 14

1        A.   In gross sales?

2        Q.   Uh-huh.

3        A.   In '94?

4        Q.   No.  I said that's what it said in '94.

5   What would your gross sales be today in '99?

6        A.   It would be somewhat more.  I don't know.

7   We usually have 5 or 10 percent increases annually.

8        Q.   Do you belong to any professional or civic

9   organization here in Montgomery?

10       A.   Have been and I'm not exactly -- I once

11   have been.  I was a member of the Lions Club.

12       Q.   Any others?

13       A.   Most of the others were trade.

14       Q.   Well, tell me about those.  I'm interested

15   in those also.  What trade organizations do you

16   belong to?

17       A.   National Association of Texaco Wholesales

18   and I'm on the board of that.

19       Q.   Okay.  And being on the board of that

20   means what?

21       A.   We meet annually and discuss policy

22   decisions.

23       Q.   Okay.  Any other trade associations,

Deposition of: Wayne Russell
11/15/1999

Page 18

1    Q.   Does the company have an attorney?

2    A.   Leon Capouano.

3    Q.   So he would be your personal attorney as

4    well as the company attorney?

5    A.   That's correct.

6    Q.   Do you have an attorney separate from Mr.

7    Capouano whose done any estate planning for you?

8    A.   My son is an attorney also in that same

9    firm.

10   Q.   Okay.  Which son is that?  Rusty?

11   A.   That's correct.

12   Q.   What would you say, Mr. Russell, is the

13   approximate amount of stocks and bonds that you

14   presently hold in value?

15   A.   You know, I just really don't know to be

16   honest with you.  It's sizable.  But I don't know

17   how much.

18   Q.   Well, can you give me some ball park

19   figure?  Are we talking about over a million?

20   A.   Yes.

21   Q.   Over two?

22   A.   Yes.

23   Q.   Over five?

```
 1          A.  Probably.

 2          Q.  Over ten?

 3          A.  I doubt it.

 4          Q.  So then probably over five but most likely

 5   less than ten?

 6          A.  That's true.

 7          Q.  All right.  How long have you been trading

 8   in stocks and bonds?

 9          A.  Probably 20 years or more.

10          Q.  Do you have any interest in real estate?

11          A.  Yes, sir.

12          Q.  Besides your house and your business

13   property?

14          A.  Yes.

15          Q.  Where would that be?

16          A.  It would be too numerous to name.

17          Q.  You have a number of investments in real

18   estate?

19          A.  Yes.

20          Q.  Would that be commercial real estate, or

21   would it just be vacant land or both?

22          A.  A combination.

23          Q.  A combination?
```

Deposition of: Wayne Russell
11/15/1999

Page 20

1        A.  Yes.

2        Q.  What would be your ball park estimate as

3   to the value of your real estate holdings?

4        A.  I don't know.

5        Q.  Well, can we go through the same thing?

6   Would it be over five million?

7        A.  Sure.

8        Q.  Ten?

9        A.  It would be somewhere between 30 and 50.

10       Q.  30 and 50.  Now, I'm talking about

11   separate and apart from where your business property

12   is and your house.

13       A.  I know what you're talking about.

14       Q.  I got you.  How long have you been

15   investing in real estate?

16       A.  A long time.

17       Q.  Now, without -- and I'm not really trying

18   to offend you.  And I don't think this is an

19   offensive question.  But from what I gather from

20   what you told me and obviously knowing the size

21   insurance policies you bought, you would classify

22   yourself as a very successful businessman, wouldn't

23   you?

Deposition of:  Wayne Russell
11/15/1999

1       A.  Fairly.

2       Q.  Fairly.  And I assume you would classify

3  yourself as being a pretty astute businessman.

4           MR. AUGHTMAN:  Object to the form.

5       A.  Fairly.

6       Q.  You pretty much tend to your financial

7  affairs and running a company of 300 employees.

8       A.  Yes, sir.

9       Q.  Well, you're certainly familiar with

10  fluctuations of market interest rates, aren't you?

11      A.  I don't understand the question.

12      Q.  Well, you're certainly familiar with the

13  fact that market interest rates go up and down.  And

14  when they go up and down, they affect earnings on

15  your investments?

16      A.  Yes, sir.  Somewhat.

17      Q.  Why was the Russell Family Insurance Trust

18  formed?

19      A.  It was done for the estate planning and to

20  transfer as much to my children and grandchildren as

21  possible during my lifetime.

22      Q.  And was this done through the advice of

23  your attorney and accountant?

Deposition of: Wayne Russell
11/15/1999

1      Q.  And when was that suit filed?

2      A.  In the last year, year and a half.

3      Q.  And is there an individual defendant in

4  that suit?

5      A.  An individual defendant would be the

6  insurance company and the agent that sold me.

7      Q.  And who was that?

8      A.  I'm trying to remember the guy's name.  I

9  can't recall his name now.

10      Q.  How did you -- how did it come about that

11  you bought a policy from American General?

12      A.  Well, we had had some problems with -- had

13  found out -- I also have a policy with Phoenix Life,

14  Phoenix Home Life.

15      Q.  Phoenix Mutual?

16      A.  Phoenix Mutual or whatever it is.  And we

17  had some problems with them on a policy.  And I was

18  talking about needing additional insurance to fund a

19  trust, a charitable trust, $2 million charitable

20  trust.  And we wound up with General American as the

21  company to supply that insurance.

22      Q.  Well, I hear what you're saying.  Who

23  formed the charitable trust for you?  Again, we're

Deposition of: Wayne Russell
11/15/1999

Page 24

1    looking at Capouano --

2         A.  No.  No.  No.  We used a different firm

3    there.  They were not experienced with that.  Dan

4    Lindsey's son and Tommy Mancuso what's the name of

5    that firm?

6         Q.  Rushton, Stakely & Johnson?

7         A.  They handled this formation of the

8    charitable trust.

9         Q.  And Tommy did that?

10        A.  Yes.

11        Q.  Mancuso?

12        A.  Yes.

13        Q.  And then was it the advice that you

14   received from Tommy that you needed an insurance

15   policy to fund the trust?

16        A.  That's correct.

17        Q.  So then how did you go about selecting

18   American General as the insurer for that policy?

19        A.  I'm trying to think of how it came about.

20   I just don't remember right now the specifics of how

21   it came about.

22        Q.  Did Mr. Easterling assist you in that?

23        A.  He put me in touch with this guy in

Deposition of: Wayne Russell
11/15/1999

Page 36

1   insurance that you may have on yourself and your
2   company. I'm talking about life insurance.
3          A. Are you talking total policies?
4          Q. Yeah, and companies. Do you know?
5          A. Close. Close. 7 and a half million with
6   Phoenix Life. I think 8 million with TransAmerica.
7          Q. Okay.
8          A. 2 million with American General, somewhere
9   in the neighborhood of 2 million with New England,
10  in the neighborhood of. That's about it.
11         Q. Is all of this insurance for the purpose
12  of funding -- well, you said 2 million is with --
13         A. Well, let me take that back. When you say
14  me personally -- when I described that, that
15  includes the insurance trust policies that I'm
16  responsible for, I guess, in a way my children own.
17  So if you get back to just what I own, no, it
18  wouldn't be anything like that. I'm trying to --
19         Q. So when you say -- all right. Well, the 2
20  million with New England, does that fund --
21         A. They own that.
22         Q. -- the family trust?
23         A. They own that.

Deposition of:  Wayne Russell
11/15/1999

Page 38

1       A.  Not that I can think of.

2       Q.  Okay.  How long have you known Gus

3   Clements?  A long time, haven't you?

4       A.  We went to college together.

5       Q.  Okay.  Gus has been in the insurance

6   business, I think, since he left college.

7       A.  That's correct.

8       Q.  Is that how long you've been dealing with

9   him in connection with insurance?

10       A.  Shortly thereafter.

11       Q.  You bought some insurance from him shortly

12   after you graduated?

13       A.  Not too long after.

14       Q.  Okay.  The New England policies that you

15   -- you did surrender some six policies when you

16   purchased your $500,000 policy with TransAmerica,

17   did you not?

18       A.  I did.

19       Q.  Okay.  You mentioned that you still have

20   -- well, let me keep this straight.  Were those New

21   England policies, those six policies, were those

22   purchased from Gus?

23       A.  Yes.

Deposition of: Wayne Russell
11/15/1999

Page 39

1    Q.  You mentioned you also still have $2

2    million worth of insurance with New England.

3    A.  The children do.  I don't.

4    Q.  Were they purchased through Gus?

5    A.  Yes.

6    Q.  The Phoenix Mutual policy was purchased

7    through Gus; right?

8    A.  It was.

9    Q.  Any other insurance that you purchased

10   through Gus?

11   A.  I think the Phoenix, the New England and

12   the TransAmerica pretty much covers what I purchased

13   through Gus.

14   Q.  Okay.  How did you happen to contact Gus

15   about these policies you bought from TransAmerica in

16   November of '94?  How did that come about?

17   A.  I called him up and invited him to give me

18   a quote.

19   Q.  All right.  But was there something that

20   occurred between you and your lawyer or you and your

21   accountant that made you realize a need for buying

22   additional insurance?

23   A.  You know, all of it was on advice from

Deposition of:  Wayne Russell
11/15/1999

1    them to, of my needs insurance-wise.

2        Q.  So is this accurate, that you had talked

3    with Mr. Capouano about your estate, estate

4    planning, estate tax issues and so forth?

5        A.  That's right.

6        Q.  You already had the insurance family trust

7    set up, did you not?

8        A.  Right.

9        Q.  And he was telling you based on your

10   financial situation you needed more insurance to

11   fund the trust because of what estate taxes were

12   going to do to you; is that right?

13       A.  Right.  He conversed with my accountant,

14   and they told me what I needed to buy.

15       Q.  All right.  And did --

16       A.  Not what I needed buy but amounts.

17       Q.  Amounts.  Was a last to die policy

18   suggested by them?

19       A.  I don't remember.  I doubt it.  I don't

20   think so.  That would have been by Gus.  I think

21   that he told me that that was the thing I needed to

22   do, because I could buy more coverage, and my estate

23   wasn't going to be settled anyway if I died first.

Deposition of: Wayne Russell
11/15/1999

Page 41

1   So it wouldn't be needed until the second step. And

2   the chances would be strong that I would probably

3   die -- historical charts show that men die sooner.

4   So Gus advised me to, from those standpoints to --

5        Q.  So you're saying it was Gus that suggested

6   the last to die policy and not something that had

7   already been suggested to you when you called Gus?

8        A.  That's correct.

9        Q.  When you talked to Mr. Clements about this

10  need for additional insurance, what, if anything,

11  did he say to you about different insureds about

12  whom he or for whom he sold insurance and the

13  availability of this last to die policy?

14       A.  Well, when this need arose, New England

15  didn't have anything at that time that he considered

16  what I needed, the best I can remember. And I had

17  full confidence in Gus. And he says, Look, I

18  represent other companies other than New England,

19  and I can get you whatever you need, and nobody will

20  beat my price.

21       Q.  And then how was that conversation left,

22  that he was going to get you some proposals?

23       A.  That's correct.

Deposition of: Wayne Russell
11/15/1999

Page 42

1      Q.   Do you know how many different companies'
2  proposals that he sent you?

3      A.   Each time it was either two or three.  But
4  you know, he got two or three competitive quotes
5  from different companies.

6      Q.   Do you remember the names of the
7  companies?

8      A.   I don't today.  No.  I really don't.  I
9  know one was Connecticut something, but I don't know
10 the full name of the company.

11     Q.   Do you have any of those proposals?

12     A.   I don't.

13     Q.   Well, do you remember how many different
14 proposals you received?  And by different, I mean
15 different companies' proposals you received before
16 you decided on the TransAmerica policies?

17     A.   I believe they had the best price of
18 three.

19     Q.   Of three?

20     A.   Yes.

21     Q.   So you think you reviewed a total of three
22 and selected TransAmerica?

23     A.   I think that's correct.  But I don't know

Deposition of:  Wayne Russell
11/15/1999

Page 43

1   the names of the other two companies that he had

2   quoted in with it.  I'm sure he could tell you.

3       Q.  Now, was it Mr. Capouano and/or your

4   accountant that told you you needed 7 and a half

5   million dollars?

6       A.  I think they told me, gave me a range of

7   what I needed.  I decided on the final amount in all

8   cases.

9       Q.  Do you remember what the final amount was?

10      A.  I sure don't.  I can't remember.  It's

11  been so long.  I can't remember.

12      Q.  Did you make the decision to buy the

13  TransAmerica policy, policies through just phone

14  conversations with Gus, or did y'all have any

15  face-to-face meetings about it?

16      A.  We had face-to-face meetings.

17      Q.  How many?

18      A.  I don't remember.  Two or three.

19      Q.  Two or three would be more than three?

20      A.  Possible.  But when I just said I don't

21  remember, I'm telling you the honest truth, I don't.

22      Q.  That's right.  Well, of course, we know

23  you had one meeting when you signed the application.

Deposition of: Wayne Russell
11/15/1999

Page 44

1      A.   Yeah.  I think it would be somewhere in

2   the neighborhood of two to five, in that range would

3   be probably my guess.

4      Q.   Where did those meetings take place?

5      A.   I don't know that.  But I would imagine

6   most of them took place in my office.

7      Q.   Your office?

8      A.   I would imagine.

9      Q.   Do you recall ever going to his office?

10     A.   No, sir.

11     Q.   Do you recall going to anyone else's

12  office besides your own to discuss this insurance?

13     A.   No, I don't recall.

14     Q.   Was anyone ever present in discussing the

15  TransAmerica Insurance other than you and Gus?

16     A.   In discussing TransAmerica?

17     Q.   Uh-huh.

18     A.   Yeah.  He had an agent with him, I think,

19  that -- is it Jeff Caddell?  That --

20     Q.   Well, you have sued Mr. Caddell?

21     A.   Yes.  I think Mr. Caddell was portrayed to

22  me as being the guy that was an agent or whatever or

23  the broker that handled TransAmerica in this part of

Deposition of: Wayne Russell
11/15/1999

1  the country.

2       Q.  How many times did you meet Mr. Caddell?

3       A.  This would be a guess.  Three or four.

4       Q.  So you think that --

5       A.  On all the policies that, you know,

6  TransAmerica policies.

7       Q.  Well, you understand that you bought three

8  TransAmerica policies.

9       A.  Yes.

10      Q.  You bought two on one occasion and one on

11 other occasion.

12      A.  I met Mr. Caddell I know on the first two.

13 I may not have met him on the last one.  I met him

14 on the first, I know, two big ones.

15      Q.  Okay.  And how many meetings do you recall

16 having then in connection with the first two?

17      A.  There again, I'm going to say two to five

18 in that range.  I don't know exactly.

19      Q.  Well, let me ask you this:  Was anyone

20 present -- let me back up.  Was Mr. Caddell present

21 during all the face-to-face meetings you had on the

22 first two concerning the TransAmerica policies?

23      A.  No, sir.

Deposition of:  Wayne Russell
11/15/1999

Page 47

```
1                  (A short break was taken.)
2          Q.   (BY MR. STEWART) Mr. Russell, the way I
3    understand what you've testified to so far is that
4    the discussions about buying the TransAmerica
5    policies emanated from your contacting Gus Clements.
6          A.   That's correct.
7          Q.   What role did Mr. Caddell play as far as
8    discussions with you about the TransAmerica
9    Insurance?
10         A.   He was kind of as an advisor to Gus on any
11   points in the policy.  So I don't remember exactly
12   how much, but probably 90 percent of the
13   conversation was with Gus and probably 10 percent
14   with Jeff.  He was just there as an advisor and
15   didn't have a whole lot of conversation to be honest
16   with you.
17         Q.   Do you remember --
18         A.   Except to verify what Gus said basically
19   is the way I remember it.
20         Q.   Do you remember anything said by Mr.
21   Caddell in any of these meetings concerning the
22   TransAmerica Insurance?
23         A.   Do I remember anything?
```

Edmondson Reporting & Video
*1030 Financial Center*      *Birmingham, Alabama 35203*        *1-800-966-2333*

Deposition of: Wayne Russell
11/15/1999

Page 48

1     Q.  Uh-huh.

2     A.  At this present time, I specifically don't

3  remember specifically what was said.

4     Q.  Tell me how the issue of replacing your

5  New England policies came about.

6     A.  After the two bigger policies were bought,

7  Gus contacted me one day several months later and

8  says, I've got an idea, that I think you ought to

9  turn all those smaller New England policies to

10 TransAmerica in one policy.  He says, I think that

11 would be the thing to do to, convert all those into

12 one policy, roll them over into one policy.  And

13 TransAmerica probably has the best price right now,

14 so I would recommend that you do that.  I listened

15 to him.

16    Q.  Well, did this conversation you just

17 testified to, did that take place on the phone?

18    A.  I would imagine he originated it with a

19 phone call, yes.  And then showed -- came by and

20 discussed it with me.

21    Q.  Had the subject of converting these New

22 England policies to a TransAmerica policy come up

23 during the discussions in buying the insurance for

Deposition of: Wayne Russell
11/15/1999

Page 51

1    understand what you're saying.  First of all, do you

2    have that chart anywhere?

3         A.  No.

4         Q.  Okay.  Of course, he was the writing agent

5    on the New England policies?

6         A.  He wrote those, that's correct.

7         Q.  So he had access to that information that

8    he had on the chart?

9         A.  Right.

10        Q.  And he showed you the six New England

11   policies, the face amount and then the present cash

12   value in each of those policies?

13        A.  Uh-huh.

14        Q.  Do you recall how much you were paying in

15   premiums for the six policies?

16        A.  I have no recollection of what that total

17   would be.

18        Q.  Okay.  Did you discuss the difference in

19   premiums?  Was that an item you discussed?

20        A.  I think I did, and I think he told me if

21   we did this, we wouldn't have to make anymore

22   payments.  We would take the cash values of those

23   New England policies.  To the best I can recollect,

Deposition of: Wayne Russell
11/15/1999

Page 52

1    we take the cash values of those New England

2    policies and roll it into a one-pay policy, whatever

3    that would get.  We would just roll it over and get

4    the maximum amount of insurance that we could get

5    and not have to ever make another payment.

6         Q.  Okay.  Do you recall that he initially

7    gave you an illustration that it would take about a

8    $70,000 one-time payment to buy $500,000 worth and

9    that y'all as the surrenders were done that you

10   ended up with, in fact, $73,000.  Do you remember

11   that?

12        A.  I know the only thing I remember is that I

13   remember something about a 73,000 being the amount

14   of my cash values.  That's all I remember.

15        Q.  Well, do you remember that you did take,

16   you did surrender the six New England policies and

17   you took the cash values in those policies and

18   applied it all to the TransAmerica policy?

19        A.  That's correct.

20        Q.  Do you remember him discussing with you

21   that there would be no tax consequences in

22   connection with that?

23        A.  I don't remember that.

Deposition of:  Wayne Russell
11/15/1999

1    A.  No.

2    Q.  Do you recognize Defendant's Exhibit No.

3  2, Mr. Russell, as being the illustration that Mr.

4  Clements showed you as far as the proposal he was

5  making about the $500,000 policy?

6    A.  This looks like it.

7    Q.  And is it your recollection that the

8  $73,000 that's reflected on that illustration is the

9  amount received from the cash surrender of the six

10  New England policies?

11    A.  That's correct.  And this would fund a

12  one-time payment, never ever have to make another

13  payment.  And I'd have half a million dollars worth

14  of insurance.

15            (Defendant's Exhibit No. 3 was marked

16              for identification and will not be

17              attached to the deposition.)

18    Q.  All right.  And let me show you Exhibit

19  No. 3.  Is that your signature in the bottom

20  left-hand corner, please, sir?

21    A.  That looks like it, yes.

22    Q.  Do you recall signing that form?

23    A.  I don't recall signing it, but it looks

Deposition of: Wayne Russell
11/15/1999

Page 60

```
1    like my signature.
2                 (Defendant's Exhibit No. 4 was marked
3                  for identification and will not be
4                  attached to the deposition.)
5         Q.  Let me show you this Exhibit No. 4.  Is
6    that your signature on the bottom left-hand corner
7    of it?
8         A.  It looks like it.
9         Q.  Do you recall signing that form?
10        A.  I do not.  Is this all -- what policy?
11        Q.  All of these questions I'm asking you
12   right now are in connection with the $500,000
13   policy.
14        A.  Oh, okay.
15             MR. WHITEHEAD:  Were these like
16   replacement forms or something?
17             MR. STEWART:  I don't know what they are.
18             THE WITNESS:  I signed whatever he asked
19   me to sign to transfer those policies.  You know, he
20   was my agent.  And I thought he was looking after
21   me.
22        Q.  (BY MR. STEWART) Did you read the forms
23   before you signed them?
```

Deposition of:  Wayne Russell
11/15/1999

Page 62

```
 1                    attached to the deposition.)
 2        Q.  Let me show you what I have marked as
 3   Defendant's Exhibit No. 6, Mr. Russell, which is a
 4   composite exhibit that are the face pages of the New
 5   England Mutual Life Insurance Company policies that
 6   were being replaced and ask you if you recognize
 7   those face pages?
 8        A.  You know, I don't remember the amount.  I
 9   remember there being several policies.  And all I
10   remember is the total value.  So I really don't know
11   how to answer this.  You know, if I look at
12   something and it says it on there, I assume that it
13   is.  But I wouldn't guarantee that to be right.  I
14   assume that it is.
15        Q.  Well --
16        A.  Do you understand what I mean?  I'm not
17   trying to be --
18        Q.  I don't want you to testify to something
19   you don't know.
20        A.  I don't know.
21        Q.  If you don't know whether you ever had any
22   of those policies that were represented by each of
23   the face pages, that's fine.  If you look at one and
```

Deposition of:  Wayne Russell
11/15/1999

Page 65

1    I was getting a face value policy for more money

2    than the total of all of those policies and not

3    having to pay any more money.  That sounded like

4    something I wanted to do.

5        Q.  Did you -- I'm not sure if I asked you

6    this.  If I did, if I'm being redundant, I

7    apologize.  But do you remember the total outlay you

8    were paying in premiums on an annual basis for these

9    six New England policies?

10       A.  No, sir.

11       Q.  Do you have a ball park idea of how much

12   you were paying?

13       A.  To honest, no

14               (Defendant's Exhibit No. 7 was marked

15                for identification and will not be

16                attached to the deposition.)

17       Q.  Let me show you what I've marked as

18   Defendant's Exhibit No. 7, Mr. Russell, which are

19   the stubs for the cash surrender amount, reflecting

20   the cash surrender amounts of the six New England

21   policies.  And I'll ask you if you recall seeing

22   those?

23       A.  I don't remember seeing them.  But if they

Deposition of: Wayne Russell
11/15/1999

Page 68

1    you remember why you made that decision?

2        A.  Advice from attorneys and accountants.

3        Q.  Okay.  Mr. Russell, the TransAmerica

4    policies that you've purchased you understood, did

5    you not, that these were universal life policies?

6        A.  I don't know what a universal life policy

7    is to be honest with you.

8        Q.  Do you know the difference between a whole

9    life policy and a term policy?

10       A.  Yes.

11       Q.  Tell me what you understand the difference

12   to be.

13       A.  I know basically.  I'll be honest with

14   you.  I do not know -- I should restate that.  I do

15   not know.  I know basically with a whole life you

16   pay, you have values that keep increasing with

17   payments, and the values stay there.  With term it's

18   sort of like renting something.  That's what I've

19   always been told.  But beyond that, that's all I

20   know.  You're just buying for a specific period of

21   time and that's it.  And beyond that, I'm not that

22   knowledgable about insurance.

23       Q.  Did you understand that the TransAmerica

Deposition of:  Wayne Russell
11/15/1999

1   refers back somewhere else.  I can't understand

2   insurance policies.  I cannot for my life.  I rely

3   basically on my instructions to him.

4        Q.  Do you remember how you obtained the

5   policies you bought from TransAmerica?

6        A.  When you say "obtained," you mean how they

7   were handed to me or --

8        Q.  Yeah.  How you received them.  Were they

9   given to you or mailed to you?

10       A.  Mr. Clements, if I remember correctly and

11  I won't swear to this, but I think he delivered them

12  to me.

13       Q.  He brought them to you?

14       A.  I would think so.

15       Q.  When he brought them to you, did he go

16  over them with you?

17       A.  He might have showed me some high points,

18  but nothing was gone over in detail.

19       Q.  Did you ask him to go over them with you?

20       A.  No, sir, because I wouldn't understand it

21  if he did.

22       Q.  But you did not ask him?

23       A.  I don't remember whether I did or not to

Deposition of: Wayne Russell
11/15/1999

Page 74

1    Q.  So you can't identify that by looking at

2    the face page?

3    A.  Well, I can look at that and see where

4    $73,000 was transferred as a one-time payment and

5    looking at half a million dollars and that's what I

6    bought.  But as far as the rest of this stuff, no,

7    sir, I can't identify anything beyond what -- but I

8    would assume that this is the policy.

9    Q.  All right.  And from what I understand

10   your testimony to be, you scanned the policy when

11   Mr. Clements brought it to you?

12   A.  Yes, sir.  And filed it.

13   Q.  Do you remember any particular thing you

14   looked at in the policy?

15   A.  I always look at the total amount of the

16   policy.  That's the main thing I'm concerned about.

17   Q.  The total amount of that $500,000?

18   A.  Yes, sir.

19   Q.  Did you looked at the premium features of

20   the policy?

21   A.  No, sir.  I had already paid my premium.

22   Q.  Did you understand by looking at the

23   policy that the policy was not what you thought you

Deposition of: Wayne Russell
11/15/1999

Page 75

1  were buying that you had 20 days in which you could
2  have returned the policy to get your money back?

3      A.  I'm not aware of that, no, sir.

4      Q.  Do you know that that's contained in the
5  policy?

6      A.  No, sir.  I was not aware of that, but if
7  it is, it is.  I'm not aware of that.

8      Q.  Okay.  Have you made any more premium
9  payments on this $500,000 policy?

10     A.  I have not.

11     Q.  Have you been told that you needed to make
12 any more premium payments on this $500,000 policy?

13     A.  No, sir.

14     Q.  Did you ever talk to Mr. Clements after
15 you received that policy and tell him that that's
16 not what you thought it was?

17     A.  Yes, sir.

18     Q.  You did?

19     A.  Well, let me make this statement.  He is
20 aware that we filed a lawsuit against him as well as
21 TransAmerica.

22     Q.  Have you talked to Mr. Clements about the
23 allegation in your complaints since you filed a

Deposition of: Wayne Russell
11/15/1999

Page 76

1  lawsuit?

2       A.  No, sir.

3       Q.  Do you recall that after you bought the

4  TransAmerica policies, Mr. Russell, that you

5  received annually statements of the policy values?

6       A.  I think I remember that, yes, sir.

7       Q.  Okay.  And when you received those

8  statements, did you read them?

9       A.  It didn't really make any difference to

10 me.  You know, I felt, you know, at the time when I

11 received them up until the time we had filed this

12 lawsuit that I found out different that the policy

13 was what it said it was.

14      Q.  Say that again.

15      A.  As I received the annual statement, I

16 assumed that the policy was what it stated that it

17 was.  Now I know it's not.

18              (Defendant's Exhibit No. 10 was marked

19              for identification and will not be

20              attached to the deposition.)

21      Q.  All right.  Let me show you Defendant's

22 Exhibit No. 10.  Do you see that that's one of the

23 statements that you received in connection with the

Deposition of: Wayne Russell
11/15/1999

Page 77

1  values in your policy?

2       A.  What's the date on this?

3       Q.  I believe it's on the front page, if you

4  will, Mr. Russell, up in here.

5       A.  '96.  All right.  Which one would this be?

6       Q.  That's on your $500,000 policy.

7       A.  All right.  That's the one I paid $73,000

8  up front.  Okay.

9       Q.  Do you recall receiving that statement?

10      A.  I don't recall it, but I'm sure I did.

11      Q.  Well, just --

12      A.  I don't remember it.

13      Q.  When you assume --

14      A.  Because I got them each year as they send

15  them out.

16      Q.  And what would you do when you received

17  them?

18      A.  File them.

19      Q.  Did you ever read them?

20      A.  Not really, no.  Why should I read them?

21      Q.  When you said "not really," and I don't

22  understand what not really means.  Did you glance at

23  it?  Did you read any part of it, or did you just

Deposition of: Wayne Russell
11/15/1999

```
 1            MR. STEWART:  So if y'all would please try
 2    to look for those and see if you can find those.
 3            Q.  (BY MR. STEWART) Are you saying, Mr.
 4    Russell, that all you recall about the transaction
 5    in which you bought the $500,000 policy from
 6    TransAmerica is -- and I'm paraphrasing, and I want
 7    you to correct me if I'm wrong.  I'm just trying to
 8    sum up your testimony  -- is that you were going to
 9    convert six New England Mutual policies that you had
10    in force, and in converting those six policies, the
11    cash values would be generated in the amount of
12    $73,000, that you would pay that $73,000 for the
13    TransAmerica $500,000 policy after which you would
14    never have to make another premium payment?  That's
15    what you're saying?
16            A.  Yes.
17            Q.  And you're telling me that you had
18    not made another premium payment as we sit here
19    today?
20            A.  No.
21            Q.  And you're telling me that you've never
22    been told that you had to make another premium
23    payment as we sit here today?
```

Deposition of:  Wayne Russell
11/15/1999

Page 82

1        A.   That's right.

2        Q.   And tell me why you have sued TransAmerica

3   then in connection with that policy.

4        A.   Because of the lawsuit that's been filed

5   by the policyholders.

6        Q.   I've completely lost you on that.

7        A.   Class action lawsuit.

8        Q.   You've sued TransAmerica because there was

9   a class action lawsuit filed?

10       A.   There was a class action lawsuit filed.

11       Q.   Right.

12       A.   They sent me information concerning the

13   class action asking me if I wanted to get into it.

14   I took those policies to a friend of the family, who

15   is an attorney.  And that's how we are where we are

16   today, under his recommendation that I see Mr.

17   Beasley's firm and take those policies and let them

18   look at them.

19       Q.   So you --

20       A.   All I know is there was a class action

21   lawsuit filed against TransAmerica concerning these

22   policies.  I was notified if I wanted to get in it.

23   I was advised not to get in it from a legal

Deposition of: Wayne Russell
11/15/1999

1    was a bad, my advice now it was a bad choice to

2    convert those New England policies from a whole life

3    to where I am.

4        Q.  Okay.  Let me -- first of all, if you'll

5    recall my question was for you to tell me what he

6    told you.  So you told me what you assumed.  I want

7    you to tell me as best you can recall sitting here

8    today what he told you about the kind of policy, and

9    I'm using your words, the kind of policy the

10   TransAmerica policy was versus the kind you had with

11   New England?

12       A.  Well, I don't know that he discussed the

13   kinds of policies at that time.  We discussed

14   amounts at the time and that I would be better off

15   on the face value amounts at that time to convert

16   those New England policies to TransAmerica.  Instead

17   of having all those little policies, to have just

18   one policy, that it was my in my best interest just

19   to convert to a one-time payment.

20       Q.  Right.  All right.  Now, at the time you

21   converted these policies, your New England policies,

22   you knew the amount of coverage you had on them.

23       A.  Yes, sir.

Deposition of: Wayne Russell
11/15/1999

1     Q.   When you made the decision you knew that,

2  didn't you?

3     A.   Yes.

4     Q.   And when you made that decision, you knew

5  the premium you were paying on them?

6     A.   Yes.

7     Q.   You knew then that you had a lot more

8  coverage than the $500,000 you bought, didn't you?

9     A.   I don't remember how much it was.  It

10  wasn't a whole lot less.  It was some less but not a

11  whole lot less.

12     Q.   Well, what do you mean by a whole lot?

13     A.   You know, to be honest with you, I assume

14  that those policies were somewhere in the

15  neighborhood of 3 or $400,000.

16     Q.   Well, let's don't assume.  Here are the

17  face pages of the six policies.  You want to add

18  them up?  This one I will admit to you says life

19  paid up at 65.  And I don't know the value of that

20  policy.  Do you remember having a life paid up at 65

21  policy?

22     A.   I don't remember it, no.

23     Q.   Do you remember how much the face value of

Deposition of:  Wayne Russell
11/15/1999

Page 87

1    it was?

2         A.   I don't.

3         Q.   Well, let's add up what we have for the

4    five of them.  Where is the first face value?

5         A.   It looks like 50.

6         Q.   50.  Okay.  What's the second?

7         A.   20.

8         Q.   Okay.

9         A.   10.

10        Q.   10.

11        A.   40.

12        Q.   40.

13        A.   10.

14        Q.   All right.  Of the five that we know the

15   face values of, that's 130,000.

16        A.   That's the five you say?

17        Q.   Uh-huh.

18        A.   There is another big one and another one

19   somewhere.

20        Q.   Well, there's a life paid up, Mr. Russell,

21   if you would.  That's what I was trying to point out

22   to you.  If you will, you see the face value of this

23   other policy, Policy 6264370, it says life paid up

Deposition of: Wayne Russell
11/15/1999

1  at 65, and it does not show the face amount.  It

2  says see schedule, and I don't have the schedule

3  page?

4       A.  I think it was a fairly large policy.

5       Q.  You do?

6       A.  Yes.

7       Q.  Do you have any recollection what it was?

8       A.  No, sir.  But it was probably as much as

9  the rest.

10      Q.  Well -- and I don't want to split hairs

11  with you.  I'm just trying to decide why, sitting

12  here today, you think it was better to have kept the

13  old policies and buy a $500,000 policy for which you

14  have made no out-of-pocket premium payments.  That

15  is correct, is it not?

16      A.  That's right.

17      Q.  And you were making premium payments on

18  the six New England policies at the time, were you

19  not?

20      A.  That's right.

21      Q.  And you don't know sitting here today

22  exactly how much coverage was provided by those six

23  New England policies?

Deposition of: Wayne Russell
11/15/1999

1    A.   Not exactly, no.

2    Q.   Okay.  But notwithstanding that you think

3  that you would be better off if you had kept those

4  six New England policies.

5    A.   I've been advised that.

6    Q.   Well, what's your own opinion about it?

7  Have you made any analysis yourself?

8    A.   Well, you know, when you follow advice, I

9  try to -- I'm not an insurance person.  I have to

10  rely on what people tell me.

11    Q.   Yes, sir.  Have you made any analysis

12  about the six policies you had versus the one you

13  have now with TransAmerica?

14    A.   In my mind, right now I was not -- it was

15  misrepresented to me, you know, what I was sold and

16  what I got.

17    Q.   Okay.  Question:  Have you made an

18  analysis of the six policies that you had versus the

19  one you have today with TransAmerica?

20    A.   I have not made an analysis per se myself.

21  But upon advice from counsel, I was told that that

22  was not the thing to have done.

23    Q.   Okay.  Now, do you recall what was said to

Deposition of:  Wayne Russell
11/15/1999

Page 93

1        Q.   (BY MR. STEWART) Mr. Russell, I have shown

2   you this illustration, that the language at the top

3   had not been copied very well.  That's a better

4   copy.  Can you identify that language now, please,

5   sir?

6        A.   "Policy to be issued per these" -- "policy

7   to be issued per these tables according to"

8   something according to Gus Clements.  That's what it

9   says.

10       Q.   Is that in your writing?

11       A.   Yes.  "Policy to be issued per these

12   tables according to Gus Clements."

13       Q.   Now, did you write that there on that date

14   of 5-11-95?

15       A.   I'm sure I did.

16       Q.   And do you think that you wrote that at

17   the time that the illustration was presented to you

18   by Mr. Clements?

19       A.   I'm sure I did.

20       Q.   Okay.  Do you recall anything else having

21   read that now and identifying this illustration that

22   we've marked as Defendant's Exhibit No. 12, does

23   that refresh your recollection about anything else

Deposition of: Wayne Russell
11/15/1999

1  that was discussed between you and Mr. Clements at

2  the time that you purchased the $500,000

3  TransAmerica policy?

4       A.  This was the amount, and this was the

5  table right here that he showed me.  This is the

6  amount, and this is the table.  This carried it out

7  'til year 100.

8       Q.  Now, the table you have pointed to was a

9  table of an assumed interest rate of 7 percent.

10      A.  That's right.

11      Q.  Did y'all have any discussion about this

12  assumed interest rate?

13      A.  Yes.  I asked him point-blank, I said,

14  "Look, I want you to be very conservative.  I want

15  you to not sell me anything that I ever have to come

16  back and pay again."  He assured me that was

17  conservative and to use these figures right here on

18  this table right here.

19      Q.  All right.  Did you --

20      A.  That's what he told me.

21      Q.  If you'll notice to the right of that

22  interest rate table, Mr. Russell, is a table that

23  says guaranteed interest rate of 4 percent.  Did you

Deposition of:  Wayne Russell
11/15/1999

1  discuss with him those tables?

2      A.  I did.  I told him and this says 4 percent

3  over here.  He says don't pay any attention to that.

4  That has really nothing to do with what you're

5  paying in.  This is the column right here that

6  you're buying this policy on right here.

7      Q.  And did you ask him to explain to you the

8  difference between an assumed rate and a guaranteed

9  rate?

10     A.  He says, "Look, that is just something

11  insurance companies put on here."  He says, "The

12  rates now are higher than this."  He says, This is

13  the rate that you -- this is a conservative number.

14     Q.  And by "this" you're pointing to the 7

15  percent?

16     A.  I'm pointing to the carry me out to 100

17  years, to be 100 years old.

18     Q.  Okay.  Now, when you get -- when you

19  received your policy, did you notice that the rates

20  that were contained inside the policy were the

21  guaranteed rates?

22     A.  Sir, I don't know what you're talking

23  about.

Deposition of: Wayne Russell
11/15/1999

Page 98

1    this illustration with you the accumulated value

2    columns and how those values accumulated?

3         A.  I'm sure after this right -- we looked

4    through this column right here, the present, because

5    he told me that interest rates were higher then than

6    what was used on this right here, and do not be

7    concerned with anything else.  And he showed me

8    where if I lived to be 100, I was taken care of,

9    still had my half a million dollars.

10         Q.  All right.  You say that Mr. Clements told

11   you that the interest rates the company was paying

12   at this time were actually higher than 7 percent?

13         A.  The best I can remember, at that time,

14   that was --

15         Q.  Did he tell you what the company was

16   paying at that time?

17         A.  No, sir.

18         Q.  You don't remember the rate he said?

19         A.  No, sir, I sure don't.

20         Q.  Okay.  Well, when you received your

21   statement of the policy value that you already

22   testified to as Defendant's Exhibit No. 10, did you

23   notice that the interest rates the company was

Deposition of: Wayne Russell
11/15/1999

Page 99

1  paying was only 6 percent?

2       A.  It didn't really make any difference to

3  me, because I had made the deal for a one-time pay.

4  It didn't make any difference.  If it went to 2

5  percent, it didn't make any difference.

6       Q.  So what interest rate the company was

7  paying was of no concern to you?

8       A.  No, sir.

9       Q.  And how the accumulated fund was or how

10  the values in the accumulated fund were being

11  derived made no difference to you?

12       A.  No, sir.

13       Q.  The same way with cash values.  How the

14  cash values were increasing and accumulated made no

15  difference to you?

16       A.  No, sir.

17       Q.  And the fact that this policy had a

18  provision in it, and I'll show you here on the first

19  page of the policy, that would have enabled you to

20  change the amount of premiums you were paying, that

21  had no value to you and your decision to buy the

22  policy?

23       A.  No, sir.  Because I had already paid him.

Deposition of:  Wayne Russell
11/15/1999

1    Q.   And the fact that the policy had a

2  provision in it that would have allowed you to

3  adjust the amount of coverage for the life

4  insurance, that had no value, was given no

5  consideration by you?

6    A.   None whatsoever.

7    Q.   Okay.  I believe your testimony before the

8  break, Mr. Russell, was to the affect that you had

9  no questions about the $500,000 policy whatsoever

10  until you received the notice of the class action

11  litigation involving TransAmerica; is that true?

12    A.   That's correct.

13    Q.   Okay.  Where is the notice that you

14  received?

15    A.   I don't know.

16    Q.   You did testify that you did receive it?

17    A.   Yes.

18    Q.   And you don't remember what you did with

19  it?

20    A.   I thought I had turned everything over to

21  Jay.

22        MR. STEWART:  Do y'all have that?

23        MR. AUGHTMAN:  I've given you everything I

Deposition of: Wayne Russell
11/15/1999

Page 102

1    of buying the TransAmerica policy.

2        A.   I've been advised that it's not the same

3    kind of policy that I had.  Therefore, the policy is

4    not as good a policy as the policies I had.  This is

5    since we've got into looking at the policies.

6        Q.   All right.  So is that your position then

7    the fact that the TransAmerica policy is not the

8    same kind of policy as were the New England

9    policies, that you would have been better off

10   keeping the New England policies?

11       A.   After everything being explained to me in

12   layman's terms where I could understand it the best

13   I can, that's my answer.

14       Q.   Well, what was explained to you in

15   layman's terms to demonstrate to you that you would

16   have been better off with the New England policies

17   instead of buying the TransAmerica policy?

18       A.   The New England policies had guaranteed

19   benefits, where I've learned that this is a variable

20   policy, and the benefits are not guaranteed and

21   erode --

22       Q.   Do what?

23       A.   And erode, the benefits erode the way it's

Deposition of:  Wayne Russell
11/15/1999

1   New England policies were better than the

2   TransAmerica policy?

3           MR. AUGHTMAN:  Object to the form.

4           THE WITNESS:  Do I have to answer?

5           MR. AUGHTMAN:  Go ahead if you can.

6       A.  I'm not an insurance expert, so I don't

7   know how you go about really analyzing one policy

8   versus another.  I'm having to listen to

9   professional advice.

10      Q.  I hear what you're saying, Mr. Russell.

11  Just so I can understand you, one of the things that

12  was explained to you that in your mind tells you

13  that the New England policies were better than the

14  TransAmerica policy was the fact that the New

15  England policies had guaranteed benefits and the

16  TransAmerica did not.  That's what you're saying?

17      A.  Yes.

18      Q.  Now, I've shown you this page in the

19  TransAmerica policy is a guaranteed basis.

20      A.  Uh-huh.

21      Q.  And what it, in effect, says is that the

22  table of value accrue at a rate of 5 percent

23  interest.

Deposition of: Wayne Russell
11/15/1999

1        A.   Uh-huh.

2        Q.   Okay.   Then I asked you if you know what

3    the value build up, the cash value build up in the

4    New England Mutual policies, what rate of interest

5    and return are they building up, and you said you

6    didn't know.

7        A.   I don't.

8        Q.   All right.   So I'm just asking you if that

9    would be -- well, wouldn't that be important for you

10   to know in comparing the two?

11       A.   I would think it would.   But I'm not an

12   expert in how you determine which is better.   I

13   don't really know to be honest with you.

14       Q.   All right.   Do you know Amos Herndon?

15       A.   Amos Herndon?

16       Q.   Uh-huh.

17       A.   I don't think I do.

18       Q.   To your knowledge, you've never talked to

19   a man named Amos Herndon?

20       A.   What does he do?

21       Q.   In the oil business.

22       A.   I know a Herndon, C. S. Herndon.

23       Q.   Where does the C. S. Herndon you know

Deposition of: Wayne Russell
11/15/1999

Page 108

1   reason to do so, because all he does is what I ask

2   him to do.

3        Q.  So to your knowledge, your brother,

4   George, has not talked to either Mr. Caddell, Mr.

5   Clements or anyone else at TransAmerica about these

6   policies?

7        A.  That's correct.

8        Q.  Okay.  All right.  Let's talk about your

9   $5 million policy and your 2 and a half million

10  dollar policy.  Okay.  You purchased those at the

11  same time, did you not?

12       A.  About the same time.

13       Q.  Well, I believe the applications are dated

14  the same date.

15       A.  Okay.  If it was the same date, it was

16  within a day or two of each other.

17       Q.  Did you have any discussions with either

18  Mr. Caddell or Mr. Clements about one of these

19  policies when you were not discussing the other

20  policy?  And I'm just trying to narrow this thing

21  down.  Do you understand?

22            You understand you have a $5 million

23  policy and a 2 and a half million dollar policy at

Deposition of:  Wayne Russell
11/15/1999

1  TransAmerica?

2      A.  I would think if I bought them at the same

3  time, everything was discussed together.

4      Q.  Well, do you recall in your own

5  recollection that you ever discussed one of these

6  policies, discussing something about one of these

7  policies that was -- when you were not discussing

8  both of them?

9      A.  I don't think so.

10     Q.  Do you recall that in connection with the

11 2 and a half million dollar policy that you

12 initially received a proposal for a $1 million

13 policy and that somewhere along the line you decided

14 to increase that to 2 and a half million?

15     A.  What I recall is this:  My accountant and

16 my attorney were discussing my needs, what they

17 thought I needed, and it varied from somewhere

18 between six and seven and a half million at the

19 time.

20         You know, when you're talking about this

21 kind of money with the other insurance I have,

22 that's not a whole lot of money if you know what I'm

23 talking about.  It is a lot of money, but when it

Deposition of: Wayne Russell
11/15/1999

1  comes to insurance purposes and estate tax purposes,

2  it's not a whole lot of difference, but anyway,

3  do --

4      Q.  You are being far too humble, Mr. Russell.

5  That's a heck of a lot of money.

6      A.  In my eyes, it's not a lot of money but

7  anyway  -- I lost my train of thought.

8      Q.  I'm asking you about the change from a

9  million to two and a half million.

10     A.  Oh, how that came about?

11     Q.  Yes.

12     A.  We had decided that I would fund -- since

13  we were trying to do this for estate tax purposes,

14  we had decided that we would take whatever it took

15  to fund a $5 million policy from a previous policy

16  that my children owned with New England Life.

17  Whatever it took to fund 5 million.

18          I was advised that they need to own it.

19  And the funds for that $5 million policy came from a

20  previous policy owned by them on my life.  The cash

21  part of it, the one-time payout that it had been

22  funded for about ten years.

23          It was done during the Reagan years when

Deposition of:  Wayne Russell
11/15/1999

1   you could transfer a half million dollars from your

2   estate tax free.  It was the last window of

3   opportunity to do that, through a gift into some

4   type of -- I've forgotten the name of it.

5           But there was a window of opportunity

6   there during the Reagan years where you could

7   transfer half a million dollars out of your estate

8   tax free.  I took advantage of it and put it in -- I

9   gifted it to the children.  This was a partial

10  investment as well as a life insurance on my life.

11  It did not have big cash values.  It was more of an

12  investment.  And during the period of time, it was

13  with New England.

14          Well, we took out what it took to fund

15  the 5 million, and it still had half a million

16  dollars, what the original amount had been invested,

17  had a cash value of that left at that time.

18      Q.  All right.  I've been listening and you'll

19  have to bear with me because you'll have to explain

20  to me some things.  You had a policy that was owned

21  by your children on your life.

22      A.  Yes, sir.

23      Q.  Do you remember what the death benefit was

Deposition of: **Wayne Russell**
11/15/1999

Page 112

1   under that policy?

2       A.   It had varying amounts, because it was

3   owned by all three.  It was owned by all three of

4   them.  A third, a third, a third.  I don't know what

5   the death benefits were.  But they never were really

6   high.  It was more of an investment-type deal that

7   had some life insurance associated with it.

8       Q.   Do you remember what kind of policy it

9   was?  We're not talking about a straight whole life

10  of course.

11      A.   Mr. Clements could tell you.  He would be

12  better than me to tell you because he was an

13  advisor, and he could tell you more about it than

14  me.

15      Q.   Okay.  But you understand that what you

16  did as reflected by the documents --

17      A.   What I did was take $350,000 in the end to

18  buy a one pay --

19      Q.   $5 million policy?

20      A.   That's right.  That was the end result.

21  That's all.

22      Q.   And then with the 2 and a half million

23  dollar policy, you are making annual premium

Deposition of: Wayne Russell
11/15/1999

1  payments of 23,000 and some odd dollars.

2      A.  I had an agreement.  We don't want to pay

3  but ten year.  You're not going to pay but ten

4  years.  You be conservative you tell me what is your

5  best ten-year deal.

6      Q.  In answer to my question, you're making

7  annual premium payments on your 2 and a half million

8  dollars for $23,047?

9      A.  I'm not.  They are.

10      Q.  They are, meaning your children?

11      A.  That's right.

12      Q.  So the $5 million policy you paid $350,000

13  up front?

14      A.  Uh-huh.  They did.

15      Q.  They did.  With the expectation that no

16  future premium payments would ever have to be made

17  to keep that policy in force?

18      A.  Exactly.

19      Q.  And on the 2 and a half million dollar

20  policy, some $23,047 in annual premium payments were

21  to be made.  And it's your testimony that the

22  expectation on that one was that after ten years no

23  additional premium payments would have to be made?

Deposition of: Wayne Russell
11/15/1999

1    A.  No more.

2        (Defendant's Exhibit No. 13 was marked

3        for identification and will not be

4        attached to the deposition.)

5    Q.  Okay.  Now, let's go over the documents.

6 Let me show you Defendant's Exhibit No. 13 and ask

7 you if you recognize this as the illustration that

8 you initially received from Mr. Clements in

9 connection with the $1 million policy that later

10 became a 2 and a half million dollar policy?  Do you

11 recognize that?

12    A.  I do.

13    Q.  And is that your handwriting at the top?

14    A.  It is.

15    Q.  And would you read into the record what

16 that says, please, sir.

17    A.  I've got an asterisk, "Policy to be issued

18 per these tables according to Jeff Caddell and Gus

19 Clements."

20    Q.  Now, do you recall when that was

21 discussed?

22    A.  I don't but there's a date there.

23    Q.  Of what?

Deposition of: Wayne Russell
11/15/1999

Page 115

1  A. Of November of '94.

2  Q. Now, you'll note that on the illustration

3 you have additional -- you said you have an asterisk

4 on it.  And on that asterisk you have it's above the

5 assumed interest rate table using present mortality

6 rates and expenses.

7  A. Right.  I questioned both of them about --

8  Q. When you say "both of them," both men?

9  A. Both Jeff and Gus about all of these

10 different tables.  You could see where I, where this

11 was written in right here by me.  And they told me

12 don't worry about these tables here.  This is the

13 table you need to look at to fund your ten-year pay

14 and what your values would be.

15  Q. Now, you were tapping your finger on the

16 table.  What table are you referring to?

17  A. This current interest rate of 6 and a

18 half.

19  Q. All right.  Do you recognize that the

20 table that you were relying on in connection with

21 this million dollar illustration says current.  You

22 have handwriting over assumed and the table that you

23 are relying on on the $500,000 policy was over the

Deposition of: Wayne Russell
11/15/1999

assumed.  Can you explain why you would be relying

on different tables?

    A.  I don't understand what you're talking

about.

    Q.  You told me that on Defendant's Exhibit

No. 12, Mr. Russell, that you relied on the values

shown under the assumed table.

    A.  The first column is where I was told that

I needed to -- this is the columns that the values

would be, whatever that was, whether it was assumed.

I don't know, you know, what terminology, you know,

he used at the time, but he told me that this was a

very conservative table.  This was a table that I

would be buying the policy on right here.

    Q.  Well, all I want you to do is tell me

this:  You did recognize that according to the

testimony you just gave when you bought the 2 and a

half million dollar policy, the first illustration

you were shown was for a million.  And you had told

-- your testimony was that the table that you relied

on was under the current interest rate, three

columns, and the current cash value column in

Exhibit No. 13; right?  Is that what you just said?

Deposition of: Wayne Russell
11/15/1999

1    A.   That I relied on these columns here.

2    Q.   Yes.

3    A.   I relied on both of them.

4    Q.   And then on -- for the $500,000 policy you

5    testified that you relied on columns under an

6    assumed interest rate, not current rate, but an

7    assumed interest rate, and then it says current cash

8    value table.  And you relied on that column?

9    A.   Well --

10   Q.   Just if you'll bear with me, I think we'll

11   get through this.  Is that true?  That's the column

12   you relied on for the 500?

13   A.   Well, I'm going to go back and restate

14   what I told you before, that when I put up my money,

15   it was for a one-time buy.  And they were to get me

16   the best deal they can get me.  Now, you know,

17   whether it's assumed or whether actual, current, I

18   don't know.  You know, I was expected and am

19   expected not to make another payment based on that.

20   Now, if you -- that's exactly what I expect.

21   Q.   But my question --

22   A.   And the table he showed me was concern

23   yourself with this table here and none other.

Deposition of:  Wayne Russell
11/15/1999

Page 118

1     Q.  Again.  You're -- in one you're pointing

2   to a set of columns under a current interest rate

3   amount and the other you're pointing to -- if you'll

4   just please listen to me, I think we can get to the

5   point.

6     A.  Sure.

7     Q.  And the other one, you're pointing to a

8   set of columns under an assumed interest rate

9   amount.  And my question to you simply put is:  Did

10  you ever have any discussions with Mr. Clements or

11  Mr. Caddell about the difference in these columns:

12  One that says an assumed interest rate and one that

13  says a current interest rate?

14    A.  I had no discussions with them.

15    Q.  You had no discussions with them about

16  that at all?

17    A.  No, sir.

18         MR. AUGHTMAN:  Can we just reflect that

19  we're looking at Exhibit 12 and 13?

20         MR. STEWART:  And it's Exhibit 12 that has

21  the assumed interest rate, and it's Exhibit 13 that

22  has the current interest rate columns that he's been

23  testifying to.

Deposition of:  Wayne Russell
11/15/1999

1          Q.   (BY MR. STEWART) Do you recall that in

2     your discussions about the million dollar policy

3     that consideration was also given as to whether

4     instead of making annual premium payments that you

5     would make a one-time dump in?

6          A.   I don't think they had enough money that

7     they wanted to do that at that time.

8          Q.   But you recall that at one point in time

9     that was a consideration?

10         A.   I don't recall that.  It may have been,

11    but I don't recall it.

12         Q.   Well, look at this illustration that y'all

13    have produced.  And there's some handwriting in the

14    top left-hand corner, and this illustration reflects

15    a one-time annualized premium of $70,359 for --

16         A.   A 2 and a half.

17         Q.   For a million, a million.

18         A.   What date does that have on it?

19         Q.   What's that up here?  It's in your

20    handwriting.  Can you see it?

21         A.   I can't read it.

22              (Defendant's Exhibit No. 14 was marked

23              for identification and will not be

Deposition of: Wayne Russell
11/15/1999

Page 121

1       A.   We decided not to do that.

2       Q.   Okay.  But you do now recognize that that's

3    what was contemplated --

4       A.   Since the paperwork you've shown me, that

5    helps solidify the statements you made, yes.  If you

6    had asked me that ten minutes ago, I could not

7    recollect or remember that.  But since it's in

8    writing here, and I can see it, yes.  And I told you

9    that there was a decision as to how much it totaled,

10   somewhere between 6 and 7 and a half million so --

11      Q.   And that's why at some point in time the

12   decision was made to go from 6 to 7 and a half;

13   right?

14      A.   Yes, sir.

15      Q.   And that's what -- so you applied -- when

16   you applied for it, you were applying for a

17   million --

18      A.   Well, that's what Gus, Gus -- because I

19   probably told him that.

20      Q.   Well, I think that's pretty clear that the

21   coverages you wanted came from your lawyer and your

22   accountant and you said, Gus, I need this.

23      A.   And probably one of them came back and

Deposition of:  Wayne Russell
11/15/1999

1    says, Why don't you just go ahead and make it 7 and

2    a half, you know.  And that's probably what

3    happened.

4              MR. AUGHTMAN:  Will you let me take a

5    break in about 10 minutes?

6              MR. STEWART:  No, I won't.

7                   (Defendant's Exhibit No. 16 was marked

8                    for identification and will be

9                    attached to the deposition.)

10       Q.  (BY MR. STEWART)  There's a page that's

11   executed that shows -- all right.  I'll show you

12   Defendant's Exhibit 16 and you recognize this then,

13   Mr. Russell, as the two and a half million dollar

14   policy that you were issued?

15       A.  I would assume that you're correct, that

16   this was the policy.

17       Q.  Now, we talked about the $500,000 policy

18   and how you received it.  Do you recall how you

19   received the 2 and a half million dollar policy and

20   the $5 million policy?

21       A.  I do not recall.  But I assume it came to

22   me.

23       Q.  Do you have any specific recollection of

Deposition of:  Wayne Russell
11/15/1999

1   him delivering those policies to you and discussing

2   those policies with you upon delivery?

3        A.   No.  He had a habit of coming out there

4   late in the afternoon, you know, 4:45, something

5   like that and us hurriedly handling our business.

6   That would be a lot of the last things he would do

7   for the day, you know.

8        Q.   But in any case, with regard to the 5

9   million and the 2 and a half million, you just have

10  no specific recollection of that?

11       A.   No.

12                 (Defendant's Exhibit No. 17 was marked

13                  for identification and will not be

14                  attached to the deposition.)

15       Q.   Let's look at Defendant's Exhibit 17,

16  which is a statement of policy costs and benefit

17  information.  Do you recall receiving that with the

18  policy?

19       A.   This is what now?

20       Q.   Statement of policy costs and benefit

21  information.

22       A.   I do not recall that, no, sir.

23       Q.   Well, that was produced to us by your

Deposition of:  Wayne Russell
11/15/1999

Page 124

1   attorney from your records.  Do you recall having

2   seen that before?

3        A.  Honestly, I don't.  But I may have.  I

4   don't know.

5        Q.  I'm just saying if it came from your

6   records, I assume that this was in your possession.

7        A.  It was in my possession whether I looked

8   at it or not.

9        Q.  Okay.  So your testimony is that while you

10  may have had Defendant's Exhibit No. 17 in your

11  possession, you don't recall ever reading it?

12       A.  I don't, that's correct.

13       Q.  Do you recall ever reading the 2 and a

14  half million dollar policy?

15       A.  No, sir.

16       Q.  There is a signed one of these somewhere,

17  Mr. Russell, but this will -- is as far as your

18  understanding of the transaction with the

19  application for the million dollar policy that was

20  later changed to 2 and a half million, do you recall

21  this amendment to your application?  And I'm

22  referring to -- what is that column at the top?

23  You've got it upside down.

Deposition of: Wayne Russell
11/15/1999

1   on a six and he said, Well, this will be the same

2   thing.  And if that's the same money, that's the

3   answer to that.

4        Q.  Do you recall ever -- and I may be being

5   redundant now.  Do you recall reading that policy?

6        A.  I think I've answered as best I could and

7   no, sir.

8        Q.  Okay.  Do you recall -- can you identify

9   that as being one of the trust checks that paid the

10  first premium on that policy?

11       A.  Yes, sir.  It says to Russell Insurance

12  Trust.

13            MR. AUGHTMAN:  Can I take that break while

14  you're looking?

15            MR. STEWART:  Yes.

16            (A short break was taken.)

17       Q.  (BY MR. STEWART) Mr. Russell, there are

18  several copies of these documents floating around.

19  I'm showing you another copy of the two and a half

20  million dollar policy.  It bears your attorney's

21  Bates Stamp number on it so --

22       A.  My attorney's what?

23       Q.  Bates Stamp number at the bottom

Deposition of: Wayne Russell
11/15/1999

1  where the first page to that is?

2      A.  I do not.  I thought I had everything

3  together that I have.

4      MR. STEWART:  Jay, if you would make a

5  note and see if that first page is somewhere.

6      Q.  Would the same thing be true with respect

7  to this annual statement, Mr. Russell, that when you

8  received it you just put it away somewhere and

9  didn't pay any attention to it?

10      A.  Not a lot of attention, that's right.

11          (Defendant's Exhibit No. 22 was marked

12          for identification and will not be

13          attached to the deposition.)

14      Q.  And let me show you Defendant's Exhibit

15  No. 22, which is another annual statement.  And

16  except on this one the second page is missing.

17      MR. STEWART:  And, in fact, Jay, that is

18  Bates stamped somewhere and you just didn't include

19  it when it was produced.  It skips from 381 to 383,

20  so I need page, Bates Stamp 382.

21      MR. AUGHTMAN:  If there is one, I'll give

22  it to you.

23      MR. STEWART:  Well, I think there would

Deposition of: Wayne Russell
11/15/1999

Page 133

-- 2 and a half million dollar policy other than the premium payments of $23,000 a year as called for in the policy?

A. That's correct.

Q. But you haven't made any premiums in addition to that?

A. No, sir.

Q. And you don't know, sitting here today, whether you will ever be required to make any premium payments beyond the ten-year period, do you?

A. As I stated before, I've been advised that I will.

Q. You have been? Is there any documentation here in connection with your policy that shows you that you're going to have to make premium payments beyond the ten-year period?

A. It's not documented or shown to me other than I was told that.

Q. When you were told that, were you pointed to anything in the way of documentation?

A. I don't remember that.

Q. But you remember being told --

A. I remember being told that, you know,