Deposition of:  Wayne Russell
11/15/1999

1    you're going to wind up paying several more

2    payments.

3         Q.   Several more?

4         A.   That's right.

5         Q.   Do you remember how many several is?

6         A.   No, sir.  Just more than the payments

7    we've made, the ten payments that we paid to start

8    with.

9         Q.   Well, you do recognize that in the policy

10   under the guaranteed basis that there's nothing on

11   that page that shows you're going to have -- after

12   the ten-year period your premium payments will

13   cease.  You recognize that, don't you?

14        A.   I take this to mean that after the tenth

15   year that this policy is going to fund itself.

16        Q.   You take what to mean?

17        A.   This schedule right here.

18        Q.   And where do you get that from?

19        A.   That's what I was told to start with.

20        Q.   Well, I'm just saying if you look under

21   this column --

22        A.   Which column are we talking about now?

23        Q.   We're talking about the column, the

Deposition of:  Wayne Russell
11/15/1999

1  planned annualized premiums.  Okay.  That shows that

2  you are to make $23,047 annual premiums for the life

3  of the policy, doesn't it?

4      A.  I bought this policy based on making ten

5  payments.  I was told that the proceeds of the

6  policy would fund itself from then on to the death

7  of the second living.

8      Q.  What are you saying, that notwithstanding

9  that this column shows that you're going to have to

10  make planned, the planned premiums in the amount of

11  $23,000 is going to have to be made that you're only

12  going to make them ten years and somebody else was

13  going to make them the rest?

14      A.  The dividends of the policy took care of

15  itself.

16      Q.  Have you read anywhere in the policy that

17  that's going to happen?

18      A.  I told you I was sold on that basis to

19  begin with.

20      Q.  Have you seen anywhere in the policy that

21  the policy provides for that?

22      A.  I haven't looked at the policy to

23  understand it.  I can't understand it anyway.  I

1  it provided?

2      A.  I tried to, and I could not follow it.

3      Q.  Let me ask you this:  Have you seen

4  anything in this policy that tells you that premiums

5  will only have to be paid for ten years by you?

6      A.  I don't remember what I read at this

7  particular time.  But I was not satisfied.  And

8  therefore, when I became frustrated and unsatisfied,

9  that's when I went to an attorney.

10     Q.  So then is this accurate?  You have a

11 class action notice.  You read the policy, and you

12 have some questions about what this policy is about

13 as compared to what you were told, so you go see a

14 lawyer.

15     A.  Yes, sir.

16     Q.  So, in other words, that's when you became

17 unhappy with it?

18     A.  I became unhappy when I was told that the

19 policy was different from what it was sold to me on,

20 the basis.

21     Q.  You were told that, or is that something

22 you read?

23     A.  I haven't been able to read it.  I can't

1  understand the flow of it.

2      Q.  Well, but it's true though, isn't it, Mr.

3  Russell, that you didn't find anything in this

4  policy when you read it after you got the class

5  action notice that says that you would only have to

6  make premium payments for ten years.  That's true,

7  isn't it?

8      A.  I haven't read that anywhere in there, no.

9      Q.  And you've been told by somebody that you

10 are going to have to make premium payments after ten

11 years but you haven't read that in writing anywhere

12 or been shown any facts or figures other than

13 somebody just told you that?

14     A.  That's correct.

15     Q.  Okay.

16     A.  If you can't read it yourself, you have to

17 rely on advice.

18     Q.  Let's talk about your $5 million policy.

19 You've already given me testimony about this New

20 England Mutual policy that was owned by your

21 children, that some money was to be taken out of

22 that policy to provide the amount that was dumped

23 into the 5 million.  Is that -- you've already told

Deposition of: Wayne Russell
11/15/1999

Page 140

1      Q.  November is when the 23,000 is the 2 and a

2   half million dollar policy --

3      A.  Oh, excuse me.  I'm confused.  The 5

4   million was a one-time pay.

5      Q.  One-time deal.  And have you been told

6   that you're going to have to make some additional

7   payments under that policy?

8      A.  Yes.

9      Q.  When are you going to have to do that?

10     A.  I don't know when.  But I've been told

11  that from people who have looked at these policies

12  that somewhere down the road if I live long enough,

13  that I'm going to have to annie-up additional

14  moneys.  And that is not what I bought.

15     Q.  Do you recall what you were told as far as

16  how long you have to live?

17     A.  I have been told -- let's see the schedule

18  there.

19     Q.  Which schedule are you wanting to look at?

20     A.  This is the one right here.  Here it is

21  right here.  I put a note on there.  That it would

22  carry me out to year, to the 99th year, still have

23  full value.

Deposition of: Wayne Russell
11/15/1999

1    Q.  All right.  But you've been told
2    differently now.  Is that what you're saying?
3    A.  Yes.
4    Q.  Okay.  What year have you been told that
5    it will go to now?
6    A.  I don't recollect that.  Just that I'm
7    going to have to -- there's a very good chance
8    unless I don't live long or my wife doesn't live
9    long that we're going to have to make additional
10   payments to fund this thing.
11   Q.  Well, tell me this:  What does live long
12   mean?  You know, different strokes for different
13   folks.  What does live long mean to you?
14   A.  85, 90.
15   Q.  90?
16   A.  Probably.
17   Q.  How old was your daddy when he died?
18   A.  My daddy is still living.
19   Q.  Is he.  How old is he?
20   A.  He's in his 80s.
21   Q.  And bless his heart.  I'd take 85 right
22   now.  Let me show you Exhibit No. 23.
23   A.  All right.

Deposition of: Wayne Russell
11/15/1999

1    A.   Really it had no bearing as I have

2  testified before.  It didn't make any difference to

3  me.  I gave him $350,000 for $5 million death

4  benefit on a last to die.  And it really didn't make

5  any difference to me what the rate was.  I gave him

6  a one-time payment never to make another payment.

7    Q.   And so you wrote out, I think you wrote

8  two checks:  One for 250 and one for 100?

9    A.   Probably did but I don't remember.

10    Q.   On the basis of this illustration in front

11  of you.

12    A.   Yes, sir.

13    Q.   And you've got one column that says

14  current.

15    A.   Yes, sir.

16    Q.   One that says assumed and one that says

17  guaranteed.

18    A.   That's right, based upon what he told me.

19    Q.   And you weren't paying any attention at

20  all to the one that says guaranteed?

21    A.   No, sir.  He said that's -- those things

22  never happen.  They always put that there and don't

23  pay any attention to it.

Deposition of: **Wayne Russell**
11/15/1999

1    Q.   The guaranteed never happens.  Is that

2    what he told you?

3    A.   Yes, sir.

4    Q.   Well, did you believe him when he said the

5    guaranteed never happens?

6    A.   I had no reason not to believe him.

7    Q.   You don't think that somebody tells you

8    something that's guaranteed that that's better than

9    something that's based on current.

10   A.   Well, look --

11   Q.   No.  Answer my question.  Do you think

12   that?

13   A.   Any time something that's guaranteed, is

14   better than something that's current.  But the man

15   told me don't pay any attention to the guarantee

16   part.  That the worse, worse, worse, worse, worse

17   case scenario.

18   Q.   Guaranteed is the worse case scenario?

19   A.   That's right.

20   Q.   And you gave somebody $350,000 and they

21   tell you that guaranteed is worse than current, and

22   you believe them.  That's what you're telling me?

23   A.   I'm telling you that he told me not to pay

1  any attention to these other two columns, that these
2  were the worse case scenarios over here.  The
3  company always pays more than that.  In fact, the
4  company was paying more than this at the time.  He
5  says, Look, you know, it's probably going to be more
6  than $5 million worth in there at the time of your
7  death.  It pays -- in other words, interest rates
8  credited to your policy are going to be better than
9  that.
10        So, you know, I'm sincere in what I'm
11  telling you.  I don't know how else to answer you.
12  I'm very sincere.
13        Q.  Well --
14        A.  Put yourself in my position.  You can
15  understand.
16        Q.  Did you understand, Mr. Russell, that
17  these figures and these columns on the left-hand
18  side that you were going to bank on were based on
19  the 6 and a half percent interest rate?
20        A.  I'm telling you again, I didn't pay any
21  attention to rates.  I instructed the man to give me
22  $5 million worth of coverage and give me the best
23  price for a one-time pay.  I don't know how else to

Deposition of:  Wayne Russell
11/15/1999

1    tell you, sir.

2        Q.   So it didn't matter to you whether this

3    current rate up here showed 6 and a half, 10, 15,

4    20?

5        A.   That's exactly right.

6        Q.   So I take it when you received your first

7    annual statement for this $5 million policy for

8    which you paid $350,000 for, that the first annual

9    statement showed the interest rate had already gone

10   down a half a point?

11       A.   Didn't mean anything.

12       Q.   Didn't mean anything?

13       A.   No.

14       Q.   And when you received the one in 1997,

15   that for your $350,000 investment, it had gone down

16   to 5.6 percent.  That didn't mean anything to you?

17       A.   Didn't mean a thing.

18       Q.   Did you notice on this illustration under

19   the guaranteed column that it showed that for your

20   and $350,000 investment that the policy would only

21   go to age 78?  Do you see that?

22       A.   What is the question again?

23       Q.   I said did you notice on the illustration

Deposition of:  Wayne Russell
11/15/1999

Page 148

1    that we've been talking about, Exhibit No. 24, that

2    under the guaranteed column it shows that for your

3    $350,000 that that policy will only go to age 78?

4         A.  I see this now.  I saw it then.  I asked

5    him about it.  He told me, Don't worry about it.

6    This is the column.  If you -- if you're going to

7    live past 100, then we've got to worry.  If you

8    don't live past 100, you're covered.

9         Q.  Do you know that that policy is paid up at

10   age 100?

11        A.  What now?

12        Q.  Do you know that this policy is paid up at

13   age 100?

14        A.  It's my assumption that it is.  I think

15   it's year 99.

16        Q.  I'm not talking about on that

17   illustration.  I'm talking about in the course of

18   the policy provisions it's paid up.

19        A.  It's paid up to the year 100.

20        Q.  I'm talking in the policy.

21        A.  In the policy?

22        Q.  Yes.

23        A.  I don't know what it says.

Deposition of:  Wayne Russell
11/15/1999

1      Q.  You do identify this as the application

2  you signed for the $5 million policy?

3      A.  I signed it.  I didn't fill it out, but I

4  signed it.

5      Q.  Do you see anything on that application

6  that is incorrect?

7      A.  Well, I haven't read it.

8      Q.  Well, would you mind.

9      A.  The whole thing, the front page or what?

10      Q.  The whole thing.  I don't think it's

11  really that complicated to read.  I just want to

12  know if there's anything on the application that's

13  incorrect.

14      A.  Okay.

15      Q.  And I'm not trying to burden you.  I'm

16  really not.

17      A.  The figures right here, I don't know

18  whether that's correct or incorrect.  I don't know

19  where it came from.  So therefore, I don't know.  So

20  I can't answer your question, sir.

21      Q.  What figures are you referring to?

22      A.  Well, here's one right here, No. 6901.  I

23  don't know anything about that.  Here's one right

Deposition of: Wayne Russell
11/15/1999

Page 151

1    here premium, annual premium, 53150. I don't know

2    anything about that. I can't tell you.

3         Q. Okay.

4         A. Do you want me to go on further?

5         Q. Anything else on that page?

6         A. That's all I see right now.

7         Q. What about the second page?

8         A. Well, there's an application for six

9    million instead of five. And we didn't get six.

10   Some of this I can't read. I don't know what that

11   is.

12        Q. Okay. Let me help you. How about looking

13   at blocks 26 through 32. Are any of those questions

14   answered incorrectly?

15        A. 26. Read the question.

16        Q. You want me to read it?

17        A. You can, yeah.

18        Q. Well, can you read it?

19        A. I can, yeah.

20        Q. Well, why don't you read it and tell me if

21   the answer is incorrect.

22        A. All right. What would be this date?

23        Q. November 3rd, 1994.

Deposition of: Wayne Russell
11/15/1999

Page 154

1  Somebody might play with the rip cord?

2      A.  I got more sense than to do that.

3      Q.  What about the next page?

4      A.  Which page are we on?

5      Q.  That next page that I see is a duplication

6  of the first.  Just look over that quickly, if you

7  would, Mr. Russell.  And tell me if anything on that

8  appears to be incorrect.

9      A.  I don't see anything in the world that's

10  incorrect.  And I signed it on the back.

11      MR. STEWART:  What's that last exhibit

12  number, Jay?

13      MR. AUGHTMAN:  26 I think was the last

14  one, the policy.

15          (Defendant's Exhibit No. 27 was marked

16              for identification and will not be

17              attached to the deposition.)

18      Q.  Okay.  Let me show you Defendant's Exhibit

19  No. 27, Mr. Russell.  Do you recall that's a policy

20  costs and benefit statement.  Do you recall

21  receiving that with your $5 million policy?

22      A.  I don't recall it but I'm sure I had.

23      Q.  Do you recall looking over it?

Deposition of: Wayne Russell
11/15/1999

Page 158

1  in at 250 and 250.  And the one that was fixed,
2  believe it or not, was worth more money in the
3  variable.  Therefore, he took probably 250 out of
4  fixed and 100 out of variable.  Do you see what I'm
5  talking about?
6      Q.  Uh-huh.
7      A.  So the two checks came not from me but
8  from New England to fund this.
9      Q.  Okay.
10      A.  Because I remember half of it being in a
11  fixed income that yielded 8 or 9 and a half percent
12  or something like that, and the other one was in a
13  variable.  And the fixed one did better than the
14  variable.  And that's the best I can remember.  They
15  were charging some high rates of interest.
16              (Defendant's Exhibit No. 30 was marked
17              for identification and will not be
18              attached to the deposition.)
19      Q.  I asked you about these annual reports.
20  But so we identify them for the record --
21      A.  There again --
22      Q.  -- Defendant's Exhibit No. 30, which is
23  the annual reports dated December, 1995 on your $5

Deposition of: Wayne Russell
11/15/1999

Page 159

1    million policy.  Did you read that?

2         A.  I'm sure I looked at it.  And it didn't

3    mean anything.  I made my payment, you know.

4         Q.  And the fact that the interest rate shown

5    on that annual report is less than the interest rate

6    reflected on that illustration had no significance

7    to you?

8         A.  Not a thing in the world.

9              (Defendant's Exhibit No. 31 was marked

10              for identification and will not be

11              attached to the deposition.)

12         Q.  And let's look at the statement dated

13    December 19, 1997, that I have marked as Defendant's

14    Exhibit 31.  Do you recall receiving that one?

15         A.  I don't recall it but the same answer as

16    above, the same thing.  I'm sure I got it.  And this

17    is on the -- which policy is this?  The same policy?

18         Q.  Yeah, the 5 million.

19         A.  Same thing.

20         Q.  Same answer.  The 5.6 percent interest

21    didn't mean a thing?

22         A.  No, sir.

23         Q.  And I assume that if it had shown 2

Deposition of: Wayne Russell
11/15/1999

Page 160

1    percent, that wouldn't mean anything to you either?

2         A.  I think I've already stated that.

3         Q.  Stated that what I just said is true?

4         A.  Yes, sir.

5         Q.  And so I understand that you've been told

6    as far as your complaint about this $5 million

7    policy, that you've been told that somewhere down

8    the line, when you don't know --

9         A.  That's right.  If I live long enough.

10        Q.  And you can't put anything more definite

11   in it than that?  Is that what you're saying?

12        A.  That's correct.

13        Q.  Would you agree with me, Mr. Russell, that

14   at least to the extent of the value shown in the

15   guaranteed table that you will not have to make any

16   premium payments on this policy at least after --

17   at least until after you reach age 78?

18        A.  That's what that states.  So I would

19   assume it states that that's the worst, worst, worst

20   case scenario --

21        Q.  Worst scenario is 78?

22        A.  Yes.

23        Q.  Would you also agree with me that these

Deposition of:  Wayne Russell
11/15/1999

Page 161

1   annual statements reflect that your policy is

2   earning better and for -- let me restate that.  That

3   the amount of interest being credited to the

4   accumulated fund is more than the guaranteed rate?

5        A.  It has been since I've had it.

6        Q.  So would you agree with me that that would

7   mean so long as that continues that the life of this

8   policy would extend beyond age 78?

9        A.  I would certainly think so from everything

10  that's been --

11       Q.  And sitting here today, we just don't know

12  what's going to happen, do we, except what's

13  guaranteed?  Guaranteed is the one certainty about

14  this we know about; right?

15       A.  That's the worst, worst case.

16       Q.  But that's also a certainty.  That's what

17  the company has guaranteed you; right?

18       A.  That's the worst case scenario.

19       Q.  We know this is going to happen.

20  Unequivocally, we know that this policy is going to

21  stay in force until age 78?

22       A.  I hope so.

23       Q.  No.  I'm serious.  I'm not trying to split

Deposition of: Wayne Russell
11/15/1999

Page 164

1        Q.   That's what this illustration says.

2        A.   Right.  Right.

3        Q.   Number 24; right?

4        A.   Right.  That's what it says.

5        Q.   And you do understand that the amount of

6    interest that's being accredited to your policy has

7    been higher than the 5 percent rate that's shown on

8    the guaranteed column?

9        A.   I noticed that the interest rates are

10   higher.

11       Q.   So then you do understand that this policy

12   will, in fact, not expire as shown on the right-hand

13   column under the guaranteed rate but will last

14   longer than that.  We just don't know exactly when

15   under a guaranteed rate it will last longer than

16   that?

17            MR. AUGHTMAN:  Object to the form.

18       A.   Uh-huh.

19       Q.   You've got to say yes or no for her.

20       A.   From what you've shown me here and what

21   I'm looking at, that's the way I take it.  That's

22   the worst case scenario --

23       Q.   Well --

Deposition of: Wayne Russell
11/15/1999

1        A.  And that these rates should make it go

2   beyond that.

3        Q.  Go beyond the 78th year that's shown here

4   in that writing in that column?

5        A.  Yes.

6        Q.  Now, has anybody told you to a certainty,

7   Mr. Russell, that this policy -- that you are

8   definitely going to have to make more premium

9   payments under that policy?

10        A.  Well, you know, it's just like I told you

11   before.  If I live long enough, I'm going to have to

12   make more payments.  Now, I don't know how long I'm

13   going to live or how long we're going to live.  But,

14   you know, there's a good chance that I will though,

15   a very good chance I will have a lengthy life, a

16   very good chance.

17        Q.  Well, I need for you, if you could, Mr.

18   Russell, to let's define that "if I live long

19   enough."  Who had told -- first of all, are you

20   sitting here under oath saying that you believe that

21   you are, in fact, definitely going to have to make

22   additional premium payments on that policy?

23        A.  I think so, yes, sir.

Deposition of: Wayne Russell
11/15/1999

Page 166

1       Q.   And what's the basis of that answer?

2       A.   If I live a normal life -- both of my

3  parents are still alive, and they're 80 years old

4  and in good health, and they're a generation ahead

5  of me.  And if I lose a little weight here and get

6  myself in shape, I see no reason that -- they're

7  just 20 years ahead of me or 22 years ahead of me,

8  so why shouldn't I.

9       Q.   Why shouldn't you what?

10      A.   Why shouldn't I live to be a reasonably

11 old person.

12      Q.   Well, what year are you saying that you're

13 going to have to make premium payments?

14      A.   I don't know that, sir.

15      Q.   Well, isn't it true, Mr. Russell, that you

16 don't, in fact, know that that's going to happen to

17 a certain?

18      A.   I do not know how long I'm going to live.

19 And it's true that if I die young, then it won't be

20 a problem.

21      Q.   Well, I'm just saying -- you're telling me

22 to a certainty, you're saying that if I live long

23 enough without quantifying what long enough is.

Deposition of: Wayne Russell
11/15/1999

Page 167

1      A.   100 years.

2      Q.   Well, I just asked you -- are you saying

3 then that you're not familiar with the fact that

4 this policy is paid up within 100 years?

5      A.   Well, what I'm telling you is this.  I

6 bought this policy and it being based on that it

7 would pay me to year 99 or 100, and the rate it is

8 going, it ain't going to do that.

9      Q.   All right.  Now, who told you that?

10     A.   I've been advised by the people who have

11 looked at these policies that it would not -- that

12 this policy if I and my wife, either one of us, live

13 to be 99 point years that we would have to annie-up

14 additional moneys based on the way this policy is

15 going at the present time.

16          Now, that is professional advice from

17 analyzing these policies of which I do not

18 understand I have been advised.

19     Q.   And who has given you that professional

20 advice?

21     A.   Well, the people who are representing me.

22     Q.   Your attorneys?

23     A.   My attorneys.

Deposition of:  Wayne Russell
11/15/1999

1    Russell, that the profitability of the company was

2    dependant in some years on an increase or decrease

3    in gross revenues?

4            MR. AUGHTMAN:  Object to the form.

5        A.  Well, that doesn't really matter as much

6    in our company as margin.

7        Q.  And you're a little ahead of me.  One

8    thing that can affect the profitability of your

9    company is expenses; correct?

10       A.  Sure.

11       Q.  And the other thing that can affect income

12   is sales?

13       A.  Sales and margin mainly.  And our volume

14   is pretty consistent, our margins are not.  It's

15   either feast or famine on gasoline.

16       Q.  And you have fixed overhead items that

17   were recurring year after year; correct?

18       A.  Yes.

19       Q.  And then you have variable expenses;

20   correct?

21       A.  Yes.

22       Q.  And variable expenses can be expenses that

23   were not anticipated before they were incurred;

Deposition of:  Wayne Russell
11/15/1999

Page 176

1    correct?

2        A.  Sure.  Sure.

3        Q.  Does Russell Petroleum prepare any type of

4    proforma or projection or illustrations, anything

5    such as that?

6        A.  No, sir.

7        Q.  Do you ever sit down before a fiscal year

8    and make any type of prediction, if you will, as to

9    what your expenses are going to be?

10       A.  No, sir.

11       Q.  Is there any type of business planning

12   done as it relates to income and expense items?

13       A.  As it relates to income, yes.

14       Q.  And what type of planning is done?

15       A.  It's done by me on expansion based on my

16   field for where the industry is headed at the time.

17       Q.  Has your feel always been correct?

18       A.  I don't miss it much.

19       Q.  Have you missed it some?

20       A.  A few times.

21       Q.  So the answer to my question is yes, you

22   have missed it?

23       A.  I have missed it.

Deposition of: Wayne Russell
11/15/1999

Page 177

1       Q.   Have you had stores that you purchased or
2   started that did not perform as expected?
3       A.   Well, you always have some that don't
4   quite meet your projections.  But I'm very
5   conservative in my projections and don't do -- try
6   not to do marginal deals.
7       Q.   That's what you attempt to do; correct?
8       A.   That's right.
9       Q.   No one would go into a deal wanting to
10  lose money?
11      A.   That's correct.
12      Q.   All right.
13      A.   It happens enough when you don't plan for
14  it.
15      Q.   Now, in terms of your personal investment
16  with Robinson-Humphrey or Salomon Smith Barney, I
17  would assume you were a preferred client?
18      A.   I would assume.
19      Q.   And you get a monthly statement from
20  Salomon Smith Barney?
21      A.   Correct.
22      Q.   And the statement shows the value of your
23  portfolio currently and previously?

Deposition of:  Wayne Russell
11/15/1999

Page 178

1      A.  Yes.

2      Q.  And it shows who your financial consultant

3   is at Robinson-Humphrey; right?

4      A.  Yes.

5      Q.  And it shows the mix of your investments

6   in terms of stocks, bonds, unit trusts, CD's, money

7   market, etc.; right?

8      A.  Yes.

9      Q.  And because you're a preferred client, it

10  also reflects the basis in your stock; in other

11  words, what you paid for it versus its current value

12  and then the gain; right?

13     A.  Whatever stocks are owned, that's correct.

14     Q.  And you certainly notice in looking at

15  that with a sizable portfolio that from month to

16  month your values go up and they go down depending

17  on what the market has done; correct?

18     A.  That's correct.

19     Q.  And does Russell Petroleum have any

20  outstanding debt?

21     A.  No.  Nothing current, weekly, monthly.

22     Q.  What do you mean by that?

23     A.  We don't have any long term debt or short

1    term debt other than just for a product that we buy.

2        Q.  Do you have a line of credit?

3        A.  No.

4        Q.  Has Russell Petroleum prior to 1994 had

5    any type of debt?

6        A.  Oh, yes.

7        Q.  And do you recall what type of debt it

8    was?

9        A.  I've owed a lot from time to time, but

10   thank goodness I don't now.

11       Q.  Was it long term debt?

12       A.  I never had any long term debt.

13       Q.  It was all short term?

14       A.  I take that back.  I did own my office

15   building, a 20-year debt, but it was paid up.

16       Q.  Have you had debt tied to the prime rate?

17       A.  I have had.

18       Q.  And, of course, you know the prime rate

19   fluctuates; correct?

20       A.  Yes.

21       Q.  And when the interest rates goes up, when

22   you're borrowing money it cuts into your

23   profitability?

Deposition of:  Wayne Russell
11/15/1999

1       A.   Sure.

2       Q.   And you understand that when interest

3   rates go down and it costs you less to borrow money,

4   your income goes up; correct?

5       A.   It should, not necessarily, but it should.

6       Q.   And interest rates are part of a cost of

7   business if you have to borrow money; correct?

8       A.   If you have to borrow money, yes.

9       Q.   So it's not a novel concept to you that

10  interest rates fluctuate from time to time; right?

11      A.   Yes.

12      Q.   I assume some of your money is invested in

13  money market funds?

14      A.   Yes.

15      Q.   Provides you some liquidity?

16      A.   Yes.

17      Q.   And right now you know that interest rates

18  on money market funds are relatively low on a

19  historical basis; correct?

20      A.   Yes.

21      Q.   And you're old enough, not that old, but

22  you're old enough to remember the late '70s when

23  interest rates were 20 percent?

Deposition of: Wayne Russell
11/15/1999

Page 181

1     A.   And higher.

2     Q.   And you're old enough to remember interest

3  rates much lower than that; correct?

4     A.   Correct.

5     Q.   And you also have some bond investments I

6  assume.

7     A.   Yes.

8     Q.   And some of those bonds carry a fixed rate

9  of interest?

10    A.   Uh-huh.

11    Q.   Is that right?

12    A.   Uh-huh, yes.

13    Q.   And that is a guarantee from a particular

14  company to pay a certain interest to the person that

15  has limped the funds; correct?

16    A.   Correct.

17    Q.   And are you familiar with the term

18  clipping coupons?

19    A.   Yes, sir.

20    Q.   And the company has guaranteed you in

21  writing an amount they're going to pay for you

22  allowing the use of your money; correct?

23    A.   That's right.

Deposition of: Wayne Russell
11/15/1999

1       Q.   And I also assume that you've had or owned

2  certificates of deposit from time to time?

3       A.   From time to time.

4       Q.   And certificates of deposit are a bank's

5  contract with you to pay you a guaranteed rate of

6  return?

7       A.   Correct.

8       Q.   Which should not fluctuate irrespective of

9  what general interest rates do in the market at

10 least for the contract period of time; correct?

11      A.   Correct.

12      Q.   So you're certainly familiar with the

13 words in the context of investing between guaranteed

14 and assumed; right?

15      A.   That's right.

16      Q.   Does Mr. Easterling send you from time to

17 time or call you from time to time with

18 recommendations for investments?

19      A.   From time to time.

20      Q.   And he may recommend a stock and tell you

21 what Salomon Smith Barney price bargains on stock

22 is; correct?

23      A.   Correct.

Deposition of: Wayne Russell
11/15/1999

Page 183

1        Q.   Tell you what the price earnings is?

2        A.   If I ask.

3        Q.   And you know what that term means;

4   correct?

5        A.   I do.

6        Q.   And there have been times, correct me if

7   I'm wrong, that notwithstanding his recommendation,

8   you've decided not to purchase a particular stock or

9   other investment that he has proposed to you?

10        A.   Plenty of times.

11        Q.   And there have been times that you have

12   taken his advice?

13        A.   That's correct.

14        Q.   And it has happened to you, has it not,

15   that stocks that he has recommended that you took

16   his advice have not perform as he told you they were

17   expected to perform?

18        A.   That has happened.

19        Q.   In other words, the stock didn't hit the

20   target.  In fact, it went down from its price when

21   it was offered?

22        A.   That has happened.

23        Q.   The Jackson versus Russell Oil case, you

Deposition of:  Wayne Russell
11/15/1999

Page 184

1    told me that was a contractural dispute?

2         A.   Uh-huh.

3         Q.   Is that correct?

4         A.   Uh-huh.

5         Q.   Were there any allegations of fraud made

6    in that lawsuit?

7         A.   They did make allegations, yes.

8         Q.   What was the allegation?

9         A.   I'd have to remember.  It was pertaining

10   to -- I know what it was.  Ethanol it was concerning

11   ethanol sales and Texaco, and they tried to prove

12   that Texaco didn't allow the sale of ethanol through

13   their pumps when, in fact, they did.

14        Q.   Who was alleged to have made a

15   misrepresentation?

16        A.   Russell Petroleum.  The deal alleged that

17   we sold him ethanol unbeknowing unto him and

18   therefore damaged his business when, in fact, we

19   bought ethanol from Texaco.  We had invoices where

20   we had purchased alcohol to make ethanol from

21   Texaco.

22        Q.   Specifically what was the allegation in

23   terms of the lie that was told to the dealer?

Deposition of:  Wayne Russell
11/15/1999

1       A.   He claimed that he was never told that

2  ethanol was in the gasoline, when it was right on

3  his ticket, every delivery ticket that he had.  But

4  he played dumb that he couldn't read, and therefore,

5  he was ignorant and, therefore, did not know that he

6  was getting alcohol in his gasoline.

7       Q.   So the dealer alleged that Russell

8  Petroleum had failed to tell him that he was

9  receiving ethanol gas?

10      A.   Ethanol in his gasoline.

11      Q.   And his belief was that he was receiving,

12 for lack of a better word, regular gas?

13      A.   That's right.

14      Q.   And your defense was we absolutely told

15 you.  It was on the ticket we gave you?

16      A.   That's right.  Each and every ticket.  And

17 it had something pertaining to ethanol on each

18 ticket.  But he claimed ignorant that he couldn't

19 read, and therefore, he wasn't told, therefore, it

20 was fraud.

21      Q.   One of the things Russell Petroleum said

22 was not only did we not commit fraud but had you

23 bothered to look at what we gave you, you would have

Deposition of: Wayne Russell
11/15/1999

Page 187

1       A.  Gosh, I'd have to go back to the files to

2  give you the date.  I'm not sure right now to be

3  honest with you.  But they stand for themselves

4  whatever date that is.

5       Q.  What's your best judgment?

6       A.  Phoenix 11 years into it, back up 11

7  years, '88, '88, somewhere in that neighborhood.

8       Q.  And was that a last to die policy?

9       A.  Yes.

10      Q.  Now, the phrase "last to die," how did you

11  become familiar with that?

12      A.  Probably through Gus.

13      Q.  Do you remember that specifically?

14      A.  No.

15      Q.  Was the Phoenix Mutual policy and the

16  purchase of it at least instigated by advice from

17  either your tax or your estate folks?

18      A.  It was instigated the same way the

19  testimony has been in this other policy here today,

20  in these other policies.

21      Q.  Is it possible that either Mr. Capouano

22  or Mr. Lindsey referred to a last to die?

23      A.  I wouldn't think so.

Deposition of:  Wayne Russell
11/15/1999

Page 188

1          Q.   Do you know that for a fact?

2          A.   I don't know it for a fact, but I wouldn't

3   think so.  I would think that Gus proposed this.

4          Q.   And specifically what was the problem with

5   the Phoenix Mutual policy?

6          A.   We agreed to pay ten payments and ten only

7   and wound up having to settle for making an

8   additional payment on a half.

9          Q.   And specifically what were you told about

10  the Phoenix Mutual policy?

11         A.   I don't understand the question.

12         Q.   Well, you said ten payments.

13         A.   This went through the ADR process.  I

14  wasn't told anything.

15         Q.   When you bought the policy in 1999 --

16         A.   Oh, when I bought it.

17         Q.   -- I'm assuming that you were told

18  something?

19         A.   I was told and I had in writing from him

20  on a letter that I would have to make only ten

21  payments in writing.

22         Q.   Do you remember specifically what was said

23  in the writing?

Deposition of:  Wayne Russell
11/15/1999

Page 189

1      A.   Those exact words.

2      Q.   You will only have to make ten payments?

3      A.   That's correct.

4      Q.   Quote, unquote?

5      A.   Quote, unquote.

6      Q.   Do you still have that letter?

7      A.   I'm sure I do somewhere.  I'm sure I do

8  and a memo to me.

9      Q.   Before your purchase of the Phoenix Mutual

10  policy, you had other policies that you had

11  purchased through Mr. Clements; is that correct?

12      A.   Yes.

13      Q.   Did you have some other insurance that had

14  been purchased through another source other than Mr.

15  Clements before 1988?

16      A.   To the best of my recollection other than

17  a New York Life policy, I think I had a New York

18  Life policy in there that goes way back that was

19  terminated or converted to a New England.  But other

20  than that, Gus, I had bought all the insurance I had

21  ever bought from Gus.

22      Q.   Okay.  So we don't get crossways with one

23  another, unless I said to the contrary, when I say

Page 190

1    the policy that you bought -- I understand there's

2    trust, there's kids and there's you?

3    A.  Yeah.

4    Q.  But I'm referring to policies which your

5    life is the one that is insured and you're making

6    the payments in some form or fashion?

7    A.  Me or the kids.

8    Q.  And I understand the tax planning and

9    everything else but just so we're clear.

10    A.  Uh-huh.

11    Q.  Before the Phoenix Mutual policy, had you

12    ever received from Gus or --

13    A.  The best -- let me clarify that.  I

14    believe it was a Metropolitan Life instead of a New

15    York Life.

16    Q.  And your recollection is that that policy

17    was converted at some point in time to a New England

18    policy?

19    A.  Yes.

20    Q.  Before 1988 on any policy of life

21    insurance that you had owned which your life was the

22    insured life, had you received a writing from Mr.

23    Clements or anyone else guaranteeing you a limited

Deposition of:  Wayne Russell
11/15/1999

Page 191

1  payment time?

2      A.  I never, never tried to buy that type of

3  insurance until I got into estate planning.

4      Q.  And in 1988 when you were dealing with the

5  Phoenix Mutual purchase, did you ask Mr. Clements

6  that he put in writing the ten-year payment feature

7  that you say it had?

8      A.  Yes.  Because that is all I told him.  I

9  said I'm not going to pay.  I said you show me.

10      Q.  And how did you know to ask for, using

11  your words, a type of policy with a limited pay

12  period?

13      A.  The same thing here.  I was going to pay

14  ten payments for 7 and a half million dollars worth

15  of coverage.  And I wasn't going to pay a penny

16  more.  You put it in writing.

17      Q.  I understand.  And I'm not arguing with

18  you.  All I want to know is you had a history with

19  insurance before 1988.

20      A.  Uh-huh.

21      Q.  And you've told me that none of those

22  policies --

23      A.  Those were small policies, and they were

1    for different purposes.  You know what I mean?  They

2    were all on my life, you know.

3        Q.  And I understand.

4            MR. AUGHTMAN:  Let him finish.

5        Q.  (BY MR. WALKER) Before 1988 you had never

6    purchased a policy, using your words, that was a

7    type of policy that had a limited pay period.  And

8    my question is:  In 1988 what had you learned that

9    caused you to demand or request from Mr. Clements a

10   policy with a guarantee in writing of ten years no

11   more premiums?

12       A.  State the question again.  I think I

13   understand it but state it again.

14       Q.  What had occurred, in terms of your

15   learning curve about insurance, to cause you to

16   request or demand from Mr. Clements some

17   confirmation that you would only pay ten years on

18   the Phoenix Mutual policy?

19       A.  First of all, this was the first estate

20   planning that I had done.  It was larger policies

21   than I had ever even dreamed of, that I would even

22   be worth, and I needed to have a finality to it.

23       Q.  But in terms of the concept, if such

Deposition of: Wayne Russell
11/15/1999

```
 1   existed, that there was a type of policy with a
 2   limited pay, did you learn that from Mr. Lindsey or
 3   from an attorney or another accountant or an estate
 4   planner?  Did you read about it?
 5         A.  I learned it from Mr. Clements.  This was
 6   a new type of insurance, even on the market then.
 7   He had had some experience with it.  It had not been
 8   out very long.  And he suggested that that was -- I
 9   could get the most bang for my buck that way.  And
10   since I was not interested in borrowing money on it,
11   that it was only for estate tax purpose, that that
12   was the joint survivor or last to die was the type
13   of policy that I needed to get the most bang for my
14   buck.  And I had followed his advice.
15         Q.  Did you consider --
16         A.  And I gave him the instructions for what I
17   wanted to do, and I asked for him to give it to me
18   in writing.
19         Q.  And did you consider the limited pay
20   feature to be a type of policy in your mind?
21              MR. AUGHTMAN:  Object to the form.
22         A.  You know I don't know enough about
23   insurance to even consider -- I didn't at that time
```

Deposition of: Wayne Russell
11/15/1999

Page 194

1   and still don't really know. You know, insurance

2   was insurance basically. All I knew is that I

3   wanted a finality on the payments, and I had to have

4   some finality. And I told him ten years is all I'm

5   going to pay. You figure out what it's going to be

6   and make me your best deal.

7       Q.  Now, did you consider that the proposal

8   and statement made by Mr. Clements was stronger if

9   you had it in writing?

10          MR. AUGHTMAN:  Object to the form.

11      A.  Well, you know, I felt like that was all I

12  needed.

13      Q.  But as compared to something he said

14  versus something in writing, it was your request

15  that he put it in writing?

16      A.  I told him --

17      Q.  Is that right or wrong?

18      A.  I don't really know how, you know, to

19  answer that question. I requested the product. He

20  gave it to me. And I told him to just send me a

21  letter stating that there would only be ten

22  payments.

23      Q.  Did you feel better or more secure having

Deposition of:  Wayne Russell
11/15/1999

Page 195

1    it in writing?

2        A.   Sure.   That was the finality of it right

3    there.

4        Q.   Do you remember what type of policy the

5    Phoenix Mutual product was?

6        A.   I assume it was just like this.

7        Q.   Do you remember any words such as

8    universal life or variable life in connection with

9    the Phoenix Mutual policy?

10        A.   I don't really.

11        Q.   Do you remember making any choices in

12    terms of the investments of your premiums on the

13    Phoenix Mutual policies?

14        A.   Making choices?

15        Q.   Yes.

16        A.   Like?

17        Q.   Like different type of mutual funds?

18        A.   As to where they could invest the money?

19        Q.   Yes.

20        A.   Oh, no.   I had nothing to do with that.

21        Q.   You certainly understand enough about

22    insurance to know that when you make a premium the

23    insurance company takes part of your money and

Deposition of: Wayne Russell
11/15/1999

Page 196

1    invests the money in something; correct?

2        A.   I'm sure they did.

3        Q.   To generate a return.

4        A.   Yes, sir.

5        Q.   And you know they don't just dig a hole in

6    their backyard somewhere?

7        A.   Yes.

8        Q.   And do you ever remember having a policy

9    of insurance where you made selections in terms of

10   how your premiums were to be invested?

11       A.   Never in my life have I been apart of

12   that.

13       Q.   Do you ever remember giving any type of

14   analysis as to the type of investor you are, such

15   as, conservative versus risk avers or moderately

16   tolerant of risk, anything such as that?

17       A.   By who?

18       Q.   By any insurance agent or broker.

19       A.   No.

20       Q.   Now, you said that you went to ADR with

21   the Phoenix Mutual issue.  Was there a determination

22   by an arbitrator, or was the matter settled short of

23   a determination by the arbitrator?

Deposition of: Wayne Russell
11/15/1999

Page 208

1    general policy.  Is there any particular reason that

2    you're aware of that Mr. Jinks was representing you

3    in that case and the Beasley firm is representing

4    you in this case?

5         A.   Jinks is more, is used to handling cases

6    of that nature with that company is the reason I

7    picked him.

8         Q.   All right.  Now, the TransAmerica policies

9    -- I think that's what I was getting to before we

10   took a break.  Without replowing too much ground,

11   you have complaints as I understand it or your

12   lawsuit involves three TransAmerica policies; is

13   that correct?

14        A.   Three.

15        Q.   And in terms of the $5 million policy that

16   is owned by the trust, do I understand correctly

17   that your complaint on that policy is that you were

18   told that you would make a one-time payment?

19        A.   Yes, sir.

20        Q.   And that is your only complaint about the

21   $5 million policy; is that correct?

22        A.   And that it won't fund itself, you know,

23   or may not fund itself.  And I may have to step in

Deposition of:  Wayne Russell
11/15/1999

Page 209

1   and make payments.

2       Q.  But that's the same thing as it being

3   something other than one-time pay; correct?

4       A.  It's more than -- it's something other

5   than what I agreed to do.

6       Q.  All right.  Let me try the question again.

7   Is your sole complaint about the $5 million policy

8   that you may have to make an additional payment at

9   some point in time on that policy?

10      A.  That's my complaint based on my -- on the

11  best advice that I have.

12      Q.  I understand.  Your testimony relating to

13  what may cause it to go wrong in your mind is based

14  upon advice that you received from your attorneys;

15  correct?

16      A.  Correct.

17      Q.  And we've already established that you

18  don't know for a fact if or when you'll have to make

19  a payment on the $5 million policy; is that correct?

20      A.  That's correct.

21      Q.  All right.  On the $2,500,000 policy owned

22  by the trust, your sole complaint on that policy is

23  that you may have to pay beyond the ten-year period;

Deposition of: Wayne Russell
11/15/1999

Page 210

1   is that correct?

2       A.   That's right.

3       Q.   And on the $500,000 policy you have two

4   complaints:   One is that you may have to make a

5   payment at some undetermined time in the future

6   beyond the one-time pay that you've already done,

7   and you're feeling that the policies you replaced

8   from New England should not have been replaced to

9   get the TransAmerica policy?

10      A.   That's correct.

11      Q.   And those are all of your complaints

12  regarding the three TransAmerica policies?

13      A.   Basically.

14      Q.   All right.  If there's anything else, let

15  me know.

16      A.   Okay.

17      Q.   But as we sit here today, those are your

18  complaints; correct?

19      A.   As I understand it, yes.

20      Q.   Now, the 2 million and the $2.5 million

21  policy were purchased at the same time; is that

22  correct?

23      A.   Very close if not.

Deposition of: Wayne Russell
11/15/1999

Page 211

1      Q.  And as you just told me, your complaint on

2  those policies is that you may have to pay at some

3  undetermined time in the future beyond the one-time

4  pay; is that correct?

5      A.  Uh-huh.

6      Q.  And on the 2.5, the ten year, beyond

7  ten-year period; correct?

8      A.  Uh-huh.

9      MR. WHITEHEAD:  You have to answer out.

10     A.  Yes.

11     Q.  On the $5 million policy specifically,

12  what did Mr. Clements tell you?

13     A.  Well, as I have stated, my instructions to

14  him was to sell me a one-time policy that I make one

15  payment on.  Be very conservative in what you sell

16  me, because I don't ever, ever want to make another

17  payment on it.  Don't sell me anything that I'll

18  ever have to make another payment on.

19     Q.  All right.  That was your instructions to

20  him?

21     A.  Yes.

22     Q.  And what statements, if any, did Mr.

23  Clements make to you regarding the $5 million

Deposition of: Wayne Russell
11/15/1999

1   policy?

2       A.   It is my understanding that he tried to

3   accommodate my wishes.

4       Q.   Regardless of your understanding, what

5   words came from his mouth to your ears regarding the

6   $5 million policy?

7       A.   I cannot recall what was said at that

8   time.

9       Q.   Would it be fair to say, Mr. Russell, that

10  your assumption is that given your instructions Mr.

11  Clements had complied with those instructions?

12      A.   I assume that he did.

13      Q.   Now, one of your instructions was to be

14  conservative; correct?

15      A.   Very, very conservative.

16      Q.   Your words were be very, very

17  conservative; correct?

18      A.   Correct.

19      Q.   What was that in reference to?

20      A.   In reference to the amount of money that I

21  will have to pay and also to make sure that he

22  didn't misfigure anything where I would have to step

23  in and make another payment ever again.

1      A.   Yeah.

2      Q.   Now, when you were telling Mr. Clements to

3  be very, very conservative, was that in reference

4  to, at least in part, the knowledge you had obtained

5  from the Phoenix Mutual issue?

6      A.   And the problems we had with it.

7      Q.   And you wanted him to be conservative in

8  terms of the projections or assumptions; is that

9  correct?

10      A.   The change --

11      Q.   Is that correct?

12      A.   Yeah.  I wanted him to be very

13  conservative with his projections and where it would

14  be, because I never wanted to make another payment.

15      Q.   Now, on the $2.5 million policy that was

16  sold about the same time as the $5 million policy,

17  and that's the one for ten years no more pay, what

18  specifically did Mr. Clements tell you regarding

19  that policy?

20      A.   I don't remember.

21      Q.   Do you remember what your instructions

22  were on that policy?

23      A.   Yeah.

Deposition of: Wayne Russell
11/15/1999

1      Q.  Did you also tell him be very, very
2  conservative?
3      A.  I did.
4      Q.  Do you remember any words that he spoke to
5  you regarding the $2.5 million policy?
6      A.  I don't recall.
7      Q.  On the $5 million policy, do you remember
8  any words that Jeff Caddell spoke to you?
9      A.  I don't recall the words.  He was there.
10      Q.  Do you remember any words that Mr. Caddell
11  spoke to you on the $2.5 million policy?
12      A.  I don't recall.
13      Q.  Do you remember any questions that you
14  asked on the $5 million policy?
15      A.  I don't recall.
16      Q.  Do you remember any questions that you
17  asked on the $2.5 million policy?
18      A.  I don't recall.
19      Q.  Was anyone else present other than you,
20  Mr. Clements and possibly Mr. Caddell?
21      A.  I don't recall, but I don't think so.
22      Q.  In connection with either the 5 million or
23  $2.5 million policy?

Deposition of: Wayne Russell
11/15/1999

1          A.  I don't recall, but I don't think so.

2          Q.  All right.  Did Mr. Clements provide you

3    an illustration or other writing in connection with

4    the 5 million and the $2.5 million policy?

5          A.  Other than what's been shown here?

6          Q.  Including what's been shown here.

7          A.  Nothing other than what's been shown here

8    today.

9          Q.  Defendant's Exhibit 2 is an illustration

10   or document or sales document regarding the $500,000

11   policy; correct?

12         A.  Uh-huh.

13         Q.  Do you remember receiving any such

14   document on either the 2.5 or $5 million policy?

15         A.  Uh-huh.

16            MR. STEWART:  There's one on the million.

17         Q.  (BY MR. WALKER) Mr. Russell, let me show

18   you what's already been marked as Defendant's

19   Exhibit 24.  And that's an illustration Mr. Clements

20   provided to you with respect to the $5 million

21   policy; is that right?

22         A.  Uh-huh.

23         Q.  You need to say yes.

Deposition of:  Wayne Russell
11/15/1999

1     that approach of a one-time payment.

2          Q.  And what did Mr. Clements tell you

3     specifically when he called with a recommendation

4     regarding the $500,000 policy and/or the replacement

5     of some existing New England policies?

6          A.  I don't remember what he said.  But we

7     wound up buying the policy.  So I assume that we

8     concurred that that was the thing to do.

9          Q.  Do you remember anything that Mr. Clements

10    ever told you about the $500,000 policy?

11         A.  No, sir.  Can you remember ten years ago

12    what you said exactly?  I can't.

13         Q.  Well, it depends.  You can ask me about an

14    Auburn football game and I can tell anything that

15    happened.

16              Is the reason that you can't remember

17    something five years ago merely because of the

18    passage of time?

19         A.  My memory is beginning to slip.  I can't

20    even recall names sometimes.  Like today, I had to

21    come back and tell you a name later.

22         Q.  But do you have any mental or physical

23    disability that in any way affects your memory?

Deposition of:  Wayne Russell
11/15/1999

Page 221

1    A.  As I previously stated, we concurred that
2  that was the thing to do and, you know, proceeded to
3  buy them.  Beyond that I don't have any memory.
4    Q.  But in terms of what he told you to prompt
5  your consideration of the replacement, do you
6  remember anything that was said?
7    A.  No, sir.
8    Q.  Okay.  I told Mr. Stewart that in looking
9  at these three TransAmerica policies that price was
10  determined.  Do you remember that you testimony?
11    A.  Uh-huh.
12    Q.  You need to say yes.
13    A.  Yes.
14    Q.  Now, do you recall looking at proposals
15  from different companies that had different prices?
16    A.  I think my testimony was earlier that Gus
17  looked at two or three different companies, and we
18  decide that TransAmerica was the best buy.
19    Q.  And when you say "TransAmerica was the
20  best buy," was that solely on TransAmerica providing
21  the lowest premium amount; i.e., the lowest price?
22    A.  And Gus' recommendation that they were a
23  good company.  I knew nothing about them.

Deposition of: Wayne Russell
11/15/1999

Page 223

1          A.   It's to keep from having to sell all the

2     properties that I own.

3          Q.   That's right.  And that's because of

4     estate taxes.

5          A.   That's right.

6          Q.   You also told Mr. Stewart, and I wrote it

7     down, that these policies at various points in time,

8     whether one pay or after ten years, would be

9     sufficient to fund themselves.  Do you remember that

10    testimony?

11         A.   Uh-huh, yes.

12         Q.   How are policies to fund themselves?

13         A.   Through interest and dividends that they

14    accumulate.

15         Q.   Through a return on your premium dollars;

16    correct?

17         A.   Correct.

18         Q.   And didn't it make sense to you, Mr.

19    Russell, that since you know interest rates and

20    dividends fluctuate based on your own personal

21    experience that in terms of how long it could be

22    affected by interest and dividends?

23         A.   What is your question?

**Deposition of: Wayne Russell**
**11/15/1999**

Q.   Doesn't that make sense to you?

A.   Doesn't what make sense?

Q.   That if future payments according to you are dependant upon interest and dividends earned, then the fact that fluctuations occur in interest and dividends can affect the length of time to pay?

A.   Yes.

Q.   The New England policies that you replaced, how long were you to pay on those policy?

A.   Varying amounts.

Q.   What did it vary to and from or from and from?

A.   When they were taken out, I think pretty much it's paid up to age 65, I think, you know. They were -- that's what most whole life's supposed to pay up at, isn't it?  I'm not -- I don't know that much about insurance.  I know some of them pay up to 65 and some of them, they were not taken out over a 10 or 15 years period and varying amounts of maturity.

Q.   Given what you have learned from your dealings with Phoenix Mutual before you ever dealt with TransAmerica, why did you not get from Mr.

Deposition of: Wayne Russell
11/15/1999

Page 225

1  Clements or Mr. Caddell or TransAmerica or some
2  other place a writing similar to that which you say
3  you got regarding the Phoenix Mutual policy?

4      A.  Well, the Phoenix -- to begin with, I
5  asked Gus for that in writing, and he gave it to me.
6  And I don't know why I did it.  It was just poor
7  judgment, I guess, poor judgment on my part.

8          And two, they blamed the increase on the
9  state law change.  And, you know, they had a state
10  law change, and they blamed that on the state of
11  Alabama, not the insurance company.  I couldn't tell
12  who was right and who was wrong.  I was just
13  irritated on what the, on the thought of having to
14  make more than ten payments.  But they blamed it on
15  the state because the state changed the law.  So at
16  that point, you know, I had no reason to doubt Gus.

17      Q.  And you have been dealing with Gus for
18  almost two decades in the insurance context --

19      A.  Uh-huh.

20      Q.  -- before you bought the Phoenix Mutual
21  policy; correct?

22      A.  I'd have to count up years but possibly
23  yes, two decades.  It could be 15 or 20 years,

Deposition of:  Wayne Russell
11/15/1999

Page 227

1  and upset because what you had been told had not

2  come to pass; correct?

3      A.  Right.

4      Q.  And wouldn't you agree with me that it was

5  particularly poor judgment not to ask Mr. Clements

6  for something in writing regarding the TransAmerica

7  policies given what you knew and had experience in

8  dealing with the Phoenix Mutual issues?

9          MR. AUGHTMAN:  Object to the form.

10     A.  It was poor judgment on my part as well as

11  part of the blame being on the state for the

12  changing law.  And I gave him the benefit of the

13  doubt concerning that.

14     Q.  Now, Defendant's Exhibit 6 -- find that

15  for me.

16         MR. STEWART:  Here it is.

17     Q.  (BY MR. WALKER) You understand that an

18  insurance policy is a contract; correct?

19     A.  Uh-huh, yes.

20     Q.  It's an agreement where you agree to do

21  certain things and the insurance company agrees to

22  do certain things; correct?

23     A.  That's correct.

Deposition of: Wayne Russell
11/15/1999

Page 238

1       A.   Yes.

2       Q.   So that's part of the policy you can

3  understand; right?

4       A.   Yes.  I can understand parts of it.

5       Q.   Now, on page 2-B, which is Bates stamped

6  Russell, 0163 at the top it says, "Table of policy

7  values and benefits.  Illustrative premiums and

8  guaranteed basis."  Do you see that?

9       A.   Yes.

10      Q.   And then the left-hand column says, "End

11  of policy year."  And it has numbers on it on down

12  to age 60 and 65; correct?

13      A.   Yes.

14      Q.   Now, you understand what that means;

15  right?

16      A.   The end of the policy year.

17      Q.   That's what it says; right?

18      A.   Yes.

19      Q.   The next column over says "Planned

20  annualized premium."  There's a number 73,351 in the

21  first year; right?

22      A.   As the money that was put up.

23      Q.   And then zeros on down?

Deposition of: Wayne Russell
11/15/1999

1         A.   Don't make any more payments.

2         Q.   And then it shows you what the death

3    benefit is; right?

4         A.   That's correct.

5         Q.   And you understand those three columns?

6         A.   Yes.  Why does it stop at 65?

7         MR. AUGHTMAN:  Let him ask the questions.

8         Q.   (BY MR. WALKER) Now, let's look at the --

9    you got Defendant's 19 and 32?

10        MR. STEWART:  There's 19 and 32 is the --

11        .Q.  (BY MR. WALKER) Let's look at Defendant's

12   19, Mr. Russell, which is the $2.5 million policy,

13   which was the ten years of payments according to

14   you.

15        A.   Uh-huh.

16        Q.   You do see that's the right one; right?

17        A.   That's right.

18        Q.   Let's look at that same page that we

19   looked at on the $500,000 policy that says "Table

20   policy values and benefits illustrative premiums and

21   guaranteed basis;" is that right?

22        A.   That's what it says.

23        Q.   Same column "end of policy year" and goes

Deposition of:  Wayne Russell
11/15/1999

Page 240

1   down to 65; right?

2       A.  That's correct.

3       Q.  Planned annualized premium?

4       A.  That's right.

5       Q.  $23,047; right?

6       A.  That's right.

7       Q.  And it goes on out through age 65; right?

8       A.  Right.

9       Q.  Which is clearly longer than ten years;

10  right?

11      A.  Yes.

12      Q.  No part of those two columns that you did

13  not understand, is there?

14      A.  No.

15      Q.  Now, that shows you something different

16  than the ten years that you supposedly were told;

17  correct?

18          MR. AUGHTMAN:  Object to the form.

19      A.  Can I explain to you?

20      Q.  No.  Does that show you something

21  differently than how you were told?

22          MR. AUGHTMAN:  You can answer however you

23  want to.

Deposition of:  Wayne Russell
11/15/1999

MR. WALKER:  As long as he answers my question.

Q.  (BY MR. WALKER) My question is simple. Does this page on Defendant's Exhibit 19 show you something different than what you were told about ten years?

A.  It was explained to me that this policy would fund itself after ten years and make whatever payments was necessary from then on for the rest of my life.

Q.  Does it reflect that premiums are due beyond ten years?

A.  Yes.

Q.  And those premiums are going to be paid by dividends and interest?

A.  That's correct.

Q.  Which fluctuate.

A.  That's right.

Q.  And so if the dividends and interest went up, you would expect to pay less than ten years; right?

A.  That's right.

Q.  And if they went down, you would expect to

Deposition of:  Wayne Russell
11/15/1999

Page 242

1   pay longer than ten years?

2       A.  I agreed to pay ten years.  That was my

3   thinking, that I knew I was going to have to pay ten

4   years, and I agreed to pay ten, and I'm willing to

5   pay ten, no more, no less.

6       Q.  I just want to make sure that you get the

7   sauce with the goose and the gander.

8       A.  Don't expect any gifts.

9       Q.  Don't want any free lunches.

10      A.  I don't want any free lunches.

11      Q.  And if the interest rates and dividends

12  went up, you would expect to get the benefit of

13  that?

14      A.  Not necessarily.  I expect to pay ten

15  years and get what I bought.

16      Q.  Where do you think the excess will go?

17      A.  I don't know.  It was immaterial to me at

18  the time, because he was being conservative enough

19  that there was no way, you know, that I was going to

20  have to make any more payments.

21      Q.  Well, I think you told Mr. Stewart that

22  you didn't pay any attention to what the interest

23  rate was, the current rate; right?

Deposition of:  Wayne Russell
11/15/1999

Page 243

1     A.   That's right.

2     Q.   Didn't make any difference to you.

3     A.   It didn't make any difference to me.

4     Q.   And I think Mr. Stewart asked you it

5  didn't make any different to you if it was 5, 6, 10,

6  15, 20 percent.

7     A.   I instructed him that I wanted to make ten

8  payments, that's all.

9     Q.   So were you willing to gift whatever

.0  excess it earned?

.1     A.   Sure.

.2     Q.   Did you make that expression known?

.3     A.   Sure, I would.

.4     Q.   Did you?

.5     A.   No.  I didn't make it known.  But I

.6  assumed that this thing was just going to handle

.7  itself on a ten-year basis or either a one-time

.8  basis, whichever policy that it pertained to.

.9     Q.   So your testimony that no matter what

:0  interest rates or dividends do, I don't want to

:1  benefit from it if it would shorten my period of

:2  pay.  Is that your testimony?

:3     A.   That's my testimony.  I still -- all I'm

Deposition of: Wayne Russell
11/15/1999

Page 252

1    Q.   And heaven forbid that that would happen.

2    But if you died at any time between now and age 71,

3    according to this illustration on the guaranteed

4    rate, you still wouldn't have had to pay anything

5    more than you bargained for?

6    A.   That's what this says.

7    Q.   And because this policy has been paying

8    interest at a higher, at an interest rate that is

9    higher than the guaranteed rate, if the projection

10   were now that it would take you until age 80 that

11   you died, some time between now and age 80, you

12   still would have gotten what you bargained for; is

13   that correct?

14   A.   Somewhere in there.  That's correct.

15   Q.   So in other words, as long as you don't

16   have to come out of pocket until whatever time, some

17   time between now and the time you died, then you

18   would have gotten what you bargained for?

19        MR. AUGHTMAN:  Object to the form.

20   A.   Basically.

21   Q.   And for whatever reason, you got, let's

22   say based on this illustration that all --

23   Illustration No. 12, Exhibit No. 12, that all

Deposition of: Wayne Russell
11/15/1999

Page 264

1          A.    It's not routine, no.

2          Q.    It's not routine by any means, is it?

3          A.    No.

4          Q.    Now, in agreeing with me, it's not routine

5     -- I assume you would also agree me that it not

6     being routine, it's important to reduce these

7     discussions and agreements between the policies to

8     writing, isn't it?

9          A.    It's very important.

10         Q.    So you brought this policy in 1994, so 5,

11    10, 15 years down the road you're not having to sit

12    there like you said by your own admission.  And your

13    memory is not as good anymore.  You don't want to

14    have to rely on your memory, do you?

15         A.    No.

16         Q.    You don't want to rely on that memory.

17    You want to rely on the written terms of a contract.

18    What you paid your money for.

19         A.    And what my instructions were to him, what

20    I paid for, what I thought I bargained for.

21         Q.    What you paid for, these policies.  We've

22    already been over that, what you paid for; right?

23                Lets face it, Mr. Russell, you don't

Deposition of:  Wayne Russell
11/15/1999

Page 265

give a rip.  You're going to be dead.

A.  That's right.  Doesn't mean anything to me.

Q.  You want somebody when you die to go in that chest of drawers or wherever you keep these to be able to pull these out and go call up Gus Clements, if you pre-decease him, and say, Gus, Russ has died, had a heart attack, whatever tragic thing happened -- maybe you do get to live to be 85 years of age.  But whatever go to these policies and say, Could you help me with my insurance.

And then TransAmerica is obligated to do exactly what these policies says, and that's what you expect of them; right?  Right?

A.  Yes.

Q.  Okay.  Now, you say you haven't examined these policies and found anything in these policies that are inconsistent with what Gus has told you. Is that true?

A.  That is true because of the facts I told you previously.  Because I'm not an insurance person and cannot understand them.

Q.  But you haven't done that.  And we've

Deposition of: Wayne Russell
11/15/1999

Page 269

policies to make sure that that's what you thought you were getting?

A.   It would be prudent to look at them.  And I glanced at them.  But I could not understand them as I testified before.

Q.   All right.  Well, did you ever --

A.   I relied on his --

Q.   Okay.

A.   -- on his abilities as a professional and to look after my interest in these policies.

Q.   All right.  But you also admit you didn't get to be where you are in the world by relying on other folks now, Mr. Russell.

A.   Yes.

Q.   You did?

A.   A lot of it, yes.

Q.   You don't think that you --

A.   Taken a lot of good advice.

Q.   Yeah.  But you also used a lot of good judgment down the road too.

A.   I tried to.

Q.   Sure.  And don't you think that if you would have studied these policies and if there was

1   something in these policies that you didn't

2   understand, don't you think all you had to do was

3   pick up the phone and call up Gus and say, Hey, Gus,

4   explain this to me.  I don't understand it.

5         A.  I guess I'm a busy man.  I just trusted

6   them.

7         Q.  Don't you think that if you had done that

8   and you had asked Gus to explain something to you

9   about these policies after you got them, that he

10  would have been more than glad to do that?

11        A.  He would have given me an answer some kind

12  of way.

13        Q.  Of course, he would have been there for

14  you, wouldn't he?  I mean, Wally's

15  over here is saying -- I mean, I guarantee you Gus

16  answers the phone when you when you call.

17        A.  Yes.

18        Q.  Okay.  You don't have any doubt about

19  that, do you?

20        A.  I've never had any problem getting ahold

21  of him.

22        Q.  All right.  Now, having said all of that,

23  why do think that in each of these policies they

C E R T I F I C A T E


STATE OF ALABAMA   )

JEFFERSON COUNTY   )

     I hereby certify that the above and
foregoing deposition was taken down by me in
stenotype and the questions and answers thereto were
reduced to writing under my supervision, and that
the foregoing represents a true and correct
transcript of the testimony given by said witness on
the said occasion.

     I further certify that I am neither of
counsel nor of kin to the parties to the action, nor
am I in anyway interested in the result of said
cause.




                    Paula Murrell,

                    COMMISSIONER


My commission expires on November 17, 2001.