IN THE CIRCUIT COURT FOR

MONTGOMERY COUNTY, ALABAMA


WAYNE RUSSELL,

      Plaintiff,

      vs.


TRANSAMERICA OCCIDENTAL LIFE

INSURANCE COMPANY; AUGUSTUS

KIRBY CLEMENTS, III; JEFFREY

LEON CADDELL, et al.,

      Defendants.


    *  *  *  *  *  *  *  *  *  *


**DEPOSITION OF AUGUSTUS KIRBY CLEMENTS, III,**

taken pursuant to notice and stipulation on

behalf of the Plaintiff, in the Law Offices of

Copeland, Franco, Screws & Gill, 444 South

Perry Street, Montgomery, Alabama, before

Jennifer Ingram, Reporter and Notary Public in

and for the State of Alabama at Large, on

November 16, 1999, commencing at 9:30 a.m.



Reagan Reporters. L.L.C.
334.262.7556
www.reaganreporters.com



EXHIBIT
A

1              *   *   *   *   *   *   *   *   *   *

2                          APPEARANCES

3     ON BEHALF OF THE PLAINTIFF:

4              JOSEPH H. AUGHTMAN, Esquire
               Beasley, Allen, Crow, Methvin,
5                   Portis & Miles
               218 Commerce Street
6              Montgomery, Alabama  36103

7

8     ON BEHALF OF THE DEFENDANT:

9              CHARLES D. STEWART, Esquire
               Spain & Gillon
               2117 2nd Avenue North
10             Birmingham, Alabama  35203

11             GEORGE W. WALKER, III, Esquire
               Copeland, Franco, Screws & Gill
12             444 South Perry Street
               Montgomery, Alabama  36104

13
               STEPHEN E. WHITEHEAD, Esquire
14             Lloyd, Schreiber & Gray
               Two Perimeter Park South
15             Suite 100
               Birmingham, Alabama  35243

16
      ALSO PRESENT:
17             STEVEN R. SHEPARD
               WAYNE RUSSELL
18

19

20                        STIPULATIONS

21         It is hereby stipulated and agreed by

22    and between counsel representing the parties

23    that the deposition of AUGUSTUS K. CLEMENTS,

1    III, is taken pursuant to notice and

2    stipulation on behalf of the Plaintiff; that

3    all formalities with respect to procedural

4    requirements are waived; that said deposition

5    may be taken before Jennifer Ingram, Reporter

6    and Notary Public in and for the State of

7    Alabama at Large, without the formality of a

8    commission; that objections to questions,

9    other than objections as to the form of the

10   questions, need not be made at this time, but

11   may be reserved for a ruling at such time as

12   the deposition may be offered in evidence or

13   used for any other purpose as provided for by

14   the Civil Rules of Procedure for the State of

15   Alabama.

16          It is further stipulated and

17   agreed by and between counsel representing the

18   parties in this case that the filing of the

19   deposition of **AUGUSTUS K. CLEMENTS, III**, is

20   hereby waived and that said deposition may be

21   introduced at the trial of this case or used

22   in any other manner by either party hereto

23   provided for by the Statute, regardless of the

```
 1      waiving of the filing of same. It is further

 2      stipulated and agreed by and between the

 3      parties hereto and the witness that the

 4      signature of the witness to this deposition is

 5      hereby waived.

 6              *   *   *   *   *   *   *   *   *   *

 7                          INDEX

 8

 9      EXAMINATION                                Page

10      BY MR. AUGHTMAN                              5

11

12      EXHIBITS                                   Page

13      PX 1 - Illustration                         81

14      PX 2 - Illustration                         82

15      PX 3 - Illustration                         83

16      PX 4 - Illustration                         86

17      PX 5 - TransAmerica policy                 116

18      PX 6 - TransAmerica policy                 117

19      PX 7 - TransAmerica Policy                 118

20      PX 8 - TransAmerica policy                 118

21

22

23
```

1          AUGUSTUS K. CLEMENTS, III, of

2     lawful age, having first been duly sworn,

3     testified as follows:

4                   EXAMINATION

5     BY MR. AUGHTMAN:

6     Q.   Would you state your full name for the Record,

7          please?

8     A.   Augustus K. Clements, III.

9     Q.   Mr. Clements, I believe you go by Gus; right?

10    A.   Right.

11    Q.   I'm Jay Aughtman.  I represent Wayne Russell,

12         and my firm represents Wayne Russell against

13         TransAmerica, yourself, and Jeff Caddell.

14         You've given depositions before, I know, so

15         you know how this process works.  But just as

16         a reminder, if I ask you a question that's

17         confusing or difficult to understand in any

18         way, please just ask me to rephrase it and I

19         will to the best of my ability.  If you do

20         respond to any question that I ask you, I will

21         assume that you understood my question.  And

22         she's going to write down everything we say.

23         Is that fair enough?

```
 1   A.   Correct.

 2   Q.   Now, speaking of depositions, tell me how many

 3        times you have given a deposition when you've

 4        been sued as an insurance agent?

 5   A.   I guess I've been involved in two or three

 6        depositions.

 7   Q.   I know you've been sued in the past in some

 8        New England cases, some by my firm.  I know

 9        you've given some depositions to some lawyers

10        at my firm.

11   A.   That's right.

12   Q.   Have you ever been deposed by any other

13        plaintiff's lawyers besides the Beasley firm?

14   A.   I don't think so.  I think everybody worked

15        for Jere Beasley.

16   Q.   Do you have any other cases pending against

17        you or the Clements Agency right now besides

18        this TransAmerica case?

19   A.   I have a case down in Mobile where one of my

20        agents down there -- I was sued because of

21        something that he may or may not have done.  I

22        think that case is still pending.

23   Q.   Is that the only two you're aware of currently
```

1         that are pending?

2    A.   Yes.

3    Q.   The one in Mobile, is the Clements Agency

4         named as a defendant?

5    A.   I don't know.

6    Q.   Obviously, you're saying the agent in Mobile

7         is named as a defendant?

8    A.   The agent and myself and the insurance

9         company.

10   Q.   Who is the other agent who is named as a

11        defendant?

12   A.   David Halviston.  He's not an agent anymore.

13        He was an agent.

14   Q.   And he worked through the Clements Agency?

15   A.   Uh-huh.

16             MR. WALKER:  You have to say yes.

17   A.   Yes.

18   Q.   Who is the corporate defendant in that case in

19        Mobile?

20   A.   The corporate defendant?

21   Q.   Yes.  Who is the insurance company being sued?

22   A.   New England.

23   Q.   Is it over what I call a vanishing premium

1        case?

2   A.   No.  This case is not.

3   Q.   What are the allegations in that lawsuit?

4   A.   This has to do with whether or not the agent

5        had a deal on the side with the insured that

6        was not copacetic, borrowing some money

7        perhaps from an insured.

8   Q.   Borrowing some money from an insured and this

9        agent Halviston sold him a policy at the same

10       time?

11  A.   No, really did not.  She was a client of his,

12       but he did not sell her a policy with those

13       funds or anything.  He just borrowed money

14       from her and didn't pay it back or hadn't paid

15       it back to my knowledge.

16  Q.   But you are named personally as a defendant?

17  A.   I think I am.  I had to give a deposition.

18  Q.   Who is the plaintiff's lawyer that took your

19       deposition?

20  A.   I can't remember his name.

21  Q.   Somebody down in Mobile?

22  A.   Yeah.  Somebody down the Mobile.

23  Q.   Did you give a deposition there?

```
 1    A.    No.   Here.

 2    Q.    Was Wally- representing you in that case?

 3    A.    Yes.

 4    Q.    What was your involvement in that situation?

 5    A.    None, zero, zilch.  I didn't even know about

 6          it.

 7    Q.    You were Halviston's supervisor or boss?

 8    A.    He was an agent of mine.  Yes.

 9    Q.    Have you ever -- I know you've given

10          depositions, but have you ever had to go to

11          trial in any case where you've been a

12          defendant?

13    A.    No.

14    Q.    Have they all settled?

15    A.    Correct.

16    Q.    Have you ever testified in trial in any

17          manner?

18    A.    No, not to my knowledge.

19    Q.    Have you ever been sued in any other case?

20          I'm not just including you as an insurance

21          agent?

22    A.    No.

23    Q.    Let me ask you this.  Have you ever sued
```

1       anybody?

2   A.  No.

3   Q.  Has the Clements Agency ever sued anybody?

4   A.  No.

5   Q.  Is it the Clements Agency?

6   A.  Correct.

7   Q.  Has it always been under that name?

8   A.  Since 1977.

9   Q.  Has the Clements Agency been named as a

10      defendant in any cases other than the ones my

11      firm has handled or the ones we have discussed

12      here so far?

13  A.  Not to my knowledge.

14  Q.  Have any of your agents outside the Montgomery

15      office been sued?

16  A.  In conjunction with some of these things you

17      mentioned, where I had to give depositions,

18      premium offset things with policies.

19  Q.  Premium offset?

20  A.  Right.

21  Q.  What agents to the best of your memory out of

22      your agency here in Montgomery have been named

23      as defendants at any time?

```
 1   A.   Only Lee Steinhelber (phonetic) and David
 2        Strawbridge to the best of my knowledge.
 3        Those are the two that I can recall.  They are
 4        not agents anymore, but they were.
 5   Q.   Did you fire them?
 6   A.   No.
 7   Q.   Did they leave voluntarily from the Clements
 8        Agency?
 9   A.   Yes.
10   Q.   Have you ever fired an agent out of your
11        agency for any type of misconduct?
12   A.   David Halviston, we released him.  The man in
13        Mobile.
14   Q.   Was that before or after the lawsuit was
15        filed?
16   A.   It was before the lawsuit was filed, but it
17        was after I found out about the allegations,
18        to the best of my knowledge.
19   Q.   Of him borrowing the money; right?
20   A.   Uh-huh.
21   Q.   The other two agents, Strawbridge and
22        Steinhelber, were they sued in cases involving
23        New England policies?
```

1   A.   Yes.  Premium offset things, little small

2        policies.

3   Q.   Those cases, did they go to trial?

4   A.   No.

5   Q.   You gave depositions in both of those cases?

6   A.   In some of them I did, a couple of them.

7   Q.   To the best of your memory, were the

8        allegations in those cases over the premium

9        offset concept?

10  A.   That's correct.

11  Q.   Is that what New England calls premium offset?

12  A.   Right.

13  Q.   You've heard it called vanishing premium,

14       haven't you?

15  A.   I've heard it called that.

16  Q.   What does TransAmerica call that concept?

17  A.   I don't know.

18  Q.   You've been in business since 1977 as the

19       Clements Agency; right?

20  A.   As the general agent or managing partner for

21       New England.  Correct.

22  Q.   I want to talk to you for a minute about your

23       work history.  I know you went to college at

1       Auburn, graduated in 1968?

2   A.  '64.

3   Q.  I'm sorry.  '64.  What did you -- give me your

4       employment history between '64 and '77.

5   A.  Well, '64 through '66, US Army, ROTC graduate,

6       artillery lieutenant.  Then I came back and

7       went to work with New England in the insurance

8       business, where I have been until now.

9   Q.  So from '68 from '77, you were an insurance

10      agent.  You weren't the New England general

11      agent though?

12  A.  That's correct.

13  Q.  What agency did you work through?

14  A.  I worked with my dad.

15  Q.  Did he have the New England general agency?

16  A.  That's correct.

17  Q.  What was the agency called during that period?

18  A.  I think it was just called New England Life,

19      A. Kirby Clements, Jr., CLU, general agent.

20  Q.  And in '77 you took over as general agent?

21  A.  No.  We became partners in '77, and he retired

22      in '83.

23  Q.  And in '77 it became the Clements Agency?

```
 1    A.    Yes.

 2    Q.    You've had an office here in Montgomery

 3          since '77 when you were managing partner;

 4          right?

 5    A.    Right.

 6    Q.    Have you had offices elsewhere?

 7    A.    We have agents in Panama City, Pensacola,

 8          Dothan, and Mobile.

 9    Q.    Do they have their own separate offices in

10          those cities?

11    A.    Yes, they do.

12    Q.    Do those offices say the Clements Agency?

13    A.    No.  They say different things.  They are just

14          agents of-- they might say Smith Financial

15          Services, et cetera.

16    Q.    And, obviously, when those agents sell

17          products through New England you get an

18          override; right?

19    A.    Yes.  We service their business and support

20          them.

21    Q.    Okay.  All right.  Now, I may be wrong about

22          this, but I have heard you are one of most

23          successful and productive New England agents
```

```
 1          in the country?
 2     A.   I don't know about that.
 3     Q.   You don't know about that?
 4     A.   Probably not.
 5     Q.   No question though you've run a successful
 6          business here in Montgomery; right?
 7     A.   Hopefully.
 8     Q.   How long has your relationship existed with
 9          TransAmerica?
10     A.   I've had a brokerage contract with
11          TransAmerica for probably 20 years.  I don't
12          know exactly.  I'm licensed with quite a few
13          companies.
14     Q.   And Wayne Russell is a client of Gus Clements,
15          personally; right?
16     A.   Yes.
17     Q.   You've handled his business yourself?
18     A.   I have a lot of it or most of it, I think, for
19          many years.
20     Q.   You say you've been licensed with TransAmerica
21          for about 20 years?
22     A.   I would say so.  Something like that.
23     Q.   And have you had to renew your license every
```

```
 1        year?
 2   A.   Either myself or TransAmerica renews it for
 3        me.  Different companies do it different ways.
 4   Q.   Do you have an idea of how many TransAmerica
 5        policies you've sold over the years?
 6   A.   Ten or twelve.
 7   Q.   And that would be during the whole time you
 8        have been licensed with them?
 9   A.   Uh-huh.
10   Q.   Is that a yes?
11   A.   Yes.
12   Q.   Out of those ten or twelve policies you've
13        sold, three of them were to Wayne Russell;
14        correct?
15   A.   Correct.
16   Q.   So that leaves us down to, roughly, seven to
17        nine other policies you've sold through
18        TransAmerica?
19   A.   Probably something like that.
20   Q.   Do you know who you sold those policies to?
21        Do you know the policyholders?
22   A.   I can think of some of them?
23   Q.   Can you tell me who they are?
```

1           MR. STEWART:  I would object to

2                that.

3           MR. AUGHTMAN:  Okay.

4    Q.   You can answer.

5           MR. STEWART:  Let me state my

6                objection for the Record.  I

7                think that's proprietary

8                information to TransAmerica and

9                that that would be a matter

10               that should be taken up with

11               the court before that

12               information ought to be

13               disclosed and --

14   A.   I really don't remember who they are.

15          MR. STEWART:  -- I would request

16               Mr. Clements not to provide the

17               information.

18   A.   I really don't know who they are anyway, to

19        tell you the truth.

20   Q.   But sitting here right now, you can't tell

21        me --

22   A.   I can't think of any of them that we have

23        written really.  I know we've done some.

1   Q.   Are they all clients here in Montgomery?

2   A.   Some of them might be in the outlying areas.

3        I'm not sure.  Most of my personal business is

4        in this area.  Although, some of it might be

5        in Auburn or Dothan.

6   Q.   And to make sure that we're clear, I was

7        referring to TransAmerica policies that you

8        personally would have sold.  Is that what

9        we're talking about?

10  A.   That's correct.

11  Q.   Are there other agents in your office --

12       strike that.  Have there been other agents in

13       your office since 1977 who have been licensed

14       to sell TransAmerica products also?

15  A.   I'm sure there have been.

16  Q.   Are you aware if any have been sold, any

17       TransAmerica policies that have been sold by

18       other agents in your agency?

19  A.   I would assume so, because the agents are

20       licensed with different companies.

21  Q.   And, certainly, your agency --

22  A.   We can't keep them from doing that.

23  Q.   Certainly your agency would have those

1         records; right?

2    A.   No.  My agency would not have those records.

3         My agency only keeps New England records.  The

4         other business that the people do is done --

5         the records are maintained on their own.

6    Q.   Let me make sure I'm clear about that.  If a

7         current agent you have right now licensed with

8         TransAmerica sells a TransAmerica policy, no

9         records concerning the policy or that sell are

10        kept within your office?

11   A.   That's correct.

12   Q.   No records or otherwise are kept on a computer

13        system at your office?

14   A.   I receive no compensation for it.  Agents can

15        be licensed with different companies, and they

16        deal directly -- I'm only a general agent for

17        New England.

18   Q.   I understand?

19   A.   So I don't have records of other agents'

20        dealings.

21   Q.   I guess, though, since you are the managing

22        partner and you really own the business over

23        here at the Clements Agency, you certainly

```
 1            keep records on the dozen people that you sold
 2            TransAmerica policies to yourself, wouldn't
 3            you?
 4    A.      Yes.
 5    Q.      And these other agents, though, where would
 6            they keep these records, or do you know, on
 7            TransAmerica?
 8    A.      They just keep them in their own files.  A lot
 9            of them have their own secretaries.  They are
10            basically independent contractors.
11    Q.      And you make no override or no commission
12            whatsoever if one of your agents sells a
13            TransAmerica product?
14    A.      None.  You are correct.
15    Q.      And, obviously, you make money on a
16            TransAmerica policy when you sell it though?
17    A.      That's correct.
18    Q.      Do you make a commission?
19    A.      Yeah.
20    Q.      Go back to the seven to nine additional
21            TransAmerica policies you have sold yourself.
22            Have you sold any of those policies on the
23            premium offset or vanishing premium concept?
```

1             MR. WALKER:   Object to the form.

2    A.    I don't remember. I'd have to go back and

3          look.  I don't know.  I haven't sold any

4          lately.  I don't know.

5    Q.    Do you know if you sold any of those seven to

6          nine policies as single-pay policies?

7             MR. WALKER:   Object to the form.

8    A.    Not to my knowledge.

9    Q.    But you're just not sure sitting here; right?

10   A.    I'm really not.

11   Q.    The reason I'm asking that is, you know, Wayne

12         Russell bought one policy, in his words, based

13         on the fact he'd only pay for ten years.  And

14         he bought two other policies based on the fact

15         that he would make single premium payments.

16         You're aware of that; right?

17   A.    I'm aware of that.

18   Q.    Have you ever been sued by one of your

19         TransAmerica policyholders other than Wayne

20         Russell?

21   A.    No.

22   Q.    And do you know if any of your other agents

23         have?

1    A.    I do not.

2    Q.    Did you tell me you are a CLU?

3    A.    Uh-huh.

4    Q.    Is that a yes?

5    A.    Yes.  Excuse me.

6    Q.    Do you have any other licenses or

7          designations?

8    A.    No.

9    Q.    What did you get your degree in at Auburn?

10   A.    Business.

11   Q.    And when did you receive your CLU designation?

12   A.    Probably, I don't know, 1970.  Maybe '72.  I'm

13         not sure, but right along in there.

14   Q.    And you had to study and take tests and work

15         to get that designation; correct?

16   A.    Correct.

17   Q.    And that's something that's recognized within

18         the insurance industry as noting you as being

19         maybe a notch above somebody who doesn't have

20         a CLU; right?

21   A.    It means that you have, at least at some point

22         in time, have had some knowledge about the

23         business.

```
 1   Q.   It certainly states that you took it upon
 2        yourself to at least try and acquire
 3        additional knowledge above and beyond what's
 4        required for an agent in the state of Alabama?
 5   A.   Correct.
 6   Q.   Have you ever had your state of Alabama
 7        insurance license revoked?
 8   A.   No.
 9   Q.   Have you ever been on probation with the
10        Alabama Department of Insurance?
11   A.   No.
12   Q.   And I guess you've never had your license
13        suspended either?
14   A.   Huh-uh.
15   Q.   Is that no?
16   A.   I mean no.
17   Q.   Have you ever been licensed in any other state
18        besides Alabama?
19   A.   Yes.  I'm licensed in, I think, Florida and
20        Georgia.
21   Q.   Would those be nonresident licenses?
22   A.   Correct.
23   Q.   You just get licenses in those states
```

1           basically by the fact that you passed the

2           Alabama insurance exam?

3     A.    Except that now you have to do some form of

4           continuing education to maintain your license

5           in that state.

6     Q.    And you're doing that; right?

7     A.    Yes.

8     Q.    How many -- do you have any employees at the

9           Clements Agency?

10    A.    Yes.

11    Q.    How many employees do you have?

12    A.    I think six.

13    Q.    What kind of job titles do those people have?

14    A.    Clerical.  Office manager, new business clerk,

15          secretary, receptionist.

16    Q.    Okay.   And the agents who work through the

17          Clements Agency, what kind of relationship do

18          you have with them?  Let me ask you that.

19    A.    They are independent contractors.  They are

20          contracted with New England through me.

21    Q.    Are all New England agents licensed through

22          you in the state of Alabama?

23    A.    No.

```
 1    Q.   You're not the only general agent?

 2    A.   I'm not. - In Birmingham there is one.

 3    Q.   Would that be Mr. Conwell?

 4    A.   No.  It would be Mr. Pittman, David Pittman.

 5    Q.   Mr. Conwell is general agent for TransAmerica?

 6    A.   I don't know what his title is there.  He is

 7         with TransAmerica.

 8    Q.   Is it Bill Conwell?  Do you know Bill Conwell?

 9    A.   I don't know him.  I don't think I've ever met

10         him.  I've talked with him over the phone.

11    Q.   Have you talked with him about this case?

12    A.   No.

13    Q.   Now, this suit has been pending for a while

14         against you and TransAmerica and Jeff Caddell,

15         but let me ask you this.  Since the suit was

16         filed, have you had any conversations with

17         Jeff Caddell about this case or the facts

18         surrounding this case?

19    A.   The only conversation that I've had with him

20         at all, because I think he was not with

21         TransAmerica at that time, is he called me on

22         the phone a time or two and said, you know, we

23         ought to get together and discuss the facts of
```

```
 1          this case.  But we never did.
 2    Q.    Was that the only thing that was said in that
 3          conversation?
 4    A.    Yes.
 5    Q.    Did you ever call him?
 6    A.    Not to my knowledge.  He called me.
 7    Q.    Did he indicate why he was wanting to get
 8          together and discuss the facts?
 9    A.    No.  I don't think he did.  He represents
10          another insurance company, and I think he was
11          going to call on me anyway to see if he could
12          get some brokerage business or something.  I'm
13          not even sure what company he's with now.  I
14          don't know.
15    Q.    Have you discussed the facts of this case in
16          any way with anyone from TransAmerica?
17    A.    No.
18    Q.    Never?
19    A.    No.
20    Q.    Now, Wally Walker is your lawyer?
21    A.    Correct.
22    Q.    And he's your only lawyer in this case?
23    A.    Correct.
```

```
 1    Q.   Have you talked with this guy right here,
 2         Charlie Stewart?  Have you talked with him
 3         about the facts of this case?
 4    A.   No.
 5    Q.   Have you talked with the gentlemen sitting
 6         next to him from Los Angeles?
 7    A.   No.  I just met him five minutes ago.
 8    Q.   What about Steve Whitehead down there?
 9    A.   No.  I just met him five minutes ago.
10    Q.   So other than that conversation with Jeff
11         Caddell, the one telephone call, and, of
12         course, your lawyer, Wally, you haven't
13         discussed this case with anybody?
14    A.   Not to my knowledge.
15    Q.   How about anybody in your office?
16    A.   No.
17    Q.   Now, your brother is a broker here in town?
18         Is it your brother?
19    A.   Yes.
20    Q.   What's his name?
21    A.   George.
22    Q.   Which brokerage firm is he with?
23    A.   Robinson Humphrey.
```

```
 1    Q.    Have you discussed this case with him?

 2    A.    No, I have not.  He doesn't know anything

 3          about it to my knowledge.  He doesn't even

 4          know it exists to my knowledge.

 5    Q.    Is he licensed to sell some insurance?

 6    A.    I assume he has his insurance license.  I

 7          really don't even know.  Most brokers do now.

 8          He doesn't actively sell insurance to my

 9          knowledge.

10    Q.    Mr. Clements, you're a longtime resident of

11          Montgomery?

12    A.    Yes.

13    Q.    Do you have relatives living here in

14          Montgomery county over the age of 19?

15    A.    Yes.

16    Q.    Is this going to be an extensive list?

17    A.    Yes.

18    Q.    Are we taking dozens of people you're related

19          to in Montgomery?

20    A.    Probably 20 or 30 or something.

21    Q.    I'm going to let your lawyer, if he will,

22          provide me with a list of those people who you

23          are related to instead of us doing through all
```

1         that.

2    A.   Okay.

3    Q.   How many brokers do you have licensed through

4         the Clements Agency right now or agents,

5         whatever you call them?

6              MR. WALKER: Object to the form.

7    A.   You mean how many agents does the Clements

8         Agency have?

9    Q.   Yes, sir.

10   A.   20, 25.

11   Q.   Is that more than usual or less than usual

12        over the last 20, 25 years, or can you say?

13   A.   Well, 25 years ago we probably we didn't have

14        quite that many.  But it hasn't changed too

15        much in the last three or four years probably.

16   Q.   And I assume a lot of agents come and go

17        through the agency?

18   A.   Yes.

19   Q.   Is it a pretty high turnover rate?

20             MR. WALKER:  Objects to the form.

21   A.   It depends from year to year.

22   Q.   What, other than when an agent gets

23        licensed -- well, strike that.  What does it

1       take for an agent to get licensed through the

2       Clements agency?  What does he have to do or

3       what qualifications does he or she have to

4       meet?

5  A.   They have to take the state insurance exam.

6       And it involves a four-and-a-half-day course.

7       It's taught up here at the Holiday Inn in

8       Prattville, and they have to take the state

9       insurance exam.  Then they can get licensed,

10      fill out some forms, and do the normal equifax

11      reports and credit checks and et cetera.

12  Q.  Let me ask you this.  What -- let's say last

13      year for the year 1998.  What kind of gross

14      revenues the Clements Agency have?

15              MR. WALKER:  I'm going to object and

16                  instruct him not to answer.

17                  I'm not going to let him answer

18                  financial, and I fail to see

19                  the relevance of that.

20  Q.  I need to ask you a few -- I think Wally

21      called it financial questions.  We'll let him

22      lodge his objections.  How much -- you've

23      already told me that you have a successful

```
 1        business.  What kind of gross pay or revenues

 2        have you personally received, say, in 1998?

 3                    MR. WALKER:  Object the form and

 4                        instruct you not to answer.  I

 5                        think that's beyond the scope

 6                        of relevancy and not

 7                        discoverable.  So I'm going to

 8                        instruct you not to answer.

 9                    THE WITNESS:  Not to answer.  Okay.

10    Q.    How much in revenue or commissions have you

11        made over the years from TransAmerica?

12                    MR. WALKER:  I will let him answer

13                        the question if you will break

14                        it down to commissions, if he

15                        knows.

16                    MR. AUGHTMAN:  Okay.  That's really

17                        what I was asking, if it's

18                        commissions.

19    A.    My commissions from TransAmerica over the

20        years, I would say 50- or $60,000, something

21        in that range.

22    Q.    Total?

23    A.    Total.
```

```
 1                    MR. STEWART:  I object to it unless
 2                       he's got -- I just want to
 3                       state my objection on the
 4                       Record so when this comes up,
 5                       if he's guessing or speculating
 6                       and that's the basis of my
 7                       objection.  If he feels like
 8                       that's a pretty solid figure
 9                       which he has a good basis to
10                       answer the question, then
11                       that's another matter.
12    A.   Well, I really don't know exactly.  I'd have
13         to go back.  Different companies do it
14         different ways with commissions, just because
15         you have a big premium on a policy does not
16         necessarily mean it's all commissionable, et
17         cetera, et cetera.  And it's pretty hard to
18         figure out how much you're getting paid on
19         certain cases.  So I really do not know, but
20         if I had to pull something out of the air --
21                    MR. WALKER:  Don't pull something
22                       out of the air.
23                    MR. STEWART:  I don't want you
```

```
 1                         speculating over the 20 years
 2                         you've been writing for
 3                         TransAmerica.  If you know, you
 4                         know.  If you don't, you
 5                         don't.
 6    A.   Well, I do not know.
 7    Q.   Let me ask you this.  Maybe you'll know this.
 8         How much did you make on commissions or the
 9         Clements Agency make in the sale of these
10         policies to Wayne Russell?
11    A.   I do not know.
12    Q.   You have no idea?
13    A.   No.
14    Q.   Do you have any idea Jeff Caddell?
15    A.   I do not know.
16    Q.   Do you have any idea how much Conwell and
17         Associates made?
18    A.   No.
19                    MR. WALKER:  If it will help you
20                    with your questions, Jay, the
21                    Clements Agency is not an
22                    entity.  It is a DBA.
23    Q.   Would -- obviously, you made some money off
```

1        the policy.  You made some commissions?

2   A.   Correct. -

3   Q.   Jeff Caddell, I would assume, made some

4        commissions or he wouldn't have been involved?

5   A.   I don't know how his compensation is set up.

6        He was an employee of the company.  He was not

7        an agent.  But I'm sure he was compensated in

8        some form or fashion or he wouldn't be

9        working.

10  Q.   Did you know do you know that he was an

11       employee of the company?

12  A.   Did I know that?

13  Q.   That's what I'm saying.  Did you know that for

14       a fact?

15  A.   Yes.

16                  MR. STEWART:  Employee of what

17                      company?

18                  THE WITNESS:  TransAmerica.

19  Q.   Do you know what the relationship with Conwell

20       and Associates was with Jeff Caddell?

21  A.   No, I do not.

22  Q.   Do you know the relationship between Conwell

23       and Associates and TransAmerica?

1   A.   Not specifically, except they somehow or

2       another represent the TransAmerica.  I don't

3       know the specifics of the relationship, and I

4       know nothing of the compensation.

5   Q.   But you know that you sold Wayne Russell a

6       five-million-dollar policy, a

7       two-and-a-half-million-dollar policy, and a

8       half-million-dollar policy with TransAmerica;

9       correct?

10   A.   That's correct.

11   Q.   And I'm going to ask you this, kind of asking

12       and refreshing your memory all at once.  The

13       half-million-dollar policy, if you will

14       remember, was paid for with, roughly, a

15       $73,000 single payment.  Does that sound

16       familiar?

17          MR. WALKER:  Object to the form.

18   A.   I think to my knowledge, yes.  I don't know

19       the specifics, but I think that's -- to the

20       best of my knowledge, that's approximately

21       correct.

22   Q.   And the $5,000,000 policy had a onetime,

23       $350,000 payment applied to it.  Does that

```
 1            sound familiar?
 2                    MR. WALKER:   Object to the form.
 3      A.    I think it was 337, but in that range.
 4      Q.    Okay.  And the two-and-a-half-million-dollar
 5            policy annual premium payments are being made
 6            on it to the tune of, roughly, $23,000 a
 7            year.  Does that sound right?
 8      A.    I'm not sure on that.
 9      Q.    Well I'll represent to you --
10      A.    But it could well be.
11      Q.    And if the documents reflect that, you have no
12            problem with that; right?
13      A.    Correct.
14      Q.    All right.  So now we've discussed how big the
15            policies are in terms of face value, how much
16            premiums are being paid.  Does that help
17            refresh your memory on how much commission you
18            made off these policies?
19      A.    Not really, because the single premium ones,
20            the compensation would be totally different.
21            I would have to go back and research it.
22      Q.    It's a different commission structure, isn't
23            it?
```

1    A.    Yes.  It's not nearly anywhere on the face

2           amount, full amount of the premium.  That's

3           some kind of -- I don't know exactly how it

4           works.

5    Q.    Well, that was going to be my next question.

6           Could you tell the jury how the commission

7           structure works on those two single-pay

8           policies?

9    A.    No, I could not.

10    Q.    Could you tell the jury how --

11    A.    It has to do -- excuse me for interrupting.

12    Q.    That's all right.

13    A.    It has to do with -- the commissionable

14           premium in a single-premium type contract is

15           much less than the total amount that's paid.

16           And it's an actuarial calculation, and I don't

17           know how they come up with that.  It's much

18           less.  The commission on the annual-premium

19           policy, the 23,000, I would say would be

20           approximately a 40 percent commission the

21           first year, and then maybe 2 percent

22           thereafter or something like that.

23    Q.    And when you're talking about --

```
 1   A.   And, again, that's to the best of my

 2        knowledge.

 3   Q.   When you talk about the commission structure,

 4        are you talking about commission structure for

 5        Gus Clements?

 6   A.   Yes.

 7   Q.   Do you know what the commission structure

 8        would have been for Jeff Caddell or --

 9   A.   No, I have no idea how they are compensated.

10   Q.   -- Conwell and Associates?

11                  MR. WALKER:   Let him finish.

12   A.   I apologize.

13   Q.   That's okay.

14   A.   No.   I don't know anything about that.

15   Q.   In your experience in, what, almost now 40

16        years in the insurance business --

17   A.   Well, 33.

18   Q.   I'm sorry.   33 years in the insurance

19        business, you would certainly believe that

20        Jeff Caddell and Conwell and Associates

21        received some type of compensation for this?

22                  MR. STEWART:   Object to the form,

23                       what he believed.
```

```
 1                    MR. WHITEHEAD:   Object to the form.

 2    A.    I'm of the opinion that they would receive

 3          some compensation.   I don't have any idea how

 4          it's structured.

 5    Q.    You have records that show how much you made

 6          on selling this policy; right?

 7    A.    I'm certain I do someplace or that I could get

 8          them from somewhere.

 9    Q.    Give me your business address please?

10    A.    847 South McDonough Street.

11    Q.    Have you been at that address for a number of

12          years?

13    A.    Yes, about 25 years.

14    Q.    What is your home address?

15    A.    Well, right now, it's apartment C-16 on Zelda.

16    Q.    Building a new house?

17    A.    No, living in an apartment.

18    Q.    Where was your previous address before the

19          apartment on Zelda?

20    A.    4403 Silver Lane.

21    Q.    Are you still married?

22    A.    I'm divorced.

23    Q.    Recently or --
```

```
 1   A.   Eight or nine months ago.

 2   Q.   What is your former wife's name?

 3   A.   Mary Ann.

 4   Q.   Does she still go by Clements?

 5   A.   Yes.

 6   Q.   Is that the only marriage you've had?

 7   A.   Correct.

 8   Q.   Have you ever been arrested for anything?

 9   A.   No.

10   Q.   Have you ever had any trouble with authorities

11        whatsoever?

12   A.   Speeding tickets.

13   Q.   Beyond traffic violations?

14   A.   No.

15   Q.   Now, let's talk about the sale of these

16        policies to Mr. Russell.  Do you have a

17        specific recollection of selling these three

18        policies to him?

19   A.   Well, I mean, I have an -- I don't know how

20        specific it is, but I recollect that we have

21        been doing business together for years and

22        we've done a lot of policies at different

23        times, and I recollect that we did this.
```

```
 1    Q.    And I'm sure before today before this morning,
 2          you've had an opportunity at your convenience
 3          to review any documents regarding these
 4          TransAmerica policies, haven't you?
 5    A.    I haven't got many documents on it, but I
 6          looked at what I had.
 7    Q.    Did you look at those recently?
 8    A.    No.
 9    Q.    What have you maintained, or what did you
10          maintain document wise, in regard to these
11          Wayne Russell TransAmerica policies?
12    A.    We had some illustrations that I know we had
13          used, and I sent them all to you or someone.
14    Q.    Did you maintain copies of the actual
15          policies?
16    A.    No.
17    Q.    Is that standard for you to not maintain the
18          policies?
19    A.    That is standard.
20    Q.    Obviously, you provide the policyholder with a
21          copy of the TransAmerica policies?
22    A.    Yes.
23    Q.    Does TransAmerica maintain a copy of Wayne
```

1       Russell's policies?

2   A.   I don't know.

3   Q.   But you're not required to?

4   A.   No.

5   Q.   Were you required -- I'm talking about

6        specifically in these sales.  Were you

7        required to maintain copies of the computer

8        illustrations?

9   A.   No.

10  Q.   But you say you did?

11  A.   Some of them.  We looked at an awful lot of

12       different illustrations at different times

13       over the years.

14  Q.   I'm just talking about these TransAmerica

15       policies?

16  A.   I know I'm talking about these, too.

17  Q.   You've looked at -- to clarify that, you've

18       looked at a lot of illustrations over the

19       years with Wayne Russell regarding

20       TransAmerica policies?

21  A.   We looked at a lot of different illustrations

22       with TransAmerica and other companies at that

23       time to the best of my knowledge.

1    Q.    What year do you remember that these policies
2          were sold to Wayne Russell?
3    A.    I think it was '87.  I don't know.  I'm not
4          sure when it was.
5    Q.    Let me ask you this.  Clearly, Mr. Clements,
6          you have no way of remembering everything that
7          you said or that Wayne Russell said to you
8          when these TransAmerica policies were sold.
9          There's no way to remember everything, is
10         there?
11   A.    Correct.
12   Q.    Now, tell me, if you can, when do you remember
13         first meeting with Wayne Russell about any of
14         these TransAmerica policies?
15   A.    Well, like I said, Wayne and I have actually
16         been doing business since 1967 or way back,
17         and we did business over the years.  These
18         TransAmerica policies we did, I don't remember
19         the year.  If you tell me, I'll agree with
20         you.  I don't remember the year to tell you
21         the truth.  I've got it in my file.  I thought
22         it was '87, maybe it was '84.
23   Q.    All I'm asking is what you remember?

```
 1   A.   Sure.  I understand.  I'll be glad to tell

 2        you, but I don't remember.

 3   Q.   Okay.  And that's fine.  That's my point.  If

 4        you don't remember, that's perfectly fine.

 5        Well, let me ask you a different way.  Do you

 6        remember which policy you sold to him first?

 7        And I'm talking about the TransAmerica

 8        policies?

 9   A.   I think we did them all about the same time.

10        They were all done at the same time, I

11        believe.  Or within a matter of weeks of each

12        other.

13   Q.   All right.  Did you approach Wayne Russell

14        about purchasing these TransAmerica policies?

15   A.   To the best of my knowledge, Wayne and I

16        visited off and on about his policies on many

17        occasions, and he was asking about these

18        survivorship-life policies or last-to-die

19        policies and wanted to look at some figures

20        and numbers and on them.  It could have well

21        been reviewing some of his other policies.

22        I'm not sure.  And I provided him with what I

23        thought at that time in my opinion to be the
```

```
 1              best thing for him to do, to get the best bang

 2              for his buck, which he's always interested in

 3              doing.  I don't blame him.  He is an astute

 4              businessman.

 5    Q.        Same as you; right?

 6    A.        I think he's a little better than I am.

 7    Q.        You think so?

 8    A.        I think so.

 9    Q.        You don't contend, though, that Wayne Russell

10              knows more about these TransAmerica insurance

11              policies than Gus Clements, do you?

12    A.        No.

13    Q.        Certainly, you would have the superior

14              knowledge in that regard; right?

15                   MR. WALKER:   Object to the form?

16    A.        I know how the look at the illustrations that

17              are prepared by the company, and look at the

18              interest rates and understand the way they

19              are -- well, to an extent understand how to

20              read them.  I don't know exactly all the

21              actuarial implications that go into them.  I

22              wouldn't have a clue.

23    Q.        Me either.  That brings up the subject I want
```

```
 1          the ask you about.  Now, you do remember
 2          utilizing some computer illustrations in
 3          selling these three policies to Wayne?
 4    A.    Yes.
 5    Q.    Where did you get those illustrations?
 6    A.    I got them from Jeff Caddell at TransAmerica.
 7    Q.    Gus Clements did not run those from his
 8          computer?
 9    A.    Absolutely not I don't have any of the
10          TransAmerica software.  Every one I got, I got
11          from TransAmerica.
12    Q.    Is that why Caddell had to get involved in
13          this sale, because he had to provide the
14          illustrations?
15    A.    Yes.  He's a field rep for TransAmerica, and I
16          think Wayne, also, wanted to meet with him, in
17          addition to me, so we could clarify anything
18          on the illustrations that I didn't
19          understand.  They're not New England policies.
20          They're TransAmerica contracts.  And we wanted
21          to make sure that whatever was on those things
22          was to the best of our knowledge correct and,
23          again, to be the best deal for Wayne.  And I
```

1         wanted the guy there, too, to back that up.

2    Q.   And, certainly, you took those illustrations

3         on these policies and showed them to Wayne?

4    A.   I did.

5    Q.   And went over them with Wayne?

6    A.   Yes.

7    Q.   Now, at the point you're showing Wayne these

8         illustrations, you didn't have copies of any

9         of these three policies at that time, did you?

10   A.   No.  We hadn't applied for them yet.

11   Q.   Nor did you have like what I call a sample

12        policy to show him either, did you?

13   A.   Not to my knowledge.

14   Q.   Basically, it was you Jeff Caddell and the

15        illustrations and Mr. Russell?

16   A.   Correct.

17   Q.   Did you use any kind of brochures or other

18        written document from TransAmerica at that

19        time to show Mr. Russell, or did you just use

20        the illustrations?

21   A.   I don't know whether Jeff Caddell had some

22        company material with him or not.  I don't

23        remember.  He may have, illustrating some of

1          the their history and what have you.  He may

2          have.  I think Wayne did want to look at some

3          financial information -- and I don't blame

4          him -- about the companies and how well

5          they've done and their stability and assets

6          and all that.  I didn't have that information,

7          but I think Jeff did provide him with some of

8          that, in addition to the illustrations.

9     Q.   I want to make sure I'm clear.  The only thing

10         prior to -- to the best of your memory now,

11         the only thing prior to the actual issuance of

12         the physical policies that you remember

13         showing and giving Wayne Russell were the

14         illustrations?

15    A.   That's correct.

16    Q.   And you would agree with me that those

17         illustrations helped convince Mr. Russell to

18         buy these policies?

19              MR. WALKER:  Object to the form.

20              MR. STEWART:  Object to the form.

21    A.   I think, to the best of any knowledge, again,

22         Wayne knew sort of what he was looking for,

23         and he did want me to look for that.  And I

```
 1          went to TransAmerica and other companies, and
 2          these illustrations seemed to be, to the best
 3          of my knowledge at that time, where he could
 4          get the best deal for his money to accomplish
 5          his objectives.
 6     Q.   You used those illustrations to sell these
 7          policies, didn't you?
 8                   MR. WALKER:   Object to the form.
 9     A.   Yes.
10     Q.   And there's nothing wrong with doing that as
11          far as you know, is there?
12     A.   It's only way we have to do it.  You have to
13          look at a projection and an illustration and
14          get them from different companies and make
15          your best judgment, and that's about all you
16          can do.
17     Q.   When you were showing these illustrations to
18          Wayne did, to the best of your memory, he
19          appear to listen to what you had to say about
20          those illustrations?
21     A.   Yeah.
22     Q.   Where were y'all meeting?
23     A.   At his office.
```

```
 1    Q.    Were you sitting in his personal office?

 2    A.    I think mostly we sat in his conference room.

 3    Q.    Okay.  And you point to things on the

 4          illustration and go over numbers on the

 5          illustration?

 6    A.    I'm sure we did.

 7    Q.    And do you remember Wayne asking you any

 8          questions about the illustrations?

 9    A.    I'm sure he did.

10    Q.    But you don't remember specifics?

11    A.    I don't remember what they specifically were,

12          but I'm sure he did.  Like I say, he's

13          interested in -- he does a good job in his

14          business and wants to know what he's buying.

15    Q.    In response to whatever questions he asked

16          you, I'm sure that you gave him an answer?

17    A.    Either myself or Jeff Caddell was with me most

18          of the time or all the of the time about the

19          illustrations and/or the company,

20          TransAmerica, itself.

21    Q.    And you remember Mr. Russell -- not to belabor

22          this -- but you remember Mr. Russell sitting

23          there and listening to what y'all had to say?
```

1    A.    Yes.

2    Q.    Paying attention?

3    A.    I do.

4    Q.    What you were telling him about these policies

5          and about the illustrations at this time, you

6          certainly expected him to rely on what you

7          said?

8                MR. WALKER:  Object to the form.

9    A.    Well, I was doing the very best I could with

10         the information that I had, yes.  I have no

11         reason to think he would think I was not

12         telling the truth.  I was telling the truth

13         about it.

14   Q.    I'm not saying you weren't.  Let me make sure

15         now.  What I was asking though is you expected

16         Mr. Russell to rely on what you were telling

17         him at this meeting; right?

18                MR. WALKER:  Object to the form.

19                MR. STEWART:  Object to the form.

20   A.    Yes.  I expected him to believe what I was

21         showing him on the illustrations was what it

22         was.

23   Q.    He had -- Mr. Russell had entrusted you to

```
 1          handle, from what I understand, all of his
 2          insurance business, his life insurance
 3          business, for a number of years, hasn't he?
 4                   MR. WALKER:  Object to the form.
 5     A.   That's true to the best of my knowledge.  Now,
 6          I don't know if he has other insurance or
 7          not.  I don't know.
 8     Q.   How many meetings do you remember having total
 9          on these three TransAmerica policies with
10          Wayne Russell?
11     A.   I would say three or four.
12     Q.   Total for all three policies; right?
13     A.   Yes.
14     Q.   Where did those meetings take place other than
15          his office?
16     A.   I think that's the only place I can remember.
17     Q.   He never came to your office?
18     A.   I don't recall it if he did.  He may have.  I
19          don't think so.  And I think Jeff Caddell
20          maybe went out there and visited with him one
21          time even when I wasn't present to go over
22          further some things, as I recall, with Wayne.
23     Q.   Do you know when that occurred?
```

```
 1   A.   They all occurred about the same time.
 2   Q.   Any reason why you wouldn't have gone out
 3        there with Jeff?
 4   A.   I don't think I was in town that day or
 5        something and Jeff was.
 6   Q.   But as far as a date, you don't know when it
 7        would have been happened?
 8   A.   No.  I don't know what date it was.  It was
 9        all about the same time.  We were looking at
10        all of this stuff approximately the same time
11        frame.
12   Q.   Okay.  Now, you've already said to the best of
13        your memory you remember three or four
14        meetings with Wayne.  Let's break it down to
15        make it a little more simple.  Tell me,
16        Mr. Clements, if you can, what you remember
17        specifically telling Wayne about the
18        $5,000,000 policy, anything that you can
19        remember specifically telling him at any
20        time.
21   A.   The only thing I can remember telling him at
22        that time was we had decided -- he had decided
23        that maybe this would be something that he
```

1      would want to do and wanted my to get him the

2      best policy that I could to accomplish his

3      objective.  And we looked several different

4      companies.  I don't remember how many.  It

5      might have been Hartford, and, certainly,

6      TransAmerica was one of the ones we looked

7      at.  We looked at it different ways, I think,

8      how much premium here, how much premium

9      there.  I don't remember exactly, but it was

10     my opinion at that time that TransAmerica

11     provided the best -- gave him the best deal

12     for his premium dollars.

13  Q. I understand that's your opinion, like you

14     just said.  Really, what I was asking is what

15     do you remember specifically telling or saying

16     to Wayne Russell about the 5,000,000?

17  A. I just showed him what was on the illustration

18     for the 5,000,000, and I think we looked at

19     some other companies' illustrations, also.

20     And this one, for the same interest rates and

21     comparing them, appeared to be the best thing

22     for him.

23  Q. Did you use those words that you just said?

```
 1   A.   Yeah, to the best of my knowledge, that's

 2        exactly what I said.  I still feel that way.

 3   Q.   When you used those words, were you talking

 4        about the TransAmerica illustration or one of

 5        these other companies?

 6   A.   The TransAmerica illustration.

 7   Q.   Anything else?

 8   A.   No.

 9   Q.   What did Wayne Russell say to you about the

10        $5,000,000 policy?

11   A.   He said, is this what you recommend; is this

12        what you think is the best thing for me to

13        do?  And I said, yes, I do; I feel that way.

14        And I had the back up -- we had Jeff Caddell

15        was there to explain whatever he wanted -- I

16        forgot what all we looked at.  Again, it was

17        all based on a certain premium, and a certain

18        illustration and interest rates and comparing

19        it with other companies that offer the same

20        products.  That's all you can do.

21   Q.   On the $5,000,000 policy, you remember

22        Mr. Russell stating to you that he only wanted

23        to make one initial lump-sum payment on that
```

```
 1        policy?
 2   A.   I do.
 3   Q.   Do you remember how much he told you he wanted
 4        to pay?
 5   A.   I think it was the 337,000, because we had
 6        those dollars in other policies.
 7   Q.   That's what I'm working up to.  Did -- but
 8        Wayne didn't say, I want to pay $337,000.  He
 9        said I want to make one payment, how much is
10        it going to cost me.  That's what he said,
11        isn't it?
12   A.   And how much can we get for that.
13   Q.   Did it fall in Gus Clements' lap to figure out
14        how much coverage and how much premium would
15        be required?
16   A.   Well, I got the illustrations from
17        TransAmerica and other companies.  They do the
18        calculations.  I couldn't tell you.  It's
19        computer illustrations and projections.
20   Q.   And that's on TransAmerica software?
21   A.   Certainly.  I don't have any TransAmerica
22        software.  I got it all from Birmingham.
23   Q.   Now, this meeting we're discussing right now,
```

```
 1            where Wayne said he wanted to pay one lump-sum

 2            payment, you didn't have the illustrations at

 3            this point, did you?

 4    A.      No.

 5    Q.      And tell me then what happened after that

 6            meeting.  What was your next step in securing

 7            this?

 8    A.      I called several different companies and got

 9            the illustrations.

10    Q.      TransAmerica being one of them?

11    A.      That's correct.

12    Q.      Did you call TransAmerica, or did you call

13            Jeff Caddell?

14    A.      I called Jeff Caddell.

15    Q.      You already knew him at this time?

16    A.      Right.  That's what he does.  He's a field rep

17            for them.  He goes around calling on producers

18            all over, I guess, the state.  I'm not sure

19            what his territory is -- was.

20    Q.      What did you say to Jeff when you called him?

21    A.      I gave him Wayne's date of birth and the

22            approximate amount of the premium and told him

23            what we wanted to do.  We wanted to try to
```

```
 1        make a single premium and see how much
 2        insurance we could get and how long it would
 3        run based on the current interest rates, et
 4        cetera.  I got an illustration.  That's what
 5        we always do.
 6    Q.  How did you receive that illustration.  Did
 7        Jeff deliver it, fax it, or mail it?
 8    A.  To the best of my knowledge, he brought it
 9        with him.  He came down here and brought it
10        with him.
11    Q.  Is that because you had an appointment set up
12        with Wayne?
13    A.  Yes.
14    Q.  At this time, were you going to see Wayne
15        about just the $5,000,000 policy?
16    A.  I don't remember.  There was three of them
17        done right along in there.  I don't remember
18        whether we did it all at the same time or had
19        different meetings.  I couldn't tell you.
20    Q.  All right.
21    A.  I think they were all done fairly close at the
22        same time.  We probably used the same physical
23        exam and all for all of them.
```

1  Q.  Did you already know how to explain the

2      TransAmerica computer illustration, or did

3      Caddell have to show you how to do it?

4              MR. WHITEHEAD:  Object to the form.

5  A.  It wasn't a New England illustration.  It was

6      a TransAmerica illustration.  I wanted to make

7      sure -- I wanted him to go with me to make

8      sure we were explaining it in the proper

9      fashion, which he did.  That's his job.

10 Q.  My point is -- and I didn't make it very

11     clear.  I apologize.  Did you and Caddell go

12     over the illustrations prior to going over it

13     with Wayne?

14 A.  I don't remember.  I don't know if we looked

15     at it first or not, because I knew he was

16     going with me and we were going do show it to

17     Wayne.

18 Q.  Wayne testified yesterday in his deposition

19     that when you and Caddell met with him about

20     all these of these policies, that it was

21     basically like you did, Gus Clements did, 90

22     percent of the talking and Caddell maybe did

23     10 percent of the talking.  Is that your

```
 1          memory?
 2    A.    Knowing how much Jeff Caddell talks, I would
 3          say it would be about the opposite.  But no --
 4          I'm not being light of it.  We both talked.  I
 5          wouldn't say it was 90 percent me and 10
 6          percent Caddell.  I would say we were maybe --
 7          we were all talking.
 8    Q.    So you're saying you didn't do any more
 9          talking at these presentations with Wayne
10          Russell than Caddell, or am I wrong?
11    A.    No, I didn't.
12    Q.    Now, would that apply to the sale of all three
13          policies?
14    A.    Yes.  We used TransAmerica on all three of
15          them.
16    Q.    What I'm saying is did you and Jeff Caddell
17          jointly sell all three of these policies to
18          Wayne?
19                MR. WHITEHEAD:  Object to the form.
20    A.    To the best of my knowledge, we did.  Now, as
21          to whether or not Jeff Caddell was in on every
22          interview, I can't remember.
23    Q.    There may have been --
```

```
 1   A.   Because Wayne and I used to meet a lot of
 2        times for different things.  I don't remember
 3        whether he was in on all the meetings or not.
 4        He was involved in all the illustrations and
 5        all, prepared them and ran them.  As to
 6        whether or not he was in all the meetings, I
 7        don't know.  I know he was here a lot.
 8   Q.   How did you figure up that Wayne was going to
 9        have to pay, I think you said, $337,000 for
10        this $5,000,000 policy?
11   A.   That was approximately the cash value that was
12        in some other single-premium variable policies
13        that he was not pleased with their
14        performance.  We were looking to try to see if
15        we could improve in his -- he wanted to do a
16        little better deal.  So that's the money he
17        used.  And he may have put some other money
18        with it.  I don't remember.
19   Q.   Were those variable policies New England
20        policies?
21   A.   Yes, they were.
22   Q.   Had you sold those to him?
23   A.   Yes.  They were single-premium variable
```

```
 1           policies owned by his trust, as I recall.
 2    Q.    Had they been in force for some time?
 3    A.    I would say three, four, five years.
 4    Q.    When you -- well, eventually, you took -- you
 5           transferred money out of those policies to pay
 6           for these TransAmerica $5,000,000 policy; is
 7           that correct?
 8                   MR. STEWART:  Object to the form.
 9                   MR. WALKER:  Object to the form.
10    A.    He decided that's what he wanted to do I
11           didn't do it.  I mean, I assisted him doing
12           it.
13    Q.    Who gave him the idea that he could even do
14           that?  Certainly you discussed that with him?
15    A.    Yes, we discussed it.
16    Q.    You told him that was an option; right?
17    A.    Absolutely.  You can change a policy any time
18           you want to.
19    Q.    And then he could take the cash value --
20    A.    Right.  The owner can change it.
21    Q.    You suggested to Wayne Russell that he could
22           take monies outs of those variable policies to
23           pay a single premium on his $5,000,000 policy;
```

```
 1          right?

 2     A.   Well, actually, Wayne suggested to me that he

 3          would like to do something like that, because

 4          he was not pleased with the performance of

 5          this guy named Mr. Heebner (phonetic) that

 6          happened to be running these funds at that

 7          time.  And Wayne, being as astute as he is,

 8          tracked the performance of these variable

 9          contracts pretty closely.  And he told me on

10          several occasions, I really don't like this;

11          this is not working the way it think it ought

12          to work; what are some others options; maybe

13          we ought to do something different.

14     Q.   Now, you say Wayne -- I know you like to say

15          Wayne is an astute business man and he's

16          tracking the performance of these variable

17          policies.  Did you help him do that?

18     A.   I gave him the information.

19     Q.   So he came to you to get some advice and help

20          on tracking those variable policies?

21     A.   He just came to me to get the current values

22          to see whether they were going up or down or

23          sideways.  I just gave it to him right off a
```

1       computer printout.

2   Q.   How much cash values were in these New England

3       variable policies at the time?

4   A.   As I recall it was a total of 337,000 in the

5       three of them, so that would be about whatever

6       that is, 108 and something in each of them.

7   Q.   So did he surrender those variable policies

8       when this transaction occurred?

9   A.   Right during that time, I think that's the

10      premium we used for the TransAmerica policy.

11   Q.   And the point I'm making is were there any

12      monies left, any values left, in those

13      variable policies?

14   A.   No.  No.  They're gone.

15   Q.   Do you remember when those variable policies

16      had been sold to Wayne?

17   A.   I do not.  I think they had been in force some

18      three or four years.

19   Q.   Now, Wayne Russell testified yesterday under

20      oath, just like you're doing here today, that

21      he stated he only wanted to pay a single

22      payment on his $5,000,000 policy.  That's what

23      you and I have already discussed?

| | | |
|---|---|---|
| 1 | A. | Correct. |
| 2 | Q. | And you understood those were his wishes; |
| 3 | | right? |
| 4 | A. | I did. |
| 5 | Q. | Did you have any response to him when he |
| 6 | | stated that? |
| 7 | A. | My only response was to get him the best |
| 8 | | illustration that I could at that time which |
| 9 | | would accomplish what he wanted to do, which |
| 10 | | is what I did. |
| 11 | Q. | I know you say you don't remember the other |
| 12 | | companies that you looked at other than |
| 13 | | TransAmerica at the time. |
| 14 | A. | I don't remember hem. |
| 15 | Q. | Obviously, you made some type of comparison |
| 16 | | with these other companies though? |
| 17 | A. | We did. |
| 18 | Q. | What were you comparing specifically, price or |
| 19 | | what? |
| 20 | A. | We were comparing if you put in X amount of |
| 21 | | premium dollars, how much insurance can you |
| 22 | | get based on your sex and age and date of |
| 23 | | birth and health and how long it is projected |

```
 1              to be there and at what age it's going to be
 2              there when you die.  You get that off these
 3              little illustrations.
 4      Q.      Was the TransAmerica $5,000,000 policy the one
 5              that required the least amount of premium up
 6              front?
 7      A.      I don't remember if it required the least
 8              amount of premium, but it was the best bang
 9              for your buck.  In other words, for that
10              premium -- I believe we were working off of
11              premium and as to how far it would carry
12              itself based on the same interest rates and
13              all.  And I think it's -- you know, I still
14              feel that way.
15      Q.      And you understood that Wayne was wanting to
16              make these changes at this time with his
17              insurance policies due to some estate planning
18              concerns; right?
19      A.      I did.
20      Q.      Now, you know Dan Lindsay down the at Jackson
21              Thornton?
22      A.      Yes.
23      Q.      Do you know Leon Capouano and Joe Warren,
```

```
 1        attorneys here in Montgomery?
 2   A.   I do.      -
 3   Q.   And Jerome Smith that works with those guys,
 4        too?
 5   A.   Yes, I do.
 6   Q.   Now, you didn't go and advise any of those
 7        guys about the purchase of these TransAmerica
 8        policies for Wayne Russell, did you?
 9   A.   I don't remember that.
10   Q.   And neither did those guys come to you for
11        advice about these TransAmerica policies for
12        Wayne, did they?
13   A.   Not to my knowledge.
14             MR. AUGHTMAN:  Let's take a break.
15                  (Brief recess.)
16   Q.   Mr. Clements, now, you agree with me when you
17        were selling these three policies to Wayne,
18        that you were doing that representing
19        TransAmerica; right?
20   A.   Correct.
21   Q.   Did New England not offer these same types of
22        products at this time?
23   A.   They did not.
```

```
 1    Q.    When I say that, did they offer joint
 2          survivorship policies?
 3    A.    They didn't sell them, no.
 4    Q.    Was that one of the main reasons you didn't
 5          sell them through New England?
 6    A.    That's certainly one of the reasons we didn't
 7          look at New England.
 8    Q.    Obviously, New England would have been your
 9          first choice, wouldn't it?
10    A.    Yes.  It probably would have been.
11    Q.    You've known Wayne for a long time.  Y'all
12          have been acquainted, been friends?
13    A.    Right.
14    Q.    You don't have any opinion, sir, do you,
15          personally, that Mr. Russell is a dishonest
16          person?
17    A.    No.  Certainly not.
18    Q.    And you certainly don't think that he would
19          sit and lie under oath, do you?
20                    MR. WALKER:  Object to the form?
21    A.    No, I don't.
22    Q.    Wasn't it your understanding that, among other
23          things, he was trying to do through the
```

```
 1          purchase of these policies was protect his
 2          estate for his family should he -- well, when
 3          he does pass away?
 4    A.    Yes, sir.
 5    Q.    Now, when the three TransAmerica policies were
 6          actually issued, did TransAmerica send them to
 7          you or Caddell?
 8    A.    The policies?
 9    Q.    Yes, sir.
10    A.    I don't remember.  Probably Jeff Caddell, who
11          brought them to me.
12    Q.    Caddell brought them to your office then?
13    A.    To the best of my knowledge.
14    Q.    Did you mail them to Wayne Russell?
15    A.    I imagine I took them out there physically.
16    Q.    You don't remember specifically though, do
17          you?
18    A.    I can't imagine mailing them.  I'm quite
19          certain that either me or Jeff Caddell took
20          them out there.
21    Q.    Do you know for sure which one of you took
22          them out there to him?
23    A.    I do not.  We may have gone together.
```

1    Q.    You're just not sure?

2    A.    Huh-uh.

3    Q.    Right?

4    A.    Correct.  I'm not sure.

5    Q.    Well, then certainly if you don't remember who

6          took them to Wayne Russell, you don't remember

7          what was said one way or the other about the

8          actual policies once they were delivered?

9    A.    No, except that they were issued as applied

10         for.  There was not any type of increase in

11         rating or change or anything other than what

12         we had applied for.  In other words, we got

13         what we had applied for.

14   Q.    And beyond that, you don't remember saying

15         anything else to Wayne, do you, at that time?

16   A.    I do not.

17   Q.    When Wayne receives annual statements --

18         that's what I call them -- do you get a copy

19         of those also from TransAmerica?

20   A.    No, I do not.  Not to my knowledge.

21   Q.    Do you know if Caddell does?

22   A.    I don't know.  Probably he does or that office

23         does probably.

```
 1   Q.   To your knowledge, neither you nor Jeff
 2        Caddell have ever gone out to see Wayne to
 3        discuss or go over the annual statements, have
 4        you?
 5   A.   I don't remember whether I have or not.
 6        Certainly not in recent years, not in the last
 7        couple two or three years.  We may have
 8        discussed them at some point in time.
 9   Q.   And going back to when the policies were
10        delivered to Mr. Russell, there was no
11        requirement from TransAmerica that you sit
12        down and go over those policies word for word?
13   A.   No.
14   Q.   And, in fact, that did not occur to your
15        memory, did it?
16   A.   That we went over the policies word for word?
17        I doubt that we did.  They were issued as
18        applied for.  There's a lot of legal
19        gobbledygook in an insurance policy, but we
20        normally do not do that.
21   Q.   All right.  Had you sold Wayne a policy
22        through Phoenix?
23   A.   Correct.
```

1    Q.   Do you remember that sale?

2    A.   Yes.  Some elements of it.

3    Q.   Do you remember when it took place?

4    A.   No.

5    Q.   Do you remember what type of policy it was?

6    A.   It was a second-to-die policy.

7    Q.   Was that a whole life, universal life, or

8         what?

9    A.   It was a hybrid, whole-life policy to the best

10        of my knowledge.

11   Q.   I need you to explain to me what a hybrid

12        whole life is.

13   A.   It was a whole life.  The dividends were used

14        to purchase term insurance inside the

15        contract, but to try to keep the premium as

16        low as you can.

17   Q.   Was it -- did it have a name other than whole

18        life?

19   A.   I don't know what the Phoenix -- maybe it was

20        called Phoenix survivorship life or something

21        like that.  I'm not certain.

22   Q.   It was not what I call ordinary life?

23   A.   Ordinary life and whole life mean the same

```
 1        thing.
 2   Q.   Correct. - That's not the kind of policy it was
 3        though, was it?
 4   A.   Yes, it was an ordinary life type policy.
 5   Q.   But you say it was purchasing term insurance.
 6   A.   Well, the dividend was being used internally
 7        to purchase term insurance.  It's whole life.
 8        It's not universal.  It's not a variable.
 9   Q.   Is it what they call flexible premium
10        adjustable life?
11   A.   No.
12   Q.   That's a form of universal life?
13   A.   Correct.
14   Q.   When you say it was purchasing term insurance,
15        so that I'm clear, you're not talking about a
16        policy that purchased like paid up additions?
17        That's not what you're talking about?
18   A.   Yeah.  Paid up additions plus term.
19   Q.   Now, you also remember in selling that Phoenix
20        policy to Wayne, that the representation was
21        made that he would only pay on it for ten
22        years.
23   A.   It seems to me it was either ten or thirteen
```

1       and a half years.

2    Q.   Well, let me --

3    A.   It was a premium offset thing, yes.

4    Q.   Let me tell you this.  Mr. Russell's documents

5        which he received from you, it shows an

6        illustration with premium payments only being

7        made for ten years?

8    A.   I'm sure that's correct.

9    Q.   And I think you know now it ends up he had to

10       pay longer than ten years?

11   A.   That's correct.  I agree.

12   Q.   When you first met with him -- tell me how you

13       explained to him the premium offset concept

14       was going to work on the policy, if you

15       remember?

16   A.   It was a projection by the insurance company

17       that the dividends would be such that the

18       premiums would offset if ten years, and it

19       didn't happen that way, because of falling

20       interest rates.  It didn't happen that way on

21       95 percent of the policies sold in America.

22   Q.   I agree.  Did you go to Wayne Russell after

23       the sale or the purchase, I should say, of

1        that Phoenix policy at any point and say,

2        Wayne, this premium offset is not going to

3        work in ten years.  Do you remember doing

4        that?

5  A.    To the best of any knowledge Wayne and I, when

6        visiting on one of our visits, Phoenix came to

7        me and said, you would be better off changing

8        this policy to some different policy series,

9        which would still be the best deal for the

10       client and would, in fact, maybe allow it to

11       be a premium offset in thirteen and a half

12       years instead of ten.  And they illustrated,,

13       again, the Phoenix people, why that was the

14       case.  It was a change in the policy series.

15       It had some actuarial -- a newer mortality

16       table was used instead of 58 CSO, they were

17       probably using the later table.  And we did

18       change the policy to my knowledge at that

19       time, again, hoping for the best deal.

20  Q.    So's your testimony that Phoenix came to you

21       about that, initially, not that you discovered

22       it?

23  A.    I don't know whether it first came to Wayne

1          and he called me or whether it came -- it

2          probably came to Wayne and he called me,

3          because most of these companies, they don't

4          deal directly with the agent, whether they

5          should or not I don't know.  Most of it goes

6          to the client and then they call me.

7     Q.   Do you remember Wayne calling you about this

8          issue?

9     A.   I don't remember specifically, no.  He

10         probably did, but I don't know.  I mean, I

11         don't know who else would have been called me.

12    Q.   Do you know what year this happened?

13    A.   No.  I'd say in the mid '80s.  I would have to

14         go look.

15    Q.   Was it before he purchased these TransAmerica

16         policies?

17    A.   Yes, I believe it was.  That's the first one

18         he bought, the Phoenix.

19    Q.   So before he bought these TransAmerica

20         policies, the issue or the fact that Wayne was

21         going to have to pay on his Phoenix policy

22         more than ten years had already manifested

23         itself?

1    A.    I think so, to the best of my knowledge.

2    Q.    Now, you are aware that you sold Wayne a

3          TransAmerica policy for two and a half million

4          dollars in face value, and his testimony

5          reflects that he was told he would only pay on

6          it for ten years.  Are you aware of that?

7                MR. WALKER:  Object to the form.

8    A.    I'm aware of that.  I think that's correct.

9    Q.    And you even provided him one of those

10         computer illustrations that we've talked about

11         showing premium payments for ten years?

12               MR. STEWART:  Object to the form.

13   A.    We went over the illustrations.  Again, that's

14         the way we sell all those policies.

15   Q.    But this was after you had sold him the

16         ten-year, premium-offset policy with Phoenix;

17         correct?

18   A.    Correct.

19   Q.    Let me ask you a question.  Why did you sell

20         him a TransAmerica ten-year, premium offset

21         after you knew the Phoenix ten-year, premium

22         offset didn't work out?

23   A.    That's what he wanted.  All I can do is get

1       them from the insurance companies in using

2       their illustrations and projections.  I don't

3       do the actuarial work.

4  Q.   So whatever numbers and work went into

5       formulating that illustration was

6       TransAmerica's doing; right?

7  A.   Correct.  Absolutely.  But, again, some

8       companies can go back and look at their

9       history in certain areas and will do better

10      with premiums than other companies will that

11      lower expenses and et cetera, et cetera.  And

12      the only way I know to look at that, again,

13      not being an actuary, is look at the

14      illustrations that are provided by the

15      companies, which is what I did.

16  Q.   And on TransAmerica --

17  A.   We didn't use Phoenix.  We went to

18      TransAmerica because they had a better deal.

19      It looked like a better bang for your buck, so

20      to speak.

21  Q.   And you understood like Wayne testified to

22      yesterday, that he wanted this two and a half

23      million dollar TransAmerica policy where he

```
 1        would only pay out of his pocket for ten

 2        years?

 3    A.  That's affirmative.

 4    Q.  You didn't tell him any different, did you?

 5              MR. STEWART:  Object to the form.

 6              MR. WALKER:  Object to the form.

 7    A.  I sold him exactly what TransAmerica said that

 8        he would have to pay for ten years, premium

 9        offset for that face amount at his age, sex,

10        date of birth, all that.

11    Q.  That's what TransAmerica sent you, and that's

12        what you sold Wayne?

13    A.  That's correct.  And I don't know -- it hasn't

14        been ten years has it?

15    Q.  No, sir, it has not.  And the same principle

16        applies on the other two TransAmerica policies

17        where Wayne expressed to you that he only

18        wanted to pay single premiums?

19    A.  Yes.

20    Q.  And you told him that could believe provided

21        through TransAmerica.  You showed him those

22        illustrations, and that's what he bought,

23        isn't it?
```

```
 1   A.   Sure did.

 2   Q.   Let me ask you this.  Are you familiar with

 3        any situation where a TransAmerica

 4        premium-offset policy has not -- the premium

 5        has not offset as illustrated?

 6   A.   I am not.

 7   Q.   And are you familiar with any TransAmerica

 8        policies that were sold on single premiums

 9        where the policyholder has been asked or been

10        billed, I should say, for subsequent premiums?

11   A.   No.

12   Q.   But that is going off your experience with

13        roughly seven to nine other policies other

14        than Wayne Russell's; right?

15   A.   That's correct.

16   Q.   I asked you are you familiar with situations

17        where this has happened.  Have you ever heard

18        any of your other agents state such?

19   A.   No.  To my knowledge, TransAmerica is still

20        doing very well.  They're a good company.

21   Q.   When you gave illustrations to Wayne on these

22        three policies, do you know how many pages

23        were included on the illustrations, each one?
```

1    A.    About six or seven.

2    Q.    Do you know that for a fact?

3    A.    No, I do not.

4    Q.    Mr. Clements, I've marked Plaintiff's Exhibit

5          1 to your deposition.  Would you just take a

6          look at this and tell me if this is a copy of

7          the illustration you provided to Mr. Russell

8          on the $5,000,000 policy?

9                              (The referred-to document was

10                              marked for identification as

11                              Plaintiff's Exhibit No. 1.)

12   A.    It looks very much like it.  I don't know if

13         this is the entire illustration.  This is

14         certainly a part of it.

15   Q.    Let me ask you this way.  That is the

16         illustration that Mr. Russell had in his

17         records that he says you provided him

18         regarding the $5,000,000 policy?

19   A.    Okay.

20   Q.    Do you have any reason to believe that that is

21         not the full illustration that you gave him?

22               MR. WALKER:  Object to the form.

23   A.    I don't know if this is all the sheets.  This

```
 1        is the numbers on it.  A lot of times these
 2        things come with disclaimers, et cetera, et
 3        cetera.  But I have to no reason to believe it
 4        would be anything different from this.  It
 5        says initial lump sum amount.
 6   Q.   Does that initial lump sum amount seem to be
 7        accurate to the best of your memory?
 8   A.   350?
 9   Q.   Yes, sir.
10   A.   I thought it was 337, but maybe Wayne put in
11        some more money.  350 may well be right.
12   Q.   I'm going to basically ask you the same
13        question on this next exhibit, which is
14        Plaintiff 's Exhibit 2.  Does that appear to
15        be a copy of the illustration you provided to
16        Mr. Russell regarding the half-million-dollar
17        policy?
18                        (The referred-to document was
19                         marked for identification as
20                         Plaintiff's Exhibit No. 2.)
21   A.   I think so.
22   Q.   All right.  Plaintiff's Exhibit 3, once again,
23        I'm going to ask you does this appear to be
```

```
 1              another illustration that you provided to
 2              Wayne Russell in the sale of the TransAmerica
 3              policy.
 4                            (The referred-to document was
 5                             marked for identification as
 6                             Plaintiff's Exhibit No. 3.)
 7    A.        I'm sure it was.  I believe we looked a whole
 8              bunch of different ones.
 9    Q.        Let me talk about that one for just a minute
10              while you're looking at it.  Do you remember
11              discussing with Wayne the possibility of
12              purchasing an $1,000,000 TransAmerica policy
13              at some point?
14    A.        I think we did discuss that.  Yes.
15    Q.        And what Plaintiff's Exhibit 3 reflects there
16              is a $1,000,000 face value, does it not?
17    A.        Correct.
18    Q.        Now, what happened was you provided him that
19              $1,000,000 illustration.  Then at some point
20              the decision was made that this policy would
21              actually by a two-and-a-half-million-dollar
22              face value policy.  Do you remember that?
23    A.        Uh-huh.
```

1    Q.    Is that a yes?

2    A.    Yes.

3    Q.    But no new two-and-a-half-million-dollar

4          illustration was run; isn't that right?

5    A.    I don't remember that.  I would say it was

6          run. But I don't remember.

7    Q.    Well, do you have a copy of that?

8    A.    No.

9    Q.    Mr. Russell, what he had in his personal

10         records of what you provided to him, was

11         Plaintiff's Exhibit 3 in regard to the

12         two-and-a-half-million-dollar policy.  And he

13         stated in his deposition that this

14         illustration was provided to him on a

15         $1,000,000 face value, that you and he

16         discussed it, and you said is, what you could

17         do is multiply this by 2.5, and it would be

18         the same as two-and-a-half-million-dollar

19         policy?

20   A.    That's true.

21   Q.    Does that sound familiar?

22   A.    Yeah, sure.  But I'm sure we ran another

23         illustration at some point in time.

```
 1   Q.   Well, do you know if you ever gave that

 2        illustration --

 3   A.   I do not know that.  But I do remember us

 4        talking about $1,000,000 and buying two and a

 5        half on that premium offset basis.

 6   Q.   Well, Mr. Russell testified that he didn't

 7        receive a --

 8   A.   Well, maybe he didn't --

 9             MR. WALKER:  Let him finish?

10   A.   I'm sorry.

11   Q.   He testified that he did not receive a new

12        illustration that reflected an actual 2.5

13        million dollar face value, that he was told by

14        you just multiply this by 2.5 on Plaintiff's

15        Exhibit 3.  Do you have any reason to dispute

16        that, I guess, is what I'm saying?

17             MR. WALKER:  Object to the form.

18   A.   No.

19   Q.   Let's look back over here at Plaintiff's

20        Exhibit 2.  If you will note that this

21        indicates an initial premium of $73,351.  Do

22        you see that?

23   A.   I do.
```

```
 1   Q.   Does that refresh your memory of how much
 2        money was used as a single pay on this
 3        half-million-dollar policy?
 4   A.   I imagine it would be the $73,351.
 5   Q.   Okay.  That's what I'm asking?
 6   A.   I'm assuming that.  That would be my opinion.
 7        I don't remember exactly what the exact
 8        premium amount was.
 9   Q.   All right.  I'm marking Plaintiff's Exhibit 4
10        to your deposition.  Let me ask you have you
11        ever seen this illustration?  It's a copy.
12                         (The referred-to document was
13                          marked for identification as
14                          Plaintiff's Exhibit No. 4.)
15   A.   I don't remember if I've seen it or not.
16        Again, we've look at -- I've looked at
17        thousands of these things.  I don't remember
18        if I've seen this one or not.
19   Q.   I will tell you that that is an illustration
20        concerning a half-million-dollar policy that
21        was produced to me by TransAmerica from their
22        files.  That did not come out of one of Wayne
23        Russell's files.  You will note at the very
```

```
 1            bottom, there is a date on that one.  Could
 2            you read the date out?
 3     A.     February 8, 1995.
 4     Q.     If you notice, the one that Mr. Russell had in
 5            his possession was dated March 17, '95?
 6     A.     Correct.
 7     Q.     Plaintiff's Exhibit 4 indicates a $70,000
 8            single payment; correct?
 9     A.     Right.
10     Q.     Which is different than Plaintiff's Exhibit 2?
11     A.     Right.
12     Q.     And in addition to that, Plaintiff's Exhibit 4
13            has three or four pages attached to the back
14            with written wordage.  Would you agree with
15            me?
16     A.     Yes.
17     Q.     Mr. Russell testified that he never received
18            any of those pages that you are flipping
19            through on Plaintiff's Exhibit 4, on the back
20            there.  Do you have any idea why he didn't
21            receive them?
22     A.     No.
23     Q.     Do you remember seeing them in regard to
```

1        Plaintiff's Exhibit 1, 2, or 3?

2   A.   I thought- that the illustrations had six or

3        seven -- more pages to them than this.  Again,

4        all the illustrations that I showed Wayne

5        Russell was brought to me by Jeff Caddell from

6        the TransAmerica office in Birmingham.  I

7        don't know whether all these attachments were

8        a part of them or not.

9   Q.   Would you look with me for a minute at these

10       last four pages attached to Plaintiff's

11       Exhibit 4, and as an insurance professional --

12       and take as much time as you want to -- tell

13       me, what are these pages?  What does this

14       include?

15   A.   Well, this is saying -- it just says these

16       assume that the current monthly deductions and

17       policy charges and interest rates remain in

18       effect for the duration of the policy.

19       Current interest rate of 7 percent, subject to

20       change at any time.  It just basically says it

21       could vary and the underlying performance, as

22       it is with any policy, is based primarily on

23       interest rates.  It could be -- it doesn't

```
 1            matter whether it's a universal contract or a
 2            whole life policy or an ordinary life policy.
 3            You just have to do the best you can and get
 4            the best company you can.  It's not
 5            guaranteed.  There is a guaranteed rate in
 6            here.  I think the guaranteed rate in this
 7            contract is 4 percent.
 8       Q.   Is that the only guarantee you see?
 9       A.   Yes.  That's the guaranteed rate that's
10            credited to the contract.  Again, if you look
11            at different illustrations and you compare
12            apples to apples or you get them as apples to
13            apples as you can, you can make a somewhat
14            determination or the best determination as you
15            can as to what the other charges may be.
16            Mortality expenses, for example, vary from
17            company to company.  And you can look at
18            different policies and different companies and
19            see which ones you think will do the best for
20            your client.  And in my opinion TransAmerica
21            was then and still is now doing a very good
22            job.
23       Q.   Okay.  Those last four pages you were just
```

    1              looking at on Plaintiff's Exhibit 4, do you
    2              think that it was necessary that Wayne Russell
    3              receive copies of those documents?
    4    A.       Yes.  I think he should have gotten them.
    5    Q.       I think you referred to them earlier as
    6              disclaimers.  Is that what you called it?
    7    A.       Some of it, yeah.  They are saying the only
    8              thing that's guaranteed is the guaranteed
    9              interest rate, basically, and that the
   10              mortality expenses can vary and that,
   11              certainly, interest rates can vary.
   12    Q.       Those four pages we are referring to, they
   13              explain provisions of these policies, don't
   14              they?
   15                   MR. WALKER:  Object to the form?
   16    A.       They explain the provisions to the
   17              illustrations and give you a guide to the
   18              illustration.  Primarily they are just
   19              discussing the fact that interest rates are
   20              not guaranteed.  Wayne knows that; he knew
   21              that.  He understands interest rates.
   22    Q.       Well, that's your opinion, though, isn't it?
   23    A.       That's my opinion.

```
 1    Q.    Was there any requirement that you're aware
 2          of, Mr. Clements, from TransAmerica that Wayne
 3          Russell must receive these last four pages
 4          along with these illustrations?
 5    A.    I don't know at the time.  Now, currently, you
 6          have to have an illustration signed.  At that
 7          time, I don't know that there was a
 8          requirement or not.
 9    Q.    There's a new Alabama insurance regulation
10          regarding that right now.  That's what you are
11          referring to, isn't it?
12    A.    Yes.  Also, it's a requirement for most life
13          insurance companies now to get the
14          illustration signed.  I don't think that was a
15          requirement at that time, but we looked at a
16          lot of different illustrations.  I'm sure some
17          of that verbiage was on some of the
18          illustrations.  I have no reason to see why it
19          wouldn't be.
20    Q.    Some of the verbiage was on the
21          illustrations.  What are you talking about?
22          What illustrations?
23    A.    I'm saying I'm sure some of these pages were
```

1       on some of these illustrations we went over.

2  Q.  With Wayne?

3  A.  Yes.  I think so.

4  Q.  But once again, Exhibits 1, 2, and 3, that

5       were in his records, don't reflect that any of

6       those pages were there, do they?

7  A.  They do not.  You are correct.

8  Q.  Do you remember how many pages were attached

9       to these illustrations when Jeff Caddell gave

10      them to you?

11  A.  I do not.  He really did not give them to me.

12      He brought them over to me, and we went out

13      and went over them with Wayne together.

14  Q.  Before the sale of these three policies to

15      Wayne Russell had you seen these types of

16      illustrations from TransAmerica before?

17  A.  I think I had done some business with

18      TransAmerica prior to dealing with Wayne.  I

19      can't remember exactly.

20  Q.  And I understand you may have done some

21      business.  But specifically what I'm asking is

22      had you seen these types of TransAmerica

23      computer illustrations before this sale?

| | | |
|---|---|---|
| 1 | A. | If I had sold the policies before this sale, I |
| 2 | | would have. If I haven't, then maybe I |
| 3 | | hadn't. I've seen a lot of those type |
| 4 | | illustrations from a lot of different |
| 5 | | companies. |
| 6 | Q. | I guess what I'm getting at is at the time you |
| 7 | | met with Wayne Russell about these |
| 8 | | illustrations, were you aware that a full and |
| 9 | | complete TransAmerica illustration had a total |
| 10 | | of seven pages, not three? |
| 11 | A. | As I said earlier, I thought they did have six |
| 12 | | or seven pages to them, not three. I'm not |
| 13 | | sure. I'm just looking at the numbers there. |
| 14 | | I don't know exactly what was given to Wayne. |
| 15 | Q. | Maybe you answered my question, maybe you |
| 16 | | didn't. What I'm asking you, though, sir, |
| 17 | | when you met with Wayne Russell about the |
| 18 | | purchase of these policies? |
| 19 | A. | Right. |
| 20 | Q. | Did you already know that a complete |
| 21 | | TransAmerica computer illustration was |
| 22 | | supposed to have seven pages with it? |
| 23 | A. | I don't know exactly how many pages it was |

```
 1            supposed to have.  Like I said, I showed him
 2            exactly what Jeff brought down from
 3            Birmingham.  It could have been five or
 4            something.  I don't know how many exactly.
 5    Q.      It could have been three?
 6    A.      Could have been.
 7    Q.      Can you tell me by looking at Plaintiff's
 8            Exhibit 1, 2, and 3 -- can you tell me
 9            anything that you specifically stated to Wayne
10            Russell about any of these illustrations?
11    A.      Only that this is what we're getting from
12            TransAmerica, which illustrates, based on
13            these interest rates, exactly how much
14            insurance it will buy and how long it will
15            stay in force.
16    Q.      Was that the same for all three, what you just
17            told me?
18    A.      Certainly.
19    Q.      Because you were pointing to Exhibit 2?
20    A.      They are all the same.  I mean, they are not
21            all the same, but they are based on the same
22            illustrations.
23    Q.      And Exhibit 3 is the policy that --
```

1    A.    Ten year.

2    Q.    If you will look for me, it shows a premium

3          payment being made for ten years?

4    A.    Correct.

5    Q.    Exhibit 2 shows a single premium, and Exhibit

6          3 shows a single premium; is that right?

7    A.    Yes.

8    Q.    Before we leave this, I want to give you a

9          fair shot to tell me anything else you

10         remember you or Wayne saying about these

11         illustrations?

12   A.    Based on what with we're saying, these

13         illustrations appeared to be the best deal for

14         him at that time.

15   Q.    You mentioned earlier that you yourself have a

16         premium offset policy that did not offset in

17         the premium year it was indicated is; that

18         right?

19   A.    That's correct.

20   Q.    Who is the company?

21   A.    New England.

22   Q.    Was it a ten year?

23   A.    I don't know.  I just know I was having to pay

```
 1              premiums a little longer than I thought I was

 2              going to have to.  I've got a got of different

 3              policies.

 4    Q.        Did you basically buy it yourself, or did you

 5              have an agent actually sell it to you?

 6    A.        No, I bought it myself.

 7    Q.        Sitting here today, Mr. Clements, have you

 8              seen what I call an in-force illustration on

 9              any of these TransAmerica policies?

10    A.        I have not.

11    Q.        Would you have the ability to get in-force

12              illustrations?

13    A.        I could request them, yes.

14    Q.        From who?

15    A.        From Caddell.  Well, it's not Caddell now.

16              From whoever the TransAmerica office in

17              Birmingham is.  That's who I deal with.

18    Q.        Once again, would they have to run those

19              illustrations?

20    A.        Yes.

21    Q.        You couldn't do it yourself?

22    A.        Could not.

23    Q.        Do you have any idea on Plaintiff's Exhibit 3,
```

```
 1          this policy of Wayne Russell's, what year the

 2          premium offset is projected at this point?  Do

 3          you have any idea?

 4    A.    I do not.  It would depend on interest rates,

 5          whatever they use as the current or assumed

 6          interest rate.

 7    Q.    You see here that this illustration at least

 8          is dated 1994?

 9    A.    Correct.

10    Q.    A little over five years ago according to this

11          date?

12    A.    Right.

13    Q.    Do you know if the premium offset year is

14          beyond the tenth year?

15    A.    I do not know.

16    Q.    Do you think it would be?

17                MR. STEWART:  Object.

18    A.    It depends on what the interest rate is.  If

19          they're going to assume -- I don't know.

20          Interest rates are probably going up today.

21    Q.    Going up?

22    A.    That's what they're saying.  I think Greenspan

23          is talking today.  All of that has an effect
```

1          on this.  We don't know exactly what it's

2          going to be.  I don't know.  It depends on

3          what interest rates you want to assume.  I do

4          think this --

5               MR. WALKER:  I think you've answered

6                    the question.

7     Q.   I'm probably the one person in the room that's

8          interested in hearing what you have to say.

9     A.   Well, I still think TransAmerica is still a

10         good company.

11              MR. WALKER:  Wait.  It works best

12                   with questions and answers and

13                   not just everybody talking.

14              THE WITNESS:  I'm sorry.

15    Q.   What about on these other two policies on

16         Exhibit 1 and 2 over here, these single pays.

17         Do you see any in-force illustrations on those

18         policies?

19    A.   I have not.

20    Q.   Do you have any idea right now sitting here

21         today whether Wayne Russell needs to be

22         putting additional money in those policies?

23    A.   I do not.

1    Q.    You are still his servicing agent on these

2          policies, aren't you?

3    A.    (Witness nods head.)

4    Q.    How would you inform him that he needed to put

5          more money in them, if that was the case?

6    A.    He would get some notification and call me and

7          ask for in-force ledgers, and I would provide

8          them for him.

9    Q.    What kind of notification would he get?

10   A.    I don't know.  He would get an annual

11         statement, probably an annual statement.  And

12         either he could call me and say get me

13         in-force ledgers or he could call and get them

14         direct.  I don't get the statements on these

15         contracts.

16   Q.    It's also your knowledge that TransAmerica is

17         not just going to up and send him some

18         in-force illustrations without them being

19         requested?

20              MR. STEWART:  Object to the form.

21   A.    Correct.  I assume that's the case.

22              MR. STEWART:  Object to what he

23                   assumes.

1    Q.    You certainly are not going to send them to

2          Wayne without him requesting them, are you?

3    A.    Probably not.

4    Q.    You haven't up to this date, have you?

5    A.    No.

6    Q.    You agree with me that an in-force

7          illustration would give the best picture, as

8          of today, right now, of where these policies

9          stand; is that right?

10   A.    That's correct.

11   Q.    What did you do about your premium offset

12         policy when it didn't offset, just keep on

13         paying?

14   A.    Kept paying the premium.

15   Q.    Pretty expensive premium?

16   A.    No, still the best deal in town.

17              MR. WALKER:  Object to the form.

18   Q.    I wouldn't expect you to say anything less

19         about New England.  All right.  Now, where

20         did -- on Plaintiff's Exhibit 2, where did

21         that $73,351 come from, if you know?

22   A.    I don't know.  It was Wayne's.

23   Q.    But do you know where he got the money?

```
 1   A.   No, I don't know where he got the money.

 2   Q.   Did it come out of his pocket or do you know?

 3   A.   I think we took some little small policies, if

 4        my memory serves correct, on one of these.  I

 5        guess it was this one and cashed them in and

 6        put all of them and some of the money in the

 7        single premium as I recall.

 8   Q.   So is that what you remember happening or are

 9        you guessing?

10   A.   Yes.  But I don't know if it was this exact

11        amount.  It was some of the premium.

12   Q.   What kind of policies?

13   A.   Small whole-life policies, probably totalling

14        much less than a half million.

15   Q.   Maybe a couple hundred thousand?

16                MR. STEWART:  Object to the form.

17                MR. WALKER:  Object to the form.

18   A.   I'm not sure.

19   Q.   Do you know what companies these policies were

20        issued by?

21   A.   They were New England contracts to my

22        knowledge.  There may have been some other

23        companies.
```

| | | |
|---|---|---|
| 1 | Q. | How many policies? |
| 2 | A. | Four or five little small policies that he had |
| 3 | | bought earlier. |
| 4 | Q. | Do you remember when he had bought them? |
| 5 | A. | Well, he bought one in 1967, I remember. |
| 6 | Q. | It was like the first one you ever sold to |
| 7 | | him? |
| 8 | A. | Right.  It was a $10,000 policy. |
| 9 | Q. | And those policies were all, like you just |
| 10 | | said, they were just regular whole life, |
| 11 | | weren't they? |
| 12 | A. | They were whole life. |
| 13 | Q. | Now, Plaintiff's Exhibit 2, that's a universal |
| 14 | | life-type policy? |
| 15 | A. | Correct. |
| 16 | Q. | There's a difference there between universal |
| 17 | | life and whole life; right? |
| 18 | A. | Correct. |
| 19 | Q. | And you would agree with me that the some of |
| 20 | | the differences between the universal life and |
| 21 | | whole life policy are the guarantees that are |
| 22 | | provided through the policies? |
| 23 | A. | Yes. |

1    Q.    Like you said just a few minutes ago,

2          Plaintiff's Exhibit 2, the universal life

3          policy, it provides a guaranteed rate of 4

4          percent?

5    A.    Right.

6                    MR. STEWART:  Object to the form.

7                    Jay, you know that's the

8                    illustration even though the

9                    policy itself the guarantee

10                   rate is five percent, so don't

11                   mislead the witness.

12                   MR. AUGHTMAN:  I didn't mislead

13                   him.

14                   MR. STEWART:  That's not the policy,

15                   that's the illustration.  If

16                   you want to ask him what the

17                   guaranteed rate in the policy

18                   is, why don't you show him the

19                   policy?

20                   MR. AUGHTMAN:  I'll ask him the way

21                   I want to ask him, using your

22                   documents.

23                   MR. STEWART:  Well, that's not the

1              policy and you know it, that's

2                   the illustration.

3         MR. AUGHTMAN:   That's fine.

4    Q.   Anyway, what other guarantees are provided

5         through those whole life New England policies

6         that y'all cashed out?

7    A.   Just a guaranteed cash value.

8    Q.   How about a guaranteed premium?

9    A.   Yeah, a guaranteed premium.

10   Q.   How about a guarantee that once the premium is

11        paid, the policy wouldn't lapse?  That was

12        guaranteed in the whole-life policies, wasn't

13        it?

14   A.   That's correct.

15   Q.   And candidly, admit with me that those are not

16        the same guarantees provided in these

17        universal life policies; right?

18        MR. WALKER:   Object to the form.

19   A.   I think it depends on how long you want to pay

20        the premiums.  We'd have to get the contract

21        out and analyze it, and I'm certainly no -- I

22        think if you're guaranteed to pay X amount of

23        premium in this universal, the contract is

```
 1            guaranteed to be in force.  Generally

 2            speaking, you can take a universal contract

 3            and get a lot more life insurance, all be it a

 4            flexible premium, for the same premium.

 5    Q.      Okay.  But you agree on that Plaintiff's

 6            Exhibit 2, the policy that's being illustrated

 7            here?

 8    A.      Yes.

 9    Q.      Wayne Russell, he very well may have to pay an

10            additional premium at some point?

11                    MR. WALKER:  Object to the form.

12                    MR. STEWART:  Object to the form.

13    A.      I don't know.  It's truly a function of

14            interest rate.

15    Q.      Do you know how to figure that and be able to

16            tell a client whether they will or they won't

17            have to pay an additional premium after a

18            single premium is paid?  Do you have the

19            ability to do that?

20    A.      No, I do not.  You would have to get with the

21            insurance company.  You have an assumed

22            interest rate of 7 percent, he wasn't paying

23            more premiums in this thing until he was 100
```

```
 1        or whatever it is.

 2   Q.   Okay.

 3   A.   And if it was six and three quarters, I don't

 4        know.  If it was six, I don't know.  If it was

 5        eight, his death benefit might increase, and

 6        his cash value would increase.  It's just a

 7        function of interest rates and mortality

 8        charts.

 9   Q.   On those old New England whole-life policies,

10        were they dividend paying policies?

11   A.   Uh-huh.

12   Q.   Is that a yes?

13   A.   Yes.

14   Q.   How does that differ with the universal life

15        policy like is illustrated on Exhibit 2?

16   A.   Well, the dividends on a whole-life policy are

17        primarily a function of the general account of

18        the insurance company, which primarily bonds

19        and mortgages, which I might add have not held

20        up too well over the years either because of

21        the falling interest rate environment we've

22        been in for the last ten years.  Most of the

23        premium offset problems have been on whole
```

1    life policies, not these, in my opinion.

2    These universal contracts are more a function

3    of short-term interest rates.  They are both

4    interest rate sensitive contracts.  Dividends

5    are a function of interest rates just like

6    universal contracts are.

7    Generally speaking, an

8    ordinary life contract or a whole life

9    contract, has a higher premium per thousand

10   because it just does.  And its's not as

11   flexible and when you're usually looking at

12   larger -- well, I won't get off into all that

13   stuff.

14   MR. WALKER:  I think the question

15   was about dividends.

16   A.  Yeah.  They are a function of interest rates

17   primarily.

18   Q.  The policy that is illustrated in Plaintiff's

19   Exhibit 2, policy does that policy draw

20   dividends?

21   A.  No.  These are universal contracts.  They

22   don't pay dividends.  They have interest

23   credited to them, but it is not considered a

```
 1          dividend.

 2   Q.     That's what I was getting at.

 3   A.     I'm sorry.

 4   Q.     I think you were referring just a minute ago

 5          when you were giving me that explanation to

 6          the cost of insurance on a whole life policy,

 7          when you were talking about the cost per

 8          thousand.  That's what you were talking about?

 9   A.     Premium per thousand.

10   Q.     We're talk about cost of insurance?

11   A.     Premium per thousand.

12   Q.     Let me ask you this.  Are you familiar -- I

13          know you are you already mentioned it -- with

14          the 1958 CSO; is that right?

15   A.     Yes.

16   Q.     Are you familiar with the 1980 CSO?

17   A.     Uh-huh.

18   Q.     Is that a yes?

19   A.     Yes, I'm familiar with it.

20   Q.     Are you familiar there is a difference between

21          the two?

22   A.     Yes.

23   Q.     Do you know what acquisition charges are?
```

1   A.   Yes.

2   Q.   Can you give me your definition of acquisition

3        charges?

4   A.   My definition would be when you buy a new

5        contract you incur certain administrative

6        expenses and commissions and issuance of the

7        policy.

8   Q.   Do you know what the acquisition costs or

9        charges were when Wayne Russell bought that

10       half-million-dollar policy?

11  A.   No.

12  Q.   Would you have had any way to figure that up?

13  A.   I don't know.

14  Q.   So obviously there was no way for you to

15       disclose that to him yourself, was there?

16  A.   No.

17  Q.   What about this, you would agree with me that,

18       Wayne Russell, when he purchased the New

19       England whole-life policies, that were

20       eventually cashed out in lieu of purchasing

21       this half-million-dollar TransAmerica policy,

22       that there was a cost of insurance applied to

23       those old policies, wasn't there?

1    A.    Yes.

2    Q.    Would you have had any way to know what the

3          cost of insurance was on those policies?

4    A.    No.  I know what the premium per thousand

5          was.  You can figure it up.

6    Q.    But you understand -- well, never mind.  Do

7          you know what the cost of insurance was when

8          he bought this half-million-dollar policy?

9                MR. WALKER:  Object to the form.

10   A.    No, I don't.  I was only going by this

11         illustration.  I know what we did, and, in my

12         opinion, this is frequently a good thing to do

13         is review these policies.  And if, in fact,

14         the person's objective's change, sometimes

15         certain little small policies can be put in a

16         larger contract, again, depending on sex, date

17         of birth, health, and all of the above, and

18         get a much larger death benefit, if, in fact,

19         that is the client's objective.  If that's not

20         his objective, then don't do it.

21   Q.    Do you know --

22   A.    There's a cost to it.

23   Q.    Do you know whether or not the cost of

1    insurance between the old New England

2    whole-life policies was different on this

3    half-million-dollar TransAmerica policy?

4              MR. WALKER:  Object to the form.

5  A.  The premium per thousand on this contract

6    right here is less.  The cost of the

7    insurance, mortality cost exactly, I don't

8    know.

9  Q.  That's what I'm referring to.  I know that you

10   understand there's a premium per thousand, but

11   I'm digging a little deeper than that.  I'm

12   looking at the cost of insurance that's

13   involved in that premium.

14 A.  I don't know.  He was a little older here.

15 Q.  Actually, he was a lot older, wasn't he?

16 A.  Certainly.  But he got a lot more insurance,

17   also.

18 Q.  Once again, since you would not have known or

19   been able to determine the cost of insurance

20   on the half-million-dollar TransAmerica

21   policy, there's no way you could have

22   disclosed that to him, could you?

23             MR. WALKER:  Object to the form.

1  A.  No.  Only by looking at the illustration.

2  Q.  That's the only information --

3  A.  This reflects the cash value depending on what

4      interest rates were.  If he wanted to buy --

5      cash it in three years, he would know

6      approximately what he would get depending on

7      the mortality cost and the investment returns

8      on the contract.

9  Q.  Do you think, Mr. Clements, in your experience

10     in the business, that mortality charges were

11     more in 1994 than they were in the 1970s or

12     less?

13              MR. STEWART:  Object to the form.

14              MR. WALKER:  Object to the form.

15 A.  I don't really know.  In my opinion, the

16     primary thing is what the client's objective

17     is.  What he wants to do with his policies and

18     how much insurance he wants to buy and what

19     his needs are.  Needs frequently change.

20     Insurance policies ought to be bought and sold

21     according to needs.

22 Q.  You aren't going to disagree with me that cost

23     was important to Wayne Russell in the purchase

1        of these policies, are you?

2    A.    No.  Cost is important to Wayne Russell about

3        anything.

4    Q.    Did you consult with anybody with TransAmerica

5        when the decision was made to replace these

6        New England whole-life policies?  Did you talk

7        to anybody at TransAmerica about the

8        replacement I guess is what I'm asking.

9    A.    No.

10    Q.    But you used their documents in getting Wayne

11        to sign one of those 1035 forms, didn't you?

12    A.    I'm sure I did.

13    Q.    And certainly the fact that these New England

14        policies were being replaced by the

15        half-million-dollar policy that was disclosed

16        by you during this transaction; right?

17    A.    I'm sure it was if they signed the 1035

18        exchange.

19    Q.    Did anybody from TransAmerica at any time

20        during this replacement of these whole-life

21        policies say -- did they call you or write you

22        or in any way communicate to you that,

23        Mr. Clements, you're not doing this right; you

1    need to rethink this?  Did anything like that

2    ever happen?

3              MR. WALKER:  Object to the form.

4    A.   Certainly not.

5    Q.   Do you realize you're a subject to the Alabama

6         Department of Insurance regulations as a

7         licensed agent in Alabama, don't?

8    A.   Right.

9    Q.   You are you familiar with those regs?

10   A.   Somewhat.

11   Q.   Are you familiar with the reg on the

12        replacement of insurance policies?

13   A.   Yes, to an extent.

14   Q.   Can you tell me the last time you reviewed

15        that reg?

16   A.   I haven't reviewed it.

17   Q.   You didn't review it in regard to doing this

18        replacement on the half-million-dollar policy

19        did you?

20   A.   No.  I think what the replacement things says

21        is you shouldn't replace a policy unless you

22        think it's in the best interest of the

23        client.  And in this case, I did think that,

1        and I do think that today.

2   Q.   Okay.

3   A.   I won't lose any sleep over that.

4   Q.   Okay.  Now, Wayne Russell testified that he

5        asked you to be really conservative in

6        illustrating these policies for him with

7        TransAmerica.  Are you in agreement that that

8        is exactly what you did?

9   A.   Yes.

10  Q.   On the two-and-a-half-million-dollar policy,

11       the one that was sold on the basis of ten

12       years worth of annual premium payments, now,

13       you would agree with me, wouldn't you,

14       Mr. Clements, that after the premium offset

15       yield, a premium is continually paid within a

16       policy, is it not?

17  A.   Correct.

18  Q.   In other words, the premium doesn't just

19       disappear and no premium is paid no matter

20       what?  That doesn't happen?

21  A.   Correct.

22  Q.   Basically, the policy takes care of itself

23       after the premium offset year?

1    A.    Self-sufficient.

2                    MR. AUGHTMAN:  Do you want to take

3                         another break?

4                         (Brief recess.)

5    Q.    Mr. Clements, I'm going to mark Exhibit 5 to

6          your deposition, which is a composite

7          exhibit.  Could you take a look at these and

8          tell me do they appear to be a copy of the

9          front page of the policies that were replaced

10         when the half-million-dollar TransAmerica

11         policy was purchased, if you know?

12                         (The referred-to document was

13                          marked for identification as

14                          Plaintiff's Exhibit No. 5.)

15   A.    Yeah.  These appear to be.

16   Q.    Once again, those are policies you had

17         previously sold to Mr. Russell; right?

18   A.    Correct.

19                    MR. STEWART:  Object to the form.

20                         The face pages are the policy

21                         pages.

22                    MR. AUGHTMAN:  That's what I said.

23                    MR. STEWART:  No.  You said those

```
 1                              are the policies.  I just don't
 2                              want these to be identified for
 3                              the Record as being the actual
 4                              policies?
 5      A.    Yes.
 6      Q.    Take your time?
 7      A.    I'm through with them.
 8      Q.    Mr. Clements, what I'm going to mark here is
 9            Plaintiff's Exhibit 6.  If you would please
10            take a look at this.  Does that appear to be a
11            copy of the half-million-dollar policy you
12            sold to Mr. Russell?
13                              (The referred-to document was
14                               marked for identification as
15                               Plaintiff's Exhibit No. 6.)
16      A.    Yes, it does appear to be.
17                    MR. STEWART:  What's that Bates
18                       stamp number.
19                    MR. AUGHTMAN:  89.
20                    MR. STEWART:  Well, the one your
21                       client identified yesterday has
22                       163 on the bottom of it.
23                    MR. AUGHTMAN:  I probably gave you
```

1                              two copies.

2    Q.    Mr. Clements, Plaintiff's Exhibit 7, which I

3          want to show you.  Would you tell me if that

4          appears to be a copy of the $5,000,000 policy

5          you sold to Wayne?

6                              (The referred-to document was

7                                marked for identification as

8                                Plaintiff's Exhibit No. 7.)

9    A.    It appears to be.

10   Q.    Plaintiff's Exhibit 8, would you --

11                    MR. STEWART:  Hang on just a minute

12                        in you don't mind.  Is 8 the

13                        two-and-a-half-million?

14                    MR. AUGHTMAN:   That's correct.

15   Q.    The two-and-a-half-million policy you sold to

16         Wayne Russell does Plaintiff's Exhibit 8

17         appear to be a copy of that?

18                              (The referred-to document was

19                                marked for identification as

20                                Plaintiff's Exhibit No. 8.)

21   A.    Yes.

22                    MR. STEWART:  Just for the Record, I

23                        don't know what differences

```
 1                        there are in the policies, but
 2                        the one that was in the Record
 3                        that was identified by your
 4                        client yesterday as being the
 5                        two-and-and-half-million-dollar
 6                        policy has the Bates stamp of
 7                        329 at the bottom.
 8   Q.   Mr. Clements, going back once again to the
 9        transaction where the old New England policies
10        were replaced and the half-million-dollar
11        TransAmerica policy was procured, it is your
12        testimony that you advised Mr. Russell to do
13        that transaction; correct?
14                   MR. WALKER:  Object to the form.
15                   MR. STEWART:  Object to the form.
16   A.   Well, I think we discussed a lot of options as
17        to whether or not he needed a $10,000 policy
18        and $40,000 policy in Wayne's situation and
19        his net worth and all being what it is.  It's
20        meaningless.  We were trying to get -- using
21        the cash value of the older policies to get a
22        bigger death benefit which might be
23        meaningful.  A $10,000 policy just doesn't
```

```
 1          make any difference.

 2     Q.   I understand all that.  I'm just saying

 3          though, that transaction was completed upon

 4          your professional advice to Mr. Russell;

 5          correct?

 6               MR. WALKER:  Object to the form.

 7     A.   Yes.  That's correct.  I think we discussed

 8          whether or not we should do it or not.  He

 9          understood what we were doing.

10     Q.   Kind of like earlier, did he listen to you

11          when y'all had this discussion?

12     A.   Yes.

13     Q.   I think you've already told me -- well, tell

14          me again, so we'll be clear, what specifically

15          you told him in regard to doing that

16          replacement?

17     A.   Well, he could get about two and a half times

18          the death benefit and using the value in the

19          older contracts which didn't make much -- they

20          were fairly small policies anyway, and

21          hopefully not have to pay any more premiums in

22          the future, which was his objective, to get

23          the most death benefit for the value.
```

1                     Frequently, you can take a

2          small older policy you might have a $10,000

3          policy that's got a $7,000 cash value in it.

4          You would be better off to take the $7,000 and

5          do something else with it, but anyway.

6     Q.   And that's the way you felt about these

7          policies?

8     A.   That's correct.

9     Q.   And regardless of the fact that the New

10         TransAmerica policy had more face value than

11         the total of the New England policies' face

12         value -- putting that aside because I know

13         that is what you are focusing on -- you

14         advised him that this replacement is what he

15         should do?

16    A.   Based on his objectives at that time.

17    Q.   Based on his objectives to plan for his

18         estate?

19    A.   That's correct.

20    Q.   And attempt to get a new policy with the cash

21         values of these old policies; correct?

22    A.   That's correct.

23    Q.   And use those cash values as a single pay in

1        this new policy?

2    A.   That's right.

3    Q.   Now, when you sold all three of these policies

4        to Mr. Russell, was there any kind of training

5        manual or sales manual provided to you by

6        TransAmerica that you were to use or could

7        use?

8    A.   No.

9    Q.   I think you testified the only thing that they

10       provided you to sale these three polices were

11       the illustrations; correct?

12   A.   And their rep.

13   Q.   And Jeff Caddell?

14   A.   Correct.

15   Q.   Had TransAmerica given you specific training

16       on how to sell one of their policies using the

17       premium offset concept?

18            MR. STEWART:   Object to the form.

19   A.   No.

20   Q.   Had they given you specific training on how to

21       do a policy replacement?

22   A.   No.

23   Q.   What training has TransAmerica given you?

```
 1   A.   None.

 2   Q.   You knew that you had to, Gus Clements,

 3        explain these policies to Wayne Russell when

 4        you sold them to him?  You had to verbally

 5        explain them to him; right?

 6             MR. WALKER:  Object to the form.

 7   A.   Explain to policies to him?

 8   Q.   Yes, sir.

 9   A.   I was to deliver the policies to him and tell

10        them they were issued as applied for.

11   Q.   I'm not talking about at the delivery.  I'm

12        just saying when you initially met with him

13        about purchasing the policies in the very

14        beginning.  And you had to explain to Wayne

15        the type of policy, what the policies -- what

16        provisions they had, how they would work.  You

17        knew you had to do that?

18             MR. WALKER:  Object to the form.

19   Q.   And you did that?

20   A.   Right.

21   Q.   You wouldn't just assume Wayne would know how

22        these policies operate and how they work and

23        what the makeup of these policies are without
```

```
 1         you explaining it to him; correct?
 2    A.   That's correct.
 3    Q.   When you took the applications out on all
 4         three policies, did you fill them out
 5         physically?  Did you fill them out?
 6    A.   Either myself or Jeff Caddell.  I think I did
 7         or maybe we did it together.
 8    Q.   And you were sitting there asking Mr. Russell
 9         questions in regard to the questions that were
10         on the application?
11    A.   Correct.
12    Q.   And did you indicate earlier that a physical
13         test was done, a medical test was done?
14    A.   Right.
15                   MR. AUGHTMAN:  I think that's all I
16                        have right now.  Do you have
17                        anything.
18                   MR. WALKER: I don't.
19                   MR. AUGHTMAN:  That's it.
20                   MR. STEWART:  Jay, for the Record,
21                        and I don't know but the
22                        production by you includes two
23                        of the policies.  And I
```

1           don't -- I would like some

2           agreement that we're going to

3           only use one policy or each in

4           this case.  And we're going to

5           come to an agreement about what

6           the policy is.  For example,

7           you just introduced two in

8           addition to what was introduced

9           by your client yesterday.  I

10          assume that your client has the

11          original policies, and there's

12          only one original.  Do you

13          know?

14      MR. AUGHTMAN:  Yeah, he's got them.

15          Are there some differences in

16          what was produced yesterday in

17          the deposition and today?

18      MR. STEWART:  I haven't compared the

19          two of them.  I just know they

20          have different Bates stamp

21          numbers from your office.  That

22          tells me of there are two

23          different copies.  But what I

126

1    could like to do is for you to

2    get all of the originals for

3    us, the originals of

4    Mr. Russell's records.  I can

5    arrange some time to come down

6    here and look at those the

7    copies are those.

8        MR. AUGHTMAN:  I'll be glad to do

9            that.

10       MR. STEWART:  So I'll know that the

11           copies that we have are true

12           copies of the originals.

13       MR. AUGHTMAN:  That's exactly right,

14           and I'll be glad to let you

15           look them over.

16

17

18

19

20

21

22    (The deposition of Augustus K. Clements,

23     III, concluded on November 16, 1999, at

1        12:05 p.m.)

2                * * * * * * * * * * * *

3                REPORTER'S CERTIFICATE

4                * * * * * * * * * * * *

5    STATE OF ALABAMA

6    COUNTY OF MONTGOMERY

7                I, Jennifer Ingram, Reporter and

8    Notary Public in and for the State of Alabama

9    at Large, do hereby certify that on November

10   16, 1999, pursuant to notice and stipulation

11   on behalf of the Plaintiff, I reported the

12   deposition of Augustus K. Clements, III, who

13   was first duly sworn by me to speak the truth,

14   the whole truth, and nothing but the truth, in

15   the above-styled cause, now pending in the

16   Circuit Court for Montgomery County, Alabama;

17   that the foregoing 126 typewritten pages

18   contain a true and accurate transcription of

19   the examination of said witness by counsel for

20   the parties set out herein; that the reading

21   and signing of said deposition was waived by

22   witness and counsel for the parties.

23                I further certify that I am

1    neither of kin nor of counsel to the  parties

2    of said cause, nor in any manner interested in

3    the results thereof.

4                    This 16th day of December,

5    1999.

6

7

8

9    _____

10   Jennifer Ingram
     Reporter and Notary Public
     State of Alabama at Large

11

12

13

14

15

16

17

18

19

20

21

22

23