Deposition of: Wayne Russell
11/15/1999

Page 1

1      IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

2

3    WAYNE RUSSELL,                )

4                                  )

5          PLAINTIFF,              )

6                                  )

7    vs.                           )    CIVIL ACTION NO.

8                                  )    CV-98-1299-GR

9    TRANSAMERICA OCCIDENTAL )

10   LIFE INSURANCE; AUGUSTUS)

11   KIRBY CLEMENTS, III;          )

12   JEFFERY LEON CADDELL;         )

13   et al.,                       )

14                                 )

15          DEFENDANT.             )

16              DEPOSITION OF:  WAYNE RUSSELL

17

18

19

20

21

22

23

EXHIBIT
B

Deposition of:  Wayne Russell
11/15/1999

**Page 2**

S T I P U L A T I O N

1
2     IT IS STIPULATED AND AGREED, by and between
3  the parties, through their respective counsel, that
4  the deposition of WAYNE RUSSELL may be taken before
5  Paula Murrell, Commissioner and Notary Public, at
6  the offices of Beasley, Wilson, Allen, Crow, 218
7  Commerce Street, Montgomery, Alabama  36104 on the
8  15th day of November 1999, commencing at 10:10 a.m.
9     IT IS FURTHER STIPULATED AND AGREED that the
10 signature to and reading of the deposition by the
11 witness is waived, the deposition to have the same
12 force and effect as if full compliance had been had
13 with all laws and rules of Court relating to the
14 taking of deposition.
15    IT IS FURTHER STIPULATED AND AGREED that it
16 shall not be necessary for any objections to be made
17 by counsel to any questions, except as to form or
18 leading question, and that counsel for the parties
19 may make objections and assign grounds at the time
20 of trial or at the time said deposition is offered
21 in evidence, or prior thereto.
22
23

**Page 4**

I N D E X

1
2
3  Examination by Mr. Stewart . . . . . . . Page 7
4  Examination by Mr. Walker . . . . . . . . Page 169
5  Examination by Mr. Whitehead. . . . . . Page 245
6  Further Examination by Mr. Stewart. . . . Page 258
7
8  Reporter's Certification . . . . . . . . . Page 275
9
10    E X H I B I T S
11
12 Defendant's Exhibit 1 . . . . . . . . . . Page 53
13 defendant's Exhibit 2 . . . . . . . . . . Page 53
14 Defendant's Exhibit 3 . . . . . . . . . . Page 59
15 Defendant's Exhibit 4 . . . . . . . . . . Page 60
16 Defendant's Exhibit 5 . . . . . . . . . . Page 61
17 Defendant's Exhibit 6 . . . . . . . . . . Page 61
18 Defendant's Exhibit 7 . . . . . . . . . . Page 65
19 Defendant's Exhibit 8 . . . . . . . . . . Page 66
20 Defendant's Exhibit 9 . . . . . . . . . . Page 73
21 Defendant's Exhibit 10 . . . . . . . . . Page 76
22 Defendant's Exhibit 11 . . . . . . . . . Page 80
23 Defendant's Exhibit 12 . . . . . . . . . Page 93

**Page 3**

A P P E A R E N C E S

1
2
3  FOR THE PLAINTIFF:
4      Mr. Joseph "Jay" Aughtman
       BEASLEY, WILSON, ALLEN, CROW
5      218 Commerce Street
       Montgomery, Alabama 36104
6
   FOR THE DEFENDANT:
7
       Mr. Charles D. Stewart
8      SPAIN & GILLON
       2117 Second Avenue, North
9      Birmingham, Alabama  35203
10     Stephen E. Whitehead
       LLOYD, SCHREIBER & GRAY
11     Two Perimeter Park South, Suite 100
       Birmingham, Alabama 35243
12
       George W. Walker
13     COPELAND, FRANCO, SCREWS & GILLS
       444 South Perry Street
14     Montgomery, Alabama  36106
15 ALSO PRESENT:  STEVEN R. SHEPARD
16
   REPORTED BY:
17
       Paula Murrell
18     EDMONDSON REPORTING & VIDEO
       1030 Financial Center
19     Birmingham, Alabama 35203
20
21
22
23

**Page 5**

1  Defendant's Exhibit 13 . . . . . . . . . Page 114
2  Defendant's Exhibit 14 . . . . . . . . . Page 120
3  Defendant's Exhibit 15 . . . . . . . . . Page
4  Defendant's Exhibit 16 . . . . . . . . . Page 122
5  Defendant's Exhibit 17 . . . . . . . . . Page 123
6  Defendant's Exhibit 18 . . . . . . . . . Page
7  Defendant's Exhibit 19 . . . . . . . . . Page 137
8  Defendant's Exhibit 20 . . . . . . . . . Page 129
9  Defendant's Exhibit 21 . . . . . . . . . Page 130
10 Defendant's Exhibit 22 . . . . . . . . . Page 131
11 Defendant's Exhibit 23 . . . . . . . . . Page 142
12 Defendant's Exhibit 24 . . . . . . . . . Page 142
13 Defendant's Exhibit 25 . . . . . . . . . Page 149
14 Defendant's Exhibit 26 . . . . . . . . . Page
15 Defendant's Exhibit 27 . . . . . . . . . Page 154
16 Defendant's Exhibit 28 . . . . . . . . . Page 155
17 Defendant's Exhibit 29 . . . . . . . . . Page 156
18 Defendant's Exhibit 30 . . . . . . . . . Page 158
19 Defendant's Exhibit 31 . . . . . . . . . Page 159
20 Defendant's Exhibit 32 . . . . . . . . . Page 163
21 Defendant's Exhibit 33 . . . . . . . . . Page 203
22 Defendant's Exhibit 34 . . . . . . . . . Page 205
23

2  (Pages 2 to 5)

## Deposition of: Wayne Russell
### 11/15/1999

**Page 6**

1    I, Paula Murrell, a court reporter
2  acting as Notary Public, State at Large, certify
3  that on this date, as provided by Rule 30 of the
4  Alabama Rules of Civil Procedure, and the foregoing
5  stipulation of counsel, there came before me at the
6  offices of Beasley, Wilson, Allen, Crow, 218
7  Commerce Street, Montgomery, Alabama 36104
8  beginning at 10:10 a.m., WAYNE RUSSELL, witness in
9  the above cause, for oral examination, whereupon the
10  following proceedings were had:
11
12        WAYNE RUSSELL
13
14      was duly sworn and testified
15        as follows:
16
17      THE COURT REPORTER:  Do we have the usual
18  stipulations, Counsel?
19    MR. STEWART:  Yes.
20    MR. AUGHTMAN:  Yes.
21    MR. WHITEHEAD:  Yes.
22    MR. WALKER:  Yes.
23

**Page 7**

1  EXAMINATION BY MR. STEWART:
2    Q.  State your name, please, sir.
3    A.  Ernest Wayne Russell, Jr.
4    Q.  And how old are you, Mr. Russell?
5    A.  57.
6    Q.  What's your date of birth?
7    A.  9-22-42.
8    Q.  And social security number?
9    A.  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.
10    Q.  Where do you live?
11    A.  3326 Stratford lane.
12    Q.  Where is that?
13    A.  Montgomery.
14    Q.  Is that what I would refer to as
15  Montgomery proper, or is that on the outskirts of
16  Montgomery?
17    A.  No.  It's in the city.
18    Q.  In the city?
19    A.  Uh-huh.
20    Q.  How long have you lived there?
21    A.  Since '76.
22    Q.  Are you married?
23    A.  Yes, sir.

**Page 8**

1    Q.  Wife's name?
2    A.  Shirley Ann.
3    Q.  And how long have you been married to her?
4    A.  Coming up on 40 years, 39, 40.
5    Q.  How many children do you have?
6    A.  Three.
7    Q.  Names and ages.
8    A.  Okay.  This will be an educated guess.
9  Mitsy Ann Russell McIntyre is 36; Ronald W. Russell,
10  35; Tina Russell Douglas, 34.
11    Q.  You went to Auburn?
12    A.  I did.
13    Q.  When did you graduate?
14    A.  1964.
15    Q.  And where were you raised?
16    A.  Grew up on a farm down in south Montgomery
17  County.
18    Q.  And is the area called anything?
19    A.  Lapine, Raynold in that little area, right
20  in the middle all three of them.  Grew up on a
21  cattle farm and cotton farm, peanut farm.
22    Q.  Have you got any education since Auburn,
23  any advanced degrees?

**Page 9**

1    A.  No, sir.
2    Q.  And when did you start in the petroleum
3  business?
4    A.  December of '67.
5    Q.  And how did you get in that business?
6    A.  Well, my father was also a real small
7  jobber for Amoco, had three or four or five small
8  little peckerwood grocery store accounts down there
9  in the country.  And along with the farm work, I had
10  worked a little bit in his operation.
11      And when I finished Auburn, I went back
12  and worked down there for three or four years.  And
13  this little operation in Montgomery had been on the
14  market for a long, long time.  And when I bought it,
15  it had deteriorated down to two stores, two
16  stations.  Picked it up for a little of nothing and
17  started with nothing.
18    Q.  You said a little jobber.  You're talking
19  about an operation different from the one your
20  father had?
21    A.  Same type.
22    Q.  Same type.  But you're talking about you
23  bought another company?

**Edmondson Reporting & Video**
**\*Birmingham, Alabama 35203\***
*\*1030 Financial Center\**                    \*1-800-966-2333\*

## Deposition of: Wayne Russell
### 11/15/1999

Page 10

1   A. That's right.
2   Q. And what kind of oil supplier were they?
3   A. Texaco.
4   Q. Texaco?
5   A. Yes, sir.
6   Q. So what are you saying? You started off
7   with two stations in about '67, and you built it up
8   to where you are now?
9   A. That's right.
10   Q. And that's where you are. You had Texaco
11   retail outlets?
12   A. Well, Texaco and unbranded, some of my own
13   brands.
14   Q. How many retail outfits do you have?
15   A. Supply? Own? What is your question?
16   There's a lot of different answers.
17   Q. Well, I guess I'm referring to a retail
18   outlet as a station-convenient store type of
19   operation, which I understand you did, that you
20   probably owned and ran. Is that not accurate?
21   A. Well, like I say, there's a lot of answers
22   to the questions you ask. We owned a certain
23   number. We operate a certain number, and we supply

Page 11

1   a certain number.
2   Q. All right. How many do you own?
3   A. Probably 25.
4   Q. Okay. And how many then do you operate?
5   And I take it by operating that somebody else owns
6   it, and you've got some kind of contract to where
7   you --
8   A. Say 20 to 25 on that owned, because it
9   varies from time to time.
10   Q. Okay.
11   A. Say within the range of 20 to 25.
12   Q. And how many do you operate?
13   A. 19.
14   Q. Okay. And how many more would you supply
15   in addition to those?
16   A. Well, we supply all the rest of the
17   difference plus another 10 or 15.
18   Q. Okay. Is your office here in Montgomery?
19   A. It is.
20   Q. What's its address?
21   A. Physical address is 3378 Tankview Court.
22   Q. How many employees do you have?
23   A. I don't know to be honest with you but

Page 12

1   somewhere in the neighborhood of 300.
2   Q. And are you the president and CEO?
3   A. I am.
4   Q. And did you have a right-arm man, so to
5   speak?
6   A. No, sir. Everything is departmentalized.
7   And they all report to me.
8   Q. Okay. How many departments do you have?
9   A. Four.
10   Q. What are they and who are the heads of
11   those?
12   A. Okay. The accountant is Jerry Wood, vice
13   president of store operations is Deon Witherow, vice
14   president of sales and wholesale sales is Mike
15   Hartselle. And my brother is comptroller, Earl
16   Russell.
17   Q. Do you have a personal accountant other
18   than Jerry Wood?
19   A. Yes.
20   Q. And who is that? Is that Dan Lindsey?
21   A. Jackson Thorn.
22   Q. Who?
23   A. Dan Lindsey with Jackson Thorn & Company.

Page 13

1   Q. Is that a local accounting firm?
2   A. It is.
3   Q. How long has Mr. Lindsey been your
4   accountant?
5   A. More than 20 years. I don't know exactly.
6   Q. Okay. Who set up the Russell Insurance
7   Trust, founded the trust?
8   A. Leon Capouano I would think.
9   Q. You don't recall who did that?
10   A. I don't.
11   Q. Who handled that for the family, you or
12   your brother?
13   A. Myself.
14   Q. What role did Jerome Smith play in that?
15   A. He just worked for Leon Capouano.
16   Q. But the person who you dealt in connection
17   with setting that up was Leon?
18   A. That's correct.
19   Q. In one of your policy files with
20   TransAmerica, Mr. Russell, it refers to the fact
21   that your company back in 1994 had gross sales in
22   the neighborhood of about $38 million. What would
23   that be today?

4 (Pages 10 to 13)

Deposition of: Wayne Russell
11/15/1999

Page 14

1    A. In gross sales?
2    Q. Uh-huh.
3    A. In '94?
4    Q. No. I said that's what it said in '94.
5  What would your gross sales be today in '99?
6    A. It would be somewhat more. I don't know.
7  We usually have 5 or 10 percent increases annually.
8    Q. Do you belong to any professional or civic
9  organization here in Montgomery?
10    A. Have been and I'm not exactly -- I once
11  have been. I was a member of the Lions Club.
12    Q. Any others?
13    A. Most of the others were trade.
14    Q. Well, tell me about those. I'm interested
15  in those also. What trade organizations do you
16  belong to?
17    A. National Association of Texaco Wholesales
18  and I'm on the board of that.
19    Q. Okay. And being on the board of that
20  means what?
21    A. We meet annually and discuss policy
22  decisions.
23    Q. Okay. Any other trade associations,

Page 15

1  organizations?
2    A. I've been on the board of the Alabama
3  Oilmens Association.
4    Q. Alabama Oilmens Association?
5    A. Yes, sir. Not president.
6    Q. Who is entitled to be a member of the
7  Alabama Oilmens Association?
8    A. Anybody that distributes motor fuels in
9  Alabama and wants to pay their dues.
10    Q. And are y'all some type of lobbying group?
11    A. We have a lobbying group, sure.
12    Q. Have you ever been involved in lobbying
13  activities yourself?
14    A. Not in a long time.
15    Q. What time period are we talking about?
16    A. Probably in my 30s and 40s.
17    Q. Any other trade association?
18    A. That's about it.
19    Q. Did your children go to high school here
20  in Montgomery?
21    A. They did.
22    Q. Which high school?
23    A. They went to several of them.

Page 16

1    Q. Well --
2    A. Well, two finished Montgomery Academy.
3  And one went to Trinity, and all of them went to St.
4  James at one time.
5    Q. Okay. Do you have a retirement plan for
6  your employees?
7    A. Have had. Don't at the present. We're in
8  the process of redoing it. We had a couple of
9  million dollars in the plant and distributed it
10  several years ago, because it was not feasible to
11  continue doing it under the present guidelines. But
12  we do not as of now. That is something we're
13  working on and plan to have in the near future
14  again, but we don't have it now.
15    Q. Who is your stockbroker?
16    A. Well, Ben Easterling is who I've done most
17  of my business with.
18    Q. What brokerage house is he with?
19    A. Robinson-Humphrey, Smith Barney.
20    Q. Do you have a principle banker?
21    A. Well, I bank mainly with Regions.
22    Q. Regions?
23    A. Yes.

Page 17

1    Q. Used to be First Alabama?
2    A. Yes.
3    Q. And with whom -- well, who with Regions is
4  your principle banker?
5    A. Sam Dendy.
6    Q. How do you spell that?
7    A. D-e-n-d-y.
8    Q. D-e-n-d-y?
9    A. That's correct.
10    Q. How long has he been your banker?
11    A. 20, 25 years.
12    Q. You maintain a line of, a business line of
13  credit with them?
14    A. I do not.
15    Q. Do you presently have any business debt
16  with them?
17    A. No.
18    Q. How about personal debt?
19    A. No.
20    Q. And do you have a financial planner,
21  somebody that you call on to do consulting work or
22  that you consult with for financial planning?
23    A. No.

5 (Pages 14 to 17)

Deposition of: Wayne Russell
11/15/1999

Page 18

1    Q. Does the company have an attorney?
2    A. Leon Capouano.
3    Q. So he would be your personal attorney as
4 well as the company attorney?
5    A. That's correct.
6    Q. Do you have an attorney separate from Mr.
7 Capouano whose done any estate planning for you?
8    A. My son is an attorney also in that same
9 firm.
10    Q. Okay. Which son is that? Rusty?
11    A. That's correct.
12    Q. What would you say, Mr. Russell, is the
13 approximate amount of stocks and bonds that you
14 presently hold in value?
15    A. You know, I just really don't know to be
16 honest with you. It's sizable. But I don't know
17 how much.
18    Q. Well, can you give me some ball park
19 figure? Are we talking about over a million?
20    A. Yes.
21    Q. Over two?
22    A. Yes.
23    Q. Over five?

Page 19

1    A. Probably.
2    Q. Over ten?
3    A. I doubt it.
4    Q. So then probably over five but most likely
5 less than ten?
6    A. That's true.
7    Q. All right. How long have you been trading
8 in stocks and bonds?
9    A. Probably 20 years or more.
10    Q. Do you have any interest in real estate?
11    A. Yes, sir.
12    Q. Besides your house and your business
13 property?
14    A. Yes.
15    Q. Where would that be?
16    A. It would be too numerous to name.
17    Q. You have a number of investments in real
18 estate?
19    A. Yes.
20    Q. Would that be commercial real estate, or
21 would it just be vacant land or both?
22    A. A combination.
23    Q. A combination?

Page 20

1    A. Yes.
2    Q. What would be your ball park estimate as
3 to the value of your real estate holdings?
4    A. I don't know.
5    Q. Well, can we go through the same thing?
6 Would it be over five million?
7    A. Sure.
8    Q. Ten?
9    A. It would be somewhere between 30 and 50.
10    Q. 30 and 50. Now, I'm talking about
11 separate and apart from where your business property
12 is and your house.
13    A. I know what you're talking about.
14    Q. I got you. How long have you been
15 investing in real estate?
16    A. A long time.
17    Q. Now, without -- and I'm not really trying
18 to offend you. And I don't think this is an
19 offensive question. But from what I gather from
20 what you told me and obviously knowing the size
21 insurance policies you bought, you would classify
22 yourself as a very successful businessman, wouldn't
23 you?

Page 21

1    A. Fairly.
2    Q. Fairly. And I assume you would classify
3 yourself as being a pretty astute businessman.
4    MR. AUGHTMAN: Object to the form.
5    A. Fairly.
6    Q. You pretty much tend to your financial
7 affairs and running a company of 300 employees.
8    A. Yes, sir.
9    Q. Well, you're certainly familiar with
10 fluctuations of market interest rates, aren't you?
11    A. I don't understand the question.
12    Q. Well, you're certainly familiar with the
13 fact that market interest rates go up and down. And
14 when they go up and down, they affect earnings on
15 your investments?
16    A. Yes, sir. Somewhat.
17    Q. Why was the Russell Family Insurance Trust
18 formed?
19    A. It was done for the estate planning and to
20 transfer as much to my children and grandchildren as
21 possible during my lifetime.
22    Q. And was this done through the advice of
23 your attorney and accountant?

6 (Pages 18 to 21)

Deposition of: Wayne Russell
11/15/1999

Page 22

1    A. It was.
2    Q. Are you presently involved in any other
3  lawsuits besides this one against TransAmerica?
4    A. Yes, sir.
5    Q. What are those or it, whichever -- how
6  many? Let's start off with that.
7    A. Just one other.
8    Q. One other?
9    A. Yes, sir.
10    Q. And what lawsuit is that?
11    A. Is it American General or General
12  American? One or the other. I think it's American
13  General.
14    Q. So you filed suit against American
15  General?
16    A. Yes.
17    Q. And who represents you in that suit?
18    A. Lynn Jinks.
19    Q. Union Springs?
20    A. That's correct.
21    Q. So the Beasley firm does not represent you
22  in that case at all?
23    A. No.

Page 23

1    Q. And when was that suit filed?
2    A. In the last year, year and a half.
3    Q. And is there an individual defendant in
4  that suit?
5    A. An individual defendant would be the
6  insurance company and the agent that sold me.
7    Q. And who was that?
8    A. I'm trying to remember the guy's name. I
9  can't recall his name now.
10    Q. How did you -- how did it come about that
11  you bought a policy from American General?
12    A. Well, we had had some problems with -- had
13  found out -- I also have a policy with Phoenix Life,
14  Phoenix Home Life.
15    Q. Phoenix Mutual?
16    A. Phoenix Mutual or whatever it is. And we
17  had some problems with them on a policy. And I was
18  talking about needing additional insurance to fund a
19  trust, a charitable trust, $2 million charitable
20  trust. And we wound up with General American as the
21  company to supply that insurance.
22    Q. Well, I hear what you're saying. Who
23  formed the charitable trust for you? Again, we're

Page 24

1  looking at Capouano --
2    A. No. No. No. We used a different firm
3  there. They were not experienced with that. Dan
4  Lindsey's son and Tommy Mancuso what's the name of
5  that firm?
6    Q. Rushton, Stakely & Johnson?
7    A. They handled this formation of the
8  charitable trust.
9    Q. And Tommy did that?
10    A. Yes.
11    Q. Mancuso?
12    A. Yes.
13    Q. And then was it the advice that you
14  received from Tommy that you needed an insurance
15  policy to fund the trust?
16    A. That's correct.
17    Q. So then how did you go about selecting
18  American General as the insurer for that policy?
19    A. I'm trying to think of how it came about.
20  I just don't remember right now the specifics of how
21  it came about.
22    Q. Did Mr. Easterling assist you in that?
23    A. He put me in touch with this guy in

Page 25

1  Birmingham who at that time -- I remember now. At
2  that time, Mr. Easterling, who is a broker for
3  Robinson-Humphrey told me that he could get some
4  insurance for me and put me in touch with this guy
5  in Birmingham who was -- is it American General or
6  General American?
7    Q. The company is American General Life
8  Insurance Company. There is such a company. I can
9  say that. I don't know which company --
10    A. American General. I get confused on the
11  two. They put me in touch with this broker in
12  Birmingham, who is an estate broker for them. And
13  the two of them came up with a policy that fit our
14  needs.
15    Q. And you say the two: Mr. Easterling in
16  conjunction with this broker in Birmingham?
17    A. Yes. Mr. Easterling got a small
18  commission out of it. But he didn't know anything
19  about insurance. But it was really the broker in
20  Birmingham.
21    Q. All right. Did either your accountant or
22  did Mr. Mancuso review the proposals in connection
23  with that policy before you bought it?

7 (Pages 22 to 25)

Deposition of:  Wayne Russell
11/15/1999

Page 26

1    A. No, sir.  They just told me what I need.
2    Q. And what was that?
3    A. I told them what I wanted, and they told
4  me the kind of policy that would, you know, that --
5  I don't know that they -- let me restate that.  I
6  went to them with a need for funding a charitable
7  trust.  And they told me after searching how much I
8  wanted to put in there and discussing my estate and
9  everything.  And I came up with I wanted to fund it
10  with $2 million.  They did the trust.  I bought the
11  insurance.
12    Q. Was this -- okay.  And you went to Mr.
13  Easterling to assist you in finding an insurance
14  company that would sell you a policy that you would
15  be satisfied with?
16    A. That's right.
17    Q. Is that what you're basically saying?
18    A. Yes.
19    Q. Was this policy bought through the payment
20  of annual premiums, or was it bought as a one-time
21  dump in?
22    A. It was a ten-year pay, guaranteed ten-year
23  pay.

Page 27

1    Q. And then what's the lawsuit about?
2    A. Well, at this present time, like I told
3  you, I'm involved with you in this lawsuit, had a
4  similar policy with Phoenix Owned Life that I did
5  not file a lawsuit on but wound up having to go
6  through the ADR process to get it settled.
7    Q. What was -- well, let me do one thing at a
8  time.
9    A. So I knew I had a problem.  So I turned
10  over all my policies to a family friend, who is,
11  he's an attorney also.  His name is Joel Gregg.
12  It's a friend of my son's, who is an attorney, to
13  just review and look at it.  And he advised me and
14  my son what to do.
15    Q. Well, did you see Mr. Gregg as an
16  attorney?
17    A. He is an attorney.
18    Q. Well, I know that.  I know is he an
19  attorney.  But did you consult him as your attorney,
20  or did you consult him just as a friend of your
21  son's?
22    A. Just as a friend of my son's.
23    Q. I guess what I'm asking you is:  Do you

Page 28

1  consider him your attorney?
2    A. No.  He's a friend of my son's.  He has
3  experience in looking at insurance policies and
4  trying to understand them a lot better than myself.
5  So I don't understand them myself.  But anyway, we
6  let him look at them and advised my son, who is an
7  attorney also, what needed to be done.  And we took
8  those steps.
9    Q. All right.  Well, the American General
10  policy, you say that the policy you bought provided
11  that you were to make ten years of premium payments
12  on it?
13    A. Yes, sir.
14    Q. How much were you paying a year for that
15  policy?
16    A. I don't know the exact figure.  It was
17  around 20 though.
18    Q. Around 20 a year?
19    A. Yes, sir.  I don't know the exact figure.
20    Q. And when did you buy that policy?  '95, 6,
21  7, somewhere in that time frame?
22    A. About '97 or 8.
23    Q. About '97 or 8?

Page 29

1    A. Late '97, early '98, somewhere in there to
2  the best of my recollection.
3    Q. And what are you saying, that Mr. Gregg
4  reviewed that policy and gave you some opinion that
5  the policy provided for something different than
6  what you thought?
7    A. His advice was to turn them all over --
8    MR. AUGHTMAN:  I'm not going to let you
9  get into that.
10    MR. STEWART:  Well, he just got through
11  saying --
12    MR. AUGHTMAN:  Well, we're not going to
13  get into it.  That's his lawyer.  He's a lawyer in
14  this case, co-counsel in this case.  He's not going
15  to get into it.
16    MR. STEWART:  He isn't on the pleadings.
17    MR. AUGHTMAN:  Yeah, he is.  He's not
18  going to get into what he talked to Joel about.
19    MR. STEWART:  He has his own pleadings?
20    MR. AUGHTMAN:  In this case, yes.
21    MR. STEWART:  Have y'all got your
22  pleadings?  Have you seen him on the pleadings in
23  this case?

8  (Pages 26 to 29)

### Deposition of: Wayne Russell
### 11/15/1999

Page 30

1    MR. WALKER: I'm not sure.
2    MR. AUGHTMAN: And he's just not going to
3  get into what he talked with Joel Gregg about.
4    MR. STEWART: Well, we just might have to
5  take it up with the judge. I mean, if you're
6  instructing him not to answer, fine.
7    MR. AUGHTMAN: That would be fine.
8    MR. STEWART: Oh, it does show him being a
9  lawyer on this case.
10    Q. (BY MR. STEWART) All right. Tell me what
11  your problems were with the Phoenix policy.
12    A. The problems were I had firm policy, I
13  thought, with ten payments. That's what I
14  instructed the agent when I bought the policy. I
15  was not going to make but ten payments and to sell
16  me something that I would only have to make ten
17  payments. And it would fund itself from then on and
18  had it strictly understood to be very conservative
19  in whatever he did in coming up with this policy.
20  But I was not going to make but ten payments. And
21  wound up I had to make more than ten payments to set
22  it up.
23    Q. Wasn't Mr. Clements the agent that sold

Page 31

1  you that policy?
2    A. He was.
3    Q. There was a class action lawsuit involving
4  the Phoenix policy, wasn't there?
5    A. That's right. That's what I hear.
6    Q. And you say you settled your claim against
7  Phoenix through arbitration?
8    A. That's right.
9    Q. Did you receive something through
10  arbitration different than what your policy
11  provided?
12    MR. AUGHTMAN: Object to the form.
13    Q. (BY MR. STEWART) What did you receive out
14  of the arbitration?
15    MR. AUGHTMAN: Was it confidential?
16    THE WITNESS: I don't know.
17    MR. STEWART: No. It was not
18  confidential.
19    A. What did it take to settle it? Is that
20  what you're saying?
21    Q. Well, yeah. I mean, you said you settled
22  it through arbitration and --
23    A. I had to pay an extra year and a half

Page 32

1  premium to settle it. Well, it would be 300. It's
2  a paid up policy.
3    Q. Okay. So you have a paid up policy with
4  them?
5    A. Yes. Well, it's been negotiated. But I
6  don't have a policy yet. All of the paperwork is
7  being negotiated and it's finalized. They're in the
8  process of getting it to us.
9    Q. Who represents Phoenix in that process?
10  Who represents the insurance company?
11    A. The ADR process is who we were dealing
12  with. I don't know. They made the decision the --
13  what do you call it -- the arbitrators or whoever,
14  you know.
15    Q. I got you. What's the total amount of
16  premium payments you have made?
17    A. There again, I don't know what the
18  payments were. I don't exactly recall. I remember
19  I had to pay an additional year and a half.
20    Q. Well, what I'm trying to find out is you
21  said the policy -- your understanding was that you
22  would have to pay ten?
23    A. That's right.

Page 33

1    Q. But you paid more than ten?
2    A. I wound up paying more than that, and I
3  was very irritated and agitated and mad as hell
4  about it.
5    Q. Well, I'm just trying to find out how many
6  premium payments you have paid today. And then
7  you're saying that in order to settle the claim, you
8  had to pay one and a half?
9    A. To my recollection, we paid 11. And we
10  still owe the half, by my best recollection.
11    Q. Oh, so you had to pay one and a half more
12  than the ten?
13    A. Yes, sir.
14    Q. That you understood that you had to pay?
15    A. Yes, sir.
16    Q. And that was settled through the
17  arbitration process?
18    A. Yes.
19    Q. Has the American General case come to
20  trial?
21    A. No, sir.
22    Q. Have you given a deposition in that case?
23    A. No, sir.

9  (Pages 30 to 33)

Deposition of:  Wayne Russell
11/15/1999

Page 34

1    Q.  Have you given any depositions ever in a
2  case besides this one?
3    A.  Yes.
4    Q.  What case was that?
5    A.  I'm trying to remember the name of it.
6  Jessie Jackson versus Russell Petroleum Corporation,
7  I believe.
8    Q.  What was that case about?
9    A.  It was a dealer that had sued us for
10  contract -- not following a contract that we had
11  with him that was a claim, the basis of the lawsuit.
12    Q.  Is that case over?
13    A.  Yes.
14    Q.  When was it disposed of?
15    A.  Several years ago.
16    Q.  Was it tried?
17    A.  It never went -- it was two insurance
18  companies.  We had settled it.
19    Q.  Who defended you in that case?
20    A.  I'll tell you in a minute.  I can't think
21  of his name right now.
22    Q.  Was it filed here in Montgomery?
23    A.  Yes.  Yes.  If it's that important, we can

Page 35

1  come back to it.
2    Q.  All right.  I assume, Mr. Russell, that
3  you've never been in any kind of criminal trouble?
4    A.  No, sir.
5    Q.  What's the state of your health?
6    A.  Good as far as I know.  I'm overweight a
7  little bit but other than that --
8    Q.  Have no health problems?
9    A.  No.
10    Q.  How about your wife?
11    A.  None.  I take that back.  In the last
12  year, she is a borderline diabetic.  But other than
13  that --
14    Q.  Is she taking insulin?
15    A.  No.
16    Q.  Do you take any kind of medication?
17    A.  No, sir.
18    Q.  Okay.  Have you had any disputes with any
19  insurance companies other than the three you've told
20  me about?
21    A.  No, sir.
22    Q.  What insurance do you presently have in
23  force today?  I'm not talking about liability

Page 36

1  insurance that you may have on yourself and your
2  company.  I'm talking about life insurance.
3    A.  Are you talking total policies?
4    Q.  Yeah, and companies.  Do you know?
5    A.  Close.  Close.  7 and a half million with
6  Phoenix Life.  I think 8 million with TransAmerica.
7    Q.  Okay.
8    A.  2 million with American General, somewhere
9  in the neighborhood of 2 million with New England,
10  in the neighborhood of.  That's about it.
11    Q.  Is all of this insurance for the purpose
12  of funding -- well, you said 2 million is with --
13    A.  Well, let me take that back.  When you say
14  me personally -- when I described that, that
15  includes the insurance trust policies that I'm
16  responsible for, I guess, in a way my children own.
17  So if you get back to just what I own, no, it
18  wouldn't be anything like that.  I'm trying to --
19    Q.  So when you say -- all right.  Well, the 2
20  million with New England, does that fund --
21    A.  They own that.
22    Q.  -- the family trust?
23    A.  They own that.

Page 37

1    Q.  Who is they?
2    A.  My children.
3    Q.  Okay.  They're the owners of that and
4  beneficiaries?
5    A.  That's right.
6    Q.  The 7 and a half million for Phoenix
7  Mutual, does that fund the insurance family trust?
8    A.  I'm not sure on some of this stuff.  I'm
9  not as up-to-date as I needed to be on this.  So I'm
10  not sure.  But either myself or my children or the
11  children's trust owns a total of what I just gave
12  you.
13    Q.  Well, do you individually have any
14  insurance separate from what you just told me about?
15    A.  Uh-huh.
16    Q.  All right.  What is that?
17    A.  I believe a half million with y'all is
18  separate.
19    Q.  Okay.  The $500,000?
20    A.  Yes.
21    Q.  Okay.  That would be included in the 8
22  million that you mentioned with TransAmerica.  Any
23  others?

10  (Pages 34 to 37)

Deposition of: Wayne Russell
11/15/1999

Page 38

1    A. Not that I can think of.
2    Q. Okay. How long have you known Gus
3 Clements? A long time, haven't you?
4    A. We went to college together.
5    Q. Okay. Gus has been in the insurance
6 business, I think, since he left college.
7    A. That's correct.
8    Q. Is that how long you've been dealing with
9 him in connection with insurance?
10    A. Shortly thereafter.
11    Q. You bought some insurance from him shortly
12 after you graduated?
13    A. Not too long after.
14    Q. Okay. The New England policies that you
15 -- you did surrender some six policies when you
16 purchased your $500,000 policy with TransAmerica,
17 did you not?
18    A. I did.
19    Q. Okay. You mentioned that you still have
20 -- well, let me keep this straight. Were those New
21 England policies, those six policies, were those
22 purchased from Gus?
23    A. Yes.

Page 39

1    Q. You mentioned you also still have $2
2 million worth of insurance with New England.
3    A. The children do. I don't.
4    Q. Were they purchased through Gus?
5    A. Yes.
6    Q. The Phoenix Mutual policy was purchased
7 through Gus; right?
8    A. It was.
9    Q. Any other insurance that you purchased
10 through Gus?
11    A. I think the Phoenix, the New England and
12 the TransAmerica pretty much covers what I purchased
13 through Gus.
14    Q. Okay. How did you happen to contact Gus
15 about these policies you bought from TransAmerica in
16 November of '94? How did that come about?
17    A. I called him up and invited him to give me
18 a quote.
19    Q. All right. But was there something that
20 occurred between you and your lawyer or you and your
21 accountant that made you realize a need for buying
22 additional insurance?
23    A. You know, all of it was on advice from

Page 40

1 them to, of my needs insurance-wise.
2    Q. So is this accurate, that you had talked
3 with Mr. Capouano about your estate, estate
4 planning, estate tax issues and so forth?
5    A. That's right.
6    Q. You already had the insurance family trust
7 set up, did you not?
8    A. Right.
9    Q. And he was telling you based on your
10 financial situation you needed more insurance to
11 fund the trust because of what estate taxes were
12 going to do to you; is that right?
13    A. Right. He conversed with my accountant,
14 and they told me what I needed to buy.
15    Q. All right. And did --
16    A. Not what I needed buy but amounts.
17    Q. Amounts. Was a last to die policy
18 suggested by them?
19    A. I don't remember. I doubt it. I don't
20 think so. That would have been by Gus. I think
21 that he told me that that was the thing I needed to
22 do, because I could buy more coverage, and my estate
23 wasn't going to be settled anyway if I died first.

Page 41

1 So it wouldn't be needed until the second step. And
2 the chances would be strong that I would probably
3 die -- historical charts show that men die sooner.
4 So Gus advised me to, from those standpoints to --
5    Q. So you're saying it was Gus that suggested
6 the last to die policy and not something that had
7 already been suggested to you when you called Gus?
8    A. That's correct.
9    Q. When you talked to Mr. Clements about this
10 need for additional insurance, what, if anything,
11 did he say to you about different insureds about
12 whom he or for whom he sold insurance and the
13 availability of this last to die policy?
14    A. Well, when this need arose, New England
15 didn't have anything at that time that he considered
16 what I needed, the best I can remember. And I had
17 full confidence in Gus. And he says, Look, I
18 represent other companies other than New England,
19 and I can get you whatever you need, and nobody will
20 beat my price.
21    Q. And then how was that conversation left,
22 that he was going to get you some proposals?
23    A. That's correct.

11 (Pages 38 to 41)

Deposition of:  Wayne Russell
11/15/1999

Page 42

1    Q. Do you know how many different companies'
2  proposals that he sent you?
3    A. Each time it was either two or three.  But
4  you know, he got two or three competitive quotes
5  from different companies.
6    Q. Do you remember the names of the
7  companies?
8    A. I don't today.  No.  I really don't.  I
9  know one was Connecticut something, but I don't know
10  the full name of the company.
11    Q. Do you have any of those proposals?
12    A. I don't.
13    Q. Well, do you remember how many different
14  proposals you received?  And by different, I mean
15  different companies' proposals you received before
16  you decided on the TransAmerica policies?
17    A. I believe they had the best price of
18  three.
19    Q. Of three?
20    A. Yes.
21    Q. So you think you reviewed a total of three
22  and selected TransAmerica?
23    A. I think that's correct.  But I don't know

Page 43

1  the names of the other two companies that he had
2  quoted in with it.  I'm sure he could tell you.
3    Q. Now, was it Mr. Capouano and/or your
4  accountant that told you you needed 7 and a half
5  million dollars?
6    A. I think they told me, gave me a range of
7  what I needed.  I decided on the final amount in all
8  cases.
9    Q. Do you remember what the final amount was?
10    A. I sure don't.  I can't remember.  It's
11  been so long.  I can't remember.
12    Q. Did you make the decision to buy the
13  TransAmerica policy, policies through just phone
14  conversations with Gus, or did y'all have any
15  face-to-face meetings about it?
16    A. We had face-to-face meetings.
17    Q. How many?
18    A. I don't remember.  Two or three.
19    Q. Two or three would be more than three?
20    A. Possible.  But when I just said I don't
21  remember, I'm telling you the honest truth, I don't.
22    Q. That's right.  Well, of course, we know
23  you had one meeting when you signed the application.

Page 44

1    A. Yeah.  I think it would be somewhere in
2  the neighborhood of two to five, in that range would
3  be probably my guess.
4    Q. Where did those meetings take place?
5    A. I don't know that.  But I would imagine
6  most of them took place in my office.
7    Q. Your office?
8    A. I would imagine.
9    Q. Do you recall ever going to his office?
10    A. No, sir.
11    Q. Do you recall going to anyone else's
12  office besides your own to discuss this insurance?
13    A. No, I don't recall.
14    Q. Was anyone ever present in discussing the
15  TransAmerica Insurance other than you and Gus?
16    A. In discussing TransAmerica?
17    Q. Uh-huh.
18    A. Yeah.  He had an agent with him, I think,
19  that -- is it Jeff Caddell?  That --
20    Q. Well, you have sued Mr. Caddell?
21    A. Yes.  I think Mr. Caddell was portrayed to
22  me as being the guy that was an agent or whatever or
23  the broker that handled TransAmerica in this part of

Page 45

1  the country.
2    Q. How many times did you meet Mr. Caddell?
3    A. This would be a guess.  Three or four.
4    Q. So you think that --
5    A. On all the policies that, you know,
6  TransAmerica policies.
7    Q. Well, you understand that you bought three
8  TransAmerica policies.
9    A. Yes.
10    Q. You bought two on one occasion and one on
11  other occasion.
12    A. I met Mr. Caddell I know on the first two.
13  I may not have met him on the last one.  I met him
14  on the first, I know, two big ones.
15    Q. Okay.  And how many meetings do you recall
16  having then in connection with the first two?
17    A. There again, I'm going to say two to five
18  in that range.  I don't know exactly.
19    Q. Well, let me ask you this:  Was anyone
20  present -- let me back up.  Was Mr. Caddell present
21  during all the face-to-face meetings you had on the
22  first two concerning the TransAmerica policies?
23    A. No, sir.

12  (Pages 42 to 45)

Deposition of:  Wayne Russell
11/15/1999

Page 46

1    Q. Okay.  So you may have had some meetings
2  with just Mr. Clements --
3    A. That's right.
4    Q. And then -- well, let me ask you this:
5  Was Mr. Clements present in connection with all the
6  meetings you had on the TransAmerica policies?
7    A. To the best of my recollection.
8    Q. Okay.  So you had some meetings possibly
9  with just Mr. Clements and you present?
10    A. Uh-huh.
11    Q. And you had some meetings where you all
12  three were present, meaning, Clements, Caddell and
13  you?
14    A. That's right.
15    Q. But you had no private meeting or meetings
16  where just you and Mr. Caddell were present?
17    A. If we did, I don't remember.
18    Q. And your best recollection is that all the
19  meetings took place in your office?
20    A. Uh-huh.
21    Q. Okay.  If you --
22      MR. AUGHTMAN:  You need something to
23  drink?

Page 47

1      (A short break was taken.)
2    Q. (BY MR. STEWART) Mr. Russell, the way I
3  understand what you've testified to so far is that
4  the discussions about buying the TransAmerica
5  policies emanated from your contacting Gus Clements.
6    A. That's correct.
7    Q. What role did Mr. Caddell play as far as
8  discussions with you about the TransAmerica
9  Insurance?
10    A. He was kind of as an advisor to Gus on any
11  points in the policy.  So I don't remember exactly
12  how much, but probably 90 percent of the
13  conversation was with Gus and probably 10 percent
14  with Jeff.  He was just there as an advisor and
15  didn't have a whole lot of conversation to be honest
16  with you.
17    Q. Do you remember --
18    A. Except to verify what Gus said basically
19  is the way I remember it.
20    Q. Do you remember anything said by Mr.
21  Caddell in any of these meetings concerning the
22  TransAmerica Insurance?
23    A. Do I remember anything?

Page 48

1    Q. Uh-huh.
2    A. At this present time, I specifically don't
3  remember specifically what was said.
4    Q. Tell me how the issue of replacing your
5  New England policies came about.
6    A. After the two bigger policies were bought,
7  Gus contacted me one day several months later and
8  says, I've got an idea, that I think you ought to
9  turn all those smaller New England policies to
10  TransAmerica in one policy.  He says, I think that
11  would be the thing to do to, convert all those into
12  one policy, roll them over into one policy.  And
13  TransAmerica probably has the best price right now,
14  so I would recommend that you do that.  I listened
15  to him.
16    Q. Well, did this conversation you just
17  testified to, did that take place on the phone?
18    A. I would imagine he originated it with a
19  phone call, yes.  And then showed -- came by and
20  discussed it with me.
21    Q. Had the subject of converting these New
22  England policies to a TransAmerica policy come up
23  during the discussions in buying the insurance for

Page 49

1  the family trust, or was this the first time that
2  subject had come up?  Do you understand what I'm
3  saying?  You said he contacted you about two months
4  later --
5    A. Several months later.  I don't know
6  exactly.
7    Q. Well, whatever.  Several months later
8  about converting the New England policies.  And I
9  guess what I'm asking is:  Is that the first time
10  that came up?
11    A. Oh, sure.
12    Q. In other words, that was after you had
13  already bought the $5 million policy and 2 and a
14  half million dollar policy?
15    A. Yes.
16    Q. And was Mr. Caddell involved in any of the
17  transactions concerning the $5 million policy?
18    A. I don't remember exactly.  But if I had to
19  make a guess, I would say no.
20    Q. Do you know how many conversations you had
21  with Mr. Clements about the $500,000 policy?
22    A. I don't know.
23    Q. Do you know how many meetings you had with

13  (Pages 46 to 49)

Deposition of:  Wayne Russell
11/15/1999

Page 50

1    him?
2        A.  No, sir.  I would assume it would be
3    somewhere in the same range as the others.  Normally
4    it takes within two and five meetings in my judgment
5    to make it happen.
6        Q.  Okay.  Well, after this phone call in
7    which he suggested to you that you convert your New
8    England policies over to one TransAmerica policy,
9    did you ever discuss with him anymore in detail
10   about what you had with New England versus what you
11   would be getting with TransAmerica?
12       A.  He came to me knowing or he had a chart
13   showing enlisting my New England policies, the face
14   value amounts and what the cash values were.
15           And to the best of my recollection, he
16   advised me that that would buy more insurance with
17   TransAmerica than what those cash values were -- not
18   cash values but what the policies were worth, not
19   the cash values were.
20           And I listened to his recommendation.
21   And we wound up converting the policy to
22   TransAmerica upon his recommendation.
23       Q.  All right.  Now, let me see if I

Page 51

1    understand what you're saying.  First of all, do you
2    have that chart anywhere?
3        A.  No.
4        Q.  Okay.  Of course, he was the writing agent
5    on the New England policies?
6        A.  He wrote those, that's correct.
7        Q.  So he had access to that information that
8    he had on the chart?
9        A.  Right.
10       Q.  And he showed you the six New England
11   policies, the face amount and then the present cash
12   value in each of those policies?
13       A.  Uh-huh.
14       Q.  Do you recall how much you were paying in
15   premiums for the six policies?
16       A.  I have no recollection of what that total
17   would be.
18       Q.  Okay.  Did you discuss the difference in
19   premiums?  Was that an item you discussed?
20       A.  I think I did, and I think he told me if
21   we did this, we wouldn't have to make anymore
22   payments.  We would take the cash values of those
23   New England policies.  To the best I can recollect,

Page 52

1    we take the cash values of those New England
2    policies and roll it into a one-pay policy, whatever
3    that would get.  We would just roll it over and get
4    the maximum amount of insurance that we could get
5    and not have to ever make another payment.
6        Q.  Okay.  Do you recall that he initially
7    gave you an illustration that it would take about a
8    $70,000 one-time payment to buy $500,000 worth and
9    that y'all as the surrenders were done that you
10   ended up with, in fact, $73,000.  Do you remember
11   that?
12       A.  I know the only thing I remember is that I
13   remember something about a 73,000 being the amount
14   of my cash values.  That's all I remember.
15       Q.  Well, do you remember that you did take,
16   you did surrender the six New England policies and
17   you took the cash values in those policies and
18   applied it all to the TransAmerica policy?
19       A.  That's correct.
20       Q.  Do you remember him discussing with you
21   that there would be no tax consequences in
22   connection with that?
23       A.  I don't remember that.

Page 53

1        Q.  You don't?
2        A.  No, sir.
3            (Defendant's Exhibit No. 1 was marked
4            for identification and will not be
5            attached to the deposition.)
6        Q.  Mr. Russell, I'm going to show you what
7    I've marked as Defendant's Exhibit 1, which is an
8    illustration for -- a TransAmerica illustration for
9    a $500,000 policy that shows a one-time payment of
10   $70,000.  Does that look familiar to you?
11       A.  No, sir.
12       Q.  So looking at that, that doesn't refresh
13   your recollection that in these initial discussions
14   Mr. Clements said, Well, we don't know exactly what
15   your cash value will be, but it's going to be around
16   $70,000, and for $70,000 you'll be able to buy this
17   $500,000 policy?  You don't remember that?
18       A.  I don't remember anything about 70,000,
19   and I don't remember anything about, anymore than
20   just the chart here that show the first three pages.
21   That's all I remember.  I don't remember additional
22   pages that you show here on this.
23           (Defendant's Exhibit No. 2 was marked

14  (Pages 50 to 53)

## Deposition of: Wayne Russell
### 11/15/1999

**Page 54**

1    for identification and will not be
2    attached to the deposition.)
3        MR. STEWART: Jay, on this next exhibit
4    it's the $73,000 illustration and the copies that I
5    was provided has some writing cut off at the top.
6    If you've got that so we can have the complete copy.
7        MR. AUGHTMAN: I've got a copy.
8        MR. STEWART: That's fine.
9        MR. AUGHTMAN: I don't know if it's any
10    better than yours.
11        MR. STEWART: Just so long as it shows all
12    that writing at the top.
13        MR. AUGHTMAN: I'll check. I don't know
14    if you can read it. It might be a little more
15    clear.
16        MR. STEWART: Is this the best we have?
17        MR. AUGHTMAN: The best I have.
18        Q. (BY MR. STEWART) Do me a favor, Mr.
19    Russell. Do you see some writing up there at the
20    top of that?
21        A. Uh-huh.
22        Q. Is that your handwriting?
23        A. What writing are we -- point to what

**Page 55**

1    you're talking about.
2        Q. Right up here at the very top.
3        A. Gus Clements it looks like it is. To be
4    honest with you, I can't see enough of the other to
5    know.
6        Q. Well, that's what I'm trying to do. I'm
7    trying to it make out. It's very dim as you can
8    see. And if you wrote it, I was hoping that you
9    could tell us what it says.
10        A. I don't know what it says.
11        MR. STEWART: Do we know where the
12    original of that is, Jay? I mean, I hate to come
13    down here and retake Mr. Russell's deposition just
14    to have him identify that writing and what it means.
15        MR. AUGHTMAN: This is the only copy I
16    have. Wayne may have a copy with a little better
17    writing in his possession.
18        MR. STEWART: Obviously the original of it
19    contains the writing.
20        MR. AUGHTMAN: It may be. But I'm saying
21    I don't have it, so I'm not sure.
22        Q. (BY MR. STEWART) Do you have the original
23    of that illustration in your records, Mr. Russell?

**Page 56**

1        A. I'm not aware that I do or not. I don't
2    know that I ever had an original to be honest with
3    you. All I know is -- I think that's my writing
4    right there, but the rest of it I'm not sure.
5        Q. Well, I mean, just so we're clear about
6    it. We understand that there was a piece of paper
7    in which the original words "Gus Clements" was
8    written on it. That's what I'm asking about. Do
9    you have any idea where that is?
10        A. I don't. It could possibly be the papers
11    that I turned over to him. But I don't have any
12    idea where that is. I can't read it.
13        Q. Well, the main thing --
14        A. It's got the date. I can read the date.
15        Q. What date are you referring to?
16        A. It looks like '95, May of '95.
17        Q. 5-11-95?
18        A. That's what it looks like.
19        Q. I'm reading upside down so --
20        A. That's not totally plain to be honest with
21    you.
22        Q. Does the date that's written there, does
23    that appear to be in your handwriting?

**Page 57**

1        A. Yes.
2        Q. What about the other markings? Let's look
3    at the one that has been identified in the record.
4    What about the other markings. Let's look up here
5    in this right-hand column where, under the
6    guaranteed interest rate. There's a circle around
7    4 percent. Did you make that circle there?
8        A. No.
9        Q. Okay. Do you know who made it?
10        A. No, I don't.
11        Q. These other markings, let's come down to
12    about the middle of the page where the number 1,986
13    is partially underlined. Did you put that mark
14    there?
15        A. I don't know where you're talking about.
16        Q. Right there.
17        A. I did not.
18        Q. And how about the upside down V? Did you
19    put that mark there?
20        A. No, I did not.
21        Q. Do you know when it was put there?
22        A. I do not.
23        Q. Do you know by whom?

15  (Pages 54 to 57)

## Deposition of:  Wayne Russell
### 11/15/1999

Page 58

1      A. I do not.
2      Q. All right. Let's look over here.
3      A. My attorney may have done it, I don't
4   know, in analyzing these things. I haven't any
5   idea.
6      Q. All right. Let's look over here in the
7   left-hand column. There are two marks, one below
8   the number, the year No. 19 and 71. There's a mark
9   there. Did you do that?
10      A. No, sir.
11      Q. Do you know who did that?
12      A. It could have been Jay. I don't know.
13      Q. And below the year 20, 1972 there's
14   another mark. Did you do that?
15      A. No, sir.
16      Q. Do you know who did that?
17      A. No, sir.
18      Q. Do these marks have any significance to
19   you at all?
20      A. Not to me, no.
21      Q. So as I understand it, you don't know when
22   they were put there and by whom and what the purpose
23   of them are?

Page 59

1      A. No.
2      Q. Do you recognize Defendant's Exhibit No.
3   2, Mr. Russell, as being the illustration that Mr.
4   Clements showed you as far as the proposal he was
5   making about the $500,000 policy?
6      A. This looks like it.
7      Q. And is it your recollection that the
8   $73,000 that's reflected on that illustration is the
9   amount received from the cash surrender of the six
10   New England policies?
11      A. That's correct. And this would fund a
12   one-time payment, never ever have to make another
13   payment. And I'd have half a million dollars worth
14   of insurance.
15      (Defendant's Exhibit No. 3 was marked
16      for identification and will not be
17      attached to the deposition.)
18      Q. All right. And let me show you Exhibit
19   No. 3. Is that your signature in the bottom
20   left-hand corner, please, sir?
21      A. That looks like it, yes.
22      Q. Do you recall signing that form?
23      A. I don't recall signing it, but it looks

Page 60

1   like my signature.
2      (Defendant's Exhibit No. 4 was marked
3      for identification and will not be
4      attached to the deposition.)
5      Q. Let me show you this Exhibit No. 4. Is
6   that your signature on the bottom left-hand corner
7   of it?
8      A. It looks like it.
9      Q. Do you recall signing that form?
10      A. I do not. Is this all -- what policy?
11      Q. All of these questions I'm asking you
12   right now are in connection with the $500,000
13   policy.
14      A. Oh, okay.
15      MR. WHITEHEAD: Were these like
16   replacement forms or something?
17      MR. STEWART: I don't know what they are.
18      THE WITNESS: I signed whatever he asked
19   me to sign to transfer those policies. You know, he
20   was my agent. And I thought he was looking after
21   me.
22      Q. (BY MR. STEWART) Did you read the forms
23   before you signed them?

Page 61

1      A. No.
2      Q. Did anyone prevent you from reading the
3   forms when you signed them?
4      A. Nobody prevented me, no.
5      (Defendant's Exhibit No. 5 was marked
6      for identification and will not be
7      attached to the deposition.)
8      Q. Let me show you Defendant's Exhibit No. 5,
9   Mr. Russell, and ask you if that's your signature in
10   the bottom right-hand corner of that page?
11      A. It looks like it.
12      Q. Do you recall signing that form in
13   connection with the $500,000 policy?
14      A. I don't know what these forms represent.
15   But I guess, I assume that's where they transferred
16   the 73,000 and something dollars to the one
17   TransAmerica half a million. Other than that, I
18   don't know what they, what all this is about.
19      Q. But that is your signature at the bottom
20   left-hand corner?
21      A. Well, writing, yes.
22      (Defendant's Exhibit No. 6 was marked
23      for identification and will not be

16  (Pages 58 to 61)

## Deposition of: Wayne Russell
## 11/15/1999

Page 62

1    attached to the deposition.)
2    Q. Let me show you what I have marked as
3    Defendant's Exhibit No. 6, Mr. Russell, which is a
4    composite exhibit that are the face pages of the New
5    England Mutual Life Insurance Company policies that
6    were being replaced and ask you if you recognize
7    those face pages?
8    A. You know, I don't remember the amount. I
9    remember there being several policies. And all I
10   remember is the total value. So I really don't know
11   how to answer this. You know, if I look at
12   something and it says it on there, I assume that it
13   is. But I wouldn't guarantee that to be right. I
14   assume that it is.
15   Q. Well --
16   A. Do you understand what I mean? I'm not
17   trying to be --
18   Q. I don't want you to testify to something
19   you don't know.
20   A. I don't know.
21   Q. If you don't know whether you ever had any
22   of those policies that were represented by each of
23   the face pages, that's fine. If you look at one and

Page 63

1    say, Yeah, I remember -- for example, the first one
2    says a $50,000 policy. I would --
3    A. I have to go back and check my records
4    with the policy numbers to give you a definite
5    answer.
6    Q. All right. So what I'm saying, you don't
7    remember the fact that you had a $50,000 New England
8    policy?
9    A. Specifically one policy for 50, no, sir.
10   Q. All right. How about the second one?
11   A. Same for all of them. I wouldn't remember
12   the amounts.
13   Q. You don't remember that you had those
14   insurance policies?
15   A. All I remember is that I had several
16   policies. And I don't know what the totals were.
17   Q. Okay. Do you remember any of the
18   specifics of the conversations between you and Mr.
19   Clements as it related to what your New England
20   policies provided; in other words, what you had at
21   that time versus the proposals he was making to you
22   about the TransAmerica policies?
23   MR. AUGHTMAN: Object to the form.

Page 64

1    A. As I explained to you, Mr. Clements had
2    always been my insurance agent. I trusted him, just
3    like you do a lawyer, you know, that you hire. We
4    had been friends for a long, long time. And I put a
5    lot of confidence in that. And I relied on what he
6    told me. And he suggested that it was in my best
7    interest to cash in these New Englands and to
8    replace it with the TransAmerica.
9    Q. Okay.
10   A. And I did what he suggested.
11   Q. All right. Do you remember anymore of the
12   specifics about his recommendation to you about
13   cashing in the New England Mutual policies to buy
14   the TransAmerica policy other than what you just
15   said?
16   A. No, sir.
17   Q. That's all you remember about it?
18   A. That's all I remember.
19   Q. He just recommended you do it?
20   A. He recommended it, and it would buy more
21   insurance than the policies --
22   Q. That you had?
23   A. -- and it made sense at the time, because

Page 65

1    I was getting a face value policy for more money
2    than the total of all of those policies and not
3    having to pay any more money. That sounded like
4    something I wanted to do.
5    Q. Did you -- I'm not sure if I asked you
6    this. If I did, if I'm being redundant, I
7    apologize. But do you remember the total outlay you
8    were paying in premiums on an annual basis for these
9    six New England policies?
10   A. No, sir.
11   Q. Do you have a ball park idea of how much
12   you were paying?
13   A. To honest, no
14       (Defendant's Exhibit No. 7 was marked
15       for identification and will not be
16       attached to the deposition.)
17   Q. Let me show you what I've marked as
18   Defendant's Exhibit No. 7, Mr. Russell, which are
19   the stubs for the cash surrender amount, reflecting
20   the cash surrender amounts of the six New England
21   policies. And I'll ask you if you recall seeing
22   those?
23   A. I don't remember seeing them. But if they

17 (Pages 62 to 65)

Deposition of:  Wayne Russell
11/15/1999

Page 66

1  total up to the total of 73,000 and some odds
2  dollars, then I assume they're correct?
3      Q.  I was just asking if you recall.
4      A.  I don't remember to be honest with you if
5  I did or didn't.
6          (Defendant's Exhibit No. 8 was marked
7          for identification and will not be
8          attached to the deposition.)
9      Q.  The next one I want to show you is
10  Defendant's Exhibit No. 8, Mr. Russell, which
11  contains your signatures, your signature in about
12  three places and ask you if you can identify that as
13  the application that you signed and made for the
14  TransAmerica $500,000 policy?
15      A.  Repeat your question on this again.  Are
16  you saying is this the application that I filled out
17  to buy this policy?
18      Q.  Right.  You didn't fill it out.  I'm sure
19  Mr. Clements filled it out but that you signed for
20  the $500,000 policy.
21      A.  It looks somewhat familiar, yes.
22      Q.  All right.  Look on page 1 of that
23  application over there under paragraph 19?

Page 67

1      A.  Page 1?
2      Q.  Right there.  Do you see where it shows
3  that the initial lump sum amount of $70,000 is
4  written in there?
5      A.  Uh-huh.
6      Q.  Do you remember I asked you a few minutes
7  ago if you remember when you talked to Mr. Clements
8  about this policy that you discussed an initial dump
9  in of 70,000, and then after the cash values were
10  received, they totaled more than that.  So that's
11  why it was changed from 70,000 to 73,000.
12          But looking at that on the application,
13  you still don't remember anything about that?
14      A.  No, sir.  All I knew was I wanted to take
15  a cash value and buy as much TransAmerica as I
16  could.
17      Q.  Okay.  The $500,000 policy was not -- the
18  proceeds of that were not to fund the insurance
19  trust; is that correct?
20      A.  I think that's correct.  I think just on
21  my personal loan, because other policies have been
22  written on it.
23      Q.  Do you know -- well, do you know why?  Do

Page 68

1  you remember why you made that decision?
2      A.  Advice from attorneys and accountants.
3      Q.  Okay.  Mr. Russell, the TransAmerica
4  policies that you've purchased you understood, did
5  you not, that these were universal life policies?
6      A.  I don't know what a universal life policy
7  is to be honest with you.
8      Q.  Do you know the difference between a whole
9  life policy and a term policy?
10      A.  Yes.
11      Q.  Tell me what you understand the difference
12  to be.
13      A.  I know basically.  I'll be honest with
14  you.  I do not know -- I should restate that.  I do
15  not know.  I know basically with a whole life you
16  pay, you have values that keep increasing with
17  payments, and the values stay there.  With term it's
18  sort of like renting something.  That's what I've
19  always been told.  But beyond that, that's all I
20  know.  You're just buying for a specific period of
21  time and that's it.  And beyond that, I'm not that
22  knowledgable about insurance.
23      Q.  Did you understand that the TransAmerica

Page 69

1  policies you were providing permitted you to change
2  the premium amount you paid on those policies if you
3  wanted to?
4      A.  No, sir.
5      Q.  You didn't understand that?
6      A.  No, sir.  I had specific instructions to
7  him on what I wanted in each policy that I bought.
8      Q.  Well, my question is:  Did you understand
9  that the policy had that feature if you wanted to
10  change the premium?
11      A.  I never asked.  I knew what I was buying
12  to start with.
13      Q.  Did you understand that the policies had a
14  feature where you could increase the amount of the
15  death benefit under the policy if you wanted to?
16      A.  I was not aware of that.  All I wanted was
17  what I told him I wanted to start with.
18      Q.  Did you ever read the policies?
19      A.  I glanced over them.  I can't read them.
20  I tried.  I don't understand them.  I can, you know,
21  just glance through them.  And it refers back to
22  some paragraph somewhere else, and that's just
23  totally -- and I tried to read it, and then it

18  (Pages 66 to 69)

**Deposition of:  Wayne Russell**
**11/15/1999**

Page 70

1  refers back somewhere else.  I can't understand
2  insurance policies.  I cannot for my life.  I rely
3  basically on my instructions to him.
4      Q.  Do you remember how you obtained the
5  policies you bought from TransAmerica?
6      A.  When you say "obtained," you mean how they
7  were handed to me or --
8      Q.  Yeah.  How you received them.  Were they
9  given to you or mailed to you?
10     A.  Mr. Clements, if I remember correctly and
11  I won't swear to this, but I think he delivered them
12  to me.
13     Q.  He brought them to you?
14     A.  I would think so.
15     Q.  When he brought them to you, did he go
16  over them with you?
17     A.  He might have showed me some high points,
18  but nothing was gone over in detail.
19     Q.  Did you ask him to go over them with you?
20     A.  No, sir, because I wouldn't understand it
21  if he did.
22     Q.  But you did not ask him?
23     A.  I don't remember whether I did or not to

Page 71

1  be honest with you.
2      Q.  You don't?
3      A.  But I would think that I allowed him to
4  show me in a five- or ten-minute visit to show me
5  the high points of the policy.
6      Q.  Well, do you recall that there was
7  anything that he showed you on the policy that you
8  did not understand when he was explaining it to you?
9      A.  As I stated before, I don't know what I'm
10  looking at when I look at it.
11     Q.  That's not what I'm asking you, Mr.
12  Russell.  I understand that.  All I'm asking is do
13  you recall --
14     A.  Did he sit down and explain the whole
15  policy to me?  No, sir.
16     Q.  But do you recall that what -- that there
17  was anything about what he explained to you that you
18  did not understand when he explained it to you?
19     A.  I don't know quite how to answer that.
20  I'm giving you my best answer in stating that he
21  spent probably ten minutes in going through the high
22  points here and there.  And we did not get in-depth.
23  I would have not understood it if we did get

Page 72

1  in-depth.
2      Q.  Do you recall him in connection with the
3  $500,000 policy explaining to you that the policy
4  had a guaranteed cash accumulation feature and a
5  cash accumulation feature that would be based on
6  crediting the values with the current interest rate?
7  Do you remember that?
8      A.  My instructions to him when I bought this
9  policy was to sell me a policy that would one-time
10  pay, and from then on, the dividends or interest or
11  whatever would totally fund that policy from then
12  on.  That was all I expected that policy to do for
13  me.
14         I bought it for estate tax purposes.  I
15  didn't want to borrow money from it.  It was
16  strictly to fund the estate tax purposes.  And
17  therefore, I relied on him after I told him what I
18  wanted to sell me what I needed and that's it.
19     Q.  Yes, sir.  Now, I'm going to repeat my
20  question.  And I'd appreciate it if you would answer
21  my question.
22     A.  I thought I did.
23     Q.  Do you recall whether or not he explained

Page 73

1  to you that the cash accumulation in this policy had
2  two features:  One feature was a guarantee feature,
3  meaning that there was a guarantee interest rate
4  that would be applied to the accumulation fund?
5      A.  I do not recall anything concerning that.
6      Q.  Do you recall that he explained to you
7  that this policy also had a feature where the cash
8  fund, the accumulation fund, would increase at the
9  market interest rate and not just the guaranteed
10  rate?
11     A.  I do not recall any of that.
12         (Defendant's Exhibit No. 9 was marked
13          for identification and will not be
14          attached to the deposition.)
15     Q.  Let me show you Defendant's Exhibit No 9,
16  Mr. Russell.  Will you look at that please, sir, and
17  tell me if you can identify that as the $500,000
18  policy you purchased from TransAmerica?
19     A.  I'm certainly not familiar with the
20  $500,000 policy.  I'll be honest with you.  The only
21  way I can look it and tell is if my signature is
22  somewhere on it or -- and I would assume that would
23  be it if it is, and it's signed back here so --

19  (Pages 70 to 73)

Deposition of:  Wayne Russell
11/15/1999

Page 74

1    Q. So you can't identify that by looking at
2 the face page?
3    A. Well, I can look at that and see where
4 $73,000 was transferred as a one-time payment and
5 looking at half a million dollars and that's what I
6 bought.  But as far as the rest of this stuff, no,
7 sir, I can't identify anything beyond what -- but I
8 would assume that this is the policy.
9    Q. All right.  And from what I understand
10 your testimony to be, you scanned the policy when
11 Mr. Clements brought it to you?
12    A. Yes, sir.  And filed it.
13    Q. Do you remember any particular thing you
14 looked at in the policy?
15    A. I always look at the total amount of the
16 policy.  That's the main thing I'm concerned about.
17    Q. The total amount of that $500,000?
18    A. Yes, sir.
19    Q. Did you looked at the premium features of
20 the policy?
21    A. No, sir.  I had already paid my premium.
22    Q. Did you understand by looking at the
23 policy that the policy was not what you thought you

Page 75

1 were buying that you had 20 days in which you could
2 have returned the policy to get your money back?
3    A. I'm not aware of that, no, sir.
4    Q. Do you know that that's contained in the
5 policy?
6    A. No, sir.  I was not aware of that, but if
7 it is, it is.  I'm not aware of that.
8    Q. Okay.  Have you made any more premium
9 payments on this $500,000 policy?
10    A. I have not.
11    Q. Have you been told that you needed to make
12 any more premium payments on this $500,000 policy?
13    A. No, sir.
14    Q. Did you ever talk to Mr. Clements after
15 you received that policy and tell him that that's
16 not what you thought it was?
17    A. Yes, sir.
18    Q. You did?
19    A. Well, let me make this statement.  He is
20 aware that we filed a lawsuit against him as well as
21 TransAmerica.
22    Q. Have you talked to Mr. Clements about the
23 allegation in your complaints since you filed a

Page 76

1 lawsuit?
2    A. No, sir.
3    Q. Do you recall that after you bought the
4 TransAmerica policies, Mr. Russell, that you
5 received annually statements of the policy values?
6    A. I think I remember that, yes, sir.
7    Q. Okay.  And when you received those
8 statements, did you read them?
9    A. It didn't really make any difference to
10 me.  You know, I felt, you know, at the time when I
11 received them up until the time we had filed this
12 lawsuit that I found out different that the policy
13 was what it said it was.
14    Q. Say that again.
15    A. As I received the annual statement, I
16 assumed that the policy was what it stated that it
17 was.  Now I know it's not.
18        (Defendant's Exhibit No. 10 was marked
19          for identification and will not be
20          attached to the deposition.)
21    Q. All right.  Let me show you Defendant's
22 Exhibit No. 10.  Do you see that that's one of the
23 statements that you received in connection with the

Page 77

1 values in your policy?
2    A. What's the date on this?
3    Q. I believe it's on the front page, if you
4 will, Mr. Russell, up in here.
5    A. '96.  All right.  Which one would this be?
6    Q. That's on your $500,000 policy.
7    A. All right.  That's the one I paid $73,000
8 up front.  Okay.
9    Q. Do you recall receiving that statement?
10    A. I don't recall it, but I'm sure I did.
11    Q. Well, just --
12    A. I don't remember it.
13    Q. When you assume --
14    A. Because I got them each year as they send
15 them out.
16    Q. And what would you do when you received
17 them?
18    A. File them.
19    Q. Did you ever read them?
20    A. Not really, no.  Why should I read them?
21    Q. When you said "not really," and I don't
22 understand what not really means.  Did you glance at
23 it?  Did you read any part of it, or did you just

Edmondson Reporting & Video
*1030 Financial Center*      *Birmingham, Alabama 35203*      *1-800-966-2333*

Deposition of:  Wayne Russell
11/15/1999

Page 78

1  open the envelope and put them in a drawer?
2      A.  Probably just looked at this right here
3  and that page and filed it.
4      Q.  All right.  Well, let's at least identify
5  what you said you probably looked at.  On page 2 of
6  Defendant's Exhibit No. 10, you pointed to this
7  figure of $73,000?
8      A.  It looked correct, because I remember
9  that's what I paid for the policy.
10     Q.  All right.  So you do think then that on
11  Defendant's Exhibit No. 10 you did look at the
12  second page?
13     A.  I'm sure I did.
14     Q.  Did you pay any attention, Mr. Russell, on
15  the first page to the fact that it says that the
16  policy for that period of time was paying a current
17  interest rate of 6 percent?
18     A.  I don't remember, no, sir.  I swear I do
19  not remember.  Or I'm sure I looked at it.  And it
20  didn't real mean a whole lot to me one way or the
21  other, still doesn't.
22     Q.  Well, do you recall that on the proposal
23  that was given to you by Mr. Clements that the

Page 79

1  policy at the time you applied for it was paying a
2  current interest rate of 7 percent?
3      A.  Sir, I paid Mr. Clements $73,000 to buy a
4  one-time policy and to make one payment.  That
5  policy he guaranteed me would fund itself from then
6  on.  That's all I remember.
7      Q.  You don't remember Mr. Clements discussing
8  with you at all the fact that if the current
9  interest rates were to decline that it would effect
10  the accumulated values in the policy?
11     A.  I told him to be conservative when he sold
12  me the policy, that I would never ever have to make
13  another payment.  I assumed that that's what he sold
14  me.
15     Q.  All right.  And here's my question:  Do
16  you recall Mr. Clements explaining to you that the
17  current interest rates would effect the accumulation
18  values in the policy?
19     A.  No, sir.  I don't recall that.
20     Q.  Do you recall Mr. Clements telling you,
21  notwithstanding what the current interest rates did,
22  that this policy had a guaranteed rate of 5 percent
23  which it would never go below?

Page 80

1      A.  It didn't make any difference.  The man
2  told me that I wouldn't have to make but one
3  payment, that it would fund itself from then on.
4      Q.  So you're saying he did not tell you that?
5      A.  No, sir.
6          (Defendant's Exhibit No. 11 was marked
7           for identification and will not be
8           attached to the deposition.)
9      Q.  Let me show you Defendant's Exhibit No.
10  11, which is your annual statement dated February
11  17th of 1999?
12     A.  The same policy?
13     Q.  Yes.  Do you recall receiving that?
14     A.  There again, I received them annually.  I
15  think I have them in my file.
16         MR. STEWART:  That raises a point, Jay.
17  The only two annual statements that we were produced
18  in this policy are the ones dated -- what's this one
19  dated -- '96 and '99.  So we're missing '97 and
20  '98.
21         MR. AUGHTMAN:  I asked Wayne about that.
22  And he's looked and this is all he had in his
23  records.  Certainly if any more surface --

Page 81

1          MR. STEWART:  So if y'all would please try
2  to look for those and see if you can find those.
3      Q.  (BY MR. STEWART)  Are you saying, Mr.
4  Russell, that all you recall about the transaction
5  in which you bought the $500,000 policy from
6  TransAmerica is -- and I'm paraphrasing, and I want
7  you to correct me if I'm wrong.  I'm just trying to
8  sum up your testimony  -- is that you were going to
9  convert six New England Mutual policies that you had
10  in force, and in converting those six policies, the
11  cash values would be generated in the amount of
12  $73,000, that you would pay that $73,000 for the
13  TransAmerica $500,000 policy after which you would
14  never have to make another premium payment?  That's
15  what you're saying?
16     A.  Yes.
17     Q.  And you're telling me that you had
18  not made another premium payment as we sit here
19  today?
20     A.  No.
21     Q.  And you're telling me that you've never
22  been told that you had to make another premium
23  payment as we sit here today?

21  (Pages 78 to 81)

Deposition of:  Wayne Russell
11/15/1999

Page 82

1    A.  That's right.
2    Q.  And tell me why you have sued TransAmerica
3  then in connection with that policy.
4    A.  Because of the lawsuit that's been filed
5  by the policyholders.
6    Q.  I've completely lost you on that.
7    A.  Class action lawsuit.
8    Q.  You've sued TransAmerica because there was
9  a class action lawsuit filed?
10    A.  There was a class action lawsuit filed.
11    Q.  Right.
12    A.  They sent me information concerning the
13  class action asking me if I wanted to get into it.
14  I took those policies to a friend of the family, who
15  is an attorney.  And that's how we are where we are
16  today, under his recommendation that I see Mr.
17  Beasley's firm and take those policies and let them
18  look at them.
19    Q.  So you --
20    A.  All I know is there was a class action
21  lawsuit filed against TransAmerica concerning these
22  policies.  I was notified if I wanted to get in it.
23  I was advised not to get in it from a legal

Page 83

1  standpoint.  And that's why I'm here today.
2    Q.  Yet nothing has happened in connection
3  with the $500,000 policy that leads you to believe
4  that what Mr. Clements told you about the policy was
5  untrue?
6    MR. AUGHTMAN:  Object to the form.
7    A.  Yes.
8    Q.  What?
9    A.  When you get a letter stating that they
10  filed a lawsuit, you know something is wrong.
11    Q.  So you're basing your lawsuit against Mr.
12  Clements as it relates to this point involving the
13  $500,000 policy, that he told you something is wrong
14  in connection with that policy merely because there
15  was a class action lawsuit filed against
16  TransAmerica?
17    MR. AUGHTMAN:  Object to the form.
18    THE WITNESS:  Do I have to answer?
19    MR. AUGHTMAN:  Yes.
20    A.  I was told by my attorneys after they
21  had --
22    MR. AUGHTMAN:  Don't get into all that,
23  what your lawyers say.

Page 84

1    A.  Okay.  Also my experience with Phoenix
2  Life in the same type policy.
3    Q.  Well, do you contend that Mr. Clements,
4  sitting here today, misrepresented anything to you
5  about the $500,000 policy?
6    A.  Yes.
7    Q.  What did he misrepresent to you?
8    A.  He misrepresented the kind of policy that
9  I got into versus what I had, that I wound up in
10  versus what I had.
11    Q.  Anything else?
12    A.  And that I'm going to have to pay more
13  money into this policy, that I never had any
14  intention of doing, to keep it in force.
15    Q.  Okay.  Anything else?
16    A.  I don't think so.  I think that covers it.
17    Q.  All right.  Tell me -- you said that he
18  misrepresented to you the kind of policy you were
19  buying versus what you had.  Tell me what he told
20  you you were buying versus what you had.
21    A.  I assumed that I was getting equal
22  insurance from what I had with New England Life.  As
23  it turns out, I did not get equal insurance.  And it

Page 85

1  was a bad, my advice now it was a bad choice to
2  convert those New England policies from a whole life
3  to where I am.
4    Q.  Okay.  Let me -- first of all, if you'll
5  recall my question was for you to tell me what he
6  told you.  So you told me what you assumed.  I want
7  you to tell me as best you can recall sitting here
8  today what he told you about the kind of policy, and
9  I'm using your words, the kind of policy the
10  TransAmerica policy was versus the kind you had with
11  New England?
12    A.  Well, I don't know that he discussed the
13  kinds of policies at that time.  We discussed
14  amounts at the time and that I would be better off
15  on the face value amounts at that time to convert
16  those New England policies to TransAmerica.  Instead
17  of having all those little policies, to have just
18  one policy, that it was my in my best interest for
19  to convert to a one-time payment.
20    Q.  Right.  All right.  Now, at the time you
21  converted these policies, your New England policies,
22  you knew the amount of coverage you had on them.
23    A.  Yes, sir.

22  (Pages 82 to 85)

Deposition of:  Wayne Russell
11/15/1999

Page 86

1    Q.  When you made the decision you knew that,
2  didn't you?
3    A.  Yes.
4    Q.  And when you made that decision, you knew
5  the premium you were paying on them?
6    A.  Yes.
7    Q.  You knew then that you had a lot more
8  coverage than the $500,000 you bought, didn't you?
9    A.  I don't remember how much it was.  It
10  wasn't a whole lot less.  It was some less but not a
11  whole lot less.
12    Q.  Well, what do you mean by a whole lot?
13    A.  You know, to be honest with you, I assume
14  that those policies were somewhere in the
15  neighborhood of 3 or $400,000.
16    Q.  Well, let's don't assume.  Here are the
17  face pages of the six policies.  You want to add
18  them up?  This one I will admit to you says life
19  paid up at 65.  And I don't know the value of that
20  policy.  Do you remember having a life paid up at 65
21  policy?
22    A.  I don't remember it, no.
23    Q.  Do you remember how much the face value of

Page 87

1  it was?
2    A.  I don't.
3    Q.  Well, let's add up what we have for the
4  five of them.  Where is the first face value?
5    A.  It looks like 50.
6    Q.  50.  Okay.  What's the second?
7    A.  20.
8    Q.  Okay.
9    A.  10.
10    Q.  10.
11    A.  40.
12    Q.  40.
13    A.  10.
14    Q.  All right.  Of the five that we know the
15  face values of, that's 130,000.
16    A.  That's the five you say?
17    Q.  Uh-huh.
18    A.  There is another big one and another one
19  somewhere.
20    Q.  Well, there's a life paid up, Mr. Russell,
21  if you would.  That's what I was trying to point out
22  to you.  If you will, you see the face value of this
23  other policy, Policy 6264370, it says life paid up

Page 88

1  at 65, and it does not show the face amount.  It
2  says see schedule, and I don't have the schedule
3  page?
4    A.  I think it was a fairly large policy.
5    Q.  You do?
6    A.  Yes.
7    Q.  Do you have any recollection what it was?
8    A.  No, sir.  But it was probably as much as
9  the rest.
10    Q.  Well -- and I don't want to split hairs
11  with you.  I'm just trying to decide why, sitting
12  here today, you think it was better to have kept the
13  old policies and buy a $500,000 policy for which you
14  have made no out-of-pocket premium payments.  That
15  is correct, is it not?
16    A.  That's right.
17    Q.  And you were making premium payments on
18  the six New England policies at the time, were you
19  not?
20    A.  That's right.
21    Q.  And you don't know sitting here today
22  exactly how much coverage was provided by those six
23  New England policies?

Page 89

1    A.  Not exactly, no.
2    Q.  Okay.  But notwithstanding that you think
3  that you would be better off if you had kept those
4  six New England policies.
5    A.  I've been advised that.
6    Q.  Well, what's your own opinion about it?
7  Have you made any analysis yourself?
8    A.  Well, you know, when you follow advice, I
9  try to -- I'm not an insurance person.  I have to
10  rely on what people tell me.
11    Q.  Yes, sir.  Have you made any analysis
12  about the six policies you had versus the one you
13  have now with TransAmerica?
14    A.  In my mind, right now I was not -- it was
15  misrepresented to me, you know, what I was sold and
16  what I got.
17    Q.  Okay.  Question:  Have you made an
18  analysis of the six policies that you had versus the
19  one you have today with TransAmerica?
20    A.  I have not made an analysis per se myself.
21  But upon advice from counsel, I was told that that
22  was not the thing to have done.
23    Q.  Okay.  Now, do you recall what was said to

Edmondson Reporting & Video
*1030 Financial Center*        *Birmingham, Alabama 35203*        *1-800-966-2333*

Deposition of: Wayne Russell
11/15/1999

Page 90

1  you in the manner of specifics as to why you
2  shouldn't have done that?
3      MR. AUGHTMAN: Wait a minute. If you're
4  asking what his lawyers told him, he's not going to
5  answer.
6      MR. STEWART: Well, he's got an allegation
7  in the lawsuit, Jay, that says that this was a
8  misrepresentation. He's testified to it. And I'm
9  entitled to know what the misrepresentation is.
10      MR. AUGHTMAN: Well, he's already told you
11  that. You're not entitled to know what we talked to
12  him about, and that's what you're asking.
13      MR. STEWART: Well, I'm entitled to know
14  why one policy -- the other policies are better than
15  this one. Or if you don't want him to discuss it,
16  fine. We'll dismiss that count in the lawsuit. It
17  don't matter to me.
18      MR. AUGHTMAN: He's already told you.
19      MR. STEWART: He told me he doesn't know.
20  He told me he's not made an independent analysis.
21  And that's what he's been told. Do you disagree
22  with that testimony?
23      MR. AUGHTMAN: If that's what you think,

Page 91

1  that's fine. Let me tell you this, you're not
2  asking him --
3      MR. STEWART: I did not ask him if you
4  told him that.
5      MR. AUGHTMAN: Sure you did.
6      MR. STEWART: I want to know what he has
7  been told. He says he has not seen an independent
8  analysis. He says that he has been told that he
9  should have kept the old policies and not bought the
10  new one. And I want to know what the specifics of
11  that is. What is better about the old policy than
12  the new one? If you don't want to disclose that,
13  fine. We'll dismiss it from the lawsuit.
14      MR. AUGHTMAN: Well, why don't you just
15  file a motion to dismiss it then, and we'll see if
16  it gets dismissed.
17      MR. STEWART: Okay. You're not going to
18  let me him answer that question?
19      MR. AUGHTMAN: No, I'm not going to let
20  him.
21      MR. STEWART: Tell me the basis that the
22  old policies are better than the new.
23      MR. AUGHTMAN: He's already told you to

Page 92

1  the best of his ability what he thinks.
2      MR. STEWART: You've sat here today and
3  you've heard the deposition testimony and you think
4  that he has told me the facts he has to support that
5  allegation.
6      MR. AUGHTMAN: I think he's answered every
7  question you've asked him other than what his
8  lawyers advised him to do.
9      MR. STEWART: I haven't said one word
10  about lawyers, Jay.
11      Q. (BY MR. STEWART) Did I ask you who told
12  you that, Mr. Russell?
13      MR. AUGHTMAN: If you got a question, ask
14  him a question.
15      MR. STEWART: I just asked him a question.
16      Q. (BY MR. STEWART) Who told you that?
17      MR. AUGHTMAN: Don't worry about it. Are
18  you ready to go to lunch?
19      MR. STEWART: All right. What time are we
20  going to be back?  1:00 o'clock?
21      THE WITNESS: It's going to be about 1:15
22  before I can get here.
23      (A lunch break was taken.)

Page 93

1      Q. (BY MR. STEWART) Mr. Russell, I have shown
2  you this illustration, that the language at the top
3  had not been copied very well. That's a better
4  copy. Can you identify that language now, please,
5  sir?
6      A. "Policy to be issued per these" -- "policy
7  to be issued per these tables according to"
8  something according to Gus Clements. That's what it
9  says.
10      Q. Is that in your writing?
11      A. Yes. "Policy to be issued per these
12  tables according to Gus Clements."
13      Q. Now, did you write that there on that date
14  of 5-11-95?
15      A. I'm sure I did.
16      Q. And do you think that you wrote that at
17  the time that the illustration was presented to you
18  by Mr. Clements?
19      A. I'm sure I did.
20      Q. Okay. Do you recall anything else having
21  read that now and identifying this illustration that
22  we've marked as Defendant's Exhibit No. 12, does
23  that refresh your recollection about anything else

Edmondson Reporting & Video
*1030 Financial Center*    *Birmingham, Alabama 35203*    *1-800-966-2333*

Deposition of:  **Wayne Russell**
11/15/1999

Page 94

1  that was discussed between you and Mr. Clements at
2  the time that you purchased the $500,000
3  TransAmerica policy?
4      A. This was the amount, and this was the
5  table right here that he showed me. This is the
6  amount, and this is the table. This carried it out
7  'til year 100.
8      Q. Now, the table you have pointed to was a
9  table of an assumed interest rate of 7 percent.
10     A. That's right.
11     Q. Did y'all have any discussion about this
12 assumed interest rate?
13     A. Yes. I asked him point-blank, I said,
14 "Look, I want you to be very conservative. I want
15 you to not sell me anything that I ever have to come
16 back and pay again." He assured me that was
17 conservative and to use these figures right here on
18 this table right here.
19     Q. All right. Did you --
20     A. That's what he told me.
21     Q. If you'll notice to the right of that
22 interest rate table, Mr. Russell, is a table that
23 says guaranteed interest rate of 4 percent. Did you

Page 95

1  discuss with him those tables?
2      A. I did. I told him and this says 4 percent
3  over here. He says don't pay any attention to that.
4  That has really nothing to do with what you're
5  paying in. This is the column right here that
6  you're buying this policy on right here.
7      Q. And did you ask him to explain to you the
8  difference between an assumed rate and a guaranteed
9  rate?
10     A. He says, "Look, that is just something
11 insurance companies put on here." He says, "The
12 rates now are higher than this." He says, This is
13 the rate that you -- this is a conservative number.
14     Q. And by "this" you're pointing to the 7
15 percent?
16     A. I'm pointing to the carry me out to 100
17 years, to be 100 years old.
18     Q. Okay. Now, when you get -- when you
19 received your policy, did you notice that the rates
20 that were contained inside the policy were the
21 guaranteed rates?
22     A. Sir, I don't know what you're talking
23 about.

Page 96

1      Q. I'm talking about this table of policy
2  values and benefits. Did you observe that in the
3  policy?
4      A. You know, I'm sure I looked at this
5  policy. But as I stated before, I put my money up
6  front. I told the man what I wanted. He's the
7  insurance expert. I relied on what he told me.
8      Q. And my question, Mr. Russell, is: When
9  you received the policy, did you turn to this page
10 2-B in the policy and notice that the rates that
11 were reflected were the guaranteed rates?
12     A. I don't remember that, no, sir.
13     Q. Well, what's your best judgment about
14 that?
15     A. About what?
16     Q. About whether you did or didn't do that.
17     A. I doubt I did. He showed the policy to
18 me and just flipping through, and I don't remember
19 one way or another whether he showed me that
20 specific table or not.
21     Q. Okay. Except for the interest rates that
22 you've just alluded to or testified about that are
23 shown on the illustration, did you have any other

Page 97

1  discussions with Mr. Clements about interest rates?
2      A. No, sir.
3      Q. Did you have any discussions with Mr.
4  Clements about the accumulated funds and how that
5  worked?
6      A. I don't know what you're talking about.
7      Q. This accumulated fund right here. The
8  accumulated value tables on both of these, did you
9  have any discussions about how that worked?
10     A. No, sir. He just told me not to pay any
11 attention but to this column right here.
12     Q. Which column? You're using two fingers.
13 Which column?
14     A. This column right here, the current values
15 right here, and this applied to my one-time payment.
16     Q. All right. Now, you're pointing to the
17 cash value column.
18     A. I never had any reason to have anything
19 other than a death benefit. Never wanted to borrow
20 any money, never wanted to do anything else, just be
21 there for estate tax purposes.
22     Q. Well, sir, my question is: Did you
23 discuss with Mr. Clements when he was going over

25  (Pages 94 to 97)

Deposition of: Wayne Russell
11/15/1999

Page 98

1  this illustration with you the accumulated value
2  columns and how those values accumulated?
3      A.  I'm sure after this right -- we looked
4  through this column right here, the present, because
5  he told me that interest rates were higher then than
6  what was used on this right here, and do not be
7  concerned with anything else.  And he showed me
8  where if I lived to be 100, I was taken care of,
9  still had my half a million dollars.
10     Q.  All right.  You say that Mr. Clements told
11  you that the interest rates the company was paying
12  at this time were actually higher than 7 percent?
13     A.  The best I can remember, at that time,
14  that was --
15     Q.  Did he tell you what the company was
16  paying at that time?
17     A.  No, sir.
18     Q.  You don't remember the rate he said?
19     A.  No, sir, I sure don't.
20     Q.  Okay.  Well, when you received your
21  statement of the policy value that you already
22  testified to as Defendant's Exhibit No. 10, did you
23  notice that the interest rates the company was

Page 99

1  paying was only 6 percent?
2      A.  It didn't really make any difference to
3  me, because I had made the deal for a one-time pay.
4  It didn't make any difference.  If it went to 2
5  percent, it didn't make any difference.
6      Q.  So what interest rate the company was
7  paying was of no concern to you?
8      A.  No, sir.
9      Q.  And how the accumulated fund was or how
10  the values in the accumulated fund were being
11  derived made no difference to you?
12     A.  No, sir.
13     Q.  The same way with cash values.  How the
14  cash values were increasing and accumulated made no
15  difference to you?
16     A.  No, sir.
17     Q.  And the fact that this policy had a
18  provision in it, and I'll show you here on the first
19  page of the policy, that would have enabled you to
20  change the amount of premiums you were paying, that
21  had no value to you and your decision to buy the
22  policy?
23     A.  No, sir.  Because I had already paid him.

Page 100

1      Q.  And the fact that the policy had a
2  provision in it that would have allowed you to
3  adjust the amount of coverage for the life
4  insurance, that had no value, was given no
5  consideration by you?
6      A.  None whatsoever.
7      Q.  Okay.  I believe your testimony before the
8  break, Mr. Russell, was to the affect that you had
9  no questions about the $500,000 policy whatsoever
10  until you received the notice of the class action
11  litigation involving TransAmerica; is that true?
12     A.  That's correct.
13     Q.  Okay.  Where is the notice that you
14  received?
15     A.  I don't know.
16     Q.  You did testify that you did receive it?
17     A.  Yes.
18     Q.  And you don't remember what you did with
19  it?
20     A.  I thought I had turned everything over to
21  Jay.
22         MR. STEWART:  Do y'all have that?
23         MR. AUGHTMAN:  I've given you everything I

Page 101

1  have.  If I got it, I gave it to you.  I'm not
2  holding anything back.
3         MR. STEWART:  Well, I don't know that I've
4  seen that but if you say you did.
5         THE WITNESS:  Supposedly we have given you
6  everything we had.
7      Q.  (BY MR. STEWART) And so do I then
8  understand your testimony that as far as whether or
9  not you were better off in replacing your six New
10  England policies with the TransAmerica policy before
11  you received the opt-out notice, you absolutely had
12  no information or facts, knowledge of any kind that
13  you would have been better off --
14     A.  That's correct.
15     Q.  -- keeping the New England policies versus
16  the TransAmerica policy;  is that true?
17         MR. AUGHTMAN:  Object to the form.
18     A.  I had no way of knowing I had a problem.
19     Q.  All right.  Now, tell me this, after you
20  received the opt-out notice, what facts or
21  information have come to your attention that
22  establish or show that you would have been better
23  off if you had kept the New England policies instead

26  (Pages 98 to 101)

Deposition of: Wayne Russell
11/15/1999

Page 102

1  of buying the TransAmerica policy.
2      A.  I've been advised that it's not the same
3  kind of policy that I had.  Therefore, the policy is
4  not as good a policy as the policies I had.  This is
5  since we've got into looking at the policies.
6      Q.  All right.  So is that your position then
7  the fact that the TransAmerica policy is not the
8  same kind of policy as were the New England
9  policies, that you would have been better off
10  keeping the New England policies?
11      A.  After everything being explained to me in
12  layman's terms where I could understand it the best
13  I can, that's my answer.
14      Q.  Well, what was explained to you in
15  layman's terms to demonstrate to you that you would
16  have been better off with the New England policies
17  instead of buying the TransAmerica policy?
18      A.  The New England policies had guaranteed
19  benefits, where I've learned that this is a variable
20  policy, and the benefits are not guaranteed and
21  erode --
22      Q.  Do what?
23      A.  And erode, the benefits erode the way it's

Page 103

1  been explained.
2      Q.  Okay.  When it was being explained to you
3  that the benefits in the TransAmerica policy were
4  not guaranteed, was consideration was given to page
5  2-B of the policy that you purchased?
6      A.  I didn't give consideration to it, no.
7      Q.  Well, I'm talking about in this
8  explanation session.  You said that it was explained
9  to me that the TransAmerica policy, the benefits
10  were not guaranteed, and I'm asking you if this
11  table --
12      A.  This table was not shown to me at the
13  time.
14      Q.  That does at the top say "guaranteed
15  basis," does it not?
16      A.  Where does it say that?
17      Q.  Right up here.  Guaranteed basis.
18      A.  Guaranteed basis two.  I don't know what
19  that means.
20      Q.  Well, what does two show on the inside?
21      A.  I don't see any two.
22      Q.  Well, excuse me.  What does two say down
23  there?

Page 104

1      A.  You want me to read it?
2      Q.  Well, you can read it for yourself.  You
3  said that you didn't know what it meant.  And I'm
4  referring you from the two that's in parenthesis out
5  by guaranteed basis and the two down at the bottom
6  that explains what it means.
7      A.  I don't really know what it means.
8      Q.  You don't.  After you read that, you
9  didn't understand it?
10      A.  No.
11      Q.  Do you know what interest rate or dividend
12  rate was being paid as a guarantee under the New
13  England policies that you replaced?
14      A.  No, sir.
15      Q.  Wouldn't it be important to you to know
16  that to be able to compare the rate of return in the
17  New England policies with the rate of return in the
18  TransAmerica policy?
19      A.  Since I surrendered those policies, I have
20  no way of knowing.
21      Q.  That's not my question.  My question was:
22  Wouldn't it be important for you to know that for
23  you to be able to make the determination that the

Page 105

1  New England policies were better than the
2  TransAmerica policy?
3      MR. AUGHTMAN:  Object to the form.
4      THE WITNESS:  Do I have to answer?
5      MR. AUGHTMAN:  Go ahead if you can.
6      A.  I'm not an insurance expert, so I don't
7  know how you go about really analyzing one policy
8  versus another.  I'm having to listen to
9  professional advice.
10      Q.  I hear what you're saying, Mr. Russell.
11  Just so I can understand you, one of the things that
12  was explained to you that in your mind tells you
13  that the New England policies were better than the
14  TransAmerica policy was the fact that the New
15  England policies had guaranteed benefits and the
16  TransAmerica did not.  That's what you're saying?
17      A.  Yes.
18      Q.  Now, I've shown you this page in the
19  TransAmerica policy is a guaranteed basis.
20      A.  Uh-huh.
21      Q.  And what it, in effect, says is that the
22  table of value accrue at a rate of 5 percent
23  interest.

27 (Pages 102 to 105)

Deposition of:  Wayne Russell
11/15/1999

Page 106

1    A. Uh-huh.
2    Q. Okay. Then I asked you if you know what
3  the value build up, the cash value build up in the
4  New England Mutual policies, what rate of interest
5  and return are they building up, and you said you
6  didn't know.
7    A. I don't.
8    Q. All right. So I'm just asking you if that
9  would be -- well, wouldn't that be important for you
10  to know in comparing the two?
11    A. I would think it would. But I'm not an
12  expert in how you determine which is better. I
13  don't really know to be honest with you.
14    Q. All right. Do you know Amos Herndon?
15    A. Amos Herndon?
16    Q. Uh-huh.
17    A. I don't think I do.
18    Q. To your knowledge, you've never talked to
19  a man named Amos Herndon?
20    A. What does he do?
21    Q. In the oil business.
22    A. I know a Herndon, C. S. Herndon.
23    Q. Where does the C. S. Herndon you know

Page 107

1  live?
2    A. Abbeville.
3    Q. Have you talked to him about your
4  TransAmerica policy?
5    A. No.
6    Q. Have you talked to him about his
7  TransAmerica policies?
8    A. No, sir. I don't know what you're
9  talking about.
10    Q. Do you know whether or not --
11    A. Does he have a TransAmerica policy?
12    MR. AUGHTMAN: Just let him ask his
13  question.
14    Q. (BY MR. STEWART) Do you know whether or
15  not, Mr. Russell, that your brother, George, had
16  ever talked to Mr. Caddell or Mr. Clements or anyone
17  else at TransAmerica about the TransAmerica
18  Insurance that you purchased? I know you weren't
19  there.
20    A. Are you asking me do I know?
21    Q. Yeah. Have you heard that your brother,
22  George --
23    A. I have not heard that. He would have no

Page 108

1  reason to do so, because all he does is what I ask
2  him to do.
3    Q. So to your knowledge, your brother,
4  George, has not talked to either Mr. Caddell, Mr.
5  Clements or anyone else at TransAmerica about these
6  policies?
7    A. That's correct.
8    Q. Okay. All right. Let's talk about your
9  $5 million policy and your 2 and a half million
10  dollar policy. Okay. You purchased those at the
11  same time, did you not?
12    A. About the same time.
13    Q. Well, I believe the applications are dated
14  the same date.
15    A. Okay. If it was the same date, it was
16  within a day or two of each other.
17    Q. Did you have any discussions with either
18  Mr. Caddell or Mr. Clements about one of these
19  policies when you were not discussing the other
20  policy? And I'm just trying to narrow this thing
21  down. Do you understand?
22    You understand you have a $5 million
23  policy and a 2 and a half million dollar policy at

Page 109

1  TransAmerica?
2    A. I would think if I bought them at the same
3  time, everything was discussed together.
4    Q. Well, do you recall in your own
5  recollection that you ever discussed one of these
6  policies, discussing something about one of these
7  policies that was -- when you were not discussing
8  both of them?
9    A. I don't think so.
10    Q. Do you recall that in connection with the
11  2 and a half million dollar policy that you
12  initially received a proposal for a $1 million
13  policy and that somewhere along the line you decided
14  to increase that to 2 and a half million?
15    A. What I recall is this: My accountant and
16  my attorney were discussing my needs, what they
17  thought I needed, and it varied from somewhere
18  between six and seven and a half million at the
19  time.
20    You know, when you're talking about this
21  kind of money with the other insurance I have,
22  that's not a whole lot of money if you know what I'm
23  talking about. It is a lot of money, but when it

28  (Pages 106 to 109)

Deposition of:  Wayne Russell
11/15/1999

Page 110

1    comes to insurance purposes and estate tax purposes,
2    it's not a whole lot of difference, but anyway,
3    do --
4        Q. You are being far too humble, Mr. Russell.
5    That's a heck of a lot of money.
6        A. In my eyes, it's not a lot of money but
7    anyway -- I lost my train of thought.
8        Q. I'm asking you about the change from a
9    million to two and a half million.
10        A. Oh, how that came about?
11        Q. Yes.
12        A. We had decided that I would fund -- since
13    we were trying to do this for estate tax purposes,
14    we had decided that we would take whatever it took
15    to fund a $5 million policy from a previous policy
16    that my children owned with New England Life.
17    Whatever it took to fund 5 million.
18            I was advised that they need to own it.
19    And the funds for that $5 million policy came from a
20    previous policy owned by them on my life.  The cash
21    part of it, the one-time payout that it had been
22    funded for about ten years.
23            It was done during the Reagan years when

Page 111

1    you could transfer a half million dollars from your
2    estate tax free.  It was the last window of
3    opportunity to do that, through a gift into some
4    type of -- I've forgotten the name of it.
5            But there was a window of opportunity
6    there during the Reagan years where you could
7    transfer half a million dollars out of your estate
8    tax free.  I took advantage of it and put it in -- I
9    gifted it to the children.  This was a partial
10    investment as well as a life insurance on my life.
11    It did not have big cash values.  It was more of an
12    investment.  And during the period of time, it was
13    with New England.
14            Well, we took out what it took to fund
15    the 5 million, and it still had half a million
16    dollars, what the original amount had been invested,
17    had a cash value of that left at that time.
18        Q. All right.  I've been listening and you'll
19    have to bear with me because you'll have to explain
20    to me some things.  You had a policy that was owned
21    by your children on your life.
22        A. Yes, sir.
23        Q. Do you remember what the death benefit was

Page 112

1    under that policy?
2        A. It had varying amounts, because it was
3    owned by all three.  It was owned by all three of
4    them.  A third, a third, a third.  I don't know what
5    the death benefits were.  But they never were really
6    high.  It was more of an investment-type deal that
7    had some life insurance associated with it.
8        Q. Do you remember what kind of policy it
9    was?  We're not talking about a straight whole life
10    of course.
11        A. Mr. Clements could tell you.  He would be
12    better than me to tell you because he was an
13    advisor, and he could tell you more about it than
14    me.
15        Q. Okay.  But you understand that what you
16    did as reflected by the documents --
17        A. What I did was take $350,000 in the end to
18    buy a one pay --
19        Q. $5 million policy?
20        A. That's right.  That was the end result.
21    That's all.
22        Q. And then with the 2 and a half million
23    dollar policy, you are making annual premium

Page 113

1    payments of 23,000 and some odd dollars.
2        A. I had an agreement.  We don't want to pay
3    but ten year.  You're not going to pay but ten
4    years.  You be conservative you tell me what is your
5    best ten-year deal.
6        Q. In answer to my question, you're making
7    annual premium payments on your 2 and a half million
8    dollars for $23,047?
9        A. I'm not.  They are.
10        Q. They are, meaning your children?
11        A. That's right.
12        Q. So the $5 million policy you paid $350,000
13    up front?
14        A. Uh-huh.  They did.
15        Q. They did.  With the expectation that no
16    future premium payments would ever have to be made
17    to keep that policy in force?
18        A. Exactly.
19        Q. And on the 2 and a half million dollar
20    policy, some $23,047 in annual premium payments were
21    to be made.  And it's your testimony that the
22    expectation on that one was that after ten years no
23    additional premium payments would have to be made?

29  (Pages 110 to 113)

Deposition of:  **Wayne Russell**
11/15/1999

## Page 114

1    A. No more.
2       (Defendant's Exhibit No. 13 was marked
3       for identification and will not be
4       attached to the deposition.)
5    Q. Okay. Now, let's go over the documents.
6  Let me show you Defendant's Exhibit No. 13 and ask
7  you if you recognize this as the illustration that
8  you initially received from Mr. Clements in
9  connection with the $1 million policy that later
10 became a 2 and a half million dollar policy? Do you
11 recognize that?
12   A. I do.
13   Q. And is that your handwriting at the top?
14   A. It is.
15   Q. And would you read into the record what
16 that says, please, sir.
17   A. I've got an asterisk, "Policy to be issued
18 per these tables according to Jeff Caddell and Gus
19 Clements."
20   Q. Now, do you recall when that was
21 discussed?
22   A. I don't but there's a date there.
23   Q. Of what?

## Page 115

1    A. Of November of '94.
2    Q. Now, you'll note that on the illustration
3  you have additional -- you said you have an asterisk
4  on it. And on that asterisk you have it's above the
5  assumed interest rate table using present mortality
6  rates and expenses.
7    A. Right. I questioned both of them about --
8    Q. When you say "both of them," both men?
9    A. Both Jeff and Gus about all of these
10 different tables. You could see where I, where this
11 was written in right here by me. And they told me
12 don't worry about these tables here. This is the
13 table you need to look at to fund your ten-year pay
14 and what your values would be.
15   Q. Now, you were tapping your finger on the
16 table. What table are you referring to?
17   A. This current interest rate of 6 and a
18 half.
19   Q. All right. Do you recognize that the
20 table that you were relying on in connection with
21 this million dollar illustration says current. You
22 have handwriting over assumed and the table that you
23 are relying on on the $500,000 policy was over the

## Page 116

1  assumed. Can you explain why you would be relying
2  on different tables?
3    A. I don't understand what you're talking
4  about.
5    Q. You told me that on Defendant's Exhibit
6  No. 12, Mr. Russell, that you relied on the values
7  shown under the assumed table.
8    A. The first column is where I was told that
9  I needed to -- this is the columns that the values
10 would be, whatever that was, whether it was assumed.
11 I don't know, you know, what terminology, you know,
12 he used at the time, but he told me that this was a
13 very conservative table. This was a table that I
14 would be buying the policy on right here.
15   Q. Well, all I want you to do is tell me
16 this: You did recognize that according to the
17 testimony you just gave when you bought the 2 and a
18 half million dollar policy, the first illustration
19 you were shown was for a million. And you had told
20 -- your testimony was that the table that you relied
21 on was under the current interest rate, three
22 columns, and the current cash value column in
23 Exhibit No. 13; right? Is that what you just said?

## Page 117

1    A. That I relied on these columns here.
2    Q. Yes.
3    A. I relied on both of them.
4    Q. And then on -- for the $500,000 policy you
5  testified that you relied on columns under an
6  assumed interest rate, not current rate, but an
7  assumed interest rate, and then it says current cash
8  value table. And you relied on that column?
9    A. Well --
10   Q. Just if you'll bear with me, I think we'll
11 get through this. Is that true? That's the column
12 you relied on for the 500?
13   A. Well, I'm going to go back and restate
14 what I told you before, that when I put up my money,
15 it was for a one-time buy. And they were to get me
16 the best deal they can get me. Now, you know,
17 whether it's assumed or whether actual, current, I
18 don't know. You know, I was expected and am
19 expected not to make another payment based on that.
20 Now, if you -- that's exactly what I expect.
21   Q. But my question --
22   A. And the table he showed me was concern
23 yourself with this table here and none other.

**Edmondson Reporting & Video**
*Birmingham, Alabama 35203*
*1030 Financial Center*        *1-800-966-2333*

Deposition of: Wayne Russell
11/15/1999

Page 118

1    Q. Again. You're -- in one you're pointing
2  to a set of columns under a current interest rate
3  amount and the other you're pointing to -- if you'll
4  just please listen to me, I think we can get to the
5  point.
6    A. Sure.
7    Q. And the other one, you're pointing to a
8  set of columns under an assumed interest rate
9  amount. And my question to you simply put is: Did
10 you ever have any discussions with Mr. Clements or
11 Mr. Caddell about the difference in these columns:
12 One that says an assumed interest rate and one that
13 says a current interest rate?
14   A. I had no discussions with them.
15   Q. You had no discussions with them about
16 that at all?
17   A. No, sir.
18     MR. AUGHTMAN: Can we just reflect that
19 we're looking at Exhibit 12 and 13?
20     MR. STEWART: And it's Exhibit 12 that has
21 the assumed interest rate, and it's Exhibit 13 that
22 has the current interest rate columns that he's been
23 testifying to.

Page 119

1    Q. (BY MR. STEWART) Do you recall that in
2  your discussions about the million dollar policy
3  that consideration was also given as to whether
4  instead of making annual premium payments that you
5  would make a one-time dump in?
6    A. I don't think they had enough money that
7  they wanted to do that at that time.
8    Q. But you recall that at one point in time
9  that was a consideration?
10   A. I don't recall that. It may have been,
11 but I don't recall it.
12   Q. Well, look at this illustration that y'all
13 have produced. And there's some handwriting in the
14 top left-hand corner, and this illustration reflects
15 a one-time annualized premium of $70,359 for --
16   A. A 2 and a half.
17   Q. For a million, a million.
18   A. What date does that have on it?
19   Q. What's that up here? It's in your
20 handwriting. Can you see it?
21   A. I can't read it.
22     (Defendant's Exhibit No. 14 was marked
23       for identification and will not be

Page 120

1      attached to the deposition.)
2    Q. Well, let me show you something else that
3  might help you. I'm going to also show you the
4  application that was signed by you for the million
5  dollar policy in an effort to try to refresh your
6  recollection is what I'm doing.
7    A. I see my writing up here now.
8    Q. Oh, you didn't see it before? I thought
9  that's what I was pointing to.
10   A. Well, I --
11   Q. Okay.
12   A. It says "70,240 cash per Gus." But I
13 can't read that date.
14   Q. Well, look at this application. And all
15 we're trying to do is reconstruct what happened.
16 This is an application dated November 3rd. You'll
17 see over here that the application is for a million
18 dollars in coverage and the proposal at that time
19 was to pay 70,300 and some odd dollars as a dump in;
20 right?
21   A. Uh-huh.
22   Q. And somewhere along the line, you
23 recognized that that was changed?

Page 121

1    A. We decided not to do that.
2    Q. Okay. But you do now recognize that that's
3  what was contemplated --
4    A. Since the paperwork you've shown me, that
5  helps solidify the statements you made, yes. If you
6  had asked me that ten minutes ago, I could not
7  recollect or remember that. But since it's in
8  writing here, and I can see it, yes. And I told you
9  that there was a decision as to how much it totaled,
10 somewhere between 6 and 7 and a half million so --
11   Q. And that's why at some point in time the
12 decision was made to go from 6 to 7 and a half;
13 right?
14   A. Yes, sir.
15   Q. And that's what -- so you applied -- when
16 you applied for it, you were applying for a
17 million --
18   A. Well, that's what Gus, Gus -- because I
19 probably told him that.
20   Q. Well, I think that's pretty clear that the
21 coverages you wanted came from your lawyer and your
22 accountant and you said, Gus, I need this.
23   A. And probably one of them came back and

31 (Pages 118 to 121)

## Deposition of: Wayne Russell
## 11/15/1999

Page 122

1  says, Why don't you just go ahead and make it 7 and
2  a half, you know. And that's probably what
3  happened.
4       MR. AUGHTMAN: Will you let me take a
5  break in about 10 minutes?
6       MR. STEWART: No, I won't.
7       (Defendant's Exhibit No. 16 was marked
8       for identification and will be
9       attached to the deposition.)
10      Q. (BY MR. STEWART) There's a page that's
11 executed that shows -- all right. I'll show you
12 Defendant's Exhibit 16 and you recognize this then,
13 Mr. Russell, as the two and a half million dollar
14 policy that you were issued?
15      A. I would assume that you're correct, that
16 this was the policy.
17      Q. Now, we talked about the $500,000 policy
18 and how you received it. Do you recall how you
19 received the 2 and a half million dollar policy and
20 the $5 million policy?
21      A. I do not recall. But I assume it came to
22 me.
23      Q. Do you have any specific recollection of

Page 123

1  him delivering those policies to you and discussing
2  those policies with you upon delivery?
3       A. No. He had a habit of coming out there
4  late in the afternoon, you know, 4:45, something
5  like that and us hurriedly handling our business.
6  That would be a lot of the last things he would do
7  for the day, you know.
8       Q. But in any case, with regard to the 5
9  million and the 2 and a half million, you just have
10 no specific recollection of that?
11      A. No.
12      (Defendant's Exhibit No. 17 was marked
13      for identification and will not be
14      attached to the deposition.)
15      Q. Let's look at Defendant's Exhibit 17,
16 which is a statement of policy costs and benefit
17 information. Do you recall receiving that with the
18 policy?
19      A. This is what now?
20      Q. Statement of policy costs and benefit
21 information.
22      A. I do not recall that, no, sir.
23      Q. Well, that was produced to us by your

Page 124

1  attorney from your records. Do you recall having
2  seen that before?
3       A. Honestly, I don't. But I may have. I
4  don't know.
5       Q. I'm just saying if it came from your
6  records, I assume that this was in your possession.
7       A. It was in my possession whether I looked
8  at it or not.
9       Q. Okay. So your testimony is that while you
10 may have had Defendant's Exhibit No. 17 in your
11 possession, you don't recall ever reading it?
12      A. I don't, that's correct.
13      Q. Do you recall ever reading the 2 and a
14 half million dollar policy?
15      A. No, sir.
16      Q. There is a signed one of these somewhere,
17 Mr. Russell, but this will -- is as far as your
18 understanding of the transaction with the
19 application for the million dollar policy that was
20 later changed to 2 and a half million, do you recall
21 this amendment to your application? And I'm
22 referring to -- what is that column at the top?
23 You've got it upside down.

Page 125

1       A. What does this amendment state?
2       MR. AUGHTMAN: The application amendment?
3       MR. STEWART: Yes.
4       THE WITNESS: Is that where it went from a
5  million to two and a half?
6       MR. STEWART: Right.
7       Q. (BY MR. STEWART) Well, if you would, just
8  read that and tell me if you have any disagreement
9  with what is said there as far as what the
10 transaction is supposed to be. There's a signed one
11 somewhere and I apologize. I cannot find it right
12 now.
13      A. That is the annual payment. And I was
14 told just to take this table over here and multiply
15 two and a half times it, that he had prepared at a
16 million. For this million dollars table here, just
17 two and a half times it. So does that come up to
18 the same number?
19      Q. Yes. That calculates to the right --
20      A. That's how we did this. Like I say, the
21 difference in the six and the seven and a half, I
22 told him first six, one of my advisors said to go
23 ahead and make 7 and a half. He had prepared this

Deposition of:  Wayne Russell
11/15/1999

Page 126

1   on a six and he said, Well, this will be the same
2   thing.  And if that's the same money, that's the
3   answer to that.
4       Q.  Do you recall ever -- and I may be being
5   redundant now.  Do you recall reading that policy?
6       A.  I think I've answered as best I could and
7   no, sir.
8       Q.  Okay.  Do you recall -- can you identify
9   that as being one of the trust checks that paid the
10  first premium on that policy?
11      A.  Yes, sir.  It says to Russell Insurance
12  Trust.
13          MR. AUGHTMAN:  Can I take that break while
14  you're looking?
15          MR. STEWART:  Yes.
16          (A short break was taken.)
17      Q.  (BY MR. STEWART) Mr. Russell, there are
18  several copies of these documents floating around.
19  I'm showing you another copy of the two and a half
20  million dollar policy.  It bears your attorney's
21  Bates Stamp number on it so --
22      A.  My attorney's what?
23      Q.  Bates Stamp number at the bottom

Page 127

1   right-hand corner, which we can only assume that
2   this came from your records since y'all produced it.
3   What I want to show you is over here on this page
4   2-B, again that we were talking about earlier.
5   You'll see a line that is drawn under there, under
6   tenth year.  Does that look like something you did?
7       A.  No.
8       Q.  Do you have any idea who did it?
9       A.  No, sir, I don't.
10      Q.  Do you know when that was done?  Do you
11  have any idea when that was done, or do you have any
12  information on that?
13      A.  I assume that it was done, probably done,
14  then looking at the policy, so I don't know.
15      Q.  So you don't have any idea where that came
16  from?
17      A.  No.
18          MR. STEWART:  Jay, where are the originals
19  all of these from which these copies were made
20  produced?
21          MR. AUGHTMAN:  They're not in this office.
22  And they're in my client's possession.  And I called
23  your office this weekend and talked to Steve about

Page 128

1   that, the letter he sent me.
2           MR. STEWART:  And you say your client, are
3   you talking about Mr. Russell?
4           MR. AUGHTMAN:  Yes.  I don't know if
5   they're in his immediate possession.  I think he
6   keeps some of these put away in various places.
7           MR. STEWART:  Well, these writings on
8   documents in your client's possession obviously may
9   or may not have some significance, and we need to
10  see the original documents with the original
11  writings on them.
12      Q.  (BY MR. STEWART) You said that you gave
13  your documents to someone and then those documents
14  were given to Mr. Aughtman.  Is that what has
15  transpired?
16      A.  Yes.
17      Q.  Who is the first person you delivered your
18  original papers to?
19      A.  Gosh.  Lapse of memory.  What's his name?
20  The attorney's name -- Joel Gregg.
21      Q.  Joel Gregg.  And was it Mr. Gregg then
22  that delivered your documents to Mr. Aughtman?
23      A.  He delivered them back to me.

Page 129

1       Q.  Delivered them back to you?
2       A.  Yes.
3       Q.  And I assume that when he delivered them
4   back to you, you didn't go through them and make
5   sure everything was in proper order and everything?
6       A.  No, sir, I didn't.
7       Q.  You just took them the way you got them
8   and brought them to Mr. Aughtman; is that correct?
9       A.  I took them and filed them back.  I put
10  them in a big pile in a box and delivered them.
11          (Defendant's Exhibit No. 20 was marked
12          for identification and will not be
13          attached to the deposition.)
14      Q.  Let me show you Defendant's Exhibit No. 20
15  which is -- well, this is another one of these
16  duplicates, which is one of these annual statements.
17  This one is dated December of '95.  That's in
18  connection with the 2 and a half million dollar
19  policy.  Do you recall seeing that annual statement?
20      A.  No, sir, I do not.
21      Q.  Do you recall ever looking at it?
22      A.  No, sir.
23      Q.  You see that on the second page of that

33  (Pages 126 to 129)

Deposition of:  Wayne Russell
11/15/1999

Page 130

1  annual statement in the value column that certain
2  entries are circled and certain entries are
3  underlined.  Do you know who did that?
4      A.  No, sir.
5      Q.  Did you do it?
6      A.  No, sir, I did not.
7      Q.  Does the fact that those entries on that
8  page, those markings are made, does that have any
9  significance to you?
10      A.  Well, I assume that it was done during an
11  analysis of the policy, somebody who was doing an
12  analysis of the policy.
13      Q.  But you weren't present when it was done,
14  were you?
15      A.  No, sir.
16          (Defendant's Exhibit No. 21 was marked
17          for identification and will not be
18          attached to the deposition.)
19      Q.  Let me show you, Mr. Russell, what I've
20  marked as Defendant's Exhibit No. 21.  And the first
21  page there's another statement of policy values
22  which is commonly referred to as annual reports.
23  And it's missing the first page.  Do you any idea

Page 131

1  where the first page to that is?
2      A.  I do not.  I thought I had everything
3  together that I have.
4          MR. STEWART:  Jay, if you would make a
5  note and see if that first page is somewhere.
6      Q.  Would the same thing be true with respect
7  to this annual statement, Mr. Russell, that when you
8  received it you just put it away somewhere and
9  didn't pay any attention to it?
10      A.  Not a lot of attention, that's right.
11          (Defendant's Exhibit No. 22 was marked
12          for identification and will not be
13          attached to the deposition.)
14      Q.  And let me show you Defendant's Exhibit
15  No. 22, which is another annual statement.  And
16  except on this one the second page is missing.
17          MR. STEWART:  And, in fact, Jay, that is
18  Bates stamped somewhere and you just didn't include
19  it when it was produced.  It skips from 381 to 383,
20  so I need page, Bates Stamp 382.
21          MR. AUGHTMAN:  If there is one, I'll give
22  it to you.
23          MR. STEWART:  Well, I think there would

Page 132

1  be.  As I said, it's Bates Stamp page 382.
2      Q.  (BY MR. STEWART)  Do you recall receiving
3  this annual statement that's dated in 1997, Mr.
4  Russell?
5      A.  No, sir.
6      Q.  Do you recall noting in that statement
7  that the current interest rate that was being
8  credited was 5.6, which was less than the assumed
9  rate or the current rate as shown on the
10  illustration?
11      A.  I don't know.
12      Q.  Now, as I understand it from your
13  testimony, the replacement of the existing insurance
14  in order to buy the 2 and a half million dollar
15  policy was not an issue or matter of discussion.  Is
16  that true?
17      A.  I didn't understand the question.
18      Q.  You did not replace any insurance,
19  existing insurance you had in order to buy the 2 and
20  a half million dollar policy?
21      A.  No, sir.
22      Q.  And you have made no premium payments on
23  the 2 and a half million dollars other -- excuse me

Page 133

1  -- 2 and a half million dollar policy other than the
2  premium payments of $23,000 a year as called for in
3  the policy?
4      A.  That's correct.
5      Q.  But you haven't made any premiums in
6  addition to that?
7      A.  No, sir.
8      Q.  And you don't know, sitting here today,
9  whether you will ever be required to make any
10  premium payments beyond the ten-year period, do you?
11      A.  As I stated before, I've been advised that
12  I will.
13      Q.  You have been?  Is there any documentation
14  here in connection with your policy that shows you
15  that you're going to have to make premium payments
16  beyond the ten-year period?
17      A.  It's not documented or shown to me other
18  than I was told that.
19      Q.  When you were told that, were you pointed
20  to anything in the way of documentation?
21      A.  I don't remember that.
22      Q.  But you remember being told --
23      A.  I remember being told that, you know,

34  (Pages 130 to 133)

Deposition of:  Wayne Russell
11/15/1999

Page 134

1  you're going to wind up paying several more
2  payments.
3      Q.  Several more?
4      A.  That's right.
5      Q.  Do you remember how many several is?
6      A.  No, sir.  Just more than the payments
7  we've made, the ten payments that we paid to start
8  with.
9      Q.  Well, you do recognize that in the policy
10  under the guaranteed basis that there's nothing on
11  that page that shows you're going to have -- after
12  the ten-year period your premium payments will
13  cease.  You recognize that, don't you?
14      A.  I take this to mean that after the tenth
15  year that this policy is going to fund itself.
16      Q.  You take what to mean?
17      A.  This schedule right here.
18      Q.  And where do you get that from?
19      A.  That's what I was told to start with.
20      Q.  Well, I'm just saying if you look under
21  this column --
22      A.  Which column are we talking about now?
23      Q.  We're talking about the column, the

Page 135

1  planned annualized premiums.  Okay.  That shows that
2  you are to make $23,047 annual premiums for the life
3  of the policy, doesn't it?
4      A.  I bought this policy based on making ten
5  payments.  I was told that the proceeds of the
6  policy would fund itself from then on to the death
7  of the second living.
8      Q.  What are you saying, that notwithstanding
9  that this column shows that you're going to have to
10  make planned, the planned premiums in the amount of
11  $23,000 is going to have to be made that you're only
12  going to make them ten years and somebody else was
13  going to make them the rest?
14      A.  The dividends of the policy took care of
15  itself.
16      Q.  Have you read anywhere in the policy that
17  that's going to happen?
18      A.  I told you I was sold on that basis to
19  begin with.
20      Q.  Have you seen anywhere in the policy that
21  the policy provides for that?
22      A.  I haven't looked at the policy to
23  understand it.  I can't understand it anyway.  I

Page 136

1  told him what I wanted.  I assumed that's what I was
2  getting.  And now I have found out I'm not getting
3  what I assumed I was getting.
4      Q.  Have you made any effort to read this
5  policy sitting here today?
6      A.  I have looked over it.  I can't understand
7  it.
8      Q.  When did you first look over it to try to
9  understand it?
10      A.  In-depth?
11      Q.  Yes, sir.  Well, whenever.  I just want to
12  know when did you attempt to read this policy to see
13  what you bought?
14      A.  When I did it myself without somebody just
15  flipping through it?
16      Q.  Uh-huh.  And when was that?
17      A.  When it was brought to my attention that
18  the class action suit had been brought, and I
19  started delving into it to see if I could understand
20  it, and I couldn't understand it.
21      Q.  But after you received notice of the class
22  action lawsuit is when you got this policy,
23  Defendant's Exhibit 19, out and read it to see what

Page 137

1  it provided?
2      A.  I tried to, and I could not follow it.
3      Q.  Let me ask you this:  Have you seen
4  anything in this policy that tells you that premiums
5  will only have to be paid for ten years by you?
6      A.  I don't remember what I read at this
7  particular time.  But I was not satisfied.  And
8  therefore, when I became frustrated and unsatisfied,
9  that's when I went to an attorney.
10      Q.  So then is this accurate?  You have a
11  class action notice.  You read the policy, and you
12  have some questions about what this policy is about
13  as compared to what you were told, so you go see a
14  lawyer.
15      A.  Yes, sir.
16      Q.  So, in other words, that's when you became
17  unhappy with it?
18      A.  I became unhappy when I was told that the
19  policy was different from what it was sold to me on,
20  the basis.
21      Q.  You were told that, or is that something
22  you read?
23      A.  I haven't been able to read it.  I can't

35  (Pages 134 to 137)

Deposition of: Wayne Russell
11/15/1999

---

**Page 138**

1  understand the flow of it.
2      Q.  Well, but it's true though, isn't it, Mr.
3  Russell, that you didn't find anything in this
4  policy when you read it after you got the class
5  action notice that says that you would only have to
6  make premium payments for ten years. That's true,
7  isn't it?
8      A.  I haven't read that anywhere in there, no.
9      Q.  And you've been told by somebody that you
10  are going to have to make premium payments after ten
11  years but you haven't read that in writing anywhere
12  or been shown any facts or figures other than
13  somebody just told you that?
14      A.  That's correct.
15      Q.  Okay.
16      Q.  If you can't read it yourself, you have to
17  rely on advice.
18      Q.  Let's talk about your $5 million policy.
19  You've already given me testimony about this New
20  England Mutual policy that was owned by your
21  children, that some money was to be taken out of
22  that policy to provide the amount that was dumped
23  into the 5 million. Is that -- you've already told

---

**Page 139**

1  me everything you know about that?
2      A.  Yes, sir.
3      Q.  All right. Do you have any criticism
4  about the way that that was handled?
5      A.  I don't follow you.
6      Q.  Well, that wasn't a replacement, was it?
7      A.  No. The criticism I have is that I've
8  been told I'm going to have to make additional
9  payments.
10      Q.  Under the 5 million?
11      A.  Yes, sir.
12      Q.  Well, where are you getting this
13  information?
14      A.  From attorneys that have taken the
15  policies and looked at them and interpreted them.
16      Q.  When are you supposed to make an
17  additional payment under the $5 million policy?
18      A.  I believe it's every December.
19      Q.  Every December?
20      A.  I think that's the date. What is the date
21  it's due? You've got some information here that we
22  can tell. It's 23,000 and something dollars. And I
23  believe it's due in December.

---

**Page 140**

1      Q.  November is when the 23,000 is the 2 and a
2  half million dollar policy --
3      A.  Oh, excuse me. I'm confused. The 5
4  million was a one-time pay.
5      Q.  One-time deal. And have you been told
6  that you're going to have to make some additional
7  payments under that policy?
8      A.  Yes.
9      Q.  When are you going to have to do that?
10      A.  I don't know when. But I've been told
11  that from people who have looked at these policies
12  that somewhere down the road if I live long enough,
13  that I'm going to have to annie-up additional
14  moneys. And that is not what I bought.
15      Q.  Do you recall what you were told as far as
16  how long you have to live?
17      A.  I have been told -- let's see the schedule
18  there.
19      Q.  Which schedule are you wanting to look at?
20      A.  This is the one right here. Here it is
21  right here. I put a note on there. That it would
22  carry me out to year, to the 99th year, still have
23  full value.

---

**Page 141**

1      Q.  All right. But you've been told
2  differently now. Is that what you're saying?
3      A.  Yes.
4      Q.  Okay. What year have you been told that
5  it will go to now?
6      A.  I don't recollect that. Just that I'm
7  going to have to -- there's a very good chance
8  unless I don't live long or my wife doesn't live
9  long that we're going to have to make additional
10  payments to fund this thing.
11      Q.  Well, tell me this: What does live long
12  mean? You know, different strokes for different
13  folks. What does live long mean to you?
14      A.  85, 90.
15      Q.  90?
16      A.  Probably.
17      Q.  How old was your daddy when he died?
18      A.  My daddy is still living.
19      Q.  Is he. How old is he?
20      A.  He's in his 80s.
21      Q.  And bless his heart. I'd take 85 right
22  now. Let me show you Exhibit No. 23.
23      A.  All right.

---

36  (Pages 138 to 141)

Deposition of:  Wayne Russell
11/15/1999

Page 142

1    Q.  That is an illustration that you sent to
2  Ben Easterling.  And do you recall why you did that?
3    A.  Okay.  This was a fax to Ben Easterling.
4  Probably so that he could quote me on some type of
5  form like this right here for that policy that I
6  bought later from -- through him and American
7  General.
8        He was not an experienced insurance guy.
9  But says that he had access to very competitive
10  rates.  And I told him, Well, send me a quote.  And
11  so I assumed that I faxed this to him to use as a
12  guide.
13        (Defendant's Exhibit No. 24 was marked
14        for identification and will not be
15        attached to the deposition.)
16    Q.  Let's look at Exhibit 24.  This is an
17  illustration that bears your handwriting at the top,
18  I believe; is that correct?
19    A.  Uh-huh.
20    Q.  You wrote that on there?
21    A.  I think so.
22    Q.  Dated November 1st, 1994?
23    A.  Uh-huh.

Page 143

1    Q.  Did you write this 5 percent in over here
2  on the guaranteed rate?
3    A.  I probably did.
4    Q.  You what does this say where this asterisk
5  is?
6    A.  "Using present mortality rates and
7  expenses."  I was told to disregard these two
8  columns here.  This is the column that you need to
9  look at.  Disregard these columns.  This is the
10  column you need to look at in your evaluation.
11    Q.  Under the current rate.  And disregard
12  these columns notwithstanding the fact that you made
13  handwritten notes with respect to those two columns
14  you were to disregard?
15    A.  I questioned them.  I questioned them.
16  There again, taking you out to the 99th year.
17    Q.  What did you understand this current
18  interest rate figured to be?  You said you
19  questioned him.  I assume that you questioned him
20  about the difference between the current, the
21  assumed and guaranteed.  What did you understand
22  this 6 and a half percent under the current interest
23  rate to be?

Page 144

1    A.  Really it had no bearing as I have
2  testified before.  It didn't make any difference to
3  me.  I gave him $350,000 for $5 million death
4  benefit on a last to die.  And it really didn't make
5  any difference to me what the rate was.  I gave him
6  a one-time payment never to make another payment.
7    Q.  And so you wrote out, I think you wrote
8  two checks:  One for 250 and one for 100?
9    A.  Probably did but I don't remember.
10    Q.  On the basis of this illustration in front
11  of you.
12    A.  Yes, sir.
13    Q.  And you've got one column that says
14  current.
15    A.  Yes, sir.
16    Q.  One that says assumed and one that says
17  guaranteed.
18    A.  That's right, based upon what he told me.
19    Q.  And you weren't paying any attention at
20  all to the one that says guaranteed?
21    A.  No, sir.  He said that's -- those things
22  never happen.  They always put that there and don't
23  pay any attention to it.

Page 145

1    Q.  The guaranteed never happens.  Is that
2  what he told you?
3    A.  Yes, sir.
4    Q.  Well, did you believe him when he said the
5  guaranteed never happens?
6    A.  I had no reason not to believe him.
7    Q.  You don't think that somebody tells you
8  something that's guaranteed that that's better than
9  something that's based on current.
10    A.  Well, look --
11    Q.  No.  Answer my question.  Do you think
12  that?
13    A.  Any time something that's guaranteed, is
14  better than something that's current.  But the man
15  told me don't pay any attention to the guarantee
16  part.  That the worse, worse, worse, worse, worse
17  case scenario.
18    Q.  Guaranteed is the worse case scenario?
19    A.  That's right.
20    Q.  And you gave somebody $350,000 and they
21  tell you that guaranteed is worse than current, and
22  you believe them.  That's what you're telling me?
23    A.  I'm telling you that he told me not to pay

37  (Pages 142 to 145)

**Deposition of: Wayne Russell**
**11/15/1999**

Page 146

1  any attention to these other two columns, that these
2  were the worse case scenarios over here. The
3  company always pays more than that. In fact, the
4  company was paying more than this at the time. He
5  says, Look, you know, it's probably going to be more
6  than $5 million worth in there at the time of your
7  death. It pays -- in other words, interest rates
8  credited to your policy are going to be better than
9  that.
10        So, you know, I'm sincere in what I'm
11  telling you. I don't know how else to answer you.
12  I'm very sincere.
13        Q. Well --
14        A. Put yourself in my position. You can
15  understand.
16        Q. Did you understand, Mr. Russell, that
17  these figures and these columns on the left-hand
18  side that you were going to bank on were based on
19  the 6 and a half percent interest rate?
20        A. I'm telling you again, I didn't pay any
21  attention to rates. I instructed the man to give me
22  $5 million worth of coverage and give me the best
23  price for a one-time pay. I don't know how else to

Page 147

1  tell you, sir.
2        Q. So it didn't matter to you whether this
3  current rate up here showed 6 and a half, 10, 15,
4  20?
5        A. That's exactly right.
6        Q. So I take it when you received your first
7  annual statement for this $5 million policy for
8  which you paid $350,000 for, that the first annual
9  statement showed the interest rate had already gone
10  down a half a point?
11        A. Didn't mean anything.
12        Q. Didn't mean anything?
13        A. No.
14        Q. And when you received the one in 1997,
15  that for your $350,000 investment, it had gone down
16  to 5.6 percent. That didn't mean anything to you?
17        A. Didn't mean a thing.
18        Q. Did you notice on this illustration under
19  the guaranteed column that it showed that for your
20  and $350,000 investment that the policy would only
21  go to age 78? Do you see that?
22        A. What is the question again?
23        Q. I said did you notice on the illustration

Page 148

1  that we've been talking about, Exhibit No. 24, that
2  under the guaranteed column it shows that for your
3  $350,000 that that policy will only go to age 78?
4        A. I see this now. I saw it then. I asked
5  him about it. He told me, Don't worry about it.
6  This is the column. If you -- if you're going to
7  live past 100, then we've got to worry. If you
8  don't live past 100, you're covered.
9        Q. Do you know that that policy is paid up at
10  age 100?
11        A. What now?
12        Q. Do you know that this policy is paid up at
13  age 100?
14        A. It's my assumption that it is. I think
15  it's year 99.
16        Q. I'm not talking about on that
17  illustration. I'm talking about in the course of
18  the policy provisions it's paid up.
19        A. It's paid up to the year 100.
20        Q. I'm talking in the policy.
21        A. In the policy?
22        Q. Yes.
23        A. I don't know what it says.

Page 149

1        Q. Did your lawyers tell you that this policy
2  is paid up at 100 regardless?
3        MR. AUGHTMAN: Don't answer that. He's
4  knows better than to ask you a silly question.
5        (Defendant's Exhibit No. 25 was marked
6        for identification and will not be
7        attached to the deposition.)
8        Q. (BY MR. STEWART) Let me show you
9  Defendant's Exhibit 25, Mr. Russell. And can you
10  identify that as the application for the $5 million
11  policy that you've signed?
12        A. I guess it is. I think we've already gone
13  over this once, haven't we?
14        Q. No, sir.
15        A. Are you sure?
16        Q. Yes, sir.
17        A. Okay. Well, it's one just like it I
18  thought.
19        Q. You do recall that you've signed three
20  applications for insurance, don't you?
21        A. Uh-huh.
22        Q. Okay. This is the third one, Mr. Russell.
23        A. Okay. All right.

38  (Pages 146 to 149)

Deposition of: Wayne Russell
11/15/1999

Page 150

1    Q. You do identify this as the application
2  you signed for the $5 million policy?
3    A. I signed it. I didn't fill it out, but I
4  signed it.
5    Q. Do you see anything on that application
6  that is incorrect?
7    A. Well, I haven't read it.
8    Q. Well, would you mind.
9    A. The whole thing, the front page or what?
10   Q. The whole thing. I don't think it's
11 really that complicated to read. I just want to
12 know if there's anything on the application that's
13 incorrect.
14   A. Okay.
15   Q. And I'm not trying to burden you. I'm
16 really not.
17   A. The figures right here, I don't know
18 whether that's correct or incorrect. I don't know
19 where it came from. So therefore, I don't know. So
20 I can't answer your question, sir.
21   Q. What figures are you referring to?
22   A. Well, here's one right here, No. 6901. I
23 don't know anything about that. Here's one right

Page 151

1  here premium, annual premium, 53150. I don't know
2  anything about that. I can't tell you.
3    Q. Okay.
4    A. Do you want me to go on further?
5    Q. Anything else on that page?
6    A. That's all I see right now.
7    Q. What about the second page?
8    A. Well, there's an application for six
9  million instead of five. And we didn't get six.
10 Some of this I can't read. I don't know what that
11 is.
12   Q. Okay. Let me help you. How about looking
13 at blocks 26 through 32. Are any of those questions
14 answered incorrectly?
15   A. 26. Read the question.
16   Q. You want me to read it?
17   A. You can, yeah.
18   Q. Well, can you read it?
19   A. I can, yeah.
20   Q. Well, why don't you read it and tell me if
21 the answer is incorrect.
22   A. All right. What would be this date?
23   Q. November 3rd, 1994.

Page 152

1    A. I'm sure at that time when we were taking
2  quotes from other companies we had the same thing
3  from another company.
4    Q. So the answer would be correct?
5    A. Yes.
6    Q. Okay. Number 27.
7    A. "Has any other company declined to issue,
8  reinstate or review, rated, modified, postponed or
9  cancelled any life insurance on proposed insurer?"
10   Q. And the answer is marked yes.
11   A. Yes.
12   Q. And look at your block down there for your
13 explanation for that.
14   A. Okay. As applied to other companies for
15 block amount but one contract will be --
16   Q. I think that should state only one
17 contract. It says one. But I think he meant to say
18 only one.
19   A. "No additional amount rated on "-- what
20 was that -- preliminary applications. All existing
21 insurance was issued on a preferred standard basis."
22   Q. Is that correct?
23   A. As far as I know, yes.

Page 153

1    Q. Okay.
2    A. Is there a problem?
3    Q. No. You act concerned like I'm trying to
4  bait you or something. All I'm trying to do is
5  establish that the information taken by the agent
6  and turned into the company is correct and if any of
7  it is incorrect. That's my question. Is any of it
8  incorrect?
9    A. It probably needs to be only where it was
10 left out.
11   Q. All right.
12   A. I don't smoke, don't smoke cigars, pipes,
13 I don't chew tobacco, no. That's correct. All
14 right. No traffic violations in three years or
15 accidents, driving under the insurance, never had a
16 ticket on that. That's correct. That's correct,
17 recreational activities, all that. I'm not involved
18 in flying or racing boats or --
19   Q. You don't do any sky diving?
20   A. No. Don't do any sky diving. So I assume
21 that everything is correct.
22   Q. If I were you, I wouldn't do any sky
23 diving with all that insurance on you, Mr. Russell.

39 (Pages 150 to 153)

Deposition of:  Wayne Russell
11/15/1999

Page 154

1  Somebody might play with the rip cord?
2      A. I got more sense than to do that.
3      Q. What about the next page?
4      A. Which page are we on?
5      Q. That next page that I see is a duplication
6  of the first.  Just look over that quickly, if you
7  would, Mr. Russell.  And tell me if anything on that
8  appears to be incorrect.
9      A. I don't see anything in the world that's
10  incorrect.  And I signed it on the back.
11      MR. STEWART:  What's that last exhibit
12  number, Jay?
13      MR. AUGHTMAN:  26 I think was the last
14  one, the policy.
15          (Defendant's Exhibit No. 27 was marked
16           for identification and will not be
17           attached to the deposition.)
18      Q. Okay.  Let me show you Defendant's Exhibit
19  No. 27, Mr. Russell.  Do you recall that's deposition
20  costs and benefit statement.  Do you recall
21  receiving that with your $5 million policy?
22      A. I don't recall it but I'm sure I had.
23      Q. Do you recall looking over it?

Page 155

1      A. No, sir.
2      Q. Have you ever looked that over?
3      A. I can't answer that truthfully, because
4  I've told you I don't recall.  I can't answer that
5  truthfully other than what I have already answered.
6          (Defendant's Exhibit No. 28 was marked
7           for identification and will not be
8           attached to the deposition.)
9      Q. Defendant's Exhibit 28, does that contain
10  your signature down at the bottom?
11      A. It does.
12      Q. And is that the signature of your wife?
13      A. It is.
14      Q. And how about your brother, George?
15      A. It is.
16      Q. All right.  Do you -- as part of this $5
17  million policy, Mr. Russell, at one time was it
18  contemplated that a number of policies were going to
19  be replaced and then something else was done?  And
20  here's the reason I'm asking you.  Look at
21  Defendant's Exhibit 29 and you see those policies
22  down there that refer to the New England policies,
23  and this is a replacement form.

Page 156

1      A. Uh-huh.
2      Q. Do you know what the purpose of that form
3  was?
4      A. No, sir.
5      Q. Do you think that this form was necessary
6  to take those values out of the policies your
7  children owned in order to fund your $5 million
8  policy?
9      A. I don't know what these policies numbers
10  are.  I'm being honest.  I don't know what they
11  relate to.  I'm sure they go to some policy.  But I
12  don't know whether it's New England or what.
13      Q. I'm asking the questions because I don't
14  know.  It says New England on the left, and there's
15  about nine policy numbers there.
16      A. He probably just listed every policy I had
17  at that time.  You know what I mean?  And not
18  knowing where they were going to come out of, but
19  they wind up coming out of that half a million
20  dollar contribution that the -- that I told you that
21  I made in the needs of the children back ten years
22  prior to or eight years prior to buying this
23  insurance.

Page 157

1      Q. So these nine policies that were shown
2  here were not --
3      A. I would think what happened here is that
4  he has listed every policy I owned in case anything
5  wanted to be done, you know, for the funding of it.
6  And it came out of three rather than nine.  And then
7  later he came up with the idea of transferring those
8  other six.  And that was his idea.
9      Q. And you paid -- you wrote checks out for
10  $250,000 and $100,000 respectably to fund the $5
11  million policy; is that right?
12      A. I'm not sure how that was funded.  But I
13  know the money came from the children from the
14  insurance they had.  But I don't know, you know --
15      Q. Well, let me show you a note that's in the
16  policy file.  And read down at the bottom of that.
17      A. Yeah.  But I don't know where these checks
18  came from, you know.  I'm sure it came from that
19  policy because it was reduced by 350,000.  So that
20  doesn't mean anything to me.
21      Q. Okay.
22      A. I think one was in a fixed policy, and one
23  was in a variable policy.  When it went in, it went

40  (Pages 154 to 157)

Deposition of: Wayne Russell
11/15/1999

Page 158

1  in at 250 and 250. And the one that was fixed,
2  believe it or not, was worth more money in the
3  variable. Therefore, he took probably 250 out of
4  fixed and 100 out of variable. Do you see what I'm
5  talking about?
6     Q. Uh-huh.
7     A. So the two checks came not from me but
8  from New England to fund this.
9     Q. Okay.
10    A. Because I remember half of it being in a
11 fixed income that yielded 8 or 9 and a half percent
12 or something like that, and the other one was in a
13 variable. And the fixed one did better than the
14 variable. And that's the best I can remember. They
15 were charging some high rates of interest.
16         (Defendant's Exhibit No. 30 was marked
17          for identification and will not be
18          attached to the deposition.)
19    Q. I asked you about these annual reports.
20 But so we identify them for the record --
21    A. There again --
22    Q. -- Defendant's Exhibit No. 30, which is
23 the annual reports dated December, 1995 on your $5

Page 159

1  million policy. Did you read that?
2     A. I'm sure I looked at it. And it didn't
3  mean anything. I made my payment, you know.
4     Q. And the fact that the interest rate shown
5  on that annual report is less than the interest rate
6  reflected on that illustration had no significance
7  to you?
8     A. Not a thing in the world.
9         (Defendant's Exhibit No. 31 was marked
10          for identification and will not be
11          attached to the deposition.)
12    Q. And let's look at the statement dated
13 December 19, 1997, that I have marked as Defendant's
14 Exhibit 31. Do you recall receiving that one?
15    A. I don't recall it but the same answer as
16 above, the same thing. I'm sure I got it. And this
17 is on the -- which policy is this? The same policy?
18    Q. Yeah, the 5 million.
19    A. Same thing.
20    Q. Same answer. The 5.6 percent interest
21 didn't mean a thing?
22    A. No, sir.
23    Q. And I assume that if it had shown 2

Page 160

1  percent, that wouldn't mean anything to you either?
2     A. I think I've already stated that.
3     Q. Stated that what I just said is true?
4     A. Yes, sir.
5     Q. And so I understand that you've been told
6  as far as your complaint about this $5 million
7  policy, that you've been told that somewhere down
8  the line, when you don't know --
9     A. That's right. If I live long enough.
10    Q. And you can't put anything more definite
11 in it than that? Is that what you're saying?
12    A. That's correct.
13    Q. Would you agree with me, Mr. Russell, that
14 at least to the extent of the value shown in the
15 guaranteed table that you will not have to make any
16 premium payments on this policy at least after --
17 at least until after you reach age 78?
18    A. That's what it states. So I would
19 assume it states that that's the worst, worst, worst
20 case scenario --
21    Q. Worst scenario is 78?
22    A. Yes.
23    Q. Would you also agree with me that these

Page 161

1  annual statements reflect that your policy is
2  earning better and for -- let me restate that. That
3  the amount of interest being credited to the
4  accumulated fund is more than the guaranteed rate?
5     A. It has been since I've had it.
6     Q. So would you agree with me that would
7  mean so long as that continues that the life of this
8  policy would extend beyond age 78?
9     A. I would certainly think so from everything
10 that's been --
11    Q. And sitting here today, we just don't know
12 what's going to happen, do we, except what's
13 guaranteed? Guaranteed is the one certainty about
14 this we know about; right?
15    A. That's the worst, worst case.
16    Q. But that's also a certainty. That's what
17 the company has guaranteed you; right?
18    A. The worst case scenario.
19    Q. We know this is going to happen.
20 Unequivocally, we know that this policy is going to
21 stay in force until age 78?
22    A. I hope so.
23    Q. No. I'm serious. I'm not trying to split

41  (Pages 158 to 161)

Deposition of: Wayne Russell
11/15/1999

Page 162

1 hairs with you. The company is guaranteeing you
2 that this policy is going to stay in force until age
3 78?
4     A. They're liable to go bankrupt, shoot. I
5 don't know. Nothing surprises me anymore.
6     Q. That's what the policy has guaranteed you
7 though?
8     A. That's what it says. But my answer is
9 nothing would surprise me anymore concerning
10 insurance companies.
11     Q. Okay.
12     A. Not only y'all but any.
13     MR. STEWART: Hang on just one minute.
14     (A short break was taken.)
15     (Defendant's Exhibit No. 32 was marked
16     for identification and will not be
17     attached to the deposition.)
18     MR. STEWART: I don't think I ever marked
19 for identification the $5 million policy, which I've
20 marked as Exhibit No. 32.
21     Q. If you will identify for the record
22 please, sir, that as being the policy that you
23 received.

Page 163

1     A. Should that have been signed back there?
2 I don't know.
3     Q. Well, I don't know. You identified the
4 one that was, in fact, signed, and I don't have the
5 original policy. So I can't -- that was produced to
6 me from your records. Anything that has a Russell
7 like this and has a Bates Stamp number was from your
8 records.
9     A. I assume that it is. I'm not disputing
10 it.
11     Q. Well, let me show you this, identify the
12 sheet that was executed -- that sheet was
13 executed --
14     A. Yes. That's the same thing.
15     Q. Yeah. There ought to be a signed sheet
16 like that in your original policy.
17     A. Okay. Looks to be the same.
18     Q. Okay. So do I understand you going back
19 to this illustration that's marked as Defendant's
20 Exhibit 24, you do understand that you will not have
21 to make any premium payments that will absolute
22 guarantee earlier than the 79th year?
23     A. That's what you're saying but --

Page 164

1     Q. That's what this illustration says.
2     A. Right. Right.
3     Q. Number 24; right?
4     A. Right. That's what it says.
5     Q. And you do understand that the amount of
6 interest that's being accredited to your policy has
7 been higher than the 5 percent rate that's shown on
8 the guaranteed column?
9     A. I noticed that the interest rates are
10 higher.
11     Q. So then you do understand that this policy
12 will, in fact, not expire as shown on the right-hand
13 column under the guaranteed rate but will last
14 longer than that. We just don't know exactly when
15 under a guaranteed rate it will last longer than
16 that?
17     MR. AUGHTMAN: Object to the form.
18     A. Uh-huh.
19     Q. You've got to say yes or no for her.
20     A. From what you've shown me here and what
21 I'm looking at, that's the way I take it. That's
22 the worst case scenario --
23     Q. Well --

Page 165

1     A. And that these rates should make it go
2 beyond that.
3     Q. Go beyond the 78th year that's shown here
4 in that writing in that column?
5     A. Yes.
6     Q. Now, has anybody told you to a certainty,
7 Mr. Russell, that this policy -- that you are
8 definitely going to have to make more premium
9 payments under that policy?
10     A. Well, you know, it's just like I told you
11 before. If I live long enough, I'm going to have to
12 make more payments. Now, I don't know how long I'm
13 going to live or how long we're going to live. But,
14 you know, there's a good chance that I will though,
15 a very good chance I will have a lengthy life, a
16 very good chance.
17     Q. Well, I need for you, if you could, Mr.
18 Russell, to let's define that "if I live long
19 enough." Who had told -- first of all, are you
20 sitting here under oath saying that you believe that
21 you are, in fact, definitely going to have to make
22 additional premium payments on that policy?
23     A. I think so, yes, sir.

42 (Pages 162 to 165)

**Deposition of:   Wayne Russell**
**11/15/1999**

Page 166

1    Q. And what's the basis of that answer?
2    A. If I live a normal life -- both of my
3    parents are still alive, and they're 80 years old
4    and in good health, and they're a generation ahead
5    of me. And if I lose a little weight here and get
6    myself in shape, I see no reason that -- they're
7    just 20 years ahead of me or 22 years ahead of me,
8    so why shouldn't I.
9    Q. Why shouldn't you what?
10    A. Why shouldn't I live to be a reasonably
11   old person.
12    Q. Well, what year are you saying that you're
13   going to have to make premium payments?
14    A. I don't know that, sir.
15    Q. Well, isn't it true, Mr. Russell, that you
16   don't, in fact, know that that's going to happen to
17   a certain?
18    A. I do not know how long I'm going to live.
19   And it's true that if I die young, then it won't be
20   a problem.
21    Q. Well, I'm just saying -- you're telling me
22   to a certainty, you're saying that if I live long
23   enough without quantifying what long enough is.

Page 167

1    A. 100 years.
2    Q. Well, I just asked you -- are you saying
3    then that you're not familiar with the fact that
4    this policy is paid up within 100 years?
5    A. Well, what I'm telling you is this. I
6    bought this policy and it being based on that it
7    would pay me to year 99 or 100, and the rate it is
8    going, it ain't going to do that.
9    Q. All right. Now, who told you that?
10    A. I've been advised by the people who have
11   looked at these policies that it would not -- that
12   this policy if I and my wife, either one of us, live
13   to be 99 point years that we would have to annie-up
14   additional moneys based on the way this policy is
15   going at the present time.
16         Now, that is professional advice from
17   analyzing these policies of which I do not
18   understand I have been advised.
19    Q. And who has given you that professional
20   advice?
21    A. Well, the people who are representing me.
22    Q. Your attorneys?
23    A. My attorneys.

Page 168

1    Q. Well, I need to know which attorneys have
2    told you that?
3    MR. AUGHTMAN: No. We're not go to get
4    into that. Why do you keep asking those silly
5    questions?
6    MR. STEWART: Well, you may think it's
7    silly, but I don't.
8    MR. AUGHTMAN: Well, he's not going to
9    answer them. I think I made that clear.
10    MR. STEWART: If the basis of his lawsuit
11   is based on what his lawyer has told him, then I'm
12   entitled to know what lawyer told him that because
13   I'm going to depose the lawyer.
14    MR. AUGHTMAN: Well, I think we'll take
15   that up another day. I think you ought to file a
16   motion on that and take that up on another day.
17    MR. STEWART: Are you instructing him not
18   to answer?
19    MR. AUGHTMAN: For the 10 or 15th time
20   today, yes. I think I'm pretty obvious about that.
21    MR. STEWART: You count in multiples,
22   don't you, Jay. 15th time, huh. Are you
23   instructing him not the answer?

Page 169

1    MR. AUGHTMAN: Under the attorney-client
2    privilege, that's exactly right.
3    MR. STEWART: Well, first of all, I'm glad
4    he said his attorney told him and you didn't object
5    to it. That opens the door. Just tell me this --
6    just instruct him not the answer.
7    Q. (BY MR. STEWART) Mr. Russell, which of
8    your attorneys told you that this policy, that some
9    time in the future to a moral certainty you're going
10   to have to pay additional premiums on this policy?
11    MR. AUGHTMAN: Don't answer.
12    MR. STEWART: We will take that up.
13    MR. AUGHTMAN: I look forward to you
14   taking the deposition of the lawyer from this firm
15   too.
16    MR. STEWART: All right. I'm through for
17   now. Anybody got any questions?
18    MR. WALKER: Yeah, I do.
19
20   EXAMINATION BY MR. WALKER:
21    Q. Mr. Russell, my name is Wally Walker. I
22   represent Gus Clements in this lawsuit.
23         Let me give you a few cautionary

43   (Pages 166 to 169)

## Deposition of: Wayne Russell
### 11/15/1999

Page 170

1  instructions so hopefully this will go pretty
2  smoothly. First of all, if you will, let me finish
3  whatever I'm going to ask, and I'll let you finish
4  answering whatever it is you're going to answer.
5  Sometimes and I've noticed it in the course of the
6  day there's been a little bit of jumping in on both
7  sides, not being critical of you or Mr. Stewart.
8  But for the benefit of the court reporter and for
9  the benefit of the transcript, if you'll just let me
10  finish, I'll let you finish.
11      Secondly, if I ask you a question that
12  you don't no understand, please tell me. I'll be
13  happy to rephrase it or try to explain it to you.
14  But if you answer my questions without telling me
15  that you did not understand them, I'm going to
16  assume that you understood the question. Okay?
17      A. (Shakes head affirmatively.)
18      Q. You have to answer out loud.
19      A. Yes.
20      Q. Let me ask you a few questions about your
21  business. What is the formal name of your company?
22      A. Russell Petroleum Corporation.
23      Q. How long has Russell Petroleum been

Page 171

1  incorporated?
2      A. I'm going to have to answer I don't know,
3  because we started off with Russell Oil Company and
4  then became Russell Oil Company Incorporated and
5  then Russell Petroleum Corporation. So I don't -- I
6  can't really give you a definite answer. I'd have
7  to research the records.
8      Q. From the time that you got in the oil
9  business, which I believe you said was in 1967,
10  has --
11      A. December of '67.
12      Q. -- has your company been incorporated?
13      A. Every since we've been in business.
14      Q. And there's been some name changes along
15  the way; right?
16      A. Uh-huh.
17      Q. And you need to say yes.
18      A. Yes, sir.
19      Q. Who are currently the stockholders of
20  Russell Petroleum Corporation?
21      A. Myself and my children.
22      Q. Who is your interest?
23      A. Mine is 75 presently and theirs is 25.

Page 172

1      Q. Do you know how many shares outstanding
2  there are?
3      A. I don't, not right offhand.
4      Q. Does Russell Petroleum Corporation pay a
5  dividend on that stock?
6      A. We have an annual dispersement based on
7  percentage of ownership.
8      Q. Well, when you say "annual dispersement,"
9  does the board --
10      A. It's --
11      Q. I'm going to get on to you just a little
12  bit. If you'll let me finish.
13      A. All right.
14      Q. Does the Board of Russell Petroleum meet
15  and declare a dividend based on the surplus of a
16  company in a given year?
17      A. Our accountants advise us as to when and
18  what to make in payments.
19      Q. And when and what you make in payments is
20  based in part on what the company has made during
21  its fiscal year; correct?
22      A. Yes.
23      Q. And a check is received by you and your

Page 173

1  children?
2      A. That's correct.
3      Q. And it's considered to be a dividend, is
4  it not?
5      A. I don't know where it's -- how it's
6  considered.
7      Q. Do you recall getting 1099s from Russell
8  Petroleum Corp.
9      A. Well, I don't recall that. But I know I
10  did. You know, what I mean? They're attached I
11  think to tax reports each year. But I don't recall
12  getting them, no. But I'm sure that they are
13  attached to them. I have seen that before.
14      Q. And you provide that to your accountant,
15  Mr. Lindsey or someone else, Jackson Thorn, for your
16  preparation of your income tax return; is that
17  correct?
18      A. Correct.
19      Q. And you understand that the dividend is
20  income that must be reported?
21      A. Correct. I just -- I don't know whether
22  they call it dividend or what it's called, you know.
23  It's a sub S dispersement.

44 (Pages 170 to 173)

Deposition of:  Wayne Russell
11/15/1999

Page 174

1    Q. Has the company, and when I say company I
2 understand that there's been different names, but
3 has the company declared a dividend each year it has
4 been in existence since 1967?
5    A. Uh-huh.
6    Q. You need to say yes.
7    A. Yes.
8    Q. Has the amount of the dividend fluctuated
9 over time?
10    A. Yes.
11    Q. Have there been years that the dividend
12 was less than it was in a previous year?
13    A. Sure.
14    Q. And that was based in part on the
15 performance of the company in terms of its
16 profitability?
17    A. Yes, sir.
18    Q. During the 32 some odd years that you've
19 been in the petroleum business, would you agree with
20 me that some years have been better than others in
21 terms of profits?
22    A. Sure.
23    Q. And would you also agree with me, Mr.

Page 175

1 Russell, that the profitability of the company was
2 dependant in some years on an increase or decrease
3 in gross revenues?
4    MR. AUGHTMAN: Object to the form.
5    A. Well, that doesn't really matter as much
6 in our company as margin.
7    Q. And you're a little ahead of me. One
8 thing that can affect the profitability of your
9 company is expenses; correct?
10    A. Sure.
11    Q. And the other thing that can affect income
12 is sales?
13    A. Sales and margin mainly. And our volume
14 is pretty consistent, our margins are not. It's
15 either feast or famine on gasoline.
16    Q. And you have fixed overhead items that
17 were recurring year after year; correct?
18    A. Yes.
19    Q. And then you have variable expenses;
20 correct?
21    A. Yes.
22    Q. And variable expenses can be expenses that
23 were not anticipated before they were incurred;

Page 176

1 correct?
2    A. Sure. Sure.
3    Q. Does Russell Petroleum prepare any type of
4 proforma or projection or illustrations, anything
5 such as that?
6    A. No, sir.
7    Q. Do you ever sit down before a fiscal year
8 and make any type of prediction, if you will, as to
9 what your expenses are going to be?
10    A. No, sir.
11    Q. Is there any type of business planning
12 done as it relates to income and expense items?
13    A. As it relates to income, yes.
14    Q. And what type of planning is done?
15    A. It's done by me on expansion based on my
16 field for where the industry is headed at the time.
17    Q. Has your feel always been correct?
18    A. I don't miss it much.
19    Q. Have you missed it some?
20    A. A few times.
21    Q. So the answer to my question is yes, you
22 have missed it?
23    A. I have missed it.

Page 177

1    Q. Have you had stores that you purchased or
2 started that did not perform as expected?
3    A. Well, you always have some that don't
4 quite meet your projections. But I'm very
5 conservative in my projections and don't do -- try
6 not to do marginal deals.
7    Q. That's what you attempt to do; correct?
8    A. That's right.
9    Q. No one would go into a deal wanting to
10 lose money?
11    A. That's correct.
12    Q. All right.
13    A. It happens enough when you don't plan for
14 it.
15    Q. Now, in terms of your personal investment
16 with Robinson-Humphrey or Salomon Smith Barney, I
17 would assume you were a preferred client?
18    A. I would assume.
19    Q. And you get a monthly statement from
20 Salomon Smith Barney?
21    A. Correct.
22    Q. And the statement shows the value of your
23 portfolio currently and previously?

45 (Pages 174 to 177)

Deposition of: **Wayne Russell**
11/15/1999

Page 178

1    A. Yes.
2    Q. And it shows who your financial consultant
3  is at Robinson-Humphrey; right?
4    A. Yes.
5    Q. And it shows the mix of your investments
6  in terms of stocks, bonds, unit trusts, CD's, money
7  market, etc.; right?
8    A. Yes.
9    Q. And because you're a preferred client, it
10  also reflects the basis in your stock; in other
11  words, what you paid for it versus its current value
12  and then the gain; right?
13    A. Whatever stocks are owned, that's correct.
14    Q. And you certainly notice in looking at
15  that with a sizable portfolio that from month to
16  month your values go up and they go down depending
17  on what the market has done; correct?
18    A. That's correct.
19    Q. And does Russell Petroleum have any
20  outstanding debt?
21    A. No. Nothing current, weekly, monthly.
22    Q. What do you mean by that?
23    A. We don't have any long term debt or short

Page 179

1  term debt other than just for a product that we buy.
2    Q. Do you have a line of credit?
3    A. No.
4    Q. Has Russell Petroleum prior to 1994 had
5  any type of debt?
6    A. Oh, yes.
7    Q. And do you recall what type of debt it
8  was?
9    A. I've owed a lot from time to time, but
10  thank goodness I don't now.
11    Q. Was it long term debt?
12    A. I never had any long term debt.
13    Q. It was all short term?
14    A. I take that back. I did own my office
15  building, a 20-year debt, but it was paid up.
16    Q. Have you had debt tied to the prime rate?
17    A. I have had.
18    Q. And, of course, you know the prime rate
19  fluctuates; correct?
20    A. Yes.
21    Q. And when the interest rates goes up, when
22  you're borrowing money it cuts into your
23  profitability?

Page 180

1    A. Sure.
2    Q. And you understand that when interest
3  rates go down and it costs you less to borrow money,
4  your income goes up; correct?
5    A. It should, not necessarily, but it should.
6    Q. And interest rates are part of a cost of
7  business if you have to borrow money; correct?
8    A. If you have to borrow money, yes.
9    Q. So it's not a novel concept to you that
10  interest rates fluctuate from time to time; right?
11    A. Yes.
12    Q. I assume some of your money is invested in
13  money market funds?
14    A. Yes.
15    Q. Provides you some liquidity?
16    A. Yes.
17    Q. And right now you know that interest rates
18  on money market funds are relatively low on a
19  historical basis; correct?
20    A. Yes.
21    Q. And you're old enough, not that old, but
22  you're old enough to remember the late '70s when
23  interest rates were 20 percent?

Page 181

1    A. And higher.
2    Q. And you're old enough to remember interest
3  rates much lower than that; correct?
4    A. Correct.
5    Q. And you also have some bond investments I
6  assume.
7    A. Yes.
8    Q. And some of those bonds carry a fixed rate
9  of interest?
10    A. Uh-huh.
11    Q. Is that right?
12    A. Uh-huh, yes.
13    Q. And that is a guarantee from a particular
14  company to pay a certain interest to the person that
15  has limped the funds; correct?
16    A. Correct.
17    Q. And are you familiar with the term
18  clipping coupons?
19    A. Yes, sir.
20    Q. And the company has guaranteed you in
21  writing an amount they're going to pay for you
22  allowing the use of your money; correct?
23    A. That's right.

46  (Pages 178 to 181)

## Deposition of: Wayne Russell
## 11/15/1999

Page 182

1    Q. And I also assume that you've had or owned
2  certificates of deposit from time to time?
3    A. From time to time.
4    Q. And certificates of deposit are a bank's
5  contract with you to pay you a guaranteed rate of
6  return?
7    A. Correct.
8    Q. Which should not fluctuate irrespective of
9  what general interest rates do in the market at
10  least for the contract period of time; correct?
11    A. Correct.
12    Q. So you're certainly familiar with the
13  words in the context of investing between guaranteed
14  and assumed; right?
15    A. That's right.
16    Q. Does Mr. Easterling send you from time to
17  time or call you from time to time with
18  recommendations for investments?
19    A. From time to time.
20    Q. And he may recommend a stock and tell you
21  what Salomon Smith Barney price bargains on stock
22  is; correct?
23    A. Correct.

Page 183

1    Q. Tell you what the price earnings is?
2    A. If I ask.
3    Q. And you know what that term means;
4  correct?
5    A. I do.
6    Q. And there have been times, correct me if
7  I'm wrong, that notwithstanding his recommendation,
8  you've decided not to purchase a particular stock or
9  other investment that he has proposed to you?
10    A. Plenty of times.
11    Q. And there have been times that you have
12  taken his advice?
13    A. That's correct.
14    Q. And it has happened to you, has it not,
15  that stocks that he has recommended that you took
16  his advice have not perform as he told you they were
17  expected to perform?
18    A. That has happened.
19    Q. In other words, the stock didn't hit the
20  target. In fact, it went down from its price when
21  it was offered?
22    A. That has happened.
23    Q. The Jackson versus Russell Oil case, you

Page 184

1  told me that was a contractural dispute?
2    A. Uh-huh.
3    Q. Is that correct?
4    A. Uh-huh.
5    Q. Were there any allegations of fraud made
6  in that lawsuit?
7    A. They did make allegations, yes.
8    Q. What was the allegation?
9    A. I'd have to remember. It was pertaining
10  to -- I know what it was. Ethanol it was concerning
11  ethanol sales and Texaco, and they tried to prove
12  that Texaco didn't allow the sale of ethanol through
13  their pumps when, in fact, they did.
14    Q. Who was alleged to have made a
15  misrepresentation?
16    A. Russell Petroleum. The deal alleged that
17  we sold him ethanol unbeknowing unto him and
18  therefore damaged his business when, in fact, we
19  bought ethanol from Texaco. We had invoices where
20  we had purchased alcohol to make ethanol from
21  Texaco.
22    Q. Specifically what was the allegation in
23  terms of the lie that was told to the dealer?

Page 185

1    A. He claimed that he was never told that
2  ethanol was in the gasoline, when it was right on
3  his ticket, every delivery ticket that he had. But
4  he played dumb that he couldn't read, and therefore,
5  he was ignorant and, therefore, did not know that he
6  was getting alcohol in his gasoline.
7    Q. So the dealer alleged that Russell
8  Petroleum had failed to tell him that he was
9  receiving ethanol gas?
10    A. Ethanol in his gasoline.
11    Q. And his belief was that he was receiving,
12  for lack of a better word, regular gas?
13    A. That's right.
14    Q. And your defense was we absolutely told
15  you. It was on the ticket we gave you?
16    A. That's right. Each and every ticket. And
17  it had something pertaining to ethanol on each
18  ticket. But he claimed ignorant that he couldn't
19  read, and therefore, he wasn't told, therefore, it
20  was fraud.
21    Q. One of the things Russell Petroleum said
22  was not only did we not commit fraud but had you
23  bothered to look at what we gave you, you would have

47  (Pages 182 to 185)

Deposition of:  Wayne Russell
11/15/1999

Page 186

1   known what you were receiving?
2       A. That's correct.
3       Q. And I assume that Russell Petroleum sends
4   out bills and other documents in writing to its
5   customers and folks that it does business with; is
6   that right?
7       A. An invoice for every load.
8       Q. And you expect the people that you send
9   bills and invoices and documents to read those
10  documents, do you not?
11      A. I expect them to be literate.
12      Q. Well, do you except them to read the
13  documents?
14      A. All they had to do was look, you know.
15      Q. And that's the reason you incur the
16  expense of a stamp and some secretary's salary to
17  send it out to someone; correct?
18      A. Correct.
19      Q. You're not doing it to make you feel good?
20      A. That's right.
21      Q. Let's talk a little bit about your
22  lawsuits.  First of all, when did you buy the
23  Phoenix Mutual policy?

Page 187

1       A. Gosh, I'd have to go back to the files to
2   give you the date.  I'm not sure right now to be
3   honest with you.  But they stand for themselves
4   whatever date that is.
5       Q. What's your best judgment?
6       A. Phoenix 11 years into it, back up 11
7   years, '88, '88, somewhere in that neighborhood.
8       Q. And was that a last to die policy?
9       A. Yes.
10      Q. Now, the phrase "last to die," how did you
11  become familiar with that?
12      A. Probably through Gus.
13      Q. Do you remember that specifically?
14      A. No.
15      Q. Was the Phoenix Mutual policy and the
16  purchase of it at least instigated by advice from
17  either your tax or your estate folks?
18      A. It was instigated the same way the
19  testimony has been in this other policy here today,
20  in these other policies.
21      Q. Is it possible that either Mr. Capouano
22  or Mr. Lindsey referred to a last to die?
23      A. I wouldn't think so.

Page 188

1       Q. Do you know that for a fact?
2       A. I don't know it for a fact, but I wouldn't
3   think so.  I would think that Gus proposed this.
4       Q. And specifically what was the problem with
5   the Phoenix Mutual policy?
6       A. We agreed to pay ten payments and ten only
7   and wound up having to settle for making an
8   additional payment on a half.
9       Q. And specifically what were you told about
10  the Phoenix Mutual policy?
11      A. I don't understand the question.
12      Q. Well, you said ten payments.
13      A. This went through the ADR process.  I
14  wasn't told anything.
15      Q. When you bought the policy in 1999 --
16      A. Oh, when I bought it.
17      Q. -- I'm assuming that you were told
18  something?
19      A. I was told and I had in writing from him
20  on a letter that I would have to make only ten
21  payments in writing.
22      Q. Do you remember specifically what was said
23  in the writing?

Page 189

1       A. Those exact words.
2       Q. You will only have to make ten payments?
3       A. That's correct.
4       Q. Quote, unquote?
5       A. Quote, unquote.
6       Q. Do you still have that letter?
7       A. I'm sure I do somewhere.  I'm sure I do
8   and a memo to me.
9       Q. Before your purchase of the Phoenix Mutual
10  policy, you had other policies that you had
11  purchased through Mr. Clements; is that correct?
12      A. Yes.
13      Q. Did you have some other insurance that had
14  been purchased through another source other than Mr.
15  Clements before 1988?
16      A. To the best of my recollection other than
17  a New York Life policy, I think I had a New York
18  Life policy in there that goes way back that was
19  terminated or converted to a New England.  But other
20  than that, Gus, I had bought all the insurance I had
21  ever bought from Gus.
22      Q. Okay.  So we don't get crossways with one
23  another, unless I said to the contrary, when I say

48  (Pages 186 to 189)

Deposition of: **Wayne Russell**
11/15/1999

Page 190

1    the policy that you bought -- I understand there's
2    trust, there's kids and there's you?
3        A. Yeah.
4        Q. But I'm referring to policies which your
5    life is the one that is insured and you're making
6    the payments in some form or fashion?
7        A. Me or the kids.
8        Q. And I understand the tax planning and
9    everything else but just so we're clear.
10       A. Uh-huh.
11       Q. Before the Phoenix Mutual policy, had you
12   ever received from Gus or --
13       A. The best -- let me clarify that. I
14   believe it was a Metropolitan Life instead of a New
15   York Life.
16       Q. And your recollection is that that policy
17   was converted at some point in time to a New England
18   policy?
19       A. Yes.
20       Q. Before 1988 on any policy of life
21   insurance that you had owned which your life was the
22   insured life, had you received a writing from Mr.
23   Clements or anyone else guaranteeing you a limited

Page 191

1    payment time?
2        A. I never, never tried to buy that type of
3    insurance until I got into estate planning.
4        Q. And in 1988 when you were dealing with the
5    Phoenix Mutual purchase, did you ask Mr. Clements
6    that he put in writing the ten-year payment feature
7    that you say it had?
8        A. Yes. Because that is all I told him. I
9    said I'm not going to pay. I said you show me.
10       Q. And how did you know to ask for, using
11   your words, a type of policy with a limited pay
12   period?
13       A. The same thing here. I was going to pay
14   ten payments for 7 and a half million dollars worth
15   of coverage. And I wasn't going to pay a penny
16   more. You put it in writing.
17       Q. I understand. And I'm not arguing with
18   you. All I want to know is you had a history with
19   insurance before 1988.
20       A. Uh-huh.
21       Q. And you've told me that none of those
22   policies --
23       A. Those were small policies, and they were

Page 192

1    for different purposes. You know what I mean? They
2    were all on my life, you know.
3        Q. And I understand.
4        MR. AUGHTMAN: Let him finish.
5        Q. (BY MR. WALKER) Before 1988 you had never
6    purchased a policy, using your words, that was a
7    type of policy that had a limited pay period. And
8    my question is: In 1988 what had you learned that
9    caused you to demand or request from Mr. Clements a
10   policy with a guarantee in writing of ten years no
11   more premiums?
12       A. State the question again. I think I
13   understand it but state it again.
14       Q. What had occurred, in terms of your
15   learning curve about insurance, to cause you to
16   request or demand from Mr. Clements some
17   confirmation that you would only pay ten years on
18   the Phoenix Mutual policy?
19       A. First of all, this was the first estate
20   planning that I had done. It was larger policies
21   than I had ever even dreamed of, that I would even
22   be worth, and I needed to have a finality to it.
23       Q. But in terms of the concept, if such

Page 193

1    existed, that there was a type of policy with a
2    limited pay, did you learn that from Mr. Lindsey or
3    from an attorney or another accountant or an estate
4    planner? Did you read about it?
5        A. I learned it from Mr. Clements. This was
6    a new type of insurance, even on the market then.
7    He had been out very long. It had not been
8    out very long. And he suggested that that was -- I
9    could get the most bang for my buck that way. And
10   since I was not interested in borrowing money on it,
11   that it was only for estate tax purpose, that that
12   was the joint survivor or last to die was the type
13   of policy that I needed to get the most bang for my
14   buck. And I had followed his advice.
15       Q. Did you consider --
16       A. And I gave him the instructions for what I
17   wanted to do, and I asked for him to give it to me
18   in writing.
19       Q. And did you consider the limited pay
20   feature to be a type of policy in your mind?
21       MR. AUGHTMAN: Object to the form.
22       A. You know I don't know enough about
23   insurance to even consider -- I didn't at that time

49 (Pages 190 to 193)

Deposition of: Wayne Russell
11/15/1999

Page 194

1  and still don't really know.  You know, insurance
2  was insurance basically.  All I knew is that I
3  wanted a finality on the payments, and I had to have
4  some finality.  And I told him ten years is all I'm
5  going to pay.  You figure out what it's going to be
6  and make me your best deal.
7       Q.  Now, did you consider that the proposal
8  and statement made by Mr. Clements was stronger if
9  you had it in writing?
10      MR. AUGHTMAN:  Object to the form.
11      A.  Well, you know, I felt like that was all I
12  needed.
13      Q.  But as compared to something he said
14  versus something in writing, it was your request
15  that he put it in writing?
16      A.  I told him --
17      Q.  Is that right or wrong?
18      A.  I don't really know how, you know, to
19  answer that question.  I requested the product.  He
20  gave it to me.  And I told him to just send me a
21  letter stating that there would only be ten
22  payments.
23      Q.  Did you feel better or more secure having

Page 195

1  it in writing?
2       A.  Sure.  That was the finality of it right
3  there.
4       Q.  Do you remember what type of policy the
5  Phoenix Mutual product was?
6       A.  I assume it was just like this.
7       Q.  Do you remember any words such as
8  universal life or variable life in connection with
9  the Phoenix Mutual policy?
10      A.  I don't really.
11      Q.  Do you remember making any choices in
12  terms of the investments of your premiums on the
13  Phoenix Mutual policies?
14      A.  Making choices?
15      Q.  Yes.
16      A.  Like?
17      Q.  Like different type of mutual funds?
18      A.  As to where they could invest the money?
19      Q.  Yes.
20      A.  Oh, no.  I had nothing to do with that.
21      Q.  You certainly understand enough about
22  insurance to know that when you make a premium the
23  insurance company takes part of your money and

Page 196

1  invests the money in something; correct?
2       A.  I'm sure they did.
3       Q.  To generate a return.
4       A.  Yes, sir.
5       Q.  And you know they don't just dig a hole in
6  their backyard somewhere?
7       A.  Yes.
8       Q.  And do you ever remember having a policy
9  of insurance where you made selections in terms of
10  how your premiums were to be invested?
11      A.  Never in my life have I been apart of
12  that.
13      Q.  Do you ever remember giving any type of
14  analysis as to the type of investor you are, such
15  as, conservative versus risk avers or moderately
16  tolerant of risk, anything such as that?
17      A.  By who?
18      Q.  By any insurance agent or broker.
19      A.  No.
20      Q.  Now, you said that you went to ADR with
21  the Phoenix Mutual issue.  Was there a determination
22  by an arbitrator, or was the matter settled short of
23  a determination by the arbitrator?

Page 197

1       A.  The arbitrator was involved.
2       Q.  I understand.  But did you reach a private
3  agreement outside of arbitration between your
4  lawyers and the lawyers for Phoenix Mutual, or did
5  the arbitrator come back with some type of decision,
6  like this is what we're going to do?
7       A.  The way I understand it is the arbitrator
8  talked pretty tough to both sides and said y'all
9  come up with a solution.  This is the way I lean on
10  this.  And they told them that they leaned on our
11  side because we had that letter right there.
12      Q.  And the arbitrator's leaning was pay an
13  extra year and a half and get a guaranteed?
14      A.  He said you better take it, told the
15  insurance company you better take it.
16      Q.  Did he tell you the same thing?
17      A.  No.
18      Q.  But the solution was pay an additional
19  year and a half premium --
20      A.  That was the solution.
21      Q.  -- in exchange for a guarantee that you
22  would pay no more?
23      A.  Ever.

Edmondson Reporting & Video
*1030 Financial Center*      *Birmingham, Alabama 35203*      *1-800-966-2333*

Deposition of: **Wayne Russell**
11/15/1999

Page 198

1    Q. When did you first learn that there was a
2    problem in your mind to the Phoenix Mutual policy?
3    A. When I received a letter from the company
4    concerning the class action lawsuit.
5    Q. And when was that?
6    A. I don't know. I don't remember.
7    Q. Was it before 1994?
8    A. I don't remember that.
9    Q. Could it have been?
10   A. I don't know.
11   Q. Do you know if you received a letter
12   regarding some class dealing with Phoenix Mutual
13   before you ever were involved with the TransAmerica
14   policies?
15   A. State that again.
16   Q. Do you know if you received this class
17   notice on the Phoenix Mutual or dealing with the
18   Phoenix Mutual policy before you ever got involved
19   with the TransAmerica policies?
20   A. I don't think so. I think it was after we
21   had already bought these that I received the notice.
22   Q. All right. And if it was after, what is
23   your best judgment of how long after?

Page 199

1    A. Somewhere between one and two years.
2    Q. So some time between 1995 and 1996?
3    A. Yeah. Might have been you '97, might have
4    been '97.
5    Q. Did you keep a copy of that notice from
6    Phoenix Mutual?
7    A. I don't know. If this was not in this
8    stack of stuff that was given to him, I don't have
9    it.
10   Q. Do you remember what the notice said?
11   A. Other than it was class action lawsuit,
12   and that if you did nothing, then you would go
13   through an ADR process. And that's what we wound up
14   doing.
15   Q. Did you consult with an attorney?
16   A. No, sir.
17   Q. Regarding the Phoenix Mutual matter?
18   A. No, sir. I'm sorry I didn't at this time.
19   Q. But you got some legal notice; right?
20   A. Yes, sir. It was all typed up. I was
21   dumb and stupid. I was dumb and stupid. I acted
22   dumb and stupid, and it cost me a lot of money.
23   Q. Leaving that aside and your judgment of

Page 200

1    yourself, you got a legal notice. You read the
2    legal notice and you determined that you wanted to
3    go through the ADR process; is that correct?
4    A. I determined since I had no experience
5    that way and I should have gone to an attorney and
6    didn't, I took what was handed down.
7    Q. I understand. But there was a choice.
8    And one choice was do nothing. And you would be
9    part of something going on in a class?
10   A. That's right.
11   Q. And the other choice was you can launch
12   out on your own and go through this alternative
13   process that we have set up?
14   A. Or you can sue them. Or you can sue the
15   company.
16   Q. And based upon reading that, you made a
17   determination, whether or not you think it was wise
18   or not looking at it in 20/20 hindsight, to launch
19   out on your own on and go through the alternative
20   process?
21   A. I made that decision on my own. I made a
22   bad decision, thinking they would do right and they
23   didn't.

Page 201

1    Q. Now, the American General policy that was
2    used to fund the charitable trust, when was that
3    policy purchased?
4    A. I can't remember the dates. But it was
5    after these others, all these other TransAmericas
6    were bought.
7    Q. After TransAmerica?
8    A. Yes. I can't keep up with dates.
9    Q. Now, when you got the class notice on the
10   Phoenix Mutual, I assume that you were upset; is
11   that correct?
12   A. Very.
13   Q. You thought you had been taken advantage
14   of in some form or fashion?
15   A. Uh-huh.
16   Q. And on the American General policy, did
17   you receive the same type of class notice?
18   A. I don't think so.
19   Q. What triggered you to think there was a
20   problem on American General?
21   A. Consultation with attorneys.
22   Q. And that was after you went to Mr. Gregg?
23   A. That's right.

**Edmondson Reporting & Video**
*Birmingham, Alabama 35203*

*1030 Financial Center*                    *1-800-966-2333*

Deposition of:  Wayne Russell
11/15/1999

Page 202

1     Q. And when you received whatever information
2  you received where you felt like the American
3  General policy was not what you were supposed to
4  get, were you upset about that?
5     A. Very.  Because that's what I had set up
6  for my charities, $2 million charitable trust for my
7  charities.
8     Q. And I assume you're still upset about
9  that?
10    A. Very.
11    Q. And what you're upset about is because you
12 don't feel like you got what you were told with
13 respect to the American General policy?
14    A. That's right.
15    Q. Now, I want -- I don't want to replow a
16 bunch of ground, but I want to make sure that I
17 understood your testimony on these three
18 TransAmerica policies.
19    MR. WHITEHEAD:  Wally, are you at a
20 breaking point?
21    MR. WALKER:  Sure.
22    (A short break was taken.)
23    Q. (BY MR. WALKER) Mr. Russell, let me show

Page 203

1  Defendant's Exhibit 33.  And you see that's a letter
2  addressed to you from Phoenix Mutual?
3     A. Uh-huh.
4     Q. And you see the date of it was in 1989?
5     A. Uh-huh.
6     Q. Look back at the front page.  And I'm
7  greatly paraphrasing.  Take your time and read it if
8  you want to, but it references some concern that you
9  had about your Phoenix Mutual policy; correct?
10    A. This was in '89?
11    Q. Yes, sir.
12    A. This is when he first came to me, and
13 this, it was the first schedule that I had saw where
14 it showed more than ten years payment.  And I
15 questioned him about it.
16    Q. And, in fact, look at this affidavit that
17 I will not mark.  But on Bates Stamp page 1457, look
18 at the first full paragraph.  And before you do
19 that, look at the last page.
20    A. This right here?
21    Q. No.  The first full paragraph.  But before
22 you do it look at the last page and confirm that
23 that's your signature, next to the last page

Page 204

1  actually.
2     A. That's my signature.  Now, what do you
3  want me to read?
4     Q. All right.  Go back one page and look at
5  the first full paragraph that starts about one year
6  after the insurance.
7     A. Okay.  I remember that.
8     Q. All right.  Now, you reference in your
9  affidavit, which you understood was a sworn
10 statement; right?  You understand an affidavit is a
11 sworn statement?
12    A. Yes.
13    Q. You reference in there that about a year
14 after you purchased the policy in 1988 you were
15 informed of some changes and you were going to be
16 required to make payments beyond ten years; correct?
17    A. Yes.  And I was --
18    Q. Upset and agitated?
19    A. Highly irate.
20    Q. And notwithstanding what Mr. Clements you
21 say put in writing regarding the ten years, within
22 what year of the purchase of the policy you were
23 aware --

Page 205

1     A. Within a year or two.
2     MR. AUGHTMAN:  Let him finish his
3  question.
4     MR. WITNESS:  Go ahead.  I'm sorry.
5     Q. (BY MR. WALKER) But clearly that would
6  have been before you ever dealt with Mr. Clements on
7  the TransAmerica policy that you became agitated,
8  irritated, upset, whatever word you would use
9  regarding the Phoenix Mutual policy; right?
10    A. That's right.
11    Q. And that in your mind what Mr. Clements
12 had told you was not correct regarding the Phoenix
13 Mutual policy?
14    A. Right.
15    Q. And Defendant's 34 the writing at the top
16 of the first page where it says, I believe, single
17 premium abbreviated then and then a number $131,939, I
18 think.  Do you see that?  Is that your writing?
19    A. No.
20    Q. Do you know whose writing it is?
21    A. I do not but it's not mine.
22    Q. Do you recall receiving Defendant's 34 in
23 connection with your purchase of the Phoenix Mutual

Edmondson Reporting & Video
*1030 Financial Center*    *Birmingham, Alabama 35203*    *1-800-966-2333*

Deposition of: Wayne Russell
11/15/1999

Page 206

1  policy?
2      A.  Do I remember receiving this?
3      Q.  Yes, sir, or seeing that.
4      A. With this written on it are you talking
5  about?
6      Q.  Just the document.
7      A.  The document.  I don't recall it.  But it
8  looks, it looks like the payments schedule of back
9  then, so I would assume it to be correct.
10     Q.  All right.  Would you agree with me, Mr.
11 Russell, that in your dealings with Mr. Clements as
12 it relates to the Phoenix Mutual policy or the
13 TransAmerica policies that he would provide you with
14 some written information in connection with your
15 decision to purchase life insurance?
16     A.  I don't follow really what you're saying.
17     Q.  Defendant's Exhibit 34, that's in front of
18 you, would you agree with me that when you dealt
19 with Mr. Clements from 1988 on proposals regarding
20 life insurance that he would furnish you some
21 written documentation about the policy?
22     A.  A schedule such as this?
23     Q.  Yes.

Page 207

1      A.  Yes.
2      Q.  Look at page 3 and, if you would, read the
3  paragraph that begins "if the dividends are
4  increased."  Just read that to yourself.
5      A.  I agreed to make ten payments and that's
6  all.
7      Q.  All right.  The question is:  Have you
8  read the paragraph on page 3 of Defendant's Exhibit
9  34, the paragraph beginning "if dividends are
10 increased?"  Was there any part that you don't
11 understand?
12     A.  I don't remember reading this, and I don't
13 know if I ever read it.
14     Q.  Not the question.  Whether this is the
15 first time you've ever read it or the umpteenth time
16 you've ever read it, having read it 30 seconds ago,
17 is there any part of that paragraph that you did not
18 understand?
19     A.  That I did not understand?
20     Q.  Yes, sir.
21     A.  Let me read it again.  I understand what I
22 read.
23     Q.  One last question about the American

Page 208

1  general policy.  Is there any particular reason that
2  you're aware of that Mr. Jinks was representing you
3  in that case and the Beasley firm is representing
4  you in this case?
5      A.  Jinks is more, is used to handling cases
6  of that nature with that company is the reason I
7  picked him.
8      Q.  All right.  Now, the TransAmerica policies
9  -- I think that's what I was getting to before we
10 took a break.  Without replowing too much ground,
11 you have complaints as I understand it or your
12 lawsuit involves three TransAmerica policies; is
13 that correct?
14     A.  Three.
15     Q.  And in terms of the $5 million policy that
16 is owned by the trust, do I understand correctly
17 that your complaint on that policy is that you were
18 told that you would make a one-time payment?
19     A.  Yes, sir.
20     Q.  And that is your only complaint about the
21 $5 million policy; is that correct?
22     A.  And that it won't fund itself, you know,
23 or may not fund itself.  And I may have to step in

Page 209

1  and make payments.
2      Q.  But that's the same thing as it being
3  something other than one-time pay; correct?
4      A.  It's more than -- it's something other
5  than what I agreed to do.
6      Q.  All right.  Let me try the question again.
7  Is your sole complaint about the $5 million policy
8  that you may have to make an additional payment at
9  some point in time on that policy?
10     A.  That's my complaint based on my -- on the
11 best advice that I have.
12     Q.  I understand.  Your testimony relating to
13 what may cause it to go wrong in your mind is based
14 upon advice that you received from your attorneys;
15 correct?
16     A.  Correct.
17     Q.  And we've already established that you
18 don't know for a fact if or when you'll have to make
19 a payment on the $5 million policy; is that correct?
20     A.  That's correct.
21     Q.  All right.  On the $2,500,000 policy owned
22 by the trust, your sole complaint on that policy is
23 that you may have to pay beyond the ten-year period;

53 (Pages 206 to 209)

Deposition of: Wayne Russell
11/15/1999

Page 210

1 is that correct?
2    A. That's right.
3    Q. And on the $500,000 policy you have two
4 complaints: One is that you may have to make a
5 payment at some undetermined time in the future
6 beyond the one-time pay that you've already done,
7 and you're feeling that the policies you replaced
8 from New England should not have been replaced to
9 get the TransAmerica policy?
10    A. That's correct.
11    Q. And those are all of your complaints
12 regarding the three TransAmerica policies?
13    A. Basically.
14    Q. All right. If there's anything else, let
15 me know.
16    A. Okay.
17    Q. But as we sit here today, those are your
18 complaints; correct?
19    A. As I understand it, yes.
20    Q. Now, the 2 million and the $2.5 million
21 policy were purchased at the same time; is that
22 correct?
23    A. Very close if not.

Page 211

1    Q. And as you just told me, your complaint on
2 those policies is that you may have to pay at some
3 undetermined time in the future beyond the one-time
4 pay; is that correct?
5    A. Uh-huh.
6    Q. And on the 2.5, the ten year, beyond
7 ten-year period; correct?
8    A. Uh-huh.
9    MR. WHITEHEAD: You have to answer out.
10    A. Yes.
11    Q. On the $5 million policy specifically,
12 what did Mr. Clements tell you?
13    A. Well, as I have stated, my instructions to
14 him was to sell me a one-time policy that I make one
15 payment on. Be very conservative in what you sell
16 me, because I don't ever, ever want to make another
17 payment on it. Don't sell me anything that I'll
18 ever have to make another payment on.
19    Q. All right. That was your instructions to
20 him?
21    A. Yes.
22    Q. And what statements, if any, did Mr.
23 Clements make to you regarding the $5 million

Page 212

1 policy?
2    A. It is my understanding that he tried to
3 accommodate my wishes.
4    Q. Regardless of your understanding, what
5 words came from his mouth to your ears regarding the
6 $5 million policy?
7    A. I cannot recall what was said at that
8 time.
9    Q. Would it be fair to say, Mr. Russell, that
10 your assumption is that given your instructions Mr.
11 Clements had complied with those instructions?
12    A. I assume that he did.
13    Q. Now, one of your instructions was to be
14 conservative; correct?
15    A. Very, very conservative.
16    Q. Your words were be very, very
17 conservative; correct?
18    A. Correct.
19    Q. What was that in reference to?
20    A. In reference to the amount of money that I
21 will have to pay and also to make sure that he
22 didn't misfigure anything where I would have to step
23 in and make another payment ever again.

Page 213

1    Q. When you say that, I take, and correct me
2 if I'm wrong, that there was some degree of
3 uncertainty or assumptions or speculation; is that
4 correct?
5    MR. AUGHTMAN: Object to the form.
6    THE WITNESS: Do I have to answer?
7    MR. AUGHTMAN: Yes.
8    A. I had already had the experience with
9 Phoenix Life. Using that basis, that's where it
10 came from.
11    Q. You had already learned from Phoenix Life,
12 number one, that dividends or some return of your
13 investment was associated with the Phoenix Mutual
14 policy; correct?
15    A. Can I explain to you how and where -- I
16 don't really know, you know.
17    Q. Well, let me just ask you: On Defendant's
18 33 -- and that was your right address; right?
19    A. Yes.
20    Q. You see in here in the second paragraph of
21 Defendant's Exhibit 33 that they talk about the
22 dividends; right?
23    A. Yeah. But that's not, that's not what I

54  (Pages 210 to 213)

Deposition of:  Wayne Russell
11/15/1999

Page 214

1  bought.
2      Q.  Regardless of what you bought, the letter
3  tells you about dividends; right?
4      A.  This is after the fact.  This is after the
5  policy was involved.
6      Q.  I'm not arguing with you.  In 1989 the
7  Phoenix Mutual policies, you knew that there were
8  dividends paid on that policy; correct?
9      A.  Look --
10     Q.  Yes or no.
11     A.  I don't know how to answer your question,
12  because this letter is two years after the policy
13  was bought.
14     Q.  Did you know in 1989 that a dividend was
15  paid on the Phoenix Mutual policy?
16     A.  I guess if you read this, yes.
17     Q.  And --
18     A.  If you read this but this was after the
19  policy was bought.
20     Q.  And you know what a dividend is.  You've
21  already told me that; right?
22     A.  Yeah.
23     Q.  Now, when you were telling Mr. Clements to

Page 215

1  be very, very conservative, was that in reference
2  to, at least in part, the knowledge you had obtained
3  from the Phoenix Mutual issue?
4      A.  And the problems we had with it.
5      Q.  And you wanted him to be conservative in
6  terms of the projections or assumptions; is that
7  correct?
8      A.  The change --
9      Q.  Is that correct?
10     A.  Yeah.  I wanted him to be very
11  conservative with his projections and where it would
12  be, because I never wanted to make another payment.
13     Q.  Now, on the $2.5 million policy that was
14  sold about the same time as the $5 million policy,
15  and that's the one for ten years no more pay, what
16  specifically did Mr. Clements tell you regarding
17  that policy?
18     A.  I don't remember.
19     Q.  Do you remember what your instructions
20  were on that policy?
21     A.  Yeah.
22     Q.  And what were your instructions?
23     A.  Ten pay only.

Page 216

1      Q.  Did you also tell him be very, very
2  conservative?
3      A.  I did.
4      Q.  Do you remember any words that he spoke to
5  you regarding the $2.5 million policy?
6      A.  I don't recall.
7      Q.  On the $5 million policy, do you remember
8  any words that Jeff Caddell spoke to you?
9      A.  I don't recall the words.  He was there.
10     Q.  Do you remember any words that Mr. Caddell
11  spoke to you on the $2.5 million policy?
12     A.  I don't recall.
13     Q.  Do you remember any questions that you
14  asked on the $5 million policy?
15     A.  I don't recall.
16     Q.  Do you remember any questions that you
17  asked on the $2.5 million policy?
18     A.  I don't recall.
19     Q.  Was anyone else present other than you,
20  Mr. Clements and possibly Mr. Caddell?
21     A.  I don't recall, but I don't think so.
22     Q.  In connection with either the 5 million or
23  $2.5 million policy?

Page 217

1      A.  I don't recall, but I don't think so.
2      Q.  All right.  Did Mr. Clements provide you
3  an illustration or other writing in connection with
4  the 5 million and the $2.5 million policy?
5      A.  Other than what's been shown here?
6      Q.  Including what's been shown here.
7      A.  Nothing other than what's been shown here
8  today.
9      Q.  Defendant's Exhibit 2 is an illustration
10  or document or sales document regarding the $500,000
11  policy; correct?
12     A.  Uh-huh.
13     Q.  Do you remember receiving any such
14  document on either the 2.5 or $5 million policy?
15     A.  Uh-huh.
16        MR. STEWART:  There's one on the million.
17     Q.  (BY MR. WALKER)  Mr. Russell, let me show
18  you what's already been marked as Defendant's
19  Exhibit 24.  And that's an illustration Mr. Clements
20  provided to you with respect to the $5 million
21  policy; is that right?
22     A.  Uh-huh.
23     Q.  You need to say yes.

55  (Pages 214 to 217)

Deposition of: Wayne Russell
11/15/1999

Page 218

1    A. Yes.
2    Q. And at the top the heading shows current,
3 assumed and guaranteed; right?
4    A. Yes, sir.
5    Q. Now, you know what those words mean;
6 right?
7    A. Yeah.
8    Q. Now, on the $500,000 policy, what
9 instructions did you give Mr. Clements if any?
10    A. On the 500 or 5 million? I'm looking at 5
11 million here.
12    Q. On the 500. Put that down. I'm switching
13 to 500. What instructions, if any, did you give Mr.
14 Clements on the $500,000 policy?
15    A. After he came to me and suggested that I
16 convert the New England policies, I agreed with him,
17 to allow him to go ahead and convert them.
18    Q. All right. And what did --
19    A. And he was going to check into the policy
20 values and let me know what the total of all the New
21 England policies, what cash values they had. And he
22 was going to take that and buy as much insurance as
23 he could and be as conservative as he could with

Page 219

1 that approach of a one-time payment.
2    Q. And what did Mr. Clements tell you
3 specifically when he called with a recommendation
4 regarding the $500,000 policy and/or the replacement
5 of some existing New England policies?
6    A. I don't remember what he said. But we
7 wound up buying the policy. So I assume that we
8 concurred that that was the thing to do.
9    Q. Do you remember anything that Mr. Clements
10 ever told you about the $500,000 policy?
11    A. No, sir. Can you remember ten years ago
12 what you said exactly? I can't.
13    Q. Well, it depends. You can ask me about an
14 Auburn football game and I can tell anything that
15 happened.
16       Is the reason that you can't remember
17 something five years ago merely because of the
18 passage of time?
19    A. My memory is beginning to slip. I can't
20 even recall names sometimes. Like today, I had to
21 come back and tell you a name later.
22    Q. But do you have any mental or physical
23 disability that in any way affects your memory?

Page 220

1    A. I believe I'm slipping now.
2    Q. But seriously is --
3    A. In the last year or two, I can't remember
4 things.
5    Q. But to your knowledge, do you have any
6 physical disability or impairment that affects your
7 memory to your knowledge?
8    A. To my knowledge, I do not have any, but I
9 know that I can't recall names, and it irritates the
10 hell out of me. And I know I know that person's
11 name.
12    Q. And are you currently on any medication
13 that would affect your memory?
14    A. No, sir, just age and miles.
15    Q. But the fact that you cannot recall
16 something from two years ago, four years ago, seven
17 years ago is merely a result of the passage of time
18 as compared to being medically induced, mentally
19 induced pharmaceutically induced; correct?
20    A. That's correct.
21    Q. Do you remember generally anything that
22 Mr. Clements told you regarding the $500,000
23 TransAmerica policy?

Page 221

1    A. As I previously stated, we concurred that
2 that was the thing to do and, you know, proceeded to
3 buy them. Beyond that I don't have any memory.
4    Q. But in terms of what he told you to prompt
5 your consideration of the replacement, do you
6 remember anything that was said?
7    A. No, sir.
8    Q. Okay. I told Mr. Stewart that in looking
9 at these three TransAmerica policies that price was
10 determined. Do you remember that you testimony?
11    A. Uh-huh.
12    Q. You need to say yes.
13    A. Yes.
14    Q. Now, do you recall looking at proposals
15 from different companies that had different prices?
16    A. I think my testimony was earlier that Gus
17 looked at two or three different companies, and we
18 decide that TransAmerica was the best buy.
19    Q. And when you say "TransAmerica was the
20 best buy," was that solely on TransAmerica providing
21 the lowest premium amount; i.e., the lowest price?
22    A. And Gus' recommendation that they were a
23 good company. I knew nothing about them.

Edmondson Reporting & Video
*1030 Financial Center*    *Birmingham, Alabama 35203*    *1-800-966-2333*

**Deposition of: Wayne Russell**
**11/15/1999**

Page 222

1    Q. But do you remember a proposal where the
2 premium was lower than the premium on any of the
3 TransAmerica policies?
4    A. It would have had to have been in the ball
5 park because price was a very big consideration. If
6 you're asking me if it was a lowest or not, I do not
7 remember. But it would have had to be right there
8 equal, or we would have bought something else.
9    Q. Because price was determinative to you?
10    A. It was very important.
11    Q. You don't need the money.
12    A. Pardon?
13    Q. You don't need the money on the death
14 benefit.
15       MR. AUGHTMAN: Object to the form.
16    A. I don't need the money.
17    Q. The policies are for tax purposes;
18 correct?
19    A. Yes.
20    Q. You're a wealthy man, and I'm not
21 badgering you about it. I wish I was. But this is
22 not a situation where you are trying to have funds
23 to bury you or to take care of your wife and kids?

Page 223

1    A. It's to keep from having to sell all the
2 properties that I own.
3    Q. That's right. And that's because of
4 estate taxes.
5    A. That's right.
6    Q. You also told Mr. Stewart, and I wrote it
7 down, that these policies at various points in time,
8 whether one pay or after ten years, would be
9 sufficient to fund themselves. Do you remember that
10 testimony?
11    A. Uh-huh, yes.
12    Q. How are policies to fund themselves?
13    A. Through interest and dividends that they
14 accumulate.
15    Q. Through a return on your premium dollars;
16 correct?
17    A. Correct.
18    Q. And didn't it make sense to you, Mr.
19 Russell, that since you know interest rates and
20 dividends fluctuate based on your own personal
21 experience that in terms of how long it could be
22 affected by interest and dividends?
23    A. What is your question?

Page 224

1    Q. Doesn't that make sense to you?
2    A. Doesn't what make sense?
3    Q. That if future payments according to you
4 are dependant upon interest and dividends earned,
5 then the fact that fluctuations occur in interest
6 and dividends can affect the length of time to pay?
7    A. Yes.
8    Q. The New England policies that you
9 replaced, how long were you to pay on those policy?
10    A. Varying amounts.
11    Q. What did it vary to and from or from and
12 from?
13    A. When they were taken out, I think pretty
14 much it's paid up to age 65, I think, you know.
15 They were -- that's what most whole life's supposed
16 to pay up at, isn't it? I'm not -- I don't know
17 that much about insurance. I know some of them pay
18 up to 65 and some of them, they were not taken out
19 over a 10 or 15 years period and varying amounts of
20 maturity.
21    Q. Given what you have learned from your
22 dealings with Phoenix Mutual before you ever dealt
23 with TransAmerica, why did you not get from Mr.

Page 225

1 Clements or Mr. Caddell or TransAmerica or some
2 other place a writing similar to that which you say
3 you got regarding the Phoenix Mutual policy?
4    A. Well, the Phoenix -- to begin with, I
5 asked Gus for that in writing, and he gave it to me.
6 And I don't know why I did it. It was just poor
7 judgment, I guess, poor judgment on my part.
8       And two, they blamed the increase on the
9 state law change. And, you know, they had a state
10 law change, and they blamed that on the state of
11 Alabama, not the insurance company. I couldn't tell
12 who was right and who was wrong. I was just
13 irritated on what, on the thought of having to
14 make more than ten payments. But they blamed it on
15 the state because the state changed the law. So at
16 that point, you know, I had no reason to doubt Gus.
17    Q. And you have been dealing with Gus for
18 almost two decades in the insurance context --
19    A. Uh-huh.
20    Q. -- before you bought the Phoenix Mutual
21 policy; correct?
22    A. I'd have to count up years but possibly
23 yes, two decades. It could be 15 or 20 years,

**Edmondson Reporting & Video**
*1030 Financial Center*    *Birmingham, Alabama 35203*    *1-800-966-2333*

Deposition of:  Wayne Russell
11/15/1999

Page 226

1   you're right.
2       Q.  And you knew Gus at Auburn?
3       A.  Uh-huh.
4       Q. · Right?
5       A.  Yeah.
6       Q.  You had not had any problems, complaints
7   or criticisms with anything that Mr. Clements had
8   assisted you with in terms of insurance before
9   Phoenix Mutual; correct?
10      A.  That was the first thing when they blamed
11  it on the changing law two or three years down the
12  road.
13      Q.  And you requested from Mr. Clements
14  something in writing to confirm what you say he told
15  you regarding the Phoenix Mutual policy
16  notwithstanding the fact that you had never had a
17  problem with anything that he had done with you in
18  the past; correct?
19      A.  That's right.  I just wanted him to verify
20  what we agreed on.
21      Q.  Now, before he talked to you in 1994 about
22  TransAmerica, you knew you had a problem with
23  Phoenix Mutual and by your own words were agitated

Page 227

1   and upset because what you had been told had not
2   come to pass; correct?
3       A.  Right.
4       Q.  And wouldn't you agree with me that it was
5   particularly poor judgment not to ask Mr. Clements
6   for something in writing regarding the TransAmerica
7   policies given what you knew and had experience in
8   dealing with the Phoenix Mutual issues?
9       MR. AUGHTMAN:  Object to the form.
10      A.  It was poor judgment on my part as well as
11  part of the blame being on the state for the
12  changing law.  And I gave him the benefit of the
13  doubt concerning that.
14      Q.  Now, Defendant's Exhibit 6 -- find that
15  for me.
16      MR. STEWART:  Here it is.
17      Q.  (BY MR. WALKER) You understand that an
18  insurance policy is a contract; correct?
19      A.  Uh-huh, yes.
20      Q.  It's an agreement where you agree to do
21  certain things and the insurance company agrees to
22  do certain things; correct?
23      A.  That's correct.

Page 228

1       Q.  And have you ever seen an insurance
2   contract that was not in writing?
3       A.  No.
4       Q.  And on page 2 of Defendant's Exhibit 6,
5   which is one of your New England policies, you see
6   it says here face amount and plan and it says "see
7   schedule of benefits plan life paid up at 95."  Do
8   you see that?
9       A.  Uh-huh.
10      Q.  You need to say yes.
11      A.  Yes.
12      Q.  Now, in terms of any other New England
13  policies, Phoenix Mutual policies, Metropolitan
14  policies, TransAmerica policies, can you tell me
15  about any one of those that have words such as paid
16  up at a particular time?
17      A.  I guess I'd do better explaining this.
18      Q.  The question is:  Can you tell me or point
19  me to a single policy that you have owned other than
20  the one New England policy that's reflected in page
21  2 of Defendant's Exhibit 6 that says paid up at 95
22  that has similar or such phraseology in terms of pay
23  up at some point in time?

Page 229

1       A.  I can't think of any.
2       Q.  Are you and Gus social friends?
3       A.  Have been for a long time.
4       Q.  What type of things do you do together?
5       A.  Well, go to parties together.  His wife
6   knows my wife.  I know both of them well.  We went
7   to school at Auburn.
8       Q.  So you consider him more than just a
9   business acquaintance?
10      A.  Yes.
11      Q.  And would you assume, Mr. Russell, and
12  again, I'm not being disparaging regarding your
13  wealth, but you would assume that you were one of
14  Gus' bigger clients?
15      A.  You know, I wouldn't know who his clients
16  are.  Gus -- I got all kind of letters from New
17  England stating about how many sales each year he's
18  achieved and all this kind of stuff for years and
19  years.  And I know he had some real wealthy clients,
20  a lot of them are wealthier than me.  So I wouldn't
21  be able to answer your question.
22      Q.  But you didn't fall off the turnip truck
23  yesterday.  You live in Montgomery just like I do.

58  (Pages 226 to 229)

Deposition of:  Wayne Russell
11/15/1999

Page 230

1   Montgomery is not New York city or Boston or LA.
2   You understand that you are a very wealth man by
3   Montgomery standards?
4       A.  Not by Blount or somebody like that.  Me
5   and Blount are real, real close, several other
6   people like that.
7       Q.  My question wasn't whether you were the
8   biggest client of Mr. Clements.  My question was:
9   Would you assume that you were one of his biggest
10  clients in terms of the amount of insurance?
11      A.  I would assume that I would be pretty high
12  up.
13      Q.  And I assume Mr. Easterling takes your
14  call when you call over to Salomon Smith Barney?
15      A.  He does.
16      Q.  Now, when you went to see Mr. Gregg -- and
17  that was because he was a friend of your son's; is
18  that correct?
19      A.  That's correct.
20      Q.  What information did you take to Mr. Gregg
21  if any?
22      A.  The policies themselves.
23      Q.  Did you take anything else?

Page 231

1       A.  No.
2       Q.  Now, do I understand you correctly that
3   what prompted you to go see Mr. Gregg was that you
4   received a class notice or some legal notice
5   regarding a class action at TransAmerica in the
6   mail?
7       A.  That's right.
8       Q.  Do you recall what the notice said?
9       A.  That they had had a class action suit
10  against them.  I talked to my son and asked him the
11  significance of it.  I thought I knew the
12  significance of it, but I asked him for a second
13  opinion.  He told me that it was serious and that I
14  really needed to let his friend, Joel, look over the
15  policies and make a recommendation.
16      Q.  As to whether -- did you seek a
17  recommendation regarding participation in the class
18  or whether or not you had a problem with your
19  policies issued by TransAmerica?
20      A.  Well, prior experience with participation
21  in the class was not, was not -- did not meet my
22  expectations.
23      Q.  So you had already learned from the

Page 232

1   Phoenix Mutual ADR process about that?
2       A.  Correct.
3       Q.  So your purpose in seeking Mr. Gregg was
4   to determine whether or not any or all of your
5   TransAmerica policies were a problem?
6       A.  That's correct.
7       Q.  And the only information that you took to
8   Mr. Gregg were the three policies themselves; is
9   that correct?
10      A.  I may have taken American General, but I
11  don't think so.  I think it was just the
12  TransAmerica.
13      Q.  But as it related to TransAmerica?
14      A.  I think it was just the three TransAmerica
15  policies.
16      Q.  And you did not know whether or not before
17  that time there was a problem or not a problem
18  regarding the policies?
19      A.  That was my first inclination with
20  TransAmerica.
21      Q.  And the reason we're here today is because
22  of a recommendation or I think you've labeled it as
23  advice that there may be a problem with one or more

Page 233

1   of your TransAmerica policies; is that correct?
2           MR. AUGHTMAN:  Object to the form.
3       A.  That's correct.
4       Q.  Now, you understand that people can file
5   lawsuits and make allegations that are not
6   meritorious; correct?
7       A.  Yeah.
8       Q.  And you've had that experience with Mr.
9   Jackson; right?
10      A.  I have an experience with him.
11      Q.  You certainly didn't admit that you were a
12  liar?
13      A.  No.
14      Q.  In fact, you denied that?
15      A.  That's correct.
16      Q.  And the fact that he said you were didn't
17  make you one.
18      A.  That's correct.
19      Q.  Now, also said that you rely on advice of
20  people such as lawyers, accountants, estate
21  planners, insurance folks; right?
22      A.  Sure.
23      Q.  Is there any particular reason or did you

59  (Pages 230 to 233)

Deposition of: Wayne Russell
11/15/1999

Page 234

1  do any investigation to determine the level of
2  expertise of Mr. Gregg or any other attorneys
3  regarding insurance matters?
4      A. I listened to my son. And since Joel was
5  a very close friend of his -- they had gone to
6  Auburn together, and he does a lot of this, and he
7  decided that he thought the best thing to do was
8  just to let Joel take a look at them.
9      Q. From the time you talked to Mr. Gregg and
10 received some advice and/or recommendation, did you
11 ever talk to Mr. Clements about any of these
12 TransAmerica policies?
13     A. No.
14     Q. Did you talk to Mr. Caddell?
15     A. No.
16     Q. Did you call anyone from TransAmerica?
17     A. No.
18     Q. So you simply proceeded through the
19 lawsuit process; is that correct?
20     A. That's to my best recollection.
21     Q. So as we sit here today, you don't know
22 what TransAmerica or Gus or Mr. Caddell would say
23 about your policies; right?

Page 235

1      A. That's correct.
2      Q. And you simply assumed --
3      A. Based on previous history.
4      Q. Previous history with the insurance
5  industry?
6      A. Yes.
7      Q. And you have assumed that the information
8  or advice that you've received regarding this
9  undefined contingency, that at some point in time
10 you may have to pay, from your attorneys is correct;
11 is that right?
12     A. That's right. And the research they have
13 done.
14     Q. Now, do you get what I call cold calls
15 from folks trying to sell you things?
16     A. All the time.
17     Q. Stocks, bonds, insurance, CD's.
18     A. You name it.
19     Q. And people make proposals or pitches to
20 you; right?
21     A. Yeah.
22     Q. And you tell more of them than not no;
23 correct?

Page 236

1      A. I tried to weed them out and not talk to
2  them.
3      Q. But when people do get through, whether
4  you're at home or at the office, you have
5  experienced people who are offering you things;
6  correct?
7      A. Sure.
8      Q. And people that send you things in writing
9  that make comparisons and illustrate things?
10     A. Sure.
11     Q. And I assume that you try to be careful
12 with your business affairs in terms of what you
13 select or invest in?
14     A. Become involved with very few of that
15 type.
16     Q. That's because you try to be careful?
17     A. I just don't know anything about them and
18 don't have time to fool with them.
19     Q. Do you recall when the $500,000 was
20 delivered to you?
21     A. I don't recall, no, sir.
22     MR. WALKER: Charlie, what number is the
23 $500,000 policy?

Page 237

1      MR. STEWART: The policy?
2      MR. WALKER: Yes.
3      Q. (BY MR. WALKER) All right. Now, you told
4  Mr. Stewart time and time again words to the effect
5  that you don't understand insurance policies.
6      A. I don't.
7      Q. They refer back and forth, and you just
8  can't follow them.
9      A. Right.
10     Q. Let's look right here. This is
11 Defendant's Exhibit 9, which you recognize is your
12 $500,000 policy.
13     A. Yes.
14     Q. Now, just as a for instance, on the front
15 page it says "Right to examine and return policy
16 within ten days. At any time within ten days after
17 you receive this policy you may return it to us or
18 the agent through whom you bought it. We will
19 cancel the policy and avoid it from the beginning.
20 We will refund to you any premiums paid." I read
21 that correctly; right?
22     A. As far as I know.
23     Q. You understand that, those two sentences?

Edmondson Reporting & Video
*Birmingham, Alabama 35203*

*1030 Financial Center*          *1-800-966-2333*

Deposition of: Wayne Russell
11/15/1999

Page 238

1    A. Yes.
2    Q. So that's part of the policy you can
3  understand; right?
4    A. Yes. I can understand parts of it.
5    Q. Now, on page 2-B, which is Bates stamped
6  Russell, 0163 at the top it says, "Table of policy
7  values and benefits. Illustrative premiums and
8  guaranteed basis." Do you see that?
9    A. Yes.
10    Q. And then the left-hand column says, "End
11  of policy year." And it has numbers on it on down
12  to age 60 and 65; correct?
13    A. Yes.
14    Q. Now, you understand what that means;
15  right?
16    A. The end of the policy year.
17    Q. That's what it says; right?
18    A. Yes.
19    Q. The next column over says "Planned
20  annualized premium." There's a number 73,351 in the
21  first year; right?
22    A. As the money that was put up.
23    Q. And then zeros on down?

Page 239

1    A. Don't make any more payments.
2    Q. And then it shows you what the death
3  benefit is; right?
4    A. That's correct.
5    Q. And you understand those three columns?
6    A. Yes. Why does it stop at 65?
7    MR. AUGHTMAN: Let him ask the questions.
8    Q. (BY MR. WALKER) Now, let's look at the --
9  you got Defendant's 19 and 32?
10    MR. STEWART: There's 19 and 32 is the --
11    Q. (BY MR. WALKER) Let's look at Defendant's
12  19, Mr. Russell, which is the $2.5 million policy,
13  which was the ten years of payments according to
14  you.
15    A. Uh-huh.
16    Q. You do see that's the right one; right?
17    A. That's right.
18    Q. Let's look at that same page that we
19  looked at on the $500,000 policy that says "Table
20  policy values and benefits illustrative premiums and
21  guaranteed basis;" is that right?
22    A. That's what it says.
23    Q. Same column "end of policy year" and goes

Page 240

1  down to 65; right?
2    A. That's correct.
3    Q. Planned annualized premium?
4    A. That's right.
5    Q. $23,047; right?
6    A. That's right.
7    Q. And it goes on out through age 65; right?
8    A. Right.
9    Q. Which is clearly longer than ten years;
10  right?
11    A. Yes.
12    Q. No part of those two columns that you did
13  not understand, is there?
14    A. No.
15    Q. Now, that shows you something different
16  than the ten years that you supposedly were told;
17  correct?
18    MR. AUGHTMAN: Object to the form.
19    A. Can I explain to you?
20    Q. No. Does that show you something
21  differently than how you were told?
22    MR. AUGHTMAN: You can answer however you
23  want to.

Page 241

1    MR. WALKER: As long as he answers my
2  question.
3    Q. (BY MR. WALKER) My question is simple.
4  Does this page on Defendant's Exhibit 19 show you
5  something different than what you were told about
6  ten years?
7    A. It was explained to me that this policy
8  would fund itself after ten years and make whatever
9  payments was necessary from then on for the rest of
10  my life.
11    Q. Does it reflect that premiums are due
12  beyond ten years?
13    A. Yes.
14    Q. And those premiums are going to be paid by
15  dividends and interest?
16    A. That's correct.
17    Q. Which fluctuate.
18    A. That's right.
19    Q. And so if the dividends and interest went
20  up, you would expect to pay less than ten years;
21  right?
22    A. That's right.
23    Q. And if they went down, you would expect to

61 (Pages 238 to 241)

Deposition of: Wayne Russell
11/15/1999

Page 242

1  pay longer than ten years?
2      A. I agreed to pay ten years. That was my
3  thinking, that I knew I was going to have to pay ten
4  years, and I agreed to pay ten, and I'm willing to
5  pay ten, no more, no less.
6      Q. I just want to make sure that you get the
7  sauce with the goose and the gander.
8      A. Don't expect any gifts.
9      Q. Don't want any free lunches.
10     A. I don't want any free lunches.
11     Q. And if the interest rates and dividends
12  went up, you would expect to get the benefit of
13  that?
14     A. Not necessarily. I expect to pay ten
15  years and get what I bought.
16     Q. Where do you think the excess will go?
17     A. I don't know. It was immaterial to me at
18  the time, because he was being conservative enough
19  that there was no way, you know, that I was going to
20  have to make any more payments.
21     Q. Well, I think you told Mr. Stewart that
22  you didn't pay any attention to what the interest
23  rate was, the current rate; right?

Page 243

1      A. That's right.
2      Q. Didn't make any difference to you.
3      A. It didn't make any difference to me.
4      Q. And I think Mr. Stewart asked you it
5  didn't make any different to you if it was 5, 6, 10,
6  15, 20 percent.
7      A. I instructed him that I wanted to make ten
8  payments, that's all.
9      Q. So were you willing to gift whatever
10  excess it earned?
11     A. Sure.
12     Q. Did you make that expression known?
13     A. Sure, I would.
14     Q. Did you?
15     A. No. I didn't make it known. But I
16  assumed that this thing was just going to handle
17  itself on a ten-year basis or either a one-time
18  basis, whichever policy that it pertained to.
19     Q. So your testimony that no matter what
20  interest rates or dividends do, I don't want to
21  benefit from it if it would shorten my period of
22  pay. Is that your testimony?
23     A. That's my testimony. I still -- all I'm

Page 244

1  looking for is a one-time pay or a ten-year pay that
2  those numbers and fine with me they can keep the
3  rest of it if it's better.
4      Q. And did you ever communicate that to Mr.
5  Clements or anyone else?
6      A. Just what I expected to pay.
7      Q. Did you communicate that to TransAmerica
8  or Mr. Clements?
9      A. I'm sure I did. That's what I expected to
10  pay.
11     MR. WALKER: I think that's all I have.
12     MR. AUGHTMAN: Any questions?
13     MR. WHITEHEAD: I got a few questions.
14     MR. AUGHTMAN: Can we take a quick break
15  before you get cranked up?
16     MR. WHITEHEAD: If you want to. I doubt
17  if I have more than five or ten minutes.
18     (A short break was taken.)
19
20  EXAMINATION BY MR. WHITEHEAD:
21     Q. Just before we get started the same as Mr.
22  Walker I'm going to assume that -- I'm going to ask
23  you questions and unless you tell me otherwise, I'm

Page 245

1  going to assume you understand what I'm talking
2  about when you give me an answer.
3      A. All right.
4      Q. Now, I wrote down your testimony from
5  earlier. And from what I understand, there's three
6  policies that issued in this suit: A 5 million, a 2
7  and a half million $500,000 policy.
8      A. True.
9      Q. You think or you don't recall any
10  discussions or meetings with Jeff Caddell on the
11  third policy, the $500,000 policy?
12     A. I don't remember any. I'm not saying
13  there aren't. I just don't remember and don't
14  recall.
15     Q. And you had two illustrations that were
16  Exhibit 24 and Exhibit 13: One was for the $5
17  million policy, one was for a $1 million policy,
18  which ultimately became a 2 and a half million
19  dollar policy.
20     A. That's correct.
21     Q. And on both of those you wrote "policy to
22  be issue per the table according to Jeff Caddell and
23  Gus Clements;" correct?

62  (Pages 242 to 245)

Deposition of:  **Wayne Russell**
11/15/1999

Page 246

1    A.  Uh-huh.
2    Q.  You acknowledge that was your handwriting?
3    A.  That's my writing.
4    Q.  And on the third issue for the $500,000
5    policy for which you can't recall any discussions
6    with Jeff Caddell.  There's handwriting indicating
7    per --
8    A.  Basically the same thing.
9    Q.  Except for the fact that it indicates per
10    discussions with Gus Clements?
11    A.  That's right.
12    Q.  Rather than Jeff Caddell and Gus Clements?
13    A.  That's correct.
14    Q.  Now, the only policy involved in this suit
15    for which you were contending there is anything
16    wrong done concerning conversion from prior policies
17    was the $500,000 policy?
18    A.  From the conversion?
19    Q.  Yes.
20    A.  Yes.
21    Q.  You don't contend to any such allegation
22    with regard to the two and a half million dollar and
23    the $5 million policy?

Page 247

1    A.  That's correct.
2    Q.  And you indicated that you thought -- of
3    course, you've known Gus for a long time and had
4    bought several policies from Gus.  And you think you
5    had somewhere between two and five meetings with him
6    on the 2 and a half million and $5 million policies.
7    A.  That's right.
8    Q.  And you can't recall that Jeff Caddell was
9    present, necessarily present at all of those
10    meetings?
11    A.  Not at all but most.
12    Q.  What's your best judgment?  Two meetings?
13    A.  That Jeff would be there?
14    Q.  That Jeff was there.
15    A.  Two or three.
16    Q.  Okay.  And those would have been at your
17    office?
18    A.  Yes.
19    Q.  And am I accurate to say that from your
20    prior testimony that you can't, you can't really
21    recall anything specifically that Jeff Caddell told
22    you about your two and a half million or $5 million
23    policies?

Page 248

1    A.  Not specifically.  Jeff was, I know he was
2    there.  And he -- you know, Gus did most of the
3    talking.  Jeff was there because he was the broker
4    and explained anything that Gus didn't or couldn't
5    or added, you know.  He was there as an advisor of
6    the, what was offered.
7    Q.  Well, for example, do you recall specific
8    things that were directed to Jeff rather than Gus,
9    certain lines of questioning, questions about
10    TransAmerica what kind of company it was or --
11    A.  I'm sure I questioned him concerning that.
12    Q.  Okay.  Anything in particular about the
13    policies themselves that you can recall that you
14    questioned Jeff Caddell about?
15    A.  Right now I cannot recall.
16    Q.  And I understand you've known Gus for a
17    long time.  But this was the first time that you met
18    Jeff?
19    A.  That's right.
20    Q.  And to your recollection, was he courteous
21    and so forth a person?
22    A.  He was.
23    Q.  He attempted to answer whatever questions

Page 249

1    that you had of him?
2    A.  Correct.
3    Q.  Do you recall any occasion where you asked
4    him a question and he had to get on the phone and
5    call somebody else to get the answer?
6    A.  I don't recall that.
7    Q.  Just from your observation as a layperson,
8    I mean, he came across as somebody who is
9    knowledgeable in the business that he was involved
10    in?
11    A.  He was.
12    Q.  Okay.  And you had testified earlier
13    that you had certain instructions that you had given
14    concerning the fact that you wanted a policy that
15    you wanted to pay for ten years?
16    A.  I gave explicit instructions to both of
17    them.
18    Q.  Okay.  And my question is:  Can you
19    differentiate whether those instructions came at a
20    meeting when Jeff was there versus a meeting that he
21    was not there?
22    A.  The first meeting.
23    Q.  Okay.

63  (Pages 246 to 249)

Deposition of:  Wayne Russell
11/15/1999

Page 250

1   A. When Jeff was there.
2   Q. So Jeff and Gus were there?
3   A. Correct.
4   Q. And you made the statement that you wanted
5   a policy that would pay for ten years and you wanted
6   the projections to be conservative?
7   A. That's exactly right.
8   Q. Now, I don't want to go into what you've
9   already testified to, but just very briefly, on all
10  three of these policies so far you've not been
11  required to pay anything beyond what you bargained
12  for?
13  A. No.
14  Q. I mean, is that a correct statement?
15  A. That's correct.
16  Q. And for example, the $500,000 policy
17  indicates that even on the guaranteed rate, the
18  earliest based on this illustration at the
19  guaranteed rate you would have to pay would be some
20  time when you were at age 71, is that correct, is
21  all that was ever paid was the guaranteed amount?
22  A. That's what the schedule shows.
23  Q. Okay. And of course, as you've indicated

Page 251

1   earlier, the policy is paying higher than the
2   guaranteed rate right now.
3   A. Yes.
4   Q. So we're talking -- you're age 57 now?
5   A. That's right.
6   Q. So we're talking somewhere -- worst case
7   scenario 14 years in the future?
8   A. Whatever it computes out to.
9   Q. If it was age 71 and you're 57 now; is
10  that right?
11  A. That's correct.
12  Q. And if you died tomorrow, you wouldn't
13  have to pay anything more than what you bargained
14  for?
15  A. I assume that would be correct.
16  Q. And if you died ten years from now, based
17  on this illustration, you still wouldn't have had to
18  pay anything more than you bargained for?
19  A. If both of us died, are you talking about?
20  Q. Both of you. I'm sorry. This is a joint
21  -- no. This is the one that's just on your own
22  life?
23  A. You're correct. You're correct.

Page 252

1   Q. And heaven forbid that that would happen.
2   But if you died at any time between now and age 71,
3   according to this illustration on the guaranteed
4   rate, you still wouldn't have had to pay anything
5   more than you bargained for?
6   A. That's what this says.
7   Q. And because this policy has been paying
8   interest at a higher, at an interest rate that is
9   higher than the guaranteed rate, if the projection
10  were now that it would take you until age 80 that
11  you died, some time between now and age 80, you
12  still would have gotten what you bargained for; is
13  that correct?
14  A. Somewhere in there. That's correct.
15  Q. So in other words, as long as you don't
16  have to come out of pocket until whatever time, some
17  time between now and the time you died, then you
18  would have gotten what you bargained for?
19  MR. AUGHTMAN: Object to the form.
20  A. Basically.
21  Q. And for whatever reason, you got, let's
22  say based on this illustration that all --
23  Illustration No. 12, Exhibit No. 12, that all

Page 253

1   TransAmerica ever paid was the guaranteed rate. And
2   you got to age 70 or is it 71, 71 and TransAmerica
3   for whatever reason said, Okay. We won't require
4   you to pay any more premiums. We'll go ahead and
5   honor this illustration, then you still, even then,
6   would have gotten what you bargained for --
7   MR. AUGHTMAN: Objection.
8   Q. (BY MR. WHITEHEAD) -- as long as they
9   didn't make you pay out of pocket?
10  MR. AUGHTMAN: Object to form.
11  A. If I lived to be 71?
12  Q. And all that had ever been paid was this
13  guaranteed rate. And the 71st year got here, and it
14  was time for you to make a premium payment if
15  TransAmerica said don't worry about it.
16  A. And I'm still alive?
17  Q. And you're still alive.
18  A. If they said that.
19  Q. You still would have been -- and my point
20  is you would have gotten what you bargained for;
21  correct?
22  MR. AUGHTMAN: Object to the form.
23  A. Well, I didn't get what I bargained for

64  (Pages 250 to 253)

**Deposition of:  Wayne Russell**
**11/15/1999**

Page 254

1  because I paid $73,351 for something I would never
2  have to worry about.  Therefore, I didn't get what I
3  bargained for.
4      Q.  All I'm saying is right now nobody other
5  than an attorney has told you that you would have to
6  pay more than your $73,000; correct?
7      A.  That's correct.  But do you understand my
8  point?
9      Q.  I understand you.  But TransAmerica hasn't
10  told you that yet?
11      A.  Well, I made my point.
12      Q.  Okay.  And the same thing goes with regard
13  to the other policies as well, the five million?
14      A.  Same goes to them.
15      Q.  You had paid initial $350,000 with the
16  anticipation or hope that you wouldn't have to pay
17  anymore beyond that?
18      A.  With the understanding that I wouldn't
19  have to pay any more than that.
20      Q.  And this illustration again shows what the
21  guaranteed rate at the oldest that would occur would
22  be age 78?
23      A.  But that's not what I bargained for.

Page 255

1  That's what it says.  But that's not what I
2  bargained for.
3      Q.  But the answers would be the same.  If you
4  died any time between now and age 78, you would have
5  paid what you were supposed to pay, and you would
6  have got what you bargained for?
7      MR. AUGHTMAN:  Object to the form.
8      Q.  (BY MR. WHITEHEAD)  I mean, you wouldn't
9  have to come out pocket any further.
10      A.  I wouldn't have had to come out of pocket
11  any further, but I still wouldn't have gotten what I
12  bargained for.
13      Q.  Well, as long as you didn't have to come
14  out of pocket, you've gotten what you bargained for?
15      MR. AUGHTMAN:  Object to the form.
16      A.  Not necessarily.
17      Q.  You've already told us that the cash
18  values didn't matter.
19      A.  That's right.  They don't.
20      Q.  And so as long as you get that death
21  benefit without having to come out of pocket more
22  than what you originally anticipated, then that's
23  what you bargained for?

Page 256

1      MR. AUGHTMAN:  Object to the form.
2      A.  There again, I made my point.  You made
3  yours.
4      Q.  Well, you understand my questions?
5      A.  Sure.
6      Q.  And you agree with me?
7      MR. AUGHTMAN:  Object to the form.
8      A.  I don't know how to answer.
9      Q.  Does the same stand true for the two and a
10  half million dollar policy?
11      MR. AUGHTMAN:  Object to the form.  Can
12  you clarify what stands true?  There's been a lot of
13  testimony.
14      Q.  (BY MR. WHITEHEAD)  Okay.  You would have
15  paid ten annual premiums on that policy; correct?
16      A.  Ten and only ten.
17      Q.  And if at the end of somewhere between now
18  and ten years you would pass away and you get your
19  death benefit, you got what you have bargained for?
20      MR. AUGHTMAN:  Object to the form.
21      THE WITNESS:  Can I answer?
22      MR. AUGHTMAN:  Yes, you can answer.
23      MR. WHITEHEAD:  Yeah, you can answer.

Page 257

1      A.  I don't feel like I got what I bargained
2  for because I've got to worry about it.
3      Q.  Well, aside from what you may worry about
4  based on what your attorneys told you, nobody else
5  has told you that you're going to have to pay
6  anything beyond that, have they?  I mean, Gus hasn't
7  told you you have to pay beyond ten years, has he?
8      A.  No.
9      Q.  And Gus hasn't told you on the 5 million
10  you'll have to pay anything more than the 350,000?
11      A.  That's correct.
12      Q.  And Gus hasn't told you on the 500,000
13  that you're going to have to pay anything beyond the
14  73,000 that you dumped in?
15      A.  That's correct.
16      Q.  And no one else at TransAmerica, including
17  Jeff Caddell, has told you that you would have to
18  pay any more than what's on these illustrations?
19      A.  That's correct.
20      Q.  Okay.  Now, is there anything else other
21  than what I've already asked you or what you've
22  testified in response to the questions of these two
23  gentlemen that you can recall specifically about

65  (Pages 254 to 257)

Deposition of:  Wayne Russell
11/15/1999

Page 258

1  Jeff Caddell, what he said to you or didn't say to
2  you other than what you've already testified to?
3      A. I think we pretty well covered it.
4      Q. And you haven't had any occasion since, I
5  guess, since you met with Jeff in 1994 to speak to
6  him again?
7      A. No, sir.
8      MR. WHITEHEAD:  That's all I have.
9  Thanks.
10     MR. STEWART:  A few more, Mr. Russell.
11
12 EXAMINATION BY MR. STEWART:
13     Q. Aside from what the attorneys have told
14 you, have you made any independent analysis of your
15 own about these three policies to determine that the
16 policies would not perform as expected?
17     A. Sir, I — from previous testimony, I don't
18 know how to make that analysis myself.  I have to
19 rely on advice, expert advice.  That's the only way
20 I know how to answer.
21     Q. So the answer to my question is then you
22 have not done so?
23     A. No, sir.

Page 259

1      Q. Okay.  Have you -- then I guess then the
2  answer to this next question and that would be have
3  you made any independent analysis in reviewing these
4  policies to determine whether or not what the
5  lawyers have told you is correct, the answer to that
6  question would be no?
7      A. True.
8      Q. Is that true?
9      A. Yes.
10     Q. Now, you understand that the three
11 policies are the contracts between you, they
12 constitute the three contracts between you and
13 TransAmerica?
14     A. Correct.
15     Q. Right?
16     A. Correct.
17     Q. And you paid your money.  And for that
18 money, this is what TransAmerica agreed to do;
19 right?  Nothing more, nothing less than what's in
20 these contracts?
21     MR. AUGHTMAN:  Object to the form.
22     A. I hope they agree to what I asked them to
23 do.

Page 260

1      Q. Well, wait a minute now.  Don't hedge on
2  me.  You paid -- for each of these three contracts,
3  you have paid money?
4      A. Correct.
5      Q. And in receipt of your money, the company
6  issued you these three policies.  And that's the
7  contract between you and TransAmerica.
8      A. That's right.
9      Q. Correct?
10     A. Correct.
11     Q. And they're obligated to perform every
12 single word in this contract, don't they, for the
13 money you gave them; correct?
14     A. It should be.
15     Q. And that's the way you do business; right?
16     A. I try to be.
17     Q. Do you have a written contract with
18 somebody and one side has to perform his part, his
19 or her part, and you have to perform your part;
20 right?  That's what a contract is all about; right?
21     A. A contract is a contract.
22     Q. All right.  Now, you and Gus have been
23 friends for what, 38 years?

Page 261

1      A. A long time.
2      Q. Well, isn't that about right?  You said
3  1960 or '61.
4      A. Probably, yeah.
5      Q. Okay.  38 years.  You socialize with him.
6      A. Sure.
7      Q. You bought a lot of policies from him.
8      A. Sure.
9      Q. Have you ever been to any Auburn football
10 games with him?
11     A. No.
12     Q. Have you been over to his house?
13     A. Yes.
14     Q. You shared in the hospitality of his home.
15     A. Sure.
16     Q. Has he shared in the hospitality of your
17 home?
18     A. Sure.
19     Q. Okay.  You didn't really believe in your
20 own heart, mind and soul that Gus Clements would
21 ever do anything deliberately to cheat you, do you,
22 Mr. Russell?
23     A. Well, I've been misled.

66  (Pages 258 to 261)

Deposition of:  **Wayne Russell**
11/15/1999

Page 262

1   Q. Well, I understand you said misled.  But
2  my question was:  Do you believe for one minute in
3  your own mind and heart that Gus would ever do
4  anything deliberately -- and I'll use your words --
5  to mislead you?
6   A. I'm going to have to think long and hard
7  there before I can give an answer to that.
8   Q. Well --
9   A. Because I don't want to say something
10  wrong one way or the other.
11   Q. That's right.
12   A. I don't know that I'm prepared to give you
13  that answer right now.
14   Q. Well, think about it.  Okay.  Because
15  you've sued him.  And you've sued him for fraud.
16  And you've sued him for intentional fraud.  You've
17  sued him for cheating, deliberately cheating you.
18  So think about it.
19   A. That's the way I feel.
20   Q. All right.  Well, I want to ask you this:
21  You've been in business a long time too, haven't
22  you?
23   A. Yes.

Page 263

1   Q. And you've had misunderstandings with
2  folks that you've done business with, hadn't you?
3   A. Yes.
4   Q. And sometimes those misunderstandings just
5  occur, don't they?
6   A. Sometimes they do.
7   Q. I mean, sometimes -- isn't there room in
8  this world today for just an honest mistake, a
9  misunderstanding that one person thought one thing
10  when maybe he wasn't listening close enough?
11   A. Sure.
12   Q. That happens, doesn't it?
13   A. Yeah.  But when you give somebody
14  instructions, that shouldn't be.
15   Q. Well, wait a minute.  You agree with me
16  that that happens?
17   A. It happens, sure.
18   Q. And would you also agree with me that the
19  type of insurance you're buying to provide some --
20  in your total package of $18 million into a family
21  insurance trust to pay for your estate taxes is not
22  the routine transaction that takes out here with
23  common man, is it?

Page 264

1   A. It's not routine, no.
2   Q. It's not routine by any means, is it?
3   A. No.
4   Q. Now, in agreeing with me, it's not routine
5  -- I assume you would also agree me that it not
6  being routine, it's important to reduce these
7  discussions and agreements between the policies to
8  writing, isn't it?
9   A. It's very important.
10   Q. So you brought this policy in 1994, so 5,
11  10, 15 years down the road you're not having to sit
12  there like you said by your own admission.  And your
13  memory is not as good anymore.  You don't want to
14  have to rely on your memory, do you?
15   A. No.
16   Q. You don't want to rely on that memory.
17  You want to rely on the written terms of a contract.
18  What you paid your money for.
19   A. And what my instructions were to him, what
20  I paid for, what I thought I bargained for.
21   Q. What you paid for, these policies.  We've
22  already been over that, what you paid for; right?
23        Lets face it, Mr. Russell, you don't

Page 265

1  give a rip.  You're going to be dead.
2   A. That's right.  Doesn't mean anything to
3  me.
4   Q. You want somebody when you die to go in
5  that chest of drawers or wherever you keep these to
6  be able to pull these out and go call up Gus
7  Clements, if you pre-decease him, and say, Gus, Russ
8  has died, had a heart attack, whatever tragic thing
9  happened -- maybe you do get to live to be 85 years
10  of age.  But whatever go to these policies and say,
11  Could you help me with my insurance.
12        And then TransAmerica is obligated to do
13  exactly what these policies says, and that's what
14  you expect of them; right?  Right?
15   A. Yes.
16   Q. Okay.  Now, you say you haven't examined
17  these policies and found anything in these policies
18  that are inconsistent with what Gus has told you.
19  Is that true?
20   A. That is true because of the facts I told
21  you previously.  Because I'm not an insurance person
22  and cannot understand them.
23   Q. But you haven't done that.  And we've

67  (Pages 262 to 265)

Deposition of:  Wayne Russell
11/15/1999

Page 266

1  shown you some pages. All three lawyers here have
2  gone over pages and have shown you some things. And
3  you don't seem to have a whole lot of difficulty in
4  understanding what a guaranteed column is.
5       MR. AUGHTMAN:  Object to the form.
6       Q. (BY MR. STEWART) What a guaranteed rate of
7  5 percent is?
8       MR. AUGHTMAN:  Object to the form.
9       Q. (BY MR. STEWART) Do you?
10      A. I don't know how to answer that. I've
11  done my best.
12      Q. Well, you certainly know that all of these
13  policies are what you wanted. You wanted $8 million
14  in life insurance and that's what you got?
15      MR. AUGHTMAN:  Object to the form.
16      Q. (BY MR. STEWART) You understand that;
17  right?
18      MR. AUGHTMAN:  Object to the form.
19      Q. (BY MR. STEWART) Sir.
20      A. Okay. I've got a policy for 8 million and
21  I don't --
22      Q. You've got three that total 8?
23      A. I have three that total 8 million. But I

Page 267

1  didn't get what I bargained for.
2       Q. Well, all of these policies show and the
3  varied terms of these policies that your money is
4  right here in them; right? Nobody has made off with
5  your money, have they?
6       A. I don't know how to answer it.
7       Q. Well, I mean, that's true, isn't it? Your
8  $350,000 that you paid, you paid is reflected in
9  that page in the policy; right? It shows you paid
10  it.
11      A. Today.
12      Q. Today. It shows the day you were
13  delivered the policy. Your $350,000 is credited to
14  that policy?
15      A. Today it shows that, yes, sir.
16      Q. Okay. The same way with the 73,000 and
17  the same way with the 23,000 you pay a month.
18  That's what the policy shows, that what you're
19  paying, what you have been paying has been credited
20  in the policy; correct?
21      A. Correct.
22      Q. Now, assume for me that when you got these
23  policies that you had studied them. And I think you

Page 268

1  would agree with me that that was the prudent thing
2  to do, especially the one that you're going to pay
3  $350,000 for. You would not disagree with me, would
4  you, Mr. Russell, that that would have been the
5  prudent thing for you to do, to examine these
6  policies and make sure based on this complicated,
7  complex transaction that this is what you want?
8       MR. AUGHTMAN:  Object to the form.
9       A. I've already answered the question before
10  as best I know how.
11      Q. Well, you told me that you didn't do it.
12  And I'm not asking you that. I'm asking you --
13  notwithstanding the fact of what you could or could
14  not understand about it, you would agree with me
15  that you would have been prudent to at least made an
16  effort when Gus Clements brought these policies to
17  you and you paid $350,000, you paid another 73 --
18  we're up to had 423, aren't we and --
19      A. Well, those --
20      Q. Hey, wait a minute. We up to $450,000
21  that you paid. Now, you're not going to sit there
22  and disagree with me that it would not have been
23  prudent to look at these three contracts, these

Page 269

1  policies to make sure that that's what you thought
2  you were getting?
3       A. It would be prudent to look at them. And
4  I glanced at them. But I could not understand them
5  as I testified before.
6       Q. All right. Well, did you ever --
7       A. I relied on his --
8       Q. Okay.
9       A. -- on his abilities as a professional and
10  to look after my interest in these policies.
11      Q. All right. But you also admit you didn't
12  get to be where you are in the world by relying on
13  other folks now, Mr. Russell.
14      A. Yes.
15      Q. You did?
16      A. A lot of it, yes.
17      Q. You don't think that you --
18      A. Taken a lot of good advice.
19      Q. Yeah. But you also used a lot of good
20  judgment down the road too.
21      A. I tried to.
22      Q. Sure. And don't you think that if you
23  would have studied these policies and if there was

Edmondson Reporting & Video
*1030 Financial Center*       *Birmingham, Alabama 35203*       *1-800-966-2333*

Deposition of:  **Wayne Russell**
11/15/1999

Page 270

1  something in these policies that you didn't
2  understand, don't you think all you had to do was
3  pick up the phone and call up Gus and say, Hey, Gus,
4  explain this to me. I don't understand it.
5      A. I guess I'm a busy man. I just trusted
6  them.
7      Q. Don't you think that if you had done that
8  and you had asked Gus to explain something to you
9  about these policies after you got them, that he
10  would have been more than glad to do that?
11     A. He would have given me an answer some kind
12  of way.
13     Q. Of course, he would have been there for
14  you, wouldn't he? I mean, Wally's
15  over here is saying -- I mean, I guarantee you Gus
16  answers the phone when you when you call.
17     A. Yes.
18     Q. Okay. You don't have any doubt about
19  that, do you?
20     A. I've never had any problem getting ahold
21  of him.
22     Q. All right. Now, having said all of that,
23  why do think that in each of these policies they

Page 271

1  have a provision that you had a right to examine
2  them? Two of them give you 20 days, and one of them
3  gives you 10. Why do you think that provision is in
4  there?
5      A. I haven't given it a second thought to be
6  honest with you.
7      Q. Well, let's think about it for a minute
8  for me. Okay. Because I want to be fair and honest
9  about all this. All right. You're a successful
10  businessman. And you didn't get that way by just
11  being out here naive in the world, that you have
12  contracts that you enter into with people. And do
13  you give 20 days to back out of it after you've
14  reached an agreement?
15     A. No. I don't enter into those kind of
16  agreements.
17     Q. That's right. And not many folks do. But
18  the insurance industry does. Did you know that?
19  And in all three of your policies you had an
20  opportunity -- they're in your house, nobody is
21  keeping you from reading them. And you had an
22  opportunity to read these policies. And if you had
23  any question about them, all you had to do was pick

Page 272

1  up the phone and call Gus. And if you didn't like
2  what he told, you could cancel all three of these
3  policies and get your money back?
4      A. I thought I was getting at the time what I
5  instructed him that I wanted.
6      Q. All right. But you never, yourself, took
7  it upon yourself to protect your own interest and
8  the sanctity of your home and review these policies
9  to make sure you were satisfied with them, did you?
10     MR. AUGHTMAN: Object to the form.
11     MR. STEWART: Sir, you can answer.
12     A. State the question again.
13     Q. I said but you never in your home, by
14  yourself, utilized the opportunity to review and
15  examine these policies to make sure you were
16  satisfied with them?
17     A. On a personal basis?
18     Q. Yes.
19     A. No.
20     Q. About it was only because -- and it's not
21  because you learned anything about your insurance
22  policies per se. It's only because you received a
23  notice of a class action lawsuit against

Page 273

1  TransAmerica that you said, Hey, there's something
2  wrong with my insurance.
3      A. That's what put me aware plus the
4  experience I had with the previous policies.
5      Q. And to this day, sitting here today, you
6  have yet to talk to Gus Clements and say, Gus, I
7  need the talk to you about these policies. I don't
8  think what you told me is right.
9      A. Gus should have come to me and talked to
10  me knowing there was going to be a class action
11  policy.
12     Q. Well --
13     A. Why didn't he come to me?
14     Q. Okay. I'll put that ball in your court.
15  Why didn't you go to him? You filed a suit.
16     A. Hey, you don't go to people when you think
17  something has been done wrong at that point. You
18  wait for them to come to you.
19     Q. Well, wait a minute. How did he know that
20  you felt like something had been done wrong?
21     A. Well, he should have known.
22     Q. How?
23     A. He got a notice of that and knew long

69  (Pages 270 to 273)

Deposition of: **Wayne Russell**
11/15/1999

Page 274

1  before I did what was happening with TransAmerica.
2      Q.  You mean just because he had notice of a
3  class action lawsuit he should have known --
4      A.  Concerning these policies.
5      Q.  -- that you had a problem with your
6  policy?
7      A.  He should have known, yes.
8      Q.  Yet you had never expressed one problem to
9  him at all.  And he's had you in his home.  He's
10  been in your home.  Good friends for 38 years.
11      A.  Well, you know, when you say "in each
12  other's homes," once a year, twice a year, maybe,
13  you know, not every weekend, you know.
14      MR. STEWART:  Well, okay.  Well, I think
15  that's all I have, Mr. Russell.
16      THE WITNESS:  Okay.
17
18  The deposition of Wayne Russell was concluded on
19      November 15, 1999, at 6:11 p.m.
20
21  (Exhibits were retained by Mr. Stewart and will be
22      distributed to all attorneys by Mr. Stewart.)
23

Page 275

1          C E R T I F I C A T E
2
3  STATE OF ALABAMA  )
4  JEFFERSON COUNTY  )
5      I hereby certify that the above and
6  foregoing deposition was taken down by me in
7  stenotype and the questions and answers thereto were
8  reduced to writing under my supervision, and that
9  the foregoing represents a true and correct
10  transcript of the testimony given by said witness on
11  the said occasion.
12      I further certify that I am neither of
13  counsel nor of kin to the parties to the action, nor
14  am I in anyway interested in the result of said
15  cause.
16
17
18
          Paula Murrell,
19          COMMISSIONER
20
21  My commission expires on November 17, 2001.
22
23

Edmondson Reporting & Video
*Birmingham, Alabama 35203*
*1030 Financial Center*          *1-800-966-2333*